## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **BROADSTRIPE, LLC, *ET AL.*,** | ) | **Case No. 09-10006 (CSS)** |
| | ) | |
| Debtors. | ) | **Jointly Administered** |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| **OFFICIAL UNSECURED** | ) | |
| **CREDITORS' COMMITTEE OF** | ) | |
| **BROADSTRIPE, LLC, on behalf** | ) | |
| **of the estate of BROADSTRIPE,** | ) | |
| **LLC,** | ) | **Adv. Pro. No. 09-50966 (CSS)** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| **HIGHLAND CAPITAL** | ) | |
| **MANAGEMENT, L.P. *et al.*,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

## COMPLAINT

The Official Committee of Unsecured Creditors (the "Committee") of Broadstripe LLC

f/k/a Millennium Digital Media Systems, LLC ("Broadstripe" or "Debtor") and its affiliated

debtors (the "Debtors"), on behalf of the estate of Broadstripe, for its complaint against

Defendants (as identified in paragraphs 15 and 16 below), alleges as follows:

## SUMMARY OF ACTION

1.      This is an action (i) to redress breaches of fiduciary duties, (ii) to equitably

subordinate Defendants' claims to those of all other creditors in Broadstripe's bankruptcy

proceedings and/or recharacterize all or some of Defendants' claims as equity interests, (iii) to make Highland liable for repaying Broadstripe's debts, and (iv) to avoid certain transfers.

2. These causes of action arise out of a scheme perpetrated by defendant Highland Capital Management L.P. ("HCMLP") which manages the operations of each of the other Defendants (HCMLP and the other defendants are collectively referred to as "Highland" or the "Defendants") to control and dominate the Debtors for the benefit of the Defendants and to the detriment of the Debtors and their non-insider creditors. Highland's scheme was and continues to be to control Broadstripe to ensure that Highland's investments are optimized if Broadstripe generates profits, but that Highland's investments are protected if Broadstripe and its other creditors suffer loss. In essence, Highland desires that all "upside" run to Highland, but all risk be borne by others.

3. The precarious situation the Debtors now find themselves in is entirely of Highland's making. Highland acquired control of the Debtors in 2006 by preventing the Debtors from selling their assets and instead having Highland execute a targeted strategy of obtaining control of every level of Broadtstripe's capital and debt structure. During 2006, Highland amassed nearly all of Broadstripe's secured debt as well as substantial amounts of bonds issued by Broadstripe's sole member, Broadstripe Capital, LLC f/k/a Millenium Digital Media Capital, LLC ("Broadstripe Capital"). Also during 2006, Highland – through a failed debt-for-equity swap – acquired equity units of non-debtor Broadstripe Holdings, LLC f/k/a Millenium Digital Media Holdings, LLC ("Broadstripe Holdings"), the holder of 90% of the membership units of Broadstripe Capital. An organizational chart is set forth in paragraph 13 hereof. These equity units, for which Highland paid no real consideration, entitled Highland to designate directors. In 2007, Highland acquired virtually all of the remaining equity units thereby cementing its full control of Broadstripe's board and management committee.

2

4.    Highland abused its power as lead lender, shareholder, and director of
Broadstripe. At every turn, Highland made management and strategic decisions for Broadstripe,
but only considered the economic impact of those decisions on Highland, but not Broadstripe.
From the start, Highland demonstrated total disregard for the welfare of Broadstripe when it
saddled Broadstripe with debt Highland knew it could never afford to repay. That financing, in
reality equity, was issued despite that Broadstripe already was severely undercapitalized.

5.    After obtaining sole control of the Broadstripe board, Highland caused
Broadstripe to take improper corporate actions, violative of fiduciary duties, but left all
associated risks and costs to be borne solely by unsecured creditors, not Highland. In essence,
Highland positioned itself to potentially realize substantial profits, but when those were never
realized (because of Highland's actions), it placed all risks and costs with others. Highland's
obstructive actions, and manipulation of Broadstripe, caused the Debtors to suffer massive
expenses and legal exposure in a two-front litigation battle with James Cable and WaveDivision.
Both were transactions blocked by Highland despite binding agreements between Broadstripe
and those parties.

6.    Despite Highland's self-serving assertions that they have continuously sought to
benefit the Debtors, these bankruptcy proceedings arise as a direct result of Highland's
mismanagement of the Debtors, conflicts of interest and self-dealing. In reality, any obligations
that Broadstripe owes to unsecured creditor were incurred because of Highland's actions in
attempting to maximize its investment at expense of all others. Moreover, Highland's
commencement of these bankruptcy cases is a transparent effort to preserve control over
Broadstripe to the detriment of the Debtors' non-insider creditors as illustrated by their proposed
plan that would give unsecured creditors 50 out of 10,000 units in reorganized Broadstripe on a
fully diluted basis. Indeed, Highland's decision to rush Broadstripe into chapter 11 and to

3

require it (as a result of a default in a Highland controlled credit agreement) to almost immediately file a chapter 11 plan reflects its desperate hope that it can maintain control over the Debtors with utter disregard to the interests of all other creditors. Highland's actions, which are in bad faith and contrary to law, should not be countenanced by this Court.

7.     To redress the harm caused to the Debtors and their non-insider creditors by Highland, the Committee seeks: (i) to recover for the benefit of the estates, the damages caused by Highlands' breaches of their fiduciary and other duties to the Debtors, (ii) to subordinate for the benefit of the estates and non-insider creditors, each of the claims and obligations incurred by the Debtors to Highland and/or recharacterize all or some of Defendants' claims as equity interests, (iii) to make Highland liable for Broadstripe's debts, and (iv) to avoid and recover transfers made prior the bankruptcy cases solely benefitting Highland.

## JURISDICTION, VENUE, AND STANDING

8.     Jurisdiction of this Court is founded upon sections 157 and 1334 of title 28 of the United States Code, in that this constitutes a civil proceeding arising under title 11 of the United States Code (the "Bankruptcy Code"), or arising in or related to the above-captioned jointly administered chapter 11 cases under the Bankruptcy Code, which are pending in the United States Bankruptcy Court for the District of Delaware.

9.     This is a core proceeding under section 157(b)(2) (A), (B), (F), (K) and (O) of title 28, United States Code.

10.     Venue in this Court is appropriate under section 1409(a) of title 28, United States Code.

11.     The Committee brings this action on behalf of the Debtors' estates pursuant to the authority granted to it in the Court's Interim Order (I) Authorizing Debtors (A) to Obtain Post-Petition Senior Secured Super-Priority Financing Pursuant to 11 U.S.C. §§ 105, 361, 362,

363(c)(2), 364(c), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral of Pre-Petition Lenders, (II) Granting Adequate Protection to Pre-Petition Lenders Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364 and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c) [Docket No. 47], as modified by the Order Extending Period For Official Committee Of Unsecured Creditors To Challenge Liens and Claims of Pre-petition Lenders dated March 11, 2009 [Docket No. 328] and the Order Compelling the Highland Deponents to Comply with Fed. R. Bankr. P. 2004 and Fed. R. Civ. P. 30(b)(6) and Extending Period for Official Committee of Unsecured Creditors to Challenge Liens and Claims of Prepetition Secured Lenders Established Pursuant to Interim DIP Financing Order [Docket No. 435]. In the event that the Court determines that, notwithstanding the above-mentioned orders, the Committee lacks standing to assert one or more of the claims stated herein, the Committee hereby seeks an order granting the Committee standing to assert such claims *nunc pro tunc* to the date of this Complaint. The claims asserted herein are also without prejudice to claims that individual creditors may have against Defendants arising out of the events described herein.

