**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

------------------------------------------------------------ x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| BROADSTRIPE, LLC, *et al.*, | : | Case No. 09-10006 (CSS) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |
| OFFICIAL UNSECURED CREDITORS' | : | |
| COMMITTEE OF BROADSTRIPE, LLC, on | : | |
| behalf of the estate of BROADSTRIPE, LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | Adv. Pro. No. 09-50966 (CSS) |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | : | |
| *et al.*, | : | |
| | : | |
| Defendants. | : | |

------------------------------------------------------------ x

## JOINT MOTION OF THE HIGHLAND DEFENDANTS FOR SUMMARY JUDGMENT WITH RESPECT TO THE COMPLAINT OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS BROUGHT ON BEHALF OF THE ESTATE OF BROADSTRIPE, LLC

DUANE MORRIS LLP
Richard W. Riley (No. 4052)
1100 North Market Street, Suite 1200
Wilmington, DE 19801-1246
Tel: (302) 657-4928

- and -

HAYNES AND BOONE, LLP
Lenard M. Parkins (admitted *pro hac vice*)
Trevor R. Hoffmann (admitted *pro hac vice*)
Jonathan Hook (admitted *pro hac vice*)
1221 Avenue of the Americas, 26th Floor
New York, NY 10020

*Counsel to Highland Capital Management, L.P.*
*and the Highland Institutional Lenders*

PEPPER HAMILTON LLP
David B. Stratton (No. 960)
Hercules Plaza, Suite 5100
1313 Market Street, P.O. Box 1709
Wilmington, DE 19899-1709
Tel: (302) 777-6566

- and -

ROPES & GRAY LLP
Robert S. Fischler (admitted *pro hac vice*)
Jared Nagley (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, NY 10036-8704

*Counsel to the Highland Retail Lenders*

**TABLE OF CONTENTS**

Page No.

PRELIMINARY STATEMENT ................................................................. 1

BACKGROUND ...................................................................................... 6

   A.   April 1998–January 2005:  No Involvement by Highland Defendants ............................ 6

   B.   February 2005:  Highland Enters the Picture ..................................................... 8

   C.   December 2005: The Proposed Wave Sale ..................................................... 9

   D.   Trimaran Mobilizes the IRNs ................................................................. 10

   E.   The July 2006 Refinancing ................................................................... 16

   F.   September 2006:  Shreffler Becomes CEO ..................................................... 18

   G.   The October 2006 Restructure ................................................................ 19

   H.   April–September 2007 ......................................................................... 22

       (i)   Comcast Sale and Termination of Westbrook's Employment .............................. 22

       (ii)  May 2007–December 2007:  Trimaran Approaches Highland to Sell Its IRN Stake ......................................................................................... 24

   I.   September 2007–February 2008:  Pursuit of Acquisition Opportunities by Broadstripe .................................................................................... 26

   J.   March 2008–December 2008:  Market Meltdown ............................................... 28

CONCLUSION ...................................................................................... 39

The Highland Institutional Lenders (collectively, the "Institutional Lenders")[1] and the

Highland Retail Lenders (collectively, the "Retail Lenders,"[2] and together with the Institutional

Lenders, the "Highland Lenders") that are funds managed by Highland Capital Management, L.P.

("Highland Capital") and that are lenders[3] and pre-petition secured creditors of the above-captioned

Debtors (the "Debtors" or "Broadstripe") under the First Lien Credit Agreement,[4] and under the

Second Lien Credit Agreement,[5] and Highland Capital (together with the Highland Lenders,

"Highland") file this motion pursuant to Federal Rule of Civil Procedure 56, made applicable by

Bankruptcy Rule 7056, seeking summary judgment (the "MSJ") with respect to all claims, causes of

action and counts raised in the Complaint (the "Complaint") filed by the Official Unsecured

Creditors' Committee of Broadstripe (the "Committee") initiating the above-captioned adversary

proceeding.

## PRELIMINARY STATEMENT

From the very first day of these cases, the Committee and its chair, James Cable, LLC

("James Cable"), have intentionally and recklessly blamed "Highland" for all of Broadstripe's ills.

---

[1] The Institutional Lenders are:  Loan Funding IV LLC; Highland Loan Funding V Ltd.; Highland Crusader Offshore Partners, L.P. ("Highland Crusader"); Southfork CLO, Ltd.; Atascosa Investments, LLC; Milam High Yield Fund; Hopkins Capital Partners; Gillespie Income Fund; Burnet Partners, LLC; Loan Funding VII LLC; Highland Credit Opportunities CDO Ltd.; Liberty CLO, Ltd.; Presidio Capital Management; Gleneagles CLO LTD; Jasper CLO, Ltd., Navarro Investment Partners LLC, Brentwood CLO, Ltd.; Eastland CLO, Ltd.; Grayson CLO LTD; Greenbriar CLO, Ltd., Highland Credit Strategies Master Fund, Red River CLO, Ltd. and Stratford CLO, Ltd.

[2] The Retail Lenders are: Highland Credit Strategies Fund, Highland Floating Rate Advantage Fund and Highland Floating Rate Fund.

[3] Highland Capital did not advance any loans, and is not a lender under any credit facility or under the IRNs.  *See* infra at ¶ 8.

[4] Second Amended and Restated First Lien Credit Agreement dated as of July 28, 2006 (as amended, supplemented or otherwise modified, the "First Lien Credit Agreement" and together with all supporting documents, the "First Lien Facility"), by and among Millennium Digital Media Systems, LLC, n/k/a Broadstripe, LLC, as borrower, The Bank of New York ("BNY") as administrative agent and the lenders party thereto from time to time (the "First Lien Lenders").

[5] Second Lien Credit Agreement dated as of July 28, 2006 (as amended, supplemented or otherwise modified, the "Second Lien Credit Agreement" and together with all supporting documents, the "Second Lien Facility"), by and among Millennium Digital Media Systems, LLC, as borrower, NexBank, SSB ("Nexbank") as administrative agent and the lenders party thereto from time to time (the "Second Lien Lenders").  The First Lien Credit Agreement and Second

Despite the fact that the various institutional and retail Highland funds are each comprised of their own distinct investors, with their own investment profiles, the Committee incorrectly sets up the Highland defendants as a monolithic enterprise and then alleges "domination" and "coercion" by "Highland." The Complaint tells a one-sided story filled with hyperbole and factual inaccuracies. The truth is quite different and mandates summary judgment in favor of Highland.

This is not a case about looting, fraud or the siphoning of value by way of a dividend, management fees or director fees. Broadstripe filed for bankruptcy because it got caught in the worst credit crunch of the last fifty years – a meltdown that has seen the disappearance of venerable institutions once thought to be "unsinkable." Unfortunately, thousands of companies during the last two years have met the same fate. Behind all the Committee's rhetoric, this lawsuit is really an effort to remake two ongoing litigations from the Delaware state courts – the James Cable and WaveDivision litigations – into "estate" claims. The result is a Complaint populated with ill-fitting causes of action (*i.e.,* equitable subordination, equitable disallowance, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and alter ego) and legal theories directly contradicted by documentary evidence in the Committee's hands. As a matter of law, the requested summary judgment must be granted.

The Proposed WaveDivision Sale

The Committee's allegations against Highland in connection with the WaveDivision litigation are easily disposed of. The Committee claims that Highland breached its purported fiduciary duty by refusing to consent to Broadstripe's "highly advantageous" February 2006 agreement to sell two of its three cable systems to WaveDivision for $157 million. The claim makes no sense. First, the Highland defendants owed no fiduciary or other duty to Broadstripe,

---

Lien Credit Agreement shall be jointly referred to as the "Credit Agreements").

since at the time they were merely lenders and held only *de minimis* equity and *no* seats on the Broadstripe Management Committee (the "<u>Management Committee</u>").  Second, the proposed Wave Sale was expressly conditioned on Broadstripe obtaining the consent of its existing senior secured lenders and its unsecured Increasing Rate Note ("<u>IRN</u>") holders.  Third, by Broadstripe's own analysis, the proposed Wave Sale was projected to wipe out more than $100 million in obligations owed by Broadstripe to its IRN holders (including Highland Crusader), and would have resulted in Broadstripe's eventual liquidation.  The Highland defendants, facing the prospect of multi-million dollar losses under the Wave Sale, did nothing more than exercise their contractual rights not to consent.  They had every right to do so.  Absent a complete re-write of lender liability laws and disregard for the terms of the senior secured loan facility and the IRN Purchase Agreement in place at the time, the Highland defendants' actions were neither wrongful nor actionable.

<u>The James Cable Transaction</u>

The Complaint's allegations regarding the James Cable transaction have even less merit than the Wave claims.  The Committee's theory as to the James Cable lawsuit is a simple one:

> Broadstripe entered into the James Cable Agreement only because it had received assurances that Highland would arrange, and if required, provide, the financing necessary to close the sale. . . . Ultimately Highland refused to provide the financing necessary to close the James Cable transaction. . . .  Thus, Highland knowingly induced Broadstripe to enter into a transaction, but then blocked Broadstripe's compliance. As a result, the transaction did not close and James Cable has asserted a large claim against Broadstripe for breach of the James Cable Agreement and has commenced litigation against Broadstripe and Highland.  Complaint at ¶¶ 49, 51.

It is a nice sounding theory, except for one problem: it is a complete fabrication.   There was no Highland commitment – written or oral – upon which Broadstripe could reasonably rely.  As testified to by Broadstripe's CFO, Michael Wylie, the individual who actually engaged in financing

discussions with Highland, ". . . [we] did not have a commitment letter from – Highland. It was not

an underwritten debt transaction."). Wylie Depo. pp. 48:3-15, 102:22-103:2.

As the Committee is well aware, because it has copies of the documents referenced herein,

Highland and Broadstripe exchanged *unsigned* draft written proposal letters and term sheets both

*prior to* Broadstripe signing the James Cable APA and *after* the James Cable APA was signed.