## THE PARTIES AND OTHER KEY PARTICIPANTS

12.     The Committee is the statutory committee of unsecured creditors duly appointed on January 15, 2009 in Broadstripe's chapter 11 case by the Office of the United States Trustee for the District of Delaware.

13.     Broadstripe is the debtor in Case No. 09-10006 (CSS), which it commenced by filing a voluntary petition under chapter 11 of the Bankruptcy Code on January 2, 2009 (the "Petition Date"). Broadstripe is, and at all relevant times was, a limited liability company organized and existing under the laws of the State of Delaware and having its principal place of business in the State of Missouri. The following is an organizational chart of the Debtors:

5



14. Broadstripe is a party to two pre-petition credit agreements: (a) the *Second Amended and Restated First Lien Credit Agreement* (the "First Lien Credit Facility") dated as of July 28, 2006, as amended from time to time among Broadstripe, The Bank of New York Mellon, as administrative agent (the "First Lien Agent") and the lenders named therein (the "First Lien Credit Parties"), and (b) the *Second Lien Credit Agreement* (the "Second Lien Credit Facility" and together with the First Lien Facility, the "Credit Facilities") dated as of July 28, 2006, as amended from time to time by Broadstripe, NexBank SSB, as administrative agent (the "Second Lien agent") and the lenders named therein (the "Second Lien Credit Parties").

15. Defendant HCMLP is a Delaware limited partnership. HCMLP is an investment manager that manages and controls the assets and investments of each of the other Defendants herein. HCMLP has dominated and controlled the Debtor since at least March 2006, when it obtained control of the lender group that, at that time, provided secured financing to the Debtor.

The principal office of HCMLP and each of the Insider Credit Parties (as defined below) is located at 13455 Noel Rd., Dallas, Texas, 75240.

16.     The following chart identifies each of the Highland controlled Defendants (the "Insider Credit Parties"), that are parties to the Credit Facilities and sets forth the principal amount to which, on information and belief, each of the Insider Credit Parties asserts it is entitled under each of the Credit Facilities:

| | Insider Credit Parties | Principal Amount First Lien Facility | Principal Amount Second Lien Facility | TOTAL |
|---|---|---|---|---|
| 1 | Highland Cr Opport CDO LP | $2,269,897 | $9,050,000 | $11,319,897 |
| 2 | Highland Cr Strategies Mstr Fd | $1,229,521 | | $1,229,521 |
| 3 | Highland Credit Strategies | $15,581,062 | | $15,581,062 |
| 4 | Highland Crusader Offshore Par | $5,449,842 | $13,000,000 | $18,449,842 |
| 5 | Highland Floating Rate Fund | $45,739,030 | | $45,739,030 |
| 6 | Highland Fltng Rate Adv Fund | $51,238,559 | | $51,238,559 |
| 7 | Highland Ln Funding V Ltd | $2,350,855 | $2,500,000 | $4,850,855 |
| 8 | Pioneer Floating Rate Trust | $21,019,866 | | $21,019,866 |
| 9 | Brentwood Clo Ltd. | $980,197 | | $980,197 |
| 10 | Eastland Clo, Ltd. | $980,197 | | $980,197 |
| 11 | Gleneagles Clo Ltd | $980,197 | $5,025,641 | $6,005,838 |
| 12 | Grayson Clo, Ltd. | $980,197 | | $980,197 |
| 13 | Greenbriar Clo, Ltd. | $980,197 | | $980,197 |
| 14 | Red River Clo Ltd | $980,197 | | $980,197 |
| 15 | Southfork Clo, Ltd. | $980,197 | $5,025,641 | $6,005,838 |
| 16 | Stratford Clo, Ltd. | $980,197 | | $980,197 |
| 17 | Atascosa Investments, LLC | | $1,000,000 | $1,000,000 |
| 18 | Burnett Partners, LLC | | $1,000,000 | $1,000,000 |
| 19 | Gillespie Income Fund, LLC | | $1,000,000 | $1,000,000 |
| 20 | Hopkins Capital Partners, LLC | | $1,000,000 | $1,000,000 |
| 21 | Jasper CLO, Ltd. | | $3,769,231 | $3,769,231 |
| 22 | Liberty CLO, Ltd. | | $5,653,846 | $5,653,846 |
| 23 | Loan Funding IV, LLC | | $1,884,615 | $1,884,615 |
| 24 | Loan Funding VII, LLC | | $3,141,026 | $3,141,026 |
| 25 | Milam High Yield Fund, LLC | | $1,000,000 | $1,000,000 |
| 26 | Navaro Investment Partners, LLC | | $1,000,000 | $1,000,000 |
| 27 | Presidio Capital Management, LLC | | $1,000,000 | $1,000,000 |

17.     The total principal amount outstanding under the Credit Facilities is $254,248,901 of which $175,198,901 is outstanding under the First Lien Facility and $79,050,000 is outstanding under the Second Lien Facility.  Of those amounts, the Insider Credit Parties hold

$152,730,208 which is equal to 87.17% of the First Lien Facility and $56,050,000 equal to 70.9% of the Second Lien Facility.

18. Defendant Highland Crusader Offshore Partners LP, is, in addition to being an Insider Credit Party, the holder of approximately 90% of approximately $373,000,000 in Increasing Rate Notes ("IRNs") issued by Broadstripe Capital and holds, directly or indirectly, approximately 90% of the membership units of Broadstripe Holdings which, as set forth above, wholly owns Broadstripe.

## FACTS

## I. EVENTS LEADING UP TO THE JULY 2006 RESTRUCTURING, THE WAVE DIVISION LITIGATION AND HIGHLAND'S ACQUISITION OF CONTROL OF BROADSTRIPE

19. Broadstripe was formed in 1998 to acquire and operate cable television systems. In 1998 and 1999, Broadstripe acquired cable systems in three different geographic regions: the Central Region (Michigan), the Mid-Atlantic Region (Maryland) and the Northwest Region (Oregon and Washington). To fund its operations and acquisitions, Broadstripe issued the IRNs and entered into a secured credit agreement.

20. On October 5, 1999, Broadstripe Capital sold $70,000,000 of IRNs pursuant to a note purchase agreement (the "IRN Agreement"). Under the IRN Agreement, the IRNs matured on March 31, 2009. They initially bore interest at the greater of 12.125% and LIBOR plus 6.50%, with the interest rate increasing periodically to a maximum rate of the greater of 16.375% and LIBOR plus 10.75%. Until maturity, Broadstripe Capital has the option to pay interest "in-kind" rather than in cash, which increases the amount owed on the IRNs. Broadstripe Capital has regularly exercised that option with the result that, at present, there are approximately $373,000,000 in outstanding IRNs.

8

21.     On December 29, 2000, Broadstripe entered into a *First Amended and Restated Credit Agreement* with a group of lenders (the "2000 Credit Facility"). The 2000 Credit Facility granted the lenders thereunder first priority liens on substantially all of Broadstripe's assets.

22.     By 2005, Broadstripe was highly leveraged and under significant pressure from its lenders to meet its obligations under the 2000 Credit Facility. As a result, on or about March 31, 2005, Broadstripe and its lenders entered into a Fifth Amendment to the 2000 Credit Facility (the "Fifth Amendment"). The Fifth Amendment required Broadstripe to pursue a sale of substantially all of its assets. To facilitate the sale, the Fifth Amendment extended the maturity date of the 2000 Credit Facility to June 30, 2006. The 2000 Credit Facility gave the lenders a veto over any sale of assets outside the ordinary course of business. To facilitate a sale, the Fifth Amendment lowered the approval threshold to effectuate an asset sale reducing it to a majority (50% plus) of principal amount of 2000 Credit Facility debt, from the prior 66 2/3% threshold level.