Highland's draft proposal and Broadstripe's counterproposal both contained the following

language:

> This letter (the "*Proposal Letter*") establishes terms under which we
> [Highland Finance Corp.][6] *might* provide the Company [Broadstripe
> Corp., LLC] a senior secured credit facility . . . Based upon
> information known to us today concerning the Transaction, we are
> pleased to provide you with this *non-binding letter* and general
> outline regarding the proposed Credit Facility . . .
>
> . . . *This letter is a non-binding proposal, to be used as a basis for
> continued discussions and due-diligence, and does not constitute a
> commitment of HFC or any lender, or an agreement to deliver such a
> commitment. If delivered, such a commitment would be subject to
> complete due diligence by HFC as well as any other lender. . . .*
>
> . . . *If delivered, a commitment would be subject to the absence of any
> material adverse condition in respect of the Borrower or financial or
> market conditions generally. . . .*
>
> . . . *This proposal letter sets forth the entire agreement* between the
> parties with respect to the matters addressed herein *and supersedes all
> prior communications, written or oral, with respect hereto. . . .*

Ex. H-1, H-2, H-3.[7]

The language of the draft proposal letters and term sheets disposes of any argument that

Highland made financing "assurances" upon which Broadstripe could have reasonably relied. On

the contrary, both the sworn testimony of Broadstripe's CFO (Wylie) set forth above and the

---

[6] Highland Finance Corp. is the Highland defendants' lending arm.

[7] All exhibits, depositions and declarations cited herein and in the Memorandum Of Law In Support Of Joint Motion Of
The Highland Defendants For Summary Judgment With Respect To The Complaint Of The Creditors Brought On

language of the drafts – which never progressed to execution – prove that Highland neither promised to provide financing *nor* "induced" Broadstripe to enter into the James Cable transaction based upon any financing assurances. By their own express terms, the proposal letters and term sheets were "non-binding," "[did] not constitute a commitment" and were subject to "market conditions." Given the clear language of the draft proposal letters and terms sheets, the first of which was delivered to Wylie at Broadstripe nine days *before* the signing of the James Cable APA, it is a fiction for the Committee to claim that Highland misled Broadstripe into believing that it had a commitment from Highland to fund the James Cable transaction. In addition, the fact that Broadstripe returned a draft of the proposal letter and term sheet back to Highland with Broadstripe's marked-up comments even *after* the signing of the James Cable APA proves that – as of the signing of the James APA – there was not an agreement on the terms of any financing arrangement from Highland or any promise by Highland to do so.

In dismissing James Cable's lawsuit against Highland earlier this year, Vice Chancellor Lamb expressed a similar insight, observing: "the amended complaint and its exhibits strongly suggest that James Cable *could not have reasonably relied* on a promise by Highland to fund." *See James Cable, LLC v. Millennium Digital Media Sys., L.L.C.*, C.A. No. 3637-VCL, 2009 WL 1638634, at *6 (Del. Ch. June 11, 2009) (emphasis added). Vice Chancellor Lamb was right, and the same logic applies with respect to any supposed reliance by Broadstripe. As a matter of black letter contract law, the Committee's claims must be dismissed, since there was no financing agreement by Highland on which Broadstripe could have reasonably relied. It is either wishful thinking or blatant disregard for commercial reality (and Rule 11 ethics) by the Committee to continue to claim otherwise.

---

Behalf Of The Estate Of Broadstripe, LLC are identified in the Appendix filed contemporaneously with the MSJ.

For the Committee to prevail on its James Cable theories, it would have to convince the Bankruptcy Court to ignore the uncontrovertible evidence and to disregard settled law regarding, among other things, the fundamental tenets of contract law. Even then, this lawsuit would be pointless, since the Committee's constituents are and always have been tens of millions of dollars out of the money.

Given the dispositive evidence set out and referenced in this MSJ, the Committee's claims must be summarily dismissed and summary judgment granted. The Committee has had copies of the documentary evidence for months and is aware of the testimony of Broadstripe's CFO. Nevertheless, the Committee has ignored the facts and continued to press its claims undaunted. In the meantime, the Highland defendants, and this estate, have been forced to incur millions of dollars in needless litigation costs.[8] The prosecution of this lawsuit by the Committee is an abuse of the system, designed to enrich nobody but the lawyers, and does so on the backs of creditors who have already lost hundreds of millions of real par dollars on the Debtors. It has to stop now.

## BACKGROUND

### A. April 1998–January 2005: No Involvement by Highland Defendants

1.      On April 8, 1998, Millennium Digital Media Capital, LLC (n/k/a Broadstripe Capital, LLC) ("Capital") was formed to acquire, develop and operate cable television and related telecommunications properties. Thereafter, Capital acquired cable television and related telecommunications properties in three regions: Maryland (the "Mid-Atlantic System"); Michigan (the "Central System"); and Washington and Oregon (the "Northwest System" and collectively, the

---

[8] In light of the outrageous circumstances and the Committee proceeding with its Complaint – the Highland defendants want the Court to consider reimbursement of their fees and expenses incurred in defending this lawsuit by those who are accountable for bringing – and continuing to prosecute – these claims.

"Systems"). The Systems are operated by Broadstripe, LLC (f/k/a Millennium Digital Media Systems, LLC), the Debtors' principal operating company. *See generally* Ex. H-4 at ¶¶ 7-12.

2. Below is a simplified chart of Broadstripe's capital structure as of the Petition Date:

**Figure 1**



3. To fund the early System acquisitions, Capital entered into a Note Purchase Agreement, dated as of October 5, 1999 (as amended, supplemented or otherwise modified, the "IRN Purchase Agreement"), whereby it borrowed $70 million in the form of IRNs due to fully mature on March 31, 2009.[9] *See* Ex. H-5.

4. In addition, Broadstripe (OpCo) entered into a $250 million loan facility dated December 29, 2000 (as amended, supplemented or otherwise modified, the "Original Loan Agreement" and together with all supporting documents, the "Original Loan Facility"), comprised of a secured term loan and a secured revolver. The initial lenders under the loan facility were Fleet

---

[9] Subsequently, the maturity date on the IRNs was extended to January 1, 2012. Ex. H-6.

National Bank, Credit Lyonnais New York Branch, First Union National Bank, Canadian Imperial Bank of Commerce, and Bank of Montreal. The administrative agent was Fleet National Bank. *See* Ex. H-7. The Original Loan Facility granted the lenders thereunder first priority liens on substantially all of Broadstripe's assets. *See* Complaint at ¶ 21.

**B. February 2005: Highland Enters the Picture**

5. The Highland Lenders' first purchase of Broadstripe debt occurred on the secondary market in February 2005. *See* Ex. H-8. By this time, Broadstripe was already indebted (i) at Opco to the existing secured lenders under the Original Loan Facility in an approximate amount of $196 million (Ex. H-9 at § 4(c)) and (ii) at Capital to the IRN holders in an approximate accreted amount of $175 million.

6. At this time, Broadstripe was also on the verge of a covenant default under the Original Loan Facility. Ex. H-9 at § 4(a). As a result, on March 31, 2005, Broadstripe's existing secured lenders executed an amendment to the Original Loan Facility (the "Fifth Amendment") providing covenant relief, shortening the Original Loan Facility's maturity date from October 30, 2008 to June 30, 2006[10] and requiring Broadstripe to sell the Systems to repay the debt owing to them regardless of any negative consequences of a sale to Broadstripe or the IRN holders. *See* Ex. H-7 at Art. XI (Maturity Date); Ex. H-9 at §§ 1.17 (adding new section 6.15 to Original Loan Agreement), 1.22(B) (Maturity Date); Complaint at ¶ 22; Fredette Depo. pp. 23:17-25:22. As set forth in the chart below, as of the date of the Fifth Amendment, the Highland Lenders were nowhere close to being "Majority Lenders" under the Fifth Amendment. *See* Ex. H-9 at § 1.22(A) (Majority Lenders).

---

[10] The Complaint alleges the Fifth Amendment extended the Original Loan Facility's maturity date. *See* Complaint at ¶ 22. This is incorrect.

**Figure 2**

| Highland Lenders' Holdings as of March 31, 2005 | | | |
| --- | --- | --- | --- |
| Debt Instrument | Amount | Total Amount Outstanding | Percentage of Holdings |
| Original Loan Facility | $22.4 million | Approximately $196 million | Approximately 11.4% |
| IRNs (held by Highland Crusader) | $41.7 million | $184.4 million | Approximately 23% |

Moore Decl. at ¶ 7. The Highland Lenders held only *de minimis* equity,[11] and no seats on the Management Committee of Broadstripe. *See* Fredette Depo. pp. 20:3-22:6.

**C. December 2005: The Proposed Wave Sale**

7. As a consequence of the Fifth Amendment, Broadstripe retained Daniels & Associates to market the company's Systems for sale. *See* Fredette Depo. pp. 27:8-15. On December 15, 2005, Broadstripe and WaveDivision Holdings, LLC ("Wave") signed a letter of intent for Wave to acquire two of Broadstripe's three Systems (*i.e.*, the Northwest and Central Systems) for $157 million (the "Wave Sale"). Ex. H-4 at ¶¶ 24, 25; Complaint at ¶ 23.

8. The Wave Sale was expressly conditioned upon and subject to the consent of (i) the Original Loan Facility lenders and (ii) the IRN holders, provided that the consent of the IRN holders would be deemed to have been obtained if Broadstripe and Wave reasonably concluded that such consent was not required. *See* Ex. H-4 at ¶ 25, Ex. H-10, H-11 at § 6.3(c)(ii), H-12 at § 6.3(c)(ii); Complaint at ¶ 23.