23.     On February 8, 2006, following an extensive auction process and lengthy negotiations, Broadstripe entered into an agreement with Wavedivision Holdings, LLC ("WaveDivision") to sell Broadstripe's Michigan, Oregon and Washington cable assets to WaveDivision for a purchase price of $157 million (the "WaveDivison Agreement"). In recognition of the lender approval requirements in the 2000 Credit Facility, as amended by the Fifth Amendment, the WaveDivision Agreement required the consent of the 2000 Credit Facility lenders prior to closing the sale.

24.     At the time the WaveDivision Agreement was executed in February 2006, Highland owned approximately 25% of the outstanding IRNs, a de minimis amount of the equity units of Broadstripe Holdings, and an approximately 10% interest in the 2000 Credit Facility. Although Highland was not, at that time, represented on Broadstripe's management committee,

Highland worked very closely with representatives of Trimaran Capital ("Trimaran"), which, through investment funds they controlled, was, at that time, a major IRN holder and also controlled Broadstripe's management committee.

25.     Highland -- working closely with Trimaran -- decided to block the closing of the transaction contemplated by the WaveDivision Agreement. To accomplish that objective, in February 2006, Highland began purchasing additional debt under the 2000 Credit Facility, with the goal of obtaining at least 51% of the debt, giving Highland the ability to block approval of the WaveDivision Agreement under the 2000 Credit Facility, as amended by the Fifth Amendment. Through its aggressive acquisition strategy, by March 31, 2006 Highland had amassed more than 51% of the 2000 Credit Facility debt, giving it a blocking position.

26.     In early March 2006, Highland and Trimaran retained Barrier Advisors, L.P., ("Barrier"), a consulting firm affiliated with Highland, to develop a plan to refinance the 2000 Credit Facility debt, as a substitute for an asset sale. Although Barrier was formally retained by Highland and Trimaran, Highland and Trimaran forced Broadstripe to agree to pay for Barrier's services and Broadstripe's management assisted Barrier in performing its analysis. Barrier provided an analysis which concluded that a restructuring of the 2000 Credit Facility debt, combined with $30 million in additional capital, combined with an acquisition/growth strategy, was an attractive alternative to the WaveDivision Agreement, from the perspective of the holders of IRNs. Barrier's analysis did not, however, examine the impact that walking away from the Wave Division Agreement would have on Broadstripe, including the massive litigation expenses and risks arising from doing that.

27.     Because Broadstripe was already overleveraged and was required to pursue a sale or refinancing under the Fifth Amendment, at approximately the same time, Highland provided Broadstripe with a proposal to refinance the 2000 Credit Facility, which among other matters,

called for a senior secured first lien revolving line of credit, a senior secured first lien term loan, and a senior secured second lien term loan facility. The aggregate amount of the proposed facility was approximately $40 million more than the amount then outstanding under the 2000 Credit Facility, including a $20 million revolver. The proposal also provided that the lenders have the right to appoint a management committee member.

## II.    THE CREDIT FACILITIES

28.     From April 2006 until the end of July 2006, Highland and Trimaran negotiated a restructuring of Broadstripe consistent with the proposals made by Highland in March 2006, while, at the same time, causing Broadstripe to delay the WaveDivision closing.

29.     On July 28, 2006, Broadstripe, Highland, the other, minority lenders under the 2000 Credit Facility, along with the other parties to First Lien Credit Facility and the Second Lien Credit Facility entered into the First Lien Credit Facility and into the Second Lien Credit Facility (the "July 2006 Restructuring").

30.     In connection with the July 2006 Restructuring, Broadstripe terminated the WaveDivision Agreement, which has resulted in extensive litigation that, as described below, is a principal reason for Broadstripe's chapter 11 filing.

31.     Additionally, Highland caused the replacement of Broadstripe's management with new management designated by Highland. Specifically, Bill Shreffler, who had been acting as a consultant to Highland with respect to Broadstripe, became the CEO and President of Broadstripe and also became a member of the management committee along with two employees of Highland. Although Trimaran retained three seats on the management committee until it sold its interest in 2007, as described below, since the July 2006 Restructuring, Highland has exercised effective control over Broadstripe due to its control of the Credit Facilities and its influence over management.

11

32.    Immediately prior to the July 2006 Restructuring, Broadstripe's indebtedness consisted of $194,877,862 in principal amount under the 2000 Credit Facility and $1,642,463 in unpaid interest, for a total claim of $196,520,325.

33.    As a result of the July 2006 Restructuring, the amount outstanding under the First Lien Credit Facility was reduced to $146,500,000. In addition, the First Lien Credit Facility included a $20,000,000 revolver. The First Lien Credit Facility incurred interest at a variable rate which during 2006 ranged from 8.90% to 10.75%. As of the close of the July 2006 Restructuring, approximately 60% of the First Lien Credit Facility was held by Highland.

34.    As part of the July 2006 Restructuring, Broadstripe also entered into the Second Lien Credit Facility in the principal amount of $70,000,000. The proceeds of the Second Lien Credit Financing were used to pay down the 2000 Credit Facility debt, to pay the fees and expenses of the refinancing and to provide additional working capital for Broadstripe. The Second Lien Credit Facility was issued in two tranches, Term Loan C in the principal amount of $30,000,000 and Term Loan D in the principal amount of $40,000,000. Term Loan C bore interest at LIBOR plus 10%. While the LIBOR interest component was paid on a current basis, the 10% portion was not payable until maturity. Term Loan D bore interest at the rate of 15% per annum of which 2% was payable on a current basis, the remaining 13% was not payable until maturity.

35.    NexBank, SSB, the Second Lien Credit Facility agent, and Highland are and at all relevant times, have been, under common ownership.

36.    In the Second Lien Credit Facility agreement NexBank, SSB is the only lender specifically identified. However, as a result of a series of transactions orchestrated by Highland commencing on the closing date of the Second Lien Credit Facility and concluding in September

2006, $62,000,000 out of the $70,000,000 in principal amount of the Second Lien Credit Facility was acquired by Highland.

37.     As a final step of the 2006 Refinancing, in October 2006, the ownership structure of Broadstripe was restructured so that the IRN owners acquired equity units in Broadstripe Holdings in proportion to their ownership of IRNs.  As a result, following the July 2006 Restructuring, Highland held 25% of the membership interests in Broadstripe Holdings.

## III.     HIGHLAND'S INCREASING CONTROL

38.     In September 2006, Highland caused Broadstripe to change its management, in a manner beneficial to Highland.

39.     Highland placed Mr. Shreffler in the CEO position.  Mr. Shreffler had strong ties to Highland.  His involvement with Broadstripe began when Barrier Advisors retained him for their engagement by the IRN holders (Highland and Trimaran) to evaluate options for their investments in Broadstripe.  Barrier, which at the time was a direct subsidiary of Highland, received a payment equal to 30% of Mr. Shreffler's first year pay by Broadstripe because Mr. Shreffler was given this title.  Indeed, Mr. Shreffler was recommended to Barrier by Tyler Nau, who at the time was a Barrier employee, but in April 2006, moved along with other Barrier employees, to Highland's private equity group.