---

[11] Highland Crusader held a *de minimis* amount (*i.e.*, less than 2.3%) of membership units in Broadstripe (Capital) that were granted to each IRN holder over time on a *pro rata* basis according to its IRN holdings pursuant to ¶¶ 1 and 5M of the IRN Purchase Agreement. *See* Ex. H-5. No other Highland Lenders ever held equity. *See* Moore Decl. at ¶ 7; Complaint at ¶ 24.

9.     The $157 million in proceeds from the proposed Wave Sale,[12] combined with expected proceeds of between $87.7 million and $125 million (based on indications of interest provided to Daniels & Associates) from a future sale of the Mid-Atlantic system (collectively, the "Expected Sale Proceeds"), were expected to be sufficient to repay in full the approximately $196 million in senior loans outstanding at the OpCo level under the Original Facility. *See* Ex. H-13 at TRI-WAV 003230-003231, H-14; Fredette Depo. pp. 51:7-55:7.  Based on these values and Broadstripe's audited financial statements, OpCo was clearly solvent at this time.  Ex. H-15 at p. 2 (member's equity).  Unfortunately, the remaining sale proceeds would have been insufficient to pay off the approximately $211 million in accreted IRN obligations at Capital existing as of December 31, 2005, wiping out between an estimated $130 million and $169 million in accreted IRN obligations.  *See* Ex. H-13; Fredette Depo. pp. 55:21-56:14.

**D.  Trimaran Mobilizes the IRNs**

10.     At the time of the Wave bid, Trimaran/Caravelle ("Trimaran")[13] was the largest IRN holder (holding approximately 43% of the IRNs).  *See* Fredette Depo. pp. 50:8-51:6; Walls Depo. pp. 228:3-18.  As of this time, Trimaran's related parties also held equity in Broadstripe and two of the six seats on Broadstripe's Management Committee.

---

[12] After payment of bank fees ($2.8 million), broker fees ($1.6 million), legal/accounting/other fees ($0.4 million) and severance, the expected net proceeds of the Wave Sale to be distributed to the senior secured lenders totaled $150.1 million.  *See* Ex. H-13 at TRI-WAV 003231.

[13] Trimaran Capital Partners, LLC was the manager of a number of investment entities.  As used herein, the term "Trimaran" is defined to include Trimaran Capital Partners, LLC, the Caravelle Millennium Investment Corporation, Caravelle Investment Fund, LLC,  CIBC WG Argosy Merchant Fund 2, L.L.C., Co-Investment Merchant Fund 3 L.L.C. and their affiliates.

**Figure 3**

| Members of Broadstripe Management Committee as of December 2005 | Affiliation |
| --- | --- |
| William Phoenix | Trimaran/Caravelle |
| Andrew Heyer | Trimaran/Caravelle |
| Darryl Thompson | TSG Capital |
| Mark Inglis | TSG Capital |
| Cleveland Christophe | TSG Capital |
| Kelvin Westbrook | Broadstripe |

*See*, *e.g.*, Ex. H-16; Fredette Depo. pp. 75:21-76:4.[14] Trimaran held *no* Original Loan Facility debt however (Fredette Depo. pp. 218:3-219:15), and so with its large IRN holdings, it stood to lose the most from the Wave Sale.

11.      Therefore, commencing in December 2005, Trimaran mobilized the IRN holders to determine whether or not to consent to the Wave Sale. *See*, *e.g.*, Walls Depo. 228:19-229:22. On December 14, 2005, at the request of William Phoenix, a Trimaran designee, Darren Fredette ("Fredette") (also of Trimaran) contacted Broadstripe's CEO, Kelvin Westbrook ("Westbrook"), to coordinate a presentation by Broadstripe to the IRN holders to be held at Trimaran's New York office. Fredette instructed Westbrook as to precisely what topics Trimaran wanted included in the presentation (Ex. H-17) and previewed and commented on drafts of it. *See* Fredette Depo. pp. 32:2-34:22. The IRN Holders were notified on December 20, 2005 of the meeting arranged by Fredette and Westbrook to be held on January 5, 2006. *See* Ex. H-18; Fredette Depo. pp. 35:2-35:12, 38:5-38:19.

12.      The IRN holders in attendance at the January 5 meeting included Fredette (Trimaran), Jay Bloom ("Bloom") (Trimaran), David Walls ("Walls") (Highland Crusader), Ethan

---

[14] As shown, the Highland Lenders held *no* seats on the Management Committee as of this date. *See* Ex. H-16; Fredette Depo. pp. 20:3-22:6.

Garber (Bear Stearns), Jim Russo (Credit Suisse), Robert Davenport (Cerberus; attended telephonically) and Kelvin Westbrook, Bruce Beard and Tim Valley (each from Broadstripe). Fredette Depo. pp. 45:12-45:23. Generally, topics covered in Broadstripe's January 5 presentation included (i) the Wave Sale process, (ii) expected proceeds and distribution waterfall for the Wave Sale, (iii) indications of interest for the Mid-Atlantic System and (iv) the financeability of Broadstripe going forward. The IRN holders also questioned the effect of the proposed Wave Sale on their IRN holdings, and suggested that Broadstripe look into financing alternatives to the Wave Sale. *See* Ex. H-13; *see also* Ex. H-10; Fredette Depo. pp. 45:12-48:20. As of the January 5, 2006 meeting, the IRN holders' respective holdings were as follows:

**Figure 4**

| IRN Holders as of January 5, 2006 | Percentage of Holdings |
|---|---|
| Caravelle Millennium Investment Corp. (Trimaran) | 42.86% |
| Highland Crusader Offshore Partners, L.P. | 25.03% |
| Madeleine, L.L.C. (Cerberus) | 20.76% |
| Credit Suisse International | 7.71% |
| Bear Stearns Credit Products Inc. | 3.65% |

*See* Fredette Depo. pp. 36:11-37:21; Moore Decl. at ¶ 6.[15]

13. On February 8, 2006, Broadstripe and Wave executed purchase agreements for the proposed Wave Sale despite Broadstripe's knowledge that the IRN Holders had not yet determined whether to consent. *See* Ex. H-4 at ¶¶ 24, 25, H-10; Complaint at ¶ 23.

14. Following the execution of the Wave purchase agreements, the Highland Lenders began buying up existing senior debt under the Original Loan Facility. *See* Ex. H-8.

---

[15] Upon information and belief, as of October 26, 2006, the IRN holdings of Madeleine, L.L.C. (Cerberus), Credit Suisse International and Bear Stearns Credit Products Inc. were as set forth in Figure 4 above. *See* Ex. H-59.

15.     On March 2, 2006, Trimaran informed Broadstripe of its and Highland Crusader's desire to retain Barrier Advisors, LP ("Barrier"), a financial advisory firm, on behalf of the IRN holders to perform financial and operational advisory services to assist in determining whether to support the Wave Sale or an alternative refinancing of the $196 million of existing debt under the Original Loan Facility. *See* Ex. H-19. On March 3, 2006, Trimaran and Highland Crusader engaged Barrier. *See* Ex. H-20, H-21, H-22; Fredette Depo. pp. 80:25-81:15.[16]

16.     Prior to its engagement, Barrier requested input from its employees as to the names of cable industry experts that Barrier should consider hiring to work on the engagement. Steven Tyler Nau ("Nau"), then a Barrier employee,[17] recommended William Shreffler ("Shreffler"), with whom Nau had previously worked at Cebridge Connections. *See* Nau Depo. pp. 20:17-22:15. Shreffler had no previous interactions with Highland Capital and no prior contact with any of the Highland portfolio companies. *See* Shreffler Depo. pp. 27:17-28:5. Aside from his recommendation of Shreffler, Nau had no involvement with the Barrier engagement. *See* Nau Depo. pp. 21:17-22:4.

17.     Trimaran and Broadstripe also began working to put together a refinancing alternative to the Wave Sale. Trimaran and Broadstripe contacted nine lending sources: Back Bay Capital, GoldenTree Asset Management, Jefferies, CSFB, Bear Stearns, Highland, Black Diamond, Morgan Stanley and Cerberus Capital to solicit proposals to refinance the Original Loan Facility as an alternative to consummating the Wave Sale. Seven of the nine institutions Trimaran and Broadstripe contacted expressed interest in making refinancing proposals. *See* Fredette Depo. pp. 123:22-127:13; Ex. H-24, H-25, H-26, H-27, H-28. Trimaran acted as a liaison between the

---

[16] Broadstripe agreed to pay the IRN holders' fees and expenses incurred in connection with the Barrier engagement pursuant to section 11B of the IRN Purchase Agreement. *See* Ex. H-5 at § 11B, H-23; Fredette Depo. pp. 286:20-289:25.

potential lenders (including Highland) and Broadstripe. *See* Ex. H-29, H-30, H-31, H-32. Trimaran also acted as the IRN holder contact point for discussions with Broadstripe's existing senior lenders. *See* Fredette Depo. pp. 82:6-84:12; Ex. H-29.

18.    By March 29, 2006, the Highland Lenders constituted "Majority Lenders" under the Original Loan Facility as a result of their purchases of senior debt. *See* Ex. H-9 at § 1.22(B) (Majority Lenders), H-33. The Highland Lenders' aggregate holdings in Broadstripe as of March 29, 2006 are set forth in Figure 5, below.

**Figure 5**

| Highland Lenders' Holdings as of March 29, 2006 | | |
|---|---|---|
| Holding | Amount | Percentage of Debt |
| Original Loan Facility (OpCo) | Approximately $103 million (out of $196 million) <br><br> - Institutional Lenders - $12.04 million; <br><br> - Retail Lenders - $91 million. | Approximately 52.6% |
| IRNs (Capital) | $53.4 million (Highland Crusader) out of approximately $212 million in accreted value of IRNs | Approximately 25% |
| Equity | *de minimis* (Highland Crusader) | *pro rata* share of membership units (*i.e.*, less than or equal to 2.5%) |
| Seats on Management Committee | None | N/A |

*See* Moore Decl. at ¶ 7; Ex. H-5 at ¶¶ 1, 5M; Ex. H-4 at ¶ 20; Complaint at ¶ 24; Fredette Depo. pp. 20:3-23:4.