40.     Highland then gave Kelvin Westbrook the title of Chairman.  Highland, recognizing substantial deficiencies in the work product of Mr. Westbrook, one of the founding partners of Broadstripe, limited his job responsibilities to shepparding through a sale of the Maryland Systems to Comcast.  Unlike any other employee at Broadstripe, Mr. Westbrook reported not to Mr. Shreffler, but directly to the Highland controlled board.  Highland negligently caused Broadstripe to retain Mr. Westbrook even when it became clear that Mr. Westbrook was interfering with the Comcast sale and should be replaced.  Highland ignored Mr.

13

Shreffler's consistent complaints and warnings about Mr. Westbrook's performance and hindarance of the Comcast deal. Only after the Comcast deal died and the damage could not be repaired, did Highland terminate Mr. Westbrook's employment. Indeed, when it finally did so, it was unilaterally and without any approval of others – demonstrating Highland's doubtless control of all management and personnel issues.

41.     During the period from March through October 2007, Highland entered into agreements to acquire almost all of the IRNs it did not already own, thereby increasing its ownership interest to approximately 92% of the total IRNs. Highland paid approximately $100 million for the IRNs it purchased in 2007 which was in excess of 50% of the face amount of the IRNs. Since the IRNs are obligations of Broadstripe Capital, the owner of the equity of Broadstripe, and the equity of Broadstripe constituted the only significant asset of Broadstripe Capital, these purchases indicate that Highland believed that Broadstripe equity value was in the neighborhood of $150 million.

42.     In connection with the purchase of the IRNs, Highland also agreed to acquire the ownership units of Broadstripe Holdings held by the IRN owners for no additional consideration. This included the 45% share of the units held by Trimaran. However, rather the consummating that transaction and Highland acquiring the Trimaran units, Highland and Trimaran entered into an agreement whereby Trimaran gave Highland an option to buy its equity units for $10.00 total, the Trimaran representatives resigned from the Broadstripe management committee, and most critically Highland obtained absolute rights to vote Trimaran's membership interests. Accordingly, since September 2007, Highland has had absolute voting control of Broadstripe.

43.     As part of Highland's purchase of Trimaran's interests, Highland caused Broadstripe to provide releases and indemnities to Trimaran. Critically, upon information and

belief, Highland itself refused to indemnify Trimaran. Rather, it forced Broadstripe and its creditors to bear the burdens of its own business decisions to buy Trimaran's interests.

## IV.   OPERATION OF BROADSTRIPE UNDER THE HIGHLAND BUSINESS PLAN.

44.    The principal focus of Highland's business plan for Broadstripe following the July 2006 Restructuring was the acquisition of additional cable operating systems so as to reduce the company's allocated overhead costs and rationalize its operations. Highland also hoped to sell Broadstripe's Maryland operations which faced significant competition and required substantial capital investment. In early 2007, Broadstripe entered into an agreement to sell the Maryland operations to Comcast, one of its competitors. This transaction was terminated by Comcast in August 2007, due to Mr. Westbrook's negligent performance in connection with that sale and when it became clear that the sale would become subject to antitrust scrutiny by the Federal Trade Commission.

45.    Due to Broadstripe's limited cash availability, either from operations or under the Credit Facilities, any acquisition would have required a substantial additional investment by Highland (which as discussed below, was promised and never provided). Alternatively, Broadtripe could have obtained financing from other sources. That option, however, was purely theoretical because Highland consistently blocked Broadstripe's attempts to seek capital from others. In fact, on numerous instances, Highland rejected requests from potential investors to sign confidentiality agreements or conduct due diligence of Broadstripe. Highland did so because it wanted to avoid bringing in outside equity which would dilute Highland's ownership and control of Broadstripe.

46.    Broadstripe was forced to turn to Highland for financing of acquisitions. And, Highland repeatedly assured Mr. Shreffler and his team that money was available and would be

forthcoming. Indeed, when Mr. Shreffler was hired, it was with the clear understanding that he was joining a growth platform, which needed financing for acquisitions. Starting in early 2007, Mr. Shreffler received repeated verbal assurances from top Highland employees, that Highland would finance Broadstripe's growth. It never did.

47.     On June 15, 2007, Broadstripe, Highland and James Cable, LLC ("James Cable") signed a letter of intent for the purchase by Broadstripe of cable television systems owned by James Cable. The letter of intent provided that all questions about Broadstripe's financing of the purchase would be addressed by Highland. Following the execution of the letter of intent, the parties negotiated an asset purchase agreement. Upon information and belief, throughout the negotiations, Highland assured both James Cable and Broadstripe representatives that Highland would finance the transaction.

48.     Broadstripe and James Cable executed an asset purchase agreement as of October 31, 2007 (the "James Cable Agreement"). The James Cable Agreement required Broadstripe to pay approximately $100 million to purchase the James Cable systems but did not contain a financing contingency. Highland and its counsel reviewed and approved the James Cable Agreement before it was signed.

49.     Upon information and belief, Broadstripe entered into the James Cable Agreement only because it had received assurances that Highland would arrange, and if required, provide, the financing necessary to close the sale. Moreover, upon information and belief, the Highland representatives on the Broadstripe board were integrally involved in all aspects of the negotiation of the James Cable Agreement and it is not possible to separate the actions taken by them as representatives of Highland and as representatives of Broadstripe.

50.     At the time that Highland caused Broadstripe to enter into the James Cable Agreement, Highland contemplated that closing the transaction would require approximately

16

$115 million and that Highland would provide approximately $50 million in new equity and the rest as senior debt. In fact, on November 17, 2007, Highland authorized Broadstripe to issue a press release indicating that Highland had "committed" to provide this financing.

51. Ultimately Highland refused to provide the financing necessary to close the James Cable transaction. Highland has asserted that it did so because of changes to the debt markets that, in Highland's view, made the deal uneconomic. Nonetheless, Highland does not, and cannot, dispute that the James Cable Agreement provided no financing out. Thus, Highland knowingly induced Broadstripe to enter into a transaction, but then blocked Broadstripe's compliance. As a result, the transaction did not close and James Cable has asserted a large claim against Broadstripe for breach of the James Cable Agreement and has commenced litigation against Broadstripe and Highland.

52. The James Cable situation was not the only instance of Highland's obstructive behavior in acquisitions. In January, 2008, Broadstripe was in advanced talks with Suddenlink for acquisition of systems to enhance the Maryland business. Highland encouraged and facilitated extensive negotiations between Broadstripe and Suddenlink, which resulted in identifying key terms for a transaction. Highland expressly agreed to underwrite financing for the acquisition, which would have required approximately $280,000,000. Based on Highland's agreement, Broadstripe and Suddenlink executed a letter of intent. However, right before that deal could be fully documented, Highland changed its mind and refused to commit to fund or backstop the deal. Highland's actions are especially troubling since it held a substantial block of equity of Suddenlink's parent company – a fact never disclosed to Broadstripe's other directors. Rather, Highland, apparently seeing an economic benefit that was never explained to Broadstripe, decided to kill the deal.

17

## V. HIGHLAND'S UNILATERAL
## CONTROL OF BROADSTRIPE.

53.     Since March 2006, Highland has effectively controlled decision making at Broadstripe.

54.     Highland controlled decisions regarding appointment and termination of key executives. For instance, Highland was directly responsible for Mr. Shreffler's appointment as CEO and the corresponding replacement of Mr. Westbrook in September 2006, and Mr. Westbrook's termination in August, 2007. Indeed, when Mr. Shreffler resigned as CEO in July 2008, Highland singlehandedly selected Gustavo Prilick (the current CEO and a board member), as his successor.