19.    During March and April of 2006, Trimaran continued to act as a liaison between Broadstripe and Highland with respect to the Highland and other refinancing proposals. *See*, *e.g.*,

---

[17] Nau later joined Highland Capital in April 2006.

Fredette Depo. pp. 159:4-160:23; Ex. H-23, H-24, H-34, H-35, H-36, H-37, H-38.  The Highland financing proposal contemplated refinancing the Original Loan Facility's outstanding $196 million debt into a new $240 million senior secured first lien revolver, senior secured first lien term loan and secured second lien term loan.  *See*, *e.g.*, Ex. H-28, H-36, H-39, H-40.  At all times, Highland's negotiations with Broadstripe were conducted on an arms' length basis.  *See* Fredette Depo. pp. 135:23-137:7.

20.     On April 3, 2006, Barrier issued a draft report concluding that with an improvement in the markets and access to additional funds to grow organically and through acquisition, Broadstripe had a reasonable chance of returning enhanced value to the IRN holders compared with the Wave Sale.  *See* Ex. H-41. [18]  The IRN holders (including Highland Crusader and Trimaran) thus determined to support a refinancing of Broadstripe's Original Loan Facility rather than the Wave Sale.  *See* Walls Depo. pp. 45:5-46:1, 236:2-12; Fredette Depo. pp. 151:4-21.

21.     On April 7, 2006, Trimaran (holding 43% of the IRNs) and Highland Crusader (holding 25% of the IRNs) exercised their contractual rights under the IRN Purchase Agreement and together notified Broadstripe of their non-consent as IRN holders to the Wave Sale, and indicated their support for the Highland refinancing proposal.  *See* Ex. H-43; *see also* Ex. H-5 at ¶¶ 4D, 6AA, 6D.  Broadstripe voluntarily accepted the Highland proposal, which culminated in a refinancing of the Original Loan Facility on July 28, 2006.  On April 21, 2006, the Highland Lenders under the Original Loan Facility exercised their contractual rights as Majority Lenders and directed the agent under the facility not to consent to the Wave Sale.  *See* Ex. H-9 at § 1.19(c), H-44.  Also on or about July 28, 2006, Broadstripe terminated the Wave Sale. [19]  Through this date,

---

[18] Barrier provided the IRN holders with a further draft of its report on or about April 14, 2006.  Its findings were consistent with those contained in its April 3, 2006 report.  *See* Ex. H-42.

[19] Thereafter, on October 4, 2006, Wave commenced litigation against Broadstripe in Seattle, Washington, seeking

Highland held no seats on the Management Committee.  *See* Ex. H-45; Fredette Depo. pp. 20:3-22:6.

## E.  The July 2006 Refinancing

22.     On July 28, 2006, Broadstripe's Management Committee approved the refinancing of Broadstripe's Original Loan Facility of $196 million into new, syndicated senior secured first and second lien facilities, paid down unsecured obligations (to creditors other than the Highland Lenders) and pumped an additional $33.9 million of liquidity into Broadstripe for working capital and other corporate purposes.  *See* Scott Decl. at ¶ 4; Ex. H-45; H-46, H-47.  The sources, uses and some salient terms of the July 2006 Refinancing facilities are summarized as follows:

**Figure 6**

| Sources and Uses of July 2006 Refinancing | | | | |
|---|---|---|---|---|
| Debt | Amount of Proceeds | Use of Proceeds | Interest Rate | Maturity Date |
| First Lien Credit Facility | $146.5 million | $146.5 million to refinance Original Loan Facility | LIBOR plus 4% | June 30, 2011 |
| First Lien Revolver | $20 million | General corporate purposes | LIBOR plus 3.5% | June 30, 2011 |
| Second Lien Facility | $70 million | $50 million to refinance Original Loan Facility;  $1.9 million for payables including management fees owing to MDM Systems;  $4.2 million to refinance fees and expenses;  $13.9 million to provide Broadstripe with Working Capital | Tranche C - LIBOR and a 10% non-accreting PIK  Tranche D - 2% and a 13% non-accreting PIK | July 27, 2012 (as amended) |

Scott Decl. at ¶ 5; Ex. H-46, H-47.

---

specific performance and damages with respect to the Wave Sale.  *See* Case No. 06-2-32115 – 4SEA.  Notwithstanding the Wave litigation, the July 2006 Refinancing allowed Broadstripe to stay in business.  Without the July 2006 Refinancing, Broadstripe would have been required under the Fifth Amendment to virtually sell itself out of existence.  *See* Ex. H-9 at § 1.17 (adding new § 6.15 to Original Loan Facility).  *See* Fredette Depo. pp. 23:6-24:6.

23.     Immediately following the July 2006 Refinancing, the Highland Lenders still held no equity or Management Committee seats in Broadstripe. As of July 28, 2006, the composition of the Management Committee was as follows:

**Figure 7**

| Membership of Broadstripe Management Committee as of July 28, 2006 | Affiliation |
| --- | --- |
| William Phoenix | Trimaran/Caravelle |
| Andrew Heyer | Trimaran/Caravelle |
| Darryl Thompson | TSG Capital |
| Mark Inglis | TSG Capital |
| Cleveland Christophe | TSG Capital |
| Kelvin Westbrook | Broadstripe |

*See* Ex. H-45; Fredette Depo. pp. 20:3-22:6.  In addition, as of July 28, 2006, the Highland Lenders' holdings were as follows:

**Figure 8**

| Highland Lenders' Holdings as of July 28, 2006 | | |
| --- | --- | --- |
| Holding | Amount | Percentage of Aggregate Holdings |
| First Lien Facility | Approximately $103 million<br><br>- Institutional Lenders - Approximately $12 million;<br><br>- Retail Lenders - Approximately $91 million | Approximately 62% |
| Second Lien Facility (held by Institutional Lenders) | $20 million | 28.57% |
| IRNs (held by Highland Crusader) | $58.1 million | Approximately 25% |
| LLC Units | *de minimis* (Highland Crusader) | *pro rata* share of membership units (i.e., less than or equal to 2.5%) |

*See* Scott Decl. at ¶ 6; Moore Decl. at ¶ 6.

**F. September 2006: Shreffler Becomes CEO**

24.     On or about September 1, 2006, Broadstripe hired Shreffler to replace Westbrook as CEO.  *See* Ex. H-48.[20]

25.     The Complaint alleges that "[i]n September 2006, Highland caused Broadstripe to change its management in a manner beneficial to Highland."  Complaint at ¶ 38.[21]  There is no truth to the allegation.  It was Trimaran, not Highland, that communicated with Shreffler in connection with his CEO-related employment negotiations.  *See*, *e.g.*, Ex. H-51, H-52, H-53, H-54, H-55. Trimaran (along with its counsel, Sonnenschein) was also responsible for drafting Shreffler's employment agreement.  *See* Ex. H-56; Fredette Depo. pp. 196:19-200:6.  Since Highland Crusader possessed only *de minimis* equity in Broadstripe and no designees on the Broadstripe Management Committee in September 2006 (*see* Fredette Depo. pp. 20:3-22:6), Highland was incapable of "causing" (and did not cause) Broadstripe to do anything at that time.  Highland did agree with the Management Committee's decision to hire Shreffler and supported his vision to expand the company through acquisitions and organic growth.  *See* Walls Depo. pp. 52:18-53:1; 92:15-18.

26.     Also contrary to the allegations contained in the Complaint, Shreffler did not have "strong ties" to Highland.  In fact, Shreffler testified at his deposition that, prior to the Barrier engagement, he had *no* previous interactions with Highland and no contact with any of its portfolio companies.  *See* MSJ at ¶ 16, above.  *See* Shreffler Depo. pp. 27:17-28:5.  While Nau (a Barrier employee at the time) identified Shreffler to Barrier as a capable cable operator (*see* Complaint at ¶ 39) when Barrier was looking to hire an industry expert as a consultant for its engagement by the

---

[20] In accordance with the Barrier engagement letter, Barrier became entitled to a headhunter fee in an amount equal to 30% of Shreffler's first-year's salary because he was a Barrier consultant hired by Broadstripe within the 12-month period following Barrier's retention.  *See* Ex. H-21.

[21] In addition to being untrue, it is unclear what relevance the allegation is meant to have, since there have been no allegations by the Committee that Shreffler did anything wrong as CEO of Broadstripe.  Moreover, according to Shreffler, throughout his tenure as Broadstripe's CEO, Broadstripe always met its cash flow and/or EBITDA

IRN holders in early 2006, Nau had no involvement in hiring Shreffler to be Broadstripe's CEO. *See* Nau Depo. at Vol. I, pp. 21:3-22:15.

27.     The Complaint also alleges that "Highland then gave Kelvin Westbrook the title of Chairman" and "Mr. Westbrook reported . . . to the Highland controlled board."  Complaint at ¶ 40. Again, this allegation is verifiably wrong.  The Management Committee gave Westbrook the title of Chairman of Millennium Digital Media Systems (*i.e.*, not the board) and Chief Strategic Officer in September 2006 – at or about the same time that Shreffler was appointed Broadstripe CEO.  *See* Ex. H-57, H-58.  Also, documentary evidence clearly shows that Trimaran and its counsel were responsible for the discussions with Westbrook, not Highland.  *See* Ex. H-56.  As discussed above, while Highland agreed with the Management Committee's actions related to Westbrook, this was a period during which Highland Crusader possessed only *de minimis* equity and no seats on the Management Committee.  Moore Decl. at ¶ 7.

**G.  The October 2006 Restructure**

28.     At the time of the July 2006 Refinancing, Broadstripe (OpCo) was solvent, since the $157 million proceeds of the Wave bid plus the expected proceeds of between $87.7 million and $125 million resulting from a sale of the Mid-Atlantic System exceeded the estimated $196 million debt at the OpCo level.  *See* 11 U.S.C. § 101(32); Ex. H-13 at pp. 10-11; Fredette Depo. pp. 51:7-55:20.