55.     Highland also controlled all financing issues within Broadstripe. Because of Highland's dual role as majority holder of both Credit Facilities and controlling director, Broadstripe had to obtain approval from Highland, both a director and as lender, to increase its facility. And, financing decisions went further: Highland had to approve (and indeed never did) any financing for acquisitions. In this regard, Highland directly determined whether any acquisitions could be closed.

56.     Highland also controlled Broadstripe's internal budgeting. Indeed, Broadstripe's management became so frustrated with Highland's entrenchment in the budget process, that it simply asked Highland to set Broadstripe's CAPEX budget. Similarly, Highland unilaterally decided whether Broadstripe could afford, and could pay, bonuses to its own employees. Highland employees became involved in day to day decisions including deciding which vendors would be paid and when. Highland even sent one of its employees to St. Louis to participate in day to day management decisions. Indeed, Messrs. Nau and Walls, both directors, were so involved in day-to-day management decisions, that top Highland employees in late 2008, warned

18

them of the impropriety of their acts, and on occasion castigated them. But, all was for naught, because Highland through its employees and designees continued to make routine management decisions, despite their role as directors and lenders.

## VI.  THE WAVEDIVISION LITIGATION AND JAMES CABLE LITIGATION DRIVE BROADSTRIPE INTO BANKRUPTCY.

57.  James Cable commenced litigation by filing a complaint in the Delaware Chancery Court on March 20, 2008. Thereafter the parties engaged in efforts to settle the litigation which contemplated a significant investment by Highland in Broadstripe including a $45 million equity investment. These efforts came to a sudden end in early October 2008 as a result of the denial of Broadstripe's summary judgment motion in the WaveDivision litigation that was pending in the Delaware Chancery Court. On October 1, 2008, Broadstripe's summary judgment motion was argued before Vice Chancellor Leo E. Strine, Jr. The premise of Broadstripe's argument was that Broadstripe was not responsible for the failure to close the WaveDivision Agreement on the ground that Broadstripe could not be held responsible for the acts of Highland and Trimaran that prevented the closing. In denying the motion, the court rejected Broadstripe's thesis and held that the evidence strongly supported the inference that Broadstripe's management, Highland and Trimaran co-operated to implement an alternative transaction that resulted in Highland obtaining control of Broadstripe. After issuing its ruling, the Court strongly urged Broadstripe and Highland to settle the action.

58.  Highland reacted to the WaveDivision summary judgment decision by immediately terminating settlement discussions with James Cable, arranging for Broadstripe to retain bankruptcy counsel and restructuring advisors, causing the Highland employee members of the Broadstripe board to resign and instructing Highland employees to cease performing any services for Broadstripe.

59.     Thus, the WaveDivision litigation and the James Cable litigation, and Highland's reactions to those proceedings, were the principal causes of Broadstripe's chapter 11 filing. Although Broadstripe has other creditors, the bulk of those claims are for good and services provided in the months just prior to filing when the company implemented a strategy of building up cash by not paying venders. Other outstanding claims are for legal fees and other expenses relating to the pending litigation with WaveDivision and James Cable.

60.     Although Highland attempted to give the appearance that it was surrendering control of Broadstripe, **that was and is an illusion**. The two remaining board members of Broadstripe were nominated and placed on the board by Highland. Top Highland officers handpicked Messers. Prilick and Dowd, both of whom have substantial prior relationships with Highland. These ties are reflected in the DIP financing proposal that was rejected by the Bankruptcy Court and in Broadstripe's proposed plan of reorganization filed very early in the case and premised on a "Plan Support Agreement" all of whose signatories are Highland employees. Effectively, both the DIP financing proposal and the proposed plan were "negotiated" by Highland with itself to the prejudice of all other constituencies.

## FIRST CLAIM FOR RELIEF

(Recharacterize The Second Lien Investments As Equity Pursuant to
Delaware State Law and 11 U.S.C. § 105)

61.     The allegations contained in Paragraphs 1 through 60 are incorporated herein by reference.

62.     Immediately prior to the July 2006 Restructuring, Broadstripe was undercapitalized and lacked liquidity to refinance the 2000 Credit Facility, on market terms.

63.     Immediately prior to the July 2006 Restructuring, Highland knew or reasonably should have known that Broadstripe was undercapitalized and lacked liquidity to refinance the 2000 Credit Facility, on market terms, much less, increase the amount of that financing.

64.     Immediately prior to the July 2006 Restructuring, Broadstripe and its representatives sought proposals to obtain financing from various banks and financial institutions including the non-Highland IRN holders, each and all of which declined to provide such financing, with some expressing doubts about the viability and financial stability of the Debtors' operations.

65.     Immediately prior to the July 2006 Restructuring, Highland knew or reasonably should have known that certain banks or financial institutions including non-Highland IRN holders declined to provide financing to Broadstripe and that several such parties expressed doubts about the viability and financial stability of the Debtors' operations.

66.     Highland thus knew that no prudent lender would refinance the 2000 Credit Facility, much less, extend credit to Broadstripe under these circumstances beyond the amount of the 2000 Credit Facility, on market terms.

67.     Immediately prior to the July 2006 Restructuring, Highland held a majority of the then outstanding amount under First Lien Credit Facility (the "First Lien Investments") and approximately 25% of the then outstanding amount of IRNs. Highland was uniquely positioned as the only entity holding both a substantial amount of IRNs and First Lien Investments.

68.     As part of the July 2006 Restructuring, Highland provided to Broadstripe approximately $62 million, designated as amounts outstanding under the Second Lien Credit Facility (the "Second Lien Investments").

69.     As part of the July 2006 Restructuring, Highland received approximately $35,000,000 as paydown of the First Lien Investments.

70.     As the net result of the July 2006 Restructuring, Highland held approximately $87,875,000 or approximately 60% of the then outstanding amount of First Lien Investments, $62,000,000 or 88.5 % of the then outstanding amount of Second Lien Investments, 25% of the then outstanding amount of IRNs, 25% of the equity interests in Broadstripe Capital, and two of the seven seats on Broadstripe's management committee.

71.     Highland's primary motivation for providing the Second Lien Investments was to protect its First Lien Investments and IRNs investments. Highland structured the July 2006 Restructuring to ensure minimal devaluation of its other interests in the Debtors and, therefore, extended debt knowing it could never be repaid by the Debtors.

72.     Recognizing that the Second Lien Investments could never be repaid, the parties agreed to provide no real fixed maturity date. Rather, the parties provided that the maturity date could be extended by "Required Lenders" under the Second Lien Credit Facility. Since shortly after issuance the Highland funds have held sufficient Second Lien Investments to constitute Required Lenders. Thus, the maturity of the Second Lien Investments has always been in Highland's sole control.

73.     Recognizing that the Second Lien Investments could never be repaid and the Debtors lacked liquidity to service that purported debt, the parties agreed to provide de minimis cash payments, with the remainder not due until maturity – again, a date controlled exclusively by Highland.

74.     To secure the Second Lien Investments, Highland accepted second priority liens on substantially all of the Debtors assets, sitting behind approximately $166,500,000 of the First Lien Investments. Immediately prior to the July 2006 Restructuring, Highland knew or reasonably should have known that Broadstripe's cash flows and asset coverage could not adequately secure the Second Lien Investments. Indeed, Highland recognized that extending the

First Lien Investments beyond $166,500,000 would have caused ratings agencies to cut the ratings to the First Lien Investments for lacking sufficient cash flows and collateral coverage. Despite these facts, Highland issued the Second Lien Investments.