29.     In contrast, since the combined proceeds of the sales would be insufficient to repay the IRN debt at Broadstripe (Capital) (*see* MSJ at ¶ 9; Fredette Depo. pp. 51:7-56:14), equity at the Broadstripe (HoldCo) level was worthless.  The July 2006 Refinancing contemplated a "second step" to reflect the economic reality that, at this point in time, the IRNs functionally were equity.

---

projections.  *See* Shreffler Depo. pp. 233:6-234:13; Ex. H-49, H-50.

*See* Fredette Depo. pp. 219:16-221:12.  The "second step" ultimately closed on October 26, 2006 (the "October 2006 Restructure").  Pursuant to the October 2006 Restructure, Broadstripe redeemed and retired the equity holdings of all of its equity holders other than Trimaran.  Contemporaneously, the existing IRN holders at Broadstripe (Capital) were admitted to Broadstripe (HoldCo) as "New Members" and purchased LLC Units in Broadstripe (HoldCo) for nominal consideration in the following percentages according to their *pro rata* holdings in the IRNs (Trimaran, which was both an equity holder and an IRN holder simply exchanged its equity for new LLC Units):

**Figure 9**

| Membership Interests as of October 26, 2006 | | | |
|---|---|---|---|
| Member Name | Percentage of IRN Holdings | LLC Units | Sharing Percentage |
| Caravelle Millennium Investment Corp. (Trimaran) | 42.86% | 4,286 | 42.86% |
| Highland Crusader Offshore Partners, L.P. (Highland Crusader) | 25.03% | 2,503 | 25.03% |
| Madeleine, L.L.C. (Cerberus) | 20.76% | 2,076 | 20.76% |
| Credit Suisse International | 7.71% | 771 | 7.71% |
| Bear Stearns Credit Products Inc. | 3.65% | 365 | 3.65% |

*See* Ex. H-59 at ¶ 11.1, H-60; Fredette Depo. pp. 249:15-253:17.

30.     Trimaran and its counsel, Sonnenschein, drafted the Third Amended and Restated LLC Agreement of Millennium Digital Media Holdings, L.L.C. dated October 26, 2006 (the "LLC Agreement") and other documentation related to the October 2006 Restructure.  *See*, *e.g.*, Ex. H-56, H-61, H-62, H-63, H-64.  For example, while a full conversion of the IRNs was originally contemplated, only a partial conversion was ultimately effected after Trimaran and its advisors determined that such a conversion would create adverse tax consequences for Broadstripe and its legacy equity holders (*i.e.*, not Highland Crusader).  *See*, *e.g.*, Ex. H-65; Fredette Depo. pp. 193:19-196:18; Walls Depo. 250:13-251:1.

31.     Pursuant to section 3.3 of the LLC Agreement, Trimaran and Highland Crusader were permitted to designate three and two persons, respectively, to the new seven-person Management Committee which was then constituted as noted in the chart below.  The balance of the Management Committee was comprised of Shreffler and Westbrook.

**Figure 10**

| Members of Broadstripe Management Committee as of October 26, 2006 | Affiliation |
| --- | --- |
| Jay Bloom | Trimaran/Caravelle |
| Darren Fredette | Trimaran/Caravelle |
| David Millison | Trimaran/Caravelle |
| David Walls | Highland Crusader |
| Carl Moore | Highland Crusader |
| William Shreffler | Broadstripe |
| Kelvin Westbrook | Broadstripe |

*See* Ex. H-59 at § 3.3.

32.     Thus, only *after* the October 2006 Restructure did Highland Crusader receive its first seats on Broadstripe's seven-member Management Committee, and even then, Highland Crusader's designees were outnumbered 5-2 (by Trimaran's three members and Shreffler and Westbrook).  *See* Fredette Depo. pp. 20:3-22:6.  On November 14, 2006, upon motion by Bloom and second by Westbrook, the Management Committee created an executive committee (the "Executive Committee") and appointed Walls, Fredette and Shreffler to serve on it.  *See* Ex. H-66.  The Executive Committee had no authority to dictate Management Committee decisions, and Highland only possessed one of the three seats on the Executive Committee.  To the extent that there was anything of import to act on, the Executive Committee would present it to the Management Committee for consideration.  *See* Shreffler Depo. pp. 72:3-73:17; Fredette Depo. pp. 257:23-260:16.

**H. April–September 2007**

    **(i)   Comcast Sale and Termination of Westbrook's Employment**

33.      Having accomplished the July 2006 Refinancing, the October 2006 Restructure, and the hiring of Shreffler as CEO, Broadstripe's next steps were to pursue efforts to divest its Mid-Atlantic assets and to begin to carry out its growth plan.

34.      On April 23, 2007, Comcast Corp. ("Comcast") executed a definitive agreement to purchase Broadstripe's Mid-Atlantic system in Anne Arundel County, Maryland for approximately $115 million. *See generally* Ex. H-67. The Comcast deal was subject to approval by the Federal Trade Commission (the "FTC"). *See* Ex. H-67 at §§ 4.4, 5.7 and Article 9; Fredette Depo. pp. 272:24-274:3.

35.      The Comcast deal was projected to be a positive development, as it would have left Broadstripe well-positioned to begin its growth phase. The sale of the Mid-Atlantic System would not only free the company of its most challenged System, but would infuse $115 million into Broadstripe to allow it to, among other things, pay down its senior secured debt and deleverage Broadstripe's balance sheet. *See* Ex. H-4 at ¶ 29; Fredette Depo. pp. 233:6-234:7.

36.      On or about May 4, 2007, with the closing of the Comcast sale on the horizon, Trimaran's Darren Fredette, acting on behalf of the Management Committee (still consisting of three Trimaran seats, two Highland seats, Shreffler and Westbrook) informed Kelvin Westbrook that Westbrook's employment would terminate following the closing of the Comcast sale. Fredette and Westbrook agreed to an orderly transition in which Westbrook would be retained to shepherd Broadstripe through the closing of the sale. *See* Ex. H-68; Fredette Depo. pp. 261:5-263:17. Broadstripe and Westbrook memorialized the transition in the form of a Separation Agreement and General Release dated June 27, 2007. *See* Ex. H-69; Fredette Depo. pp. 263:18-264:19.

37.     The rationale for keeping Westbrook in charge of the Comcast deal was that Westbrook had key personal relationships with Comcast's founders (including Brian Roberts – Comcast's CEO, and Roberts' father, who was Comcast's former Chairman). *See* Walls Depo. pp. 245:3-20; Shreffler Depo. p. 206:25-207:11; Fredette Depo. pp. 228:19-230:14. Indeed, as a result of these relationships, Broadstripe had been receiving ongoing tangible benefits in the form of approximately $200,000 per month in programming discounts. *See* Walls Depo. pp. 245:21-246:15; Shreffler Depo. pp. 54:15-55:5; Fredette Depo. pp. 229:15-230:22; Ex. H-4 at ¶ 28. In addition, based on Comcast's $115 million purchase price for the Mid-Atlantic System, Westbrook had a $1 million to $1.250 million incentive to close the Comcast deal as quickly as possible (*i.e.,* the sooner the closing, the higher the incentive). *See* Ex. H-58 at ¶ 9; Fredette Depo. pp. 242:17-244:6.

38.     As discussed above, the Comcast APA, which was entered into on April 23, 2007, had always been subject to approval by the FTC. *See* Ex. H-67 at §§ 4.4, 5.7 and Article 9; *see also* MSJ at ¶ 34. Unfortunately, on September 7, 2007, Comcast chose to terminate the Comcast APA pursuant to section 11.1(e) thereof following a regulatory holdup related to a second "unexpected (and quite lengthy) request for data" from the FTC. *See* Ex. H-70; Fredette Depo. pp. 272:24-274:12. As explained by Walls, Comcast informed Broadstripe that Comcast "would not entertain an additional request as this was over and above the information the [sic] customarily provide for small acquisitions such as this. Millennium and counsel offered to assist in any way but Comcast chose to walk." *See* Ex. H-4 at ¶ 28; H-71.[22]

---

[22] As is the case throughout the Complaint, the Committee ignores the facts and tries to paint Highland as the controlling force during the 2006 and 2007 time periods. The Complaint alleges that "Highland negligently *caused* Broadstripe to retain Mr. Westbrook when it became clear that Mr. Westbrook was *interfering* with the Comcast sale." Complaint at ¶ 40 (emphasis added). Again, since the Highland Crusader designees comprised a *minority* of the Management Committee at this time, they could not "cause" it to do anything. *See, e.g.,* Ex. H-72, H-73; Moore Decl. at ¶ 10. Moreover, the Committee is incapable of producing any evidence that Westbrook was "interfering" with the sale. Indeed, as discussed in ¶ 37 above, Westbrook was economically *incentivized* to get the Comcast sale closed. *See* Ex. H-59 at ¶ 9. While it is unfortunate that Comcast exercised its contractual right to terminate the sale, this cannot be

39.     Following Comcast's termination of the Mid-Atlantic sale, Westbrook left Broadstripe.[23]

### (ii)   May 2007–December 2007:  Trimaran Approaches Highland to Sell Its IRN Stake

40.     On or about May 31, 2007, with the Comcast sale pending and Broadstripe's future looking bright, Trimaran approached Highland Crusader seeking to sell Trimaran's entire IRN holdings and LLC Units.  *See* Walls Depo. pp. 233:24-234:13; Fredette Depo. pp. 266:17-267:17.[24]

41.     Trimaran's stated reason for selling its IRN holdings was that the CDO with which the IRNs invested was winding down, and Trimaran needed to monetize its IRN holdings to obtain a $9 million deferred management fee.  Trimaran also believed the price Highland Crusader was willing to pay to be attractive.  *See* Walls Depo. pp. 234:5-13; Fredette Depo. pp. 267:18-268:23.