75.     Despite knowing that the Second Lien Investments could never be repaid, Highland structured the July 2006 Restructuring as it did to protect its interests in the IRNs. The IRNs are debts of Broadstripe Capital, whose sole asset is its membership interest in Broadstripe. If Highland or anybody else infused equity into Broadstripe, that would have diluted Broadstripe Capital's ownership of Broadstripe, and in turn would have devalued the IRNs. Moreover, since Highland knew that nobody else would issue substantial amounts of Second Lien Investments, by structuring the July 2006 Refinancing as it did, Highland assured that nobody else would enter Broadstripe's capital or debt structure, and potentially threaten Highland's control over the company. Highland thus layered PIKed debt (i.e. debt without current payment obligations), with very little servicing requirements, thereby priming general unsecured creditors, solely to protect itself.

76.     Based on the real nature of the Second Lien Investments and Highland's ulterior motives in providing that financing, the Second Lien Investments should be recharacterized as equity.

## SECOND CLAIM FOR RELIEF

(Equitable Subordination of Highland's First Lien Investments and
Second Lien Investments Pursuant to 11 U.S.C. § 510(c))

77.     The allegations contained in Paragraphs 1 through 76 are incorporated herein by reference.

78.     Highland engaged in inequitable conduct by, among other things, layering secured debt on the Debtors' already undercapitalized capital structure, acting solely to protect its

23

interests in the IRNs and First Lien Investments; treating Broadstripe as its alter ego; blocking the highly advantageous WaveDivision Transaction; causing Broadstripe to expend time and resources pursuing acquisitions such as James Cable and Suddenlink, only for Highland to then block any financing for those acquisitions; causing Broadstripe to incur avoidable legal risk and litigation expenses; and refusing to adequately capitalize Broadstripe.

79. Highland's misconduct resulted in injury to Broadstripe's creditors by increasing Highland's claims against the Debtors, exposing Broadstripe to litigation claims, causing Broadstripe to lose the vast advantages of potential transactions, and proportionately decreasing the amount of funds available to pay the Debtors' other creditors.

80. Highland's misconduct conferred an unfair advantage on Highland, including, but not limited to, Highland's putative secured position relative to the Debtors' assets, Highland's control over Broadstripe, and protection of the value of the IRNs by preventing any third party financing which would have benefitted Broadstripe and its creditors, but potentially diluted the IRNs.

81. Subordinating amounts owed under the First Lien Credit Facility and the Second Lien Credit Facility under 11 U.S.C. § 510(c) is not inconsistent with the other provisions of the Bankruptcy Code.

82. Because Highland, an insider of the Debtors, conducted itself inequitably, resulting in injury to the Debtors' other creditors and conferring an advantage upon Highland, and such subordination is not inconsistent with other provisions of the Bankruptcy Code, the First Lien Investments and the Second Lien Investments should be equitably subordinated and paid in priority with the Debtors' other equity interest holders.

24

# THIRD CLAIM FOR RELIEF

(Alter Ego Pursuant to Delaware Law)

83.     The allegations contained in Paragraphs 1 through 82 are incorporated herein by reference.

84.     Since on or about September 2007, Highland has controlled voting of more than 90% of the membership interests of Broadstripe Holdings, Broadstripe's sole member. Even before then, however, Highland exerted absolute control over Broadstripe.

85.     Beginning in October 2006, Highland employees held two of the seven member seats on the management committee. The others, three designated by Trimaran and two management members, permitted Highland to make important decisions regarding Broadstripe's operations and management. Since even before then, Highland has directed the appointment of all high level officers of Broadstripe including its past and current chief-executive-officers.

86.     On or about August 31, 2007, Highland acquired Trimaran's entire position in IRNs, member units, and seats on the management committee. Since then, each member of Broadstripe's management committee has been directly or indirectly designated by Highland, which members were either Highland employees or Broadstripe executives, such as Mr. Shreffler, who were appointed by and answered directly to Highland.

87.     Highland has kept Broadstripe undercapitalized since it first acquired majority control of the 2000 Credit Facility debt in March 2006.

88.     Despite keeping Broadstripe undercapitalized, Highland has continued to receive interest payments and substantial fees under the Credit Facilities. Moreover, Highland has been able to look for acquisition options for Broadstripe, without actually committing any funds for those transactions and placing all risks and costs of not closing transaction on Broadstripe and its other creditors.

89.     Moreover, Broadstripe, at Highland's control, has disregarded corporate formalities and operated as a façade of Highland including, without limitation, by permitting Highland employees to make management, finance, and personnel decisions, relying on Highland to prepare projections and financial analyses, and by permitting Highland to act in the place of Broadstripe's officers.

90.     While Highland pretended that Broadstripe was making its own decisions, then approved by the management committee, in reality things did not work like that. Rather, Highland unilaterally made critical decisions and informed Broadstripe's management how to comport, thus Highland effectively managed Broadstripe.

91.     Because of Highland's control over Broadstripe in all levels of corporate functions, the Court should disregard any corporate separation between Broadstripe and Highland.

## FOURTH CLAIM FOR RELIEF

(Breach of Fiduciary Duty of Care Pursuant to
Delaware Law )

92.     The allegations contained in Paragraphs 1 through 91 are incorporated herein by reference.

93.     Highland, as an actual or de facto controlling shareholder, owed a duty of care to Broadstripe and its creditors because the Debtors have been insolvent since before July 2006.

94.     Despite owing this duty of care, Highland, including, but not limited to, through the actions of David Walls, Tyler Nau, and Carl Moore, as designees of Highland and, at relevant times, members of the Broadstripe Management Committee, breached its fiduciary duty of care by not act as reasonably prudent business persons in considering all the information available and acting on an informed basis.

26

95.     Highland's actions in breach of its fiduciary duty of care include, but are not limited to, interfering with the timing and consummation of the WaveDivision transaction to permit Highland time to amass a blocking position of the 2000 Credit Facility debt; failing to consider the interests of the unsecured creditors in distributing and committing the assets of the Debtors; causing Broadstripe to pursue acquisitions, but denying Broadstripe any financing to close, thus exposing Broadstripe to substantial risk and liabilities; ignoring the best interests of Broadstripe when making director and officer hirings; generally treating Broadstripe as vehicle for potential further investments, rather than as a company to which it owed duties; and failing to provide its expertise as to how to rehabilitate the Debtors. Indeed, as Broadstripe approached Chapter 11, Highland made the conscious decision to refuse to provide the help and expertise Broadstripe needed, even when implored to do so by the Debtor.

96.     Highland's actions in breaching its fiduciary duty of care owed to Broadtsripe and its creditors as an actual or de facto controlling shareholder proximately caused damage to the Debtors, for which Highland is liable.

## FIFTH CLAIM FOR RELIEF

(Breach of Fiduciary Duty of Loyalty Pursuant to
Delaware Law)

97.     The allegations contained in Paragraphs 1 through 96 are incorporated herein by reference.

98.     Highland, as an actual or de facto controlling shareholder, owed a fiduciary duty of loyalty to Broadstripe and its creditors because the Debtors have been insolvent since before July 2006.

27

99. Despite owing this duty of loyalty, Highland, including, but not limited to, through the actions of David Walls, Tyler Nau, and Carl Moore, designees of Highland and members of the Broadstripe Management Committee, breached its fiduciary duty of loyalty.