42.     Highland Crusader purchased Trimaran's IRN holdings for approximately $65 million in cash, thus increasing Highland Crusader's stake in Broadstripe's long-term future.  *See* Fredette Depo. pp. 274:23-275:8; Wylie Depo. pp. 35:4-23.

43.     Trimaran conditioned the IRN sale on Highland Crusader causing Broadstripe to enter into an indemnification agreement and a general release[25] with Trimaran.  *See generally* Ex. H-74.  The Indemnification Agreement was negotiated by, among others, Broadstripe's counsel,

---

laid at the feet of the Highland defendants.

[23] The Complaint alleges that "[o]nly after the Comcast deal died and the damage could not be repaired, did Highland terminate Mr. Westbrook's employment.  Indeed, when it finally did so, it was unilaterally and without any approval of others – demonstrating Highland's doubtless control of all management and personnel issues."  Complaint at ¶ 40.  The allegation is demonstrably false.  With the Comcast deal having terminated, Westbrook had no ongoing role with Broadstripe.  *See*, *e.g.*, Walls Depo. pp. 57:10-57:17.  Indeed, Westbrook's *Separation Agreement*, negotiated by Trimaran and its counsel included a formula based on the sale or failed sale of the Mid-Atlantic System for calculation of his termination date.  *See* Ex. H-59 at ¶ 1.  While Dave Walls (a designee of Highland Crusader) delivered the message to Westbrook that he need not physically remain at Broadstripe's premises following the termination of the Comcast deal, the decision to terminate Mr. Westbrook's employment had been made by the Management Committee several months earlier.  *See* MSJ at ¶¶ 36.

[24] Earlier, on March 21, 2007, Highland Crusader had purchased Cerberus' approximately $53 million in IRN holdings for approximately $30 million, bringing its economic interest in the IRNs from approximately 25% to 46%.  Moore Decl. at ¶ 8.

[25] The Highland defendants, the Debtors and Trimaran have all searched their files, but have been unable to locate an

Bruce Beard, and was structured to offer similar protections to those Trimaran already possessed under the LLC Agreement and the IRN Purchase Agreement. *See* Ex. H-75, H-76, H-77, H-78; Moore Depo. pp. 149:9-156:1. On these bases, Broadstripe's Management Committee – including Shreffler and Westbrook – evaluated and authorized the sale and Indemnification Agreement. *See* Moore Depo. pp. 150:1–19.

44. The trade closed on August 31, 2007, and increased Highland Crusader's IRNs holdings from approximately 46% to approximately 89%.[26] *See* Ex. H-79.

45. Pursuant to Section 3.3(a)(ii)(A) of the LLC Agreement, and as a result of the IRN trade, Trimaran's membership (*i.e.*, three seats) on the Management Committee ended at or about this time. *See* Shreffler Depo. pp. 76:1-14; Fredette Depo. pp. 301:8-17. As discussed in ¶ 39, above, at about this time, Westbrook also departed Broadstripe. *See*, *e.g*., Shreffler Depo. pp. 58:10-13. This was the <u>first time</u> that Highland Crusader ever held a majority of seats on the Management Committee.

**Figure 11**

| Members of Broadstripe Management Committee as of September 2007 | Affiliation |
| --- | --- |
| David Walls | Highland Crusader |
| Carl Moore | Highland Crusader |
| William Shreffler | Broadstripe |

Moore Decl. at ¶ 10.[27]

---

executed release in favor of Trimaran.

[26] While Trimaran's LLC Units (*i.e.,* the equity interests at HoldCo) were intended to be "stapled to" and traded along with the Trimaran's IRN holdings, the LLC Unit portion of the Trimaran trade never settled, since such transfer would have triggered a change in control, which, among other things, might have resulted in adverse tax consequences to Broadstripe and required Broadstripe to obtain the consent of up to 30 of its franchise authorities. The trade of the LLC Units also required consent of Broadstripe's lenders, and consent was withheld by Black Diamond for several months. Therefore, Trimaran continues to hold 42.86% of the LLC Units. *See, e.g.,* Ex. H-4 at ¶ 20; Ex. H-80. Notwithstanding this fact, since the closing of the IRN trade, Trimaran has typically agreed to vote its LLC Units as requested by Highland Crusader. Moore Decl. at ¶ 9.

[27] As a result of Westbrook's and Trimaran's departure from the Management Committee and pursuant to the terms of

## I. September 2007–February 2008: Pursuit of Acquisition Opportunities by Broadstripe

46.      Despite the blow dealt by Comcast's termination of the Mid-Atlantic sale, in September of 2007, Broadstripe continued to pursue its growth strategy in an effort to "increase [its] competitiveness and overall stability."  *See* Ex. H-4 at ¶ 30.  Under Shreffler's leadership (both before and after Trimaran exited the picture), Broadstripe engaged in acquisition-related discussions with, among others, Suddenlink Communications (formerly Cebridge Connections), James Cable, Vista III Media, and Atlantic Broadband.  Wylie Depo. pp. 30:19-31:14.[28]

47.      Beginning in October 2007, Highland's lending arm – Highland Financial Corp. – engaged in discussions with Broadstripe regarding a possible financing of the James Cable transaction.  Unsigned draft proposal letters and terms sheets regarding the terms of a possible financing were exchanged between Highland and Broadstripe beginning on October 22, 2007.  *See* Ex. H-1, H-2, H-3.  The draft proposal letter provided by Highland to Broadstripe prior to execution of the contained the following language:

> . . . This letter (the "*Proposal Letter*") establishes terms under which we *might* provide the Company [Broadstripe Corp., LLC] a senior secured credit facility . . . Based upon information known to us today concerning the Transaction, we are pleased to provide you with this *non-binding letter* and general outline regarding the proposed Credit Facility . . .
>
> *This letter is a non-binding proposal, to be used as a basis for continued discussions and due-diligence, and does not constitute a commitment of HFC or any lender, or an agreement to deliver such a commitment.  If delivered, such a commitment would be subject to complete due diligence by HFC as well as any other lender.*

---

the LLC Agreement, Highland had the ability to appoint additional members of the Management Committee.  At the suggestion of Moore and Walls, the Management Committee determined to investigate the possibility of filling the seat with an independent director.  *See* Ex. H-81, H-82, H-83, H-93; Walls Depo. pp. 198:21-200:19; Moore Depo. pp. 123:9-125:17; MSJ at ¶ 59, below.

[28] With the exception of the James Cable discussions, none of the discussions with any other potential acquisition target resulted in a signed asset purchase agreement.  While Broadstripe did enter into a non-binding letter of intent above for the purchase of certain assets from Suddenlink, the matter did not proceed to a signed APA.  Wylie Depo. pp. 41:13-43:12.  Unlike the James Cable transaction, no litigation resulted from the failed transaction.

> Please note, moreover, that the terms and conditions of the proposed Credit Facility are not limited to those set forth herein or in Attachment A. Those matters that are not covered or made clear herein or in Attachment A are subject to mutual agreement of the parties. *The terms and conditions of this letter may be modified only in writing.*
>
> *. . . If delivered, a commitment would be subject to the absence of any material adverse condition in respect of the Borrower or financial or market conditions generally. . . .*
>
> *. . . This proposal letter sets forth the entire agreement between the parties with respect to the matters addressed herein and supersedes all prior communications, written or oral, with respect hereto. . . .*

*See* Ex. H-1, H-2, H-3.

48. On October 31, 2007, fully cognizant that it had no financing commitment in hand, Broadstripe's discussions with James Cable culminated in a signed APA (the "<u>James Cable APA</u>") with a purchase price of approximately $110 million, subject to adjustments.

49. Not only was there no promise made or a written financing commitment signed prior to the execution of the James Cable APA (*see* Wylie Depo. pp. 48:3-15; 102:22-103:2), but, in fact, it was not until November 8, 2007 (eight days *after* signing the James Cable APA), Broadstripe, through Wylie, finally transmitted its counsel's markup of the proposal letter and term sheet back to Highland. *See* Ex. H-1, H-2, H-3. This proves that Broadstripe and Highland never reached agreement on the financing of the James Cable deal prior to Broadstripe's execution of the James Cable APA. Indeed, as testified to by Broadstripe's CFO, Mike Wylie, Highland *never* committed to finance the deal. Wylie Depo. pp. 48:3-15; 102:22-103:2.

**J. March 2008–December 2008:  Market Meltdown**

50.     Unfortunately, like millions of businesses, banks and consumers worldwide, Broadstripe began confronting liquidity issues during the first quarter of 2008.  *See*, *e.g.*, Ex. H-84, H-85; Wylie Depo. pp. 109:7-24.

51.     Though they too were being affected by the economic meltdown, the Highland Lenders continued to support Broadstripe to the extent they could.  The Highland Lenders investigated a number of financing scenarios, in an effort to refinance Broadstripe's debt and fund the James Cables and Suddenlink deals.  *See*, *e.g.*, Ex. H-86, H-87, H-88.  Unfortunately, none of the scenarios was commercially feasible to Highland.  Dondero Depo. pp. 63:10-23; 77:5-9.

52.     On February 20, 2008, Highland Crusader filled one of the vacant seats on the Management Committee with Nau, bringing its membership on the now four-seat Management Committee up to three people.  Nau possessed experience in the cable industry as a result of his prior employment at Cequel Communications.  *See* Nau Depo. pp. 10:8-22; Ex. H-89.