100. Highland's actions in breach of its fiduciary duty of loyalty, each undertaken to further its own financial interests, include, but are not limited to, interfering with the timing and consummation of the WaveDivision transaction to permit Highland time to amass a blocking position of the 2000 Credit Facility debt; failing to consider the interests of the unsecured creditors in distributing and committing the assets of the Debtors; causing Broadstripe to pursue acquisitions, but denying Broadstripe any financing to close, thus exposing Broadstripe to substantial risk and liabilities; ignoring the best interests of Broadstripe when making director and officer hirings; generally treating Broadstripe as vehicle for potential further investments, rather than as a company to which it owed duties; and failing to provide its expertise as to how to rehabilitate the Debtors. Indeed, as Broadstripe approached Chapter 11, Highland made the conscious decision to refuse to provide the help and expertise Broadstripe needed, even when implored to do so by the Debtor.

101. Highland's actions in breaching its fiduciary duty of loyalty owed to Broadstripe and its creditors as an actual or de facto controlling shareholder proximately caused damage to the Debtors, for which Highland is liable.

## SIXTH CLAIM FOR RELIEF

(Highland's Aiding and Abetting Breaches of Fiduciary
Duty of Care By Broadstripe's Officers and Directors Pursuant to
Delaware Law)

102. The allegations contained in Paragraphs 1 through 101 are incorporated herein by reference.

103. Each and every member of the Broadstripe Management Committee owed a fiduciary duty of care to the Broadstripe and its creditors because the Debtors have been insolvent since before July 2006.

104. The members of the Broadstripe Management Committee breached their fiduciary duty of care.

105. Specifically, the members of the Broadstripe Management Committee did not act as reasonably prudent business persons in considering all the information available and acting on an informed basis, when, among other things, interfering with the timing and consummation of the WaveDivision transaction to permit Highland time to amass a blocking position of the 2000 Credit Facility debt; failing to consider the interests of the unsecured creditors in distributing and committing the assets of the Debtors; causing Broadstripe to pursue acquisitions, but denying Broadstripe any financing to close, thus exposing Broadstripe to substantial risk and liabilities; ignoring the best interests of Broadstripe when making director and officer hirings; generally treating Broadstripe as vehicle for potential further investments, rather than as a company to which it owed duties; and failing to provide its expertise as to how to rehabilitate the Debtors.

106. Highland knowingly participated in and induced all of the breaches of the fiduciary duty of care owed by the Broadstripe Management Committee, including David Walls, Carl Moore and Tyler Nau who were the Highland employees during those breaches, and such breaches were on account of, or for the direct benefit of Highland. Highland knew of the Broadstripe Management Committee's actions, but failed to take any action to stop them (indeed, in some instances encouraged them), instead taking advantage of the Broadstripe Management Committee members' breaches of the fiduciary duty of care for the benefit of Highland. Such concerted actions by Highland and the Broadstripe Management Committee proximately caused damage to the Debtors and their creditors, for which Highland is liable.

## SEVENTH CLAIM FOR RELIEF

(Highland's Aiding and Abetting Breaches of Fiduciary
Duty of Loyalty By Broadstripe's Officers and Directors Pursuant to
Delaware Law)

107. The allegations contained in Paragraphs 1 through 106 are incorporated herein by reference.

108. Each and every member of the Broadstripe Management Committee owed a fiduciary duty of loyalty the Broadstripe's creditors because the Debtors have been insolvent since before July 2006.

109. The members of the Broadstripe Management Committee breached their fiduciary duty of loyalty. Specifically, the Broadstripe Management Committee members had a special relationship of trust with the Debtors, and were prohibited from acting in their own best interests. However, the Broadstripe Management Committee members acted in their own best interests by, among other things, interfering with the timing and consummation of the WaveDivision transaction to permit Highland time to amass a blocking position of the 2000 Credit Facility debt; failing to consider the interests of the unsecured creditors in distributing and committing the assets of the Debtors; causing Broadstripe to pursue acquisitions, but denying Broadstripe any financing to close, thus exposing Broadstripe to substantial risk and liabilities; ignoring the best interests of Broadstripe when making director and officer hirings; generally treating Broadstripe as vehicle for potential further investments, rather than as a company to which it owed duties; and failing to provide its expertise as to how to rehabilitate the Debtors.

110. Highland knew of the Broadstripe Management Committee's actions, but failed to take any action to stop them (indeed, in some instances encouraged them), instead taking advantage of the Broadstripe Management Committee's breaches of their fiduciary duty of loyalty for the benefit of Highland. Such concerted actions by Highland and the Broadstripe

Management Committee proximately caused damage to the Debtors, for which Highland is liable.

## EIGHTH CLAIM FOR RELIEF

(Avoidance of Preferential Transfers Relating
to First Lien Investments Under 11 U.S.C. § 547)

111.    The allegations contained in Paragraphs 1 through 110 are incorporated herein by reference.

112.    Alternatively, and without waiving the foregoing arguments, in the event Highland's First Lien Investments are undersecured, the Committee seeks to recover transfers of the Debtors' property made to, or for the benefit of Highland and its affiliates with respect to the First Lien Investments.

113.    In the year preceding the Petition Date, the Debtors made transfers of property of the Debtors as interest or fees purportedly with respect to the First Lien Investments, which, upon information and belief, totaled in excess of $9,423,207.00 (collectively, the "First Lien Preferential Transfers") and include the following transfers:

| Date | Amount |
| --- | --- |
| 1/30/2008 | $3,317,246.00 |
| 1/28/2008 | $89,508.00 |
| 2/6/2008 | $42,780.00 |
| 2/20/2008 | $43,149.00 |
| 2/26/2008 | $43,547.00 |
| 2/28/2008 | $23,387.00 |
| 2/29/2008 | $875,435.00 |
| 3/6/2008 | $10,762.00 |
| 3/17/2008 | $224,737.00 |
| 3/17/2008 | $415,707.00 |
| 5/30/2008 | $3,883,858.00 |
| 6/17/2008 | $100,178.00 |
| 6/30/2008 | $3,944.00 |
| 7/21/2008 | $99,291.00 |
| 8/28/2008 | $49,322.00 |
| 9/15/2008 | $100,280.00 |
| 10/21/2008 | $100,076.00 |

114.     The Committee seeks to recover the First <u>Lien Preferential Transfers</u> to the extent made to or for the benefit of Highland and its affiliates.

115.     The First Lien Preferential Transfers were each made by the Debtors within one year prior to the Petition Date.

116.     Highland, including the Highland funds receiving or benefitting from the First Lien Preferential Transfers, are insiders of the Debtors as Highland Crusader Offshore Partners, L.P. owns and controls more than 20% of the equity of Broadstripe Capital, and Highland Crusader Offshore Partners, L.P. is managed by Highland Capital Management, L.P., which manages all funds receiving the First Lien Preferential Transfers.

117.     The First Lien Preferential Transfers include, but are not limited to, the payments purportedly made as debt service by the Debtors pursuant to the First Lien Credit Facility and were made on account of an antecedent debt owed by the Debtors before each of the First Lien Preferential Transfers was made.

118.     As of the date of each of the First Lien Preferential Transfers, the relevant Debtors were insolvent, and enabled Highland to receive more than Highland would receive if (i) these Bankruptcy Cases were under chapter 7 of the Bankruptcy Code; (ii) if each of the First Lien Preferential Transfers were not made; and (iii) Highland received payment of the debt in accordance with other provisions in the Bankruptcy Code.

119.     The Committee seeks to recover the First Lien Preferential Transfers made to or for the benefit of Highland and its affiliates, as they were made in violation of 11 U.S.C. § 547(b).