53.     In March 2008, certain of the Highland First Lien Lenders agreed to an amendment of the First Lien Facility to provide Broadstripe with $10 million of new revolver availability under the First Lien Facility.  *See* Ex. H-90.  The amendment also provided for up to $55 million in accordion financing for the James Cable transaction.  *See* Ex. H-91; Walls Depo. pp. 254:11-14.  No lender under the First Lien facility (including the Highland Lenders) was obligated to provide the $55 million in accordion financing to finance the James Cable transaction.  *See* Ex. H-91 at ¶ 6. Unfortunately, Black Diamond – which possessed enough First Lien debt to give it a blocking position – had on several occasions taken an obstructionist position with respect to consents and amendments.  *See* Walls Depo. pp. 190:25-191:21; Wylie Depo. pp. 84:12-85:13; Fredette Depo. pp. 208:20-209:15.  Here, too, Black Diamond was refusing to consent to the amendment.  *See* Daugherty Depo. pp. 244:20-245:2; Walls Depo. pp. 193:7-15; Nau Depo. pp. 153:6-25.  As a

result, the Highland Lenders were forced to actually buy out Black Diamond's approximately $64.4 million position at a price of $0.98375/dollar prior to being able to pass the amendment. *See* Ex. H-8, H-92; Walls Depo. pp. 192:2-5; Daugherty Depo. pp. 244:10-19. This dramatically increased the size of Highland's First Lien holdings. As shown in the table below, as of March 17, 2008, the Highland defendants had the following positions with respect to Broadstripe:

**Figure 12**

| Highland Lenders' Holdings as of March 17, 2008 | | |
|---|---|---|
| Holding | Amount | Percentage of Aggregate Holdings |
| First Lien Facility | Approximately $173 million<br><br>- Institutional Lenders - Approximately $39 million;<br><br>- Retail Lenders - Approximately $134 million | Approximately 98.1% |
| Second Lien Facility (held by Institutional Lenders) | $62 million | Approximately 89% |
| IRNs (held by Highland Crusader) | $313.46 million | Approximately 89% |
| LLC Units | N/A | Approximately 46% (Highland Crusader), plus membership units granted under IRN Purchase Agreement |
| Seats on Management Committee | Three seats out of four. | N/A |

*See* Scott Decl. at ¶ 8; Moore Decl. at ¶ 7; Ex. H-93.

54. Also in March 2008, the Management Committee authorized Shreffler and Wylie to seek and explore additional sources of financing and to meet with potential financing sources for the purpose of financing James Cable and other acquisitions. *See* Shreffler Depo. pp. 103:19-22.

55. During April and May 2008, Shreffler and Wylie worked with Nau, as well as with brokers DH Capital and Waller Capital to set up meetings with potential financing sources,

including TA Associates, Warburg Pincus and Providence Equity. *See*, *e.g.*, Ex. H-94, H-95, H-96; Shreffler Depo. pp. 119:7-120:6; Nau Depo. Vol. II, pp. 207:9-208:5. A number of financing alternatives were discussed, including creating a new management company structure to attract outside financing for a possible James Cable acquisition or reorganizing Broadstripe's corporate structure by separating the challenged Mid-Atlantic System assets from the accreting Central and Northwest System assets and allowing new investors to invest into Central and Northwest Systems alone. *See* Ex. H-93; Shreffler Depo. pp. 121:16-122:20. Although certain of the meetings resulted in informal indications of possible interest, none progressed beyond that. *See* Shreffler Depo. pp. 125:2- 127:7, 218:9-219:24.

56.     On April 16, 2008, Broadstripe terminated the James Cable APA. *See* Ex. H-97. Litigation ensued, with James Cable suing both Broadstripe and Highland in the Delaware Chancery Court on April 24, 2008 (the "Delaware Chancery Action"). *See* C.A. No. 3637-VCL (Del. Ch. Ct.).

57.     In that litigation, James Cable alleged, among other things, that the Highland defendants had orally committed to finance the James Cable sale, and that James Cable had agreed to the deal in reasonable reliance on the Highland defendants' alleged financing commitment. James Cable asserted claims against the Highland defendants for, among other things, tortious interference, alter ego theories, and oral inducement. *See* Ex. H-98. The Highland defendants disputed the James Cable allegations, and filed a motion to dismiss the claims. *See* Ex. H-99, H-100. As discussed at ¶¶ 71-73, below, on June 11, 2009, Vice Chancellor Lamb ruled on Highland's motion and dismissed Highland from the James Cable litigation in its entirety. James Cable did not appeal the decision.

58.     Although not announced publicly until late July, in May of 2008, Shreffler notified Nau that he had decided to resign as CEO of Broadstripe.[29]  *See* Ex. H-101; Shreffler Depo. pp. 18:5-16; 127:10-12.  He had joined Broadstripe with an intention to grow the company through acquisition (and to garner personal upside through equity ownership).  *See* Shreffler Depo. pp. 197:22-198:11.  While he became frustrated at Broadstripe's inability to make significant acquisitions without Highland's funding, he did not blame Highland.  Rather, he understood that as a result of the market collapse, the Highland Lenders were simply not in a position to fund deals of this magnitude.  *See* Shreffler Depo. pp. 134:2-12.

59.     During the spring and summer of 2008, the Management Committee continued to evaluate potential candidates for an independent director position.  Given the economic climate and Broadstripe's liquidity issues, Kevin Dowd ("Dowd") was recommended to the Management Committee by certain individuals at Highland that had worked with Dowd on other matters, and knew him to be effective in distressed and turnaround situations.  *See*, *e.g.*, Ex. H-102; Daugherty Depo. pp. 93:23-94:19; Moore Depo. pp. 122:25-125:11.  Dowd is a principal in his own restructuring advisory firm, The Berkeley Square Group LLC, and has over 30 years of experience in restructuring and holding operating management positions in distressed businesses across a wide variety of industries.  *See* www.//bsqg.com/chairman.php.  On July 11, 2008, Kevin Dowd joined the Management Committee as an independent member.

---

[29] Shreffler's resignation became official effective July 15, 2008, following which he stayed on as a consultant while Broadstripe looked for a new CEO.

**Figure 13**

| Members of Broadstripe Management Committee as of July 11, 2008 | Affiliation |
|---|---|
| David Walls | Highland Crusader |
| Carl Moore | Highland Crusader |
| Steven Tyler Nau | Highland Crusader |
| Kevin Dowd | Independent |
| William Shreffler | Broadstripe |

*See* Ex. H-103.

60.     Also in July 2008, Broadstripe determined that it needed another cash infusion.  Prior to entering into an amendment with the second lien lenders to provide the additional liquidity, the Management Committee determined that it would be prudent to hire DH Capital to study the loan market and ensure that the amendment was being offered on terms favorable to Broadstripe.  *See, e.g.*, Ex. H-103, H-104.  On the basis of its study, the Management Committee concluded that the terms of the amendment were superior to those Broadstripe could obtain elsewhere.  *See* Moore Depo. at 148:15-24; Ex. H-105, H-106.  The required lenders under the Second Lien Credit Facility agreed to an amendment whereby the Institutional Lenders would provide up to $17.25 million in financing under certain conditions.  *See generally* Ex. H-107.  On July 21, 2008, Broadstripe entered into the amendment. *See* Ex. H-108.

61.     That same day (July 21, 2008), Broadstripe drew down $4.05 million.  Scott Decl. at ¶ 9.  On August 12, 2008, Broadstripe drew down an additional $5 million.  Scott Decl. at ¶ 9.[30] Following the draws by Broadstripe, the Highland defendants had the following positions with respect to Broadstripe:

---

[30] In connection with the July 21, 2008 amendment of the Second Lien Credit Agreement, the Highland Lenders received an original issue discount ("OID") of 9% on each borrowing made under the amendment on and after July 21, 2008.  Moore Decl. at ¶ 11.  This OID was designed to permit an increase in the interest rate under the Second Lien Credit Agreement without having to increase the interest rate under the First Lien Credit Agreement, which would

**Figure 14**

| Highland Lenders' Holdings as of August 12, 2008 | | |
|---|---|---|
| Holding | Amount | Percentage of Aggregate Holdings |
| First Lien Facility | Approximately $173 million<br><br>- Institutional Lenders - Approximately $39 million;<br><br>- Retail Lenders - Approximately $134 million | Approximately 98.3% |
| Second Lien Facility (held by Institutional Lenders) | $71.05 million | Approximately 90% |
| IRNs (held by Highland Crusader) | $313.46 million | Approximately 92.3% |
| LLC Units | N/A | Approximately 46% (Highland Crusader), plus membership units granted under IRN Purchase Agreement |
| Seats on Management Committee | Three seats out of four. | N/A |

Scott Decl. at ¶ 9; Moore Decl. at ¶ 7; Stuecheli Decl. at ¶ 3; Ex. H-109.

62.     These additional loans were made by the Second Lien Lenders for working capital needs and to act as a liquidity bridge to provide Broadstripe with liquidity to sell South Lyon, a small non-core subscriber system.  *See* Moore Decl at ¶ 12; Ex. H-110, H-111.  Unfortunately, Broadstripe was unable to sell South Lyon and so no proceeds were received.  Moore Decl. at ¶ 12.

63.     Broadstripe continued to have liquidity issues into the third quarter of 2008.  The Management Committee, upon certain of the Highland Lenders' recommendation, hired Gustavo Prilick ("Prilick") as a consultant.  Prilick was a crisis manager that certain of the Highland Lenders had worked with in the past on HySky Communications, L.L.C. and SunCom Wireless Holding workouts and whose performance had impressed them.  *See* Ex. H-109; Moore Depo. pp. 135:24-138:21; Daugherty Depo. pp. 41:12-42:24; Dondero Depo. pp. 86:9-88:3.

---

otherwise have been required under the First Lien credit documents.  Moore Decl. at ¶ 11.

64.     As discussed above, Shreffler had informed the Management Committee in May 2008 of his intention to resign as CEO of Broadstripe.  *See* MSJ at ¶ 58, above.  While Shreffler was willing to enter into a transition agreement to stay with Broadstripe until a new CEO could be found, there was a pressing need to find a suitable CEO – one with experience dealing with distressed companies.  *See* Shreffler Depo. pp. 156:9-158:5; Nau Depo. Vol. III, pp. 223:8-224:7.