## NINTH CLAIM FOR RELIEF

(Avoidance of Preferential Transfers Relating
to Second Lien Investments Under 11 U.S.C. § 547)

120.    The allegations contained in Paragraphs 1 through 119 are incorporated herein by reference.

121.    In the year preceding the Petition Date, the Debtors made transfers of property of the Debtors as interest or fees purportedly with respect to the Second Lien Investments, which, upon information and belief, totaled in excess of $1,631,571.00 (collectively, the "Second Lien Preferential Transfers") and include the following transfers:

| Date | Amount |
|------|--------|
| 1/28/2008 | $125,550.00 |
| 1/31/2008 | $68,889.00 |
| 2/28/2008 | $84,992.00 |
| 2/29/2008 | $64,444.00 |
| 3/28/2008 | $46,350.00 |
| 3/28/2008 | $37,778.00 |
| 4/17/2007 | $169,983.00 |
| 7/17/2008 | $481,289.00 |
| 10/17/2008 | $552,296.00 |

122.    The Committee seeks to recover the Second Lien Preferential Transfers to the extent made to or for the benefit of Highland and its affiliates.

123.    The Second Lien Preferential Transfers were each made by the Debtors within one year prior to the Petition Date.

124.    Highland, including the Highland funds receiving or benefitting from the Second Lien Preferential Transfers, are insiders of the Debtors, as Highland Crusader Offshore Partners, L.P. owns and controls more than 20% of the equity of Broadstripe Capital, and Highland Crusader Offshore Partners, L.P. is managed by Highland Capital Management, L.P., which manages all funds receiving the Second Lien Preferential Transfers.

33

125.     The Second Lien Preferential Transfers include, but are not limited to, the payments purportedly made as debt service by the Debtors pursuant to the Second Lien Credit Facility, and were all made on account of an antecedent debt owed by the Debtors before each of the Second Lien Preferential Transfers was made.

126.     As of the date of each of the Second Lien Preferential Transfers, the relevant Debtors were insolvent, and enabled Highland to receive more than Highland would receive if (i) these Bankruptcy Cases were under chapter 7 of the Bankruptcy Code; (ii) if each of the Second Lien Preferential Transfers were not made; and (iii) Highland received payment of the debt in accordance with other provisions in the Bankruptcy Code.

127.     The Committee seeks to recover the Second Lien Preferential Transfers made to or for the benefit of Highland and its affiliates, as they were made in violation of 11 U.S.C. § 547(b).

## TENTH CLAIM FOR RELIEF

(Recovery of Fraudulent Transfers Under 11 U.S.C. § 548)

128.     The allegations contained in Paragraphs 1 through 127 are incorporated herein by reference.

129.     In the alternative, if and to the extent, any First Lien Preferential Transfers or Second Lien Preferential Transfers were not paid on account of an antecedent debt because the Highland transferee was not the holder of the corresponding debt against Broadstripe, the Committee seeks to recover such payments as made in violation of 11 U.S.C. § 548 because such payments would be made for less than reasonably equivalent value when the Debtor was or was rendered insolvent.

## ELEVENTH CLAIM FOR RELIEF

### (Recovery of Avoided Preferential Transfers Under 11 U.S.C. § 550)

130.    The allegations contained in Paragraphs 1 through 129 are incorporated herein by reference.

131.    To the extent the First Lien Preferential Transfers and the Second Lien Preferential Transfers are avoided under 11 U.S.C. § 547 or 11 U.S.C. § 548, the Committee seeks an order under 11 U.S.C. § 550 against Highland for the turnover in the amount of such avoided transfers.

## TWELFTH CLAIM FOR RELIEF

### (Disallowance of Claims Under Principles of Equity And 11 U.S.C. § 502(d))

132.    The allegations contained in Paragraphs 1 through 131 are incorporated herein by reference.

133.    Highland's claims seek to recover approximately $152,000,000 on the First Lien Investments and $56,000,000 on the Second Lien Investments.

134.    However, those claims also represent amounts that are avoidable under 11 U.S.C. §§ 547and/or 548, and/or for which Highland is liable for repayment to the Debtors.

135.    Highland's claims also include claims for attorneys' fees, costs, prepayment penalties and interest on the Investments, which are avoidable and/or which should be denied to Highland on the grounds that the Investments are not adequately secured.

136.    Additionally, Highland's claim fails to account for the original issue discounts it received when investing. Since those discounts have not yet accreted to full value, Highland is not now entitled to full payment of what it bought at a discount.

137. In addition, Highland, through its actions as described herein, undertook a scheme to own the Debtors, manipulating the Debtors' financially distressed situation to allow Highland to take complete control of the Debtors, ensuring that whether the Debtors' improved or failed, Highland would protect its investments at the expense of anyone and everyone else, including the Debtors' unsecured creditors.

138. As such, the Debtors seek an order from this Court disallowing Highland's claims under 11 U.S.C. § 502(d), or alternatively, under equitable principles.

**WHEREFORE**, the Committee respectfully requests that the Court enter judgment in favor of the Committee on its:

(i)      First Claim for Relief, pursuant to Delaware law and 11 U.S.C. § 105, recharacterizing the Second Lien Investments as equity;

(ii)     Second Claim for Relief, pursuant to 11 U.S.C. § 510(c), equitably subordinating First Lien Investments and Second Lien Investments held by Highland to all other debts asserted against Broadstripe;

(iii)    Third Claim for Relief, pursuant to Delaware law, disregard any corporate separation between Broadstripe and Highland;

(iv)    Fourth Claim for Relief, pursuant to Delaware law finding that Highland breached its fiduciary duty of care;

(v)     Fifth Claim for Relief, pursuant to Delaware law finding that Highland breached its fiduciary duty of loyalty;

(vi)    Sixth Claim for Relief, pursuant to Delaware law finding that Highland aided and abetted the Broadstripe board's breach of fiduciary duty of care;

(vii)   Seventh Claim for Relief, pursuant to Delaware law finding that Highland aided and abetted the Broadstripe board's breach of fiduciary duty of loyalty;

(viii)     Eighth Claim for Relief, pursuant to 11 U.S.C. § 547 avoiding preferential transfers related to the First Lien Investments made to or for the benefit of Highland or its affiliates;

(ix)     Ninth Claim for Relief, pursuant to 11 U.S.C. § 547 avoiding preferential transfers related to the Second Lien Investments made to or for the benefit of Highland or its affiliates;

(x)     Tenth Claim for Relief, in the alternative, pursuant to 11 U.S.C. § 548 avoiding fraudulent transfers on account of the First Lien Investments or the Second Lien Investments made to or for the benefit of Highland or its affiliates;

(xi)     Eleventh Claim for Relief, pursuant to 11 U.S.C. § 550 to recover avoided preferential and/or fraudulent transfers;

(xii)     Twelfth Claim for Relief, pursuant to 11 U.S.C. § 502(d), or, alternatively, under principles of equity, disallowing Highland's claims; and

(xiii)     enter judgment awarding the Committee pre-judgment interest on its claims together with its costs and attorneys' fees, to the fullest extent allowed by law; and

(xiv)    enter judgment awarding the Committee such other and further relief as the

Court may deem just and proper.

Dated: June 12, 2009
        Wilmington, Delaware

                    POTTER ANDERSON & CORROON LLP

By:

Steven M. Yoder (No.3885)
R. Stephen McNeill (No. 5210)
Hercules Plaza
1313 North Market Street, 6th Floor
Wilmington, Delaware 19801
Phone: (302) 984-6000
Fax: (302) 658-1192

- and -

KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP
David M. Friedman
David J. Mark
Daniel A. Fliman
1633 Broadway
New York, New York 10019
Telephone:   (212) 506-1700
Facsimile:   (212) 506-1800

*Attorneys for Official Committee of Unsecured
Creditors of Broadstripe LLC, et al*

39