65.     In a July 25, 2008 e-mail from Timothy Lawler ("Lawler") of Highland Capital to Carl Moore ("Moore"), Lawler informed Moore of the preference of Jim Dondero ("Dondero"), Highland Capital's managing partner, that Broadstripe get Prilick involved in working with the company.  *See* Ex. H-112.  Notwithstanding Dondero's apparent direction, however, Broadstripe did not immediately hire Prilick for any purpose but rather completed an extensive vetting process assisted by Lawler and his team.  Only after reviewing dozens of candidates' resumes, and conducting multiple in-person interviews, did Broadstripe determine to retain Prilick.  *See* Ex. H-113.  Even then, Prilick was hired first (on August 7, 2008) as a *consultant*.  Only later (on or about September 5, 2008) was Prilick hired as CEO.  *See* Ex. H-109, H-114, H-115, H-116.

66.     On October 21, 2008, Walls resigned from Highland Capital as a result of a "reduction in force" at Highland Capital and contemporaneously gave up his seat on the Management Committee.  *See* Walls Depo. pp. 30:7-15; Daugherty Depo. pp. 61:8-16.  Following Wall's resignation from the Management Committee, it was comprised of two Highland Crusader designees (Nau and Moore) and two non-Highland Crusader designees (Dowd and Prilick).

Figure 15

| Members of Broadstripe Management Committee as of October 21, 2008 | Affiliation |
|---|---|
| Carl Moore | Highland Crusader |
| Steven Tyler Nau | Highland Crusader |
| Kevin Dowd | Independent |
| William Shreffler | Broadstripe |

*See* Moore Decl. at ¶ 10. During this same time period, Broadstripe retained and worked with

Stephen Dube of CXO as financial/restructuring advisors and Gardere Wynne Sewell, LLP as

insolvency counsel to assist with a potential restructuring. *See* Ex. H-4 at ¶ 34, H-117; Nau Depo.

Vol. II, pp. 223:11-225:12.

      67. On November 19, 2008, Nau resigned from the Management Committee when he

was assigned to work on a different project by Highland. *See* Nau Depo. Vol. II p. 289:10-20;

Daugherty Depo. pp. 84:17-85:7. From that time until Broadstripe's bankruptcy filing, the

Management Committee only had three members (Moore (Highland Crusader), Prilick

(Broadstripe), and Kevin Dowd (independent)).

Figure 16

| Members of Broadstripe Management Committee as of November 19, 2008 | Affiliation |
|---|---|
| Carl Moore | Highland Crusader |
| Kevin Dowd | Independent |
| Gustavo Prilick | Broadstripe |

*See* Ex. H-115.

      68. On November 28, 2008, Broadstripe received a forbearance from its First Lien

Lenders (including the Highland Lenders) regarding a principal payment that was due to them so

that it could make payments to certain trade creditors. *See* Ex. H-4 at ¶ 33. Broadstripe also

received a forbearance from its Second Lien Lenders (including the Highland Lenders) from the

triggering of the Second Lien Credit Agreement's cross-default provisions. *See generally* Ex. H-118.

69.     In addition, during 2008, while Broadstripe engaged in settlement negotiations with James Cable in connection with James Cable's lawsuit in the Delaware Chancery Court, negotiations ended after Broadstripe's summary judgment motion in the Wave litigation was denied. The Highland lenders had been exploring solutions to help fund a James Cable settlement (and, in fact, an agreement had been reached in principle to fund the purchase of James Cable at a price of $95 million). Following denial of the Wave summary judgment motion, however, the Highland lenders determined that they were unwilling to sink additional funds into Broadstripe with the overhang of the continuing Wave litigation. *See* Daugherty Depo. pp. 159:20-160:3.

70.     Broadstripe (OpCo and Capital) filed for bankruptcy protection in the Bankruptcy Court for the District of Delaware on January 2, 2009. *See* Daugherty Depo. pp. 164:20-166:14; Ex. H-4 at ¶¶ 13-14.

71.     As discussed above at ¶ 57, Vice Chancellor Lamb heard oral argument on the Highland defendants' motion to dismiss the James Cable lawsuit during November 2008, but had not yet ruled when Broadstripe filed for bankruptcy protection. During oral argument, V.C. Lamb made the following statement on the record to counsel for James Cable:

> . . . when sophisticated people - - and I take it your clients are sophisticated and they were represented by sophisticated lawyers when they signed this contract - - when they deal this way and then come into court later and want to sue a lot of people that they didn't sign contracts with, it's the sort of disruption in what ought to be sort of the normal flow of commerce that courts are somewhat wary or chary of permitting. . . ."

*See* Ex. H-119 at 67:23-68:7.

72.     On January 20, 2009, James Cable filed a motion to lift the automatic stay to continue to pursue its litigation against Broadstripe in the Delaware Chancery Court. [D.I. 97.]

While the Debtors objected to the lift stay motion [D.I. 207], the Highland defendants filed a response seeking the Bankruptcy Court's clarification that, regardless of whether the case remained stayed against the Debtors, the James Cable litigation was not stayed as against the Highland defendants.  [D.I. 206, 209.]  This Court ultimately denied the lift stay motion, but did clarify that the James Cable litigation was not stayed as against the Highland Defendants.  [D.I. 281.]  On March 6, 2009, the Highland defendants filed a copy of the Bankruptcy Court's order with the Delaware Chancery Court.

73.     On June 11, 2009, the Delaware Chancery Court issued a memorandum and order granting the Highland defendants' motion to dismiss, and dismissing the Delaware Chancery Action as against the Highland defendants in its entirety.  *See James Cable,* 2009 WL 1638634 (Del. Ch. Ct. June 11, 2009).  The memorandum and order contains the following rulings by V.C. Lamb:

> The claims in James Cable's amended complaint spring from Highland's alleged obligation to provide funding for the transaction at issue.  The allegations against Highland are . . . inconsistent with the structure of the APA, which was heavily negotiated by sophisticated parties.

*James Cable* Decision at *3.

> . . . James Cable does not adequately allege facts to support an inference that Highland had any obligation to fund.  To the contrary, *the amended complaint and the exhibits attached thereto show that the parties negotiated a transaction where the responsibility to arrange financing fell on Broadstripe's shoulders.*

*Id.* at *5 (emphasis added).

> . . . the amended complaint alleges that the LOI "identified Highland Capital as both the primary investor and the source of answers to questions about the financing."  This language does not reflect a promise.  It does not convey an intent to act in connection with the funding of the transaction.  At most, it creates a promise to answer questions (a promise that is not alleged to be breached) and is a representation that Highland is Broadstripe's primary investor (a claim James Cable does not dispute).

*Id.* at *15.[31]

> . . . the amended complaint alleges that Highland representatives "pitched themselves for purposes of a transaction with James [Cable], and made representations about the advantages of doing a transaction with a company controlled by Highland." These allegations also fail to identify a promise because they fail to identify any manifestation of an intention to act or any commitment by Highland. This allegation does not identify a promise by Highland, but merely contains an admittedly true statement about the ownership structure of Broadstripe and an allegation that Highland touted its financial capabilities.

*Id.* at *6.

> While not necessary for the court's determination … the court notes that *the amended complaint and its exhibits strongly suggest that James Cable could not have reasonably relied on a promise by Highland to fund.* The buyer's ability to pay the purchase price is generally the single most important concern of a seller. In sophisticated merger and acquisition activity with large amounts of money at stake, such as here, the parties typically reduce even seemingly insignificant matters to writing. . . . *If James Cable could have convinced Highland to fund the deal, Highland's obligations would likely have been extensively negotiated and reduced to writing with a substantial amount of detail.*

*Id.* at *6.

> . . . *James Cable has failed to adequately allege that Highland engaged in any wrongdoing . . . .*

*Id.* at *7 (emphasis added). Despite Vice Chancellor Lamb's ruling (and the language of the draft proposal letters and CFO Wylie's deposition testimony that Highland never agreed to finance the James Cable deal), the Committee continues to press ahead with this lawsuit. Exactly like James Cable did in the Chancery Court litigation, however, the Committee has failed to allege any claims or meritorious causes of action which are sustainable against Highland.

---

[31] Incidentally, the Complaint makes the same allegation regarding the LOI. Complaint at ¶ 47.

# CONCLUSION

Based upon the summary judgment facts set forth herein, and the dispositive controlling authority cited by Highland in the memorandum of law filed contemporaneously herewith, Highland respectfully requests the Court (i) enter summary judgment on the entirety of the Complaint with prejudice, awarding costs and expenses, and (ii) grant such other and further relief as is just and proper.

Date:   September 10, 2009
       Wilmington, Delaware

| | |
|---|---|
| ___/s/ Richard W. Riley___ | ___/s/ David B. Stratton___ |
| Richard W. Riley (No. 4052) | David B. Stratton (No. 960) |
| DUANE MORRIS LLP | PEPPER HAMILTON LLP |
| 1100 North Market Street, Suite 1200 | Hercules Plaza, Suite 5100 |
| Wilmington, DE 19801-1246 | 1313 Market Street, P.O. Box 1709 |
| | Wilmington, DE 19899-1709 |
| - and - | |
| | - and - |
| Lenard M. Parkins (admitted *pro hac vice*) | |
| Trevor R. Hoffmann (admitted *pro hac vice*) | Robert S. Fischler (admitted *pro hac vice*) |
| Jonathan Hook (admitted *pro hac vice*) | Jared Nagley (admitted *pro hac vice*) |
| HAYNES AND BOONE, LLP | ROPES & GRAY LLP |
| 1221 Avenue of the Americas, 26th Floor | 1211 Avenue of the Americas |
| New York, NY 10020 | New York, NY 10036-8704 |
| | |
| *Counsel to Highland Capital Management, L.P.* | *Counsel to the Highland Retail Lenders* |
| *and the Highland Institutional Lenders* | |