1          IN THE UNITED STATES BANKRUPTCY COURT

2              FOR THE DISTRICT OF DELAWARE

3   IN RE:                         : Chapter 11
                                   :
4   BROADSTRIPE, LLC, et al.,      : Case No. 09-10006 (CSS)
                                   :
5        Debtors.                  : Jointly Administered
    . . . . . . . . . . . . . . . .:
6                                  :
    OFFICIAL UNSECURED CREDITORS'  :
7   COMMITTEE OF BROADSTRIPE, LLC  :
    on behalf of the estate of     : Adv. Proc. No. 09-50966(CSS)
8   BROADSTRIPE, LLC,              :
                                   :
9           Plaintiff,             :
                                   :
10  v.                             :
                                   :
11  HIGHLAND CAPITAL MANAGEMENT,   :
    L.P.,                          :
12                                 :
            Defendants.            :
13  . . . . . . . . . . . . . . . .:

14                      Wilmington, Delaware
                        February 1, 2010
15                         10:06 a.m.

16                  TRANSCRIPT OF HEARING
          BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
17              UNITED STATES BANKRUPTCY JUDGE

18  APPEARANCES:

19  For the Debtors:        Don A. Beskrone, Esq.
                            Ashby & Geddes, P.A.
20  For Highland Retail
    Lenders:                Steve Hoort, Esq.
21                          Menachem M. Bensinger, Esq.
                            Benjamin Schwartz, Esq.
22                          Ropes & Gray

23                          David Stratton, Esq.
                            Pepper Hamilton
24

25

| | | |
|---|---|---|
| 1 | For the Committee: | David Mark, Esq. |
| 2 | | Daniel Fliman, Esq. |
| | | Kasowitz Benson Torres & Friedman |
| 3 | | Etta R. Wolfe, Esq. |
| | | Potter Anderson & Corroon |
| 4 | | |
| | For Highland | |
| 5 | Institutional Lenders | |
| | & Highland Capital: | Lenard Parkins, Esq. |
| 6 | | Trevor Hoffmann, Esq. |
| | | David Liebenstein, Esq. |
| 7 | | Haynes & Boone |
| 8 | | Richard Riley, Esq. |
| | | Duane Morris |
| 9 | | |
| | For James Cable: | Michael W. Romanczuk, Esq. |
| 10 | | Richards Layton & Finger |
| 11 | <u>Via Telephone</u>: | |
| 12 | For Island Capital | |
| | Management: | Jonathan Hook, Esq. |
| 13 | | Jon Melko, Esq. |
| | | Dan Goldman, Esq. |
| 14 | | Haynes & Boone |
| 15 | | |
| 16 | Court Recorder: | Leslie Murin |
| 17 | Transcribing Service: | Perfect Pages Transcription & |
| | | Reporting, Inc. |
| 18 | | 18 Tuckerton Road |
| | | Shamong, NJ 08088 |
| 19 | | (609) 654-8880 |
| 20 | Proceedings recorded by electronic sound recording; | |
| | transcript produced by transcription service. | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

Perfect Pages Transcription & Reporting, Inc.
(609) 654-8880

1

<u>INDEX</u>

2

3

4 EXHIBITS:                                    <u>Marked</u>    <u>Received</u>

5

6 2          E-mail from Mr. Fredette          15

7 3          Agreement between Mr. Walls       58
           and Mr. Fredette

8 4          Document                          28

9 21         11/16/07 e-mail from              71
           Dave Walls

10

11 24         Letter from Paul Hastings         97
           to Todd Travers

12

13 71         E-mail from Pat Dougherty         23

14

15

16

17

18

19

20

21

22

23

24

25

1      (Call to order of the Court.)

2          THE COURT:  Please be seated.  Good morning, Mr.

3  Beskrone.

4          MR. BESKRONE:  Good morning, Your Honor.  May it

5  please the Court, Don Beskrone for the Debtors.  Your Honor,

6  there's one item on the agenda this morning, that's the Joint

7  Motion of the Highland Defendants for Summary Judgment With

8  Respect to the Committee's Action, and I'll cede the podium to

9  the Highland Defendants.

10          THE COURT:  All right.

11          MR. RILEY:  Good morning, Your Honor.  Richard Riley

12  for Duane Morris.  Lenard Parkins from the Haynes & Boone firm

13  will, I think, handle the hearing.

14          THE COURT:  Very good.  Thank you.  Good morning,

15  Mr. Parkins.

16          MR. PARKINS:  Good morning, Your Honor.  How are

17  you?  Your Honor, first I have some demonstrative exhibits I'd

18  like to approach the bench and hand to counsel --

19          THE COURT:  Yes, that's fine.

20          MR. PARKINS:  May I approach, Your Honor?

21          THE COURT:  Yes.  Thank you.  Thank you.

22          MR. PARKINS:  Thank you, Your Honor.  My name is

23  Lenard Parkins.  I'm with Haynes & Boone and represent the

24  Institutional Highland Lenders.  For the purposes of argument

25  today, for the Institutional Lenders, I will argue most of the

1  points and Mr. Trevor Hoffmann will argue many of the

2  preference issues with respect to the summary judgment issue.

3  We also have counsel for the Retail Funds here from Ropes &

4  Gray who will also participate in the argument from the

5  Highland Lenders' side.

6         I'd first like to start by saying that we are not

7  going to spend a lot of time going through the summary

8  judgment standards.  Your Honor's decision in the U.S.

9  Wireless Communication case from May of 2008 summed it up

10 better than I could ever argue it, and it clearly sets out the

11 points needed for summary judgment.  We have, as the Court

12 noted, put the ball in play and the requisite give and take of

13 the various parties here is in play now with respect to the

14 summary judgment issues before the Court.

15        The first issue I want to talk about today with

16 respect to summary judgment is the recharacterization issue.

17 I'm going to take it on first.  The recharacterization issue,

18 Your Honor, revolves around a refinancing of the first lien,

19 existing first lien indebtedness, that was on Broadstripe

20 since well before the refinancing occurred.  The financing was

21 in place at least in the beginning of 2005.  In 2005, the then

22 existing senior lenders entered into what's been called

23 Amendment number 5, requiring Broadstripe to basically sell

24 its assets within a year from June of 2005 and, in fact,

25 Broadstripe targeted its efforts to accomplish this in order

1  to retire the bank debt or as much of the bank debt as it

2  could.

3  In July of 2006, a refinancing did take place, led

4  by the Highland Defendants, wherein there was a first and

5  second lien tranche.  The existing indebtedness that was

6  refinanced total $196 million, and if Your Honor would look

7  and move to tab number 5 of the demonstrative exhibits, this

8  was contained in our briefing.  The issue here is the sources

9  and uses of the funds.  The total amount of indebtedness, as I

10  said, existing at the date of the refinancing in July was $196

11  million.  The refinancing took place in two parts, a first

12  lien term loan and a first lien revolver, as you can see at

13  146.5 and $20 million, and a second lien facility of $70

14  million.  The $70 million second lien facility, 50 million of

15  it was used to complete the takeout of the existing senior

16  facility and the other money, as you can see, are in the use

17  of proceeds column, were used by the company for the purposes

18  set out therein.  The conclusion of the refinancing, the

19  result of the refinancing was the existing lenders were taken

20  out in full for $196 million.  Other indebtedness was paid.

21  $33 million of working capital was made available at the time

22  of the refinancing and the company moved on in 2006 to

23  continue to operate.

24  The question of recharacterization clearly under the

25  issues of the Submicron case and the other leading cases that

speak to these issues, which include <u>AutoStyle</u>, which is the

leading case, and then other cases, <u>Submicron</u> and <u>Radner</u> and

<u>Exide</u>, certainly in this Circuit, in this District, speak to

the issue of what was the intention of the parties at the time

the indebtedness was put in place.  Was it intended to be debt

or was it intended to be not debt, capital contribution or

equity?  The summary judgment evidence is unequivocal that

this is debt.  If you go through the <u>AutoStyle</u> criteria, which

we have in our Brief, and I'm not going to recite it all over

again, the issue of compliance with date, there a note,

there's instruments, it was collateralized, it had maturity,

it had interest payments with respect to the various tranches

of the second lien indebtedness, all demonstrate that it was

indebtedness.  More importantly, though, this debt was put in

place in the contents of --

        THE COURT:  Well, let me interrupt.

        MR. PARKINS:  Sure.

        THE COURT:  Some of the factors that may require or

may be disputed facts are whether the repayment was dependent

on success, the inadequacy of capitalization, security -- I'm

just going through some notes of mine -- and the presence or

absence of a sinking fund.  On those factors, do I have --

don't I have a dispute as to material fact?

        MR. PARKINS:  I don't think you have a material fact

dispute, which would lead to not being able to grant us

1  summary judgment of the recharacterization, and here's why.

2  First of all, the cases are clear that the 11 points are not

3  an absolute checklist you have to go through, point number

4  one. And if you go through -- if you did go through the

5  checklist, we would satisfy, as you identified of the 11 seven

6  of them already. The other issue, which is very clear, is

7  that in Submicron and under the Submicron case and Radner

8  case, when a company is refinanced by existing lenders in a

9  distressed situation, those criteria are not necessarily

10  followed with respect to the purposes of the refinancing. So

11  in the context of the law in this Circuit, which is very

12  strong in Submicron and Radner, those criteria which are in

13  AutoStyle, which are an out of distress situation, refinancing

14  don't apply under the context of encouraging lenders to put

15  more money into a borrower in order to try to fix it and help

16  it. The Submicron case and the Radner case clearly speak to

17  the policy issue and clearly define the law in this Circuit

18  that those criteria don't apply and are not controlling.

19        THE COURT: Well, I understand that but didn't Judge

20  Ambro while saying that also said, putting considerable weight

21  I think on Judge Robinson's "reference to the conflicting

22  testimony and relative credibility presented by both parties"

23  and noting with respect to recharacterization "answers lie in

24  facts that confer context case by case." Now I'm not exactly

25  sure what that means or doesn't mean and I'm not arguing the

1   implications today but when the Court tells me, and I

2   understand certainly that the refinancing of existing debt in

3   a distressed situation puts a gloss on what the Court's going

4   to have to look at, but at bottom don't I have to look deeper

5   or aren't there issues that are going to require a trial?  And

6   I think your answer has been, well, basically -- and maybe I'm

7   mischaracterizing it -- the hurdle that the Committee has to

8   meet is so high that you just can't prove it in this context.

9           MR. PARKINS:  The answer I think of material fact is

10  one that would change the outcome.  I think Your Honor defined

11  it, it's defined in other cases, would change the outcome of

12  the case.  And the material facts, there aren't -- no material

13  facts would change the outcome.  First of all, we have most of

14  the criteria satisfied.  Second of all, we have the law in

15  this Circuit.  And third of all, we have an audit opinion from

16  E & Y, the independent auditors, that in 2006 if you go to it,

17  and we have the exhibits here and I'll point the Court to it

18  in a minute, identify this as long-term debt.  Now the

19  criteria of all the cases is, was this debt or equity at the

20  time?  And the question is answered.  You have independent

21  auditors who deem this as debt.  The evidence, the summary

22  judgment evidence, is overwhelming.  They have no summary

23  judgment evidence to say to the contrary and they have to have

24  the burden that it is to the contrary.  If I may approach,

25  Your Honor, with these two exhibits?

1            THE COURT:  Yes.

2            MR. PARKINS:  With one exhibit.  Yes.

3            THE COURT:  Thank you.

4            MR. PARKINS:  I think the reference, Your Honor, is

5    best used to exhibit from the Appendix A565.  This is the

6    audited financial statement of the Millennium Digital Media

7    Company, the operating company, for the year 2006.  And I

8    think it is important to go to the notes of the financial

9    statement because this reflects the audited financial

10   statements for the year in which the debt was put on the

11   company and the financing was put on the company.

12           THE COURT:  Okay.

13           MR. PARKINS:  And if you go to this statement, if

14   you look at note 6, which is on page A581, Your Honor --

15           THE COURT:  Okay.

16           MR. PARKINS:  -- we have a discussion there by the

17   independent auditors, Ernst & Young, of this credit facility

18   under long-term debt.  It says "current credit facility."  And

19   there's discussion there of the first and the second lien

20   indebtedness defined as long-term debt and the discussion of

21   the criteria of the long-term debt, the maturity date, the

22   interest rates, the principal payments, etcetera, all of which

23   are criteria under AutoStyle and under all the other cases in

24   this Circuit with respect to identifying this instrument as

25   debt.

1        It seems to me, Your Honor, that with respect to

2   summary judgment evidence, which this is in the record and we

3   have the testimony of the various parties who have always

4   considered this as debt and never considered it anything but

5   debt, that the indebtedness done as part of the refinancing,

6   the second lien indebtedness is debt, it will not be

7   recharacterized as debt.  There is no summary judgment

8   evidence put forward by the Committee to controvert the

9   summary judgment evidence that is before the Court.  It is

10  overwhelming that this is debt.  For example, let's talk about

11  capitalization.  You talked about the capitalization issue,

12  Your Honor.  I'll just take that as an example, if I may.

13        THE COURT:  Yes.

14        MR. PARKINS:  The capitalization of this company in

15  the spring of 2006 when this financing was done was at risk.

16  In fact, in another exhibit I'm going to hand you, which was

17  the audit opinion from the year 2006 --

18        THE COURT:  Well, if a company is undercapitalized,

19  arguably, and you increase debt load, how does that at least

20  not provide the risk that it continues to be undercapitalized,

21  and I guess the answer is "the terms."

22        MR. PARKINS:  I will answer that.

23        THE COURT:  Okay.

24        MR. PARKINS:  May I approach, Your Honor?

25        THE COURT:  Yes, you anticipated.  Not hard to do.

1    Thank you.  There we go.  Excuse me.

2           MR. PARKINS:  Now if we look at what has been marked

3    as B0127 as appendix number and we go to the first page of

4    this audit opinion by Ernst & Young, likewise the auditors for

5    the company in 2005, you will see on the last, next to last

6    paragraph, the going concern notation.  Going concern.  It's

7    called a going concern opinion, where there was serious doubt

8    as to the viability of the company's operations.  Now if the

9    Court will look at the opinion given a year later, which was

10   the first exhibit I handed you, A565, Your Honor will see that

11   the company has healed and there is no going concern caveat to

12   the opinion.  So what we have here is a company who was in

13   trouble in 2006 and a company that was healed, at least from

14   the auditor's point of view, by virtue of the refinancing in

15   2006.  Now how do we look at that?  How do we reach that

16   conclusion other than this lawyer standing here saying it

17   happened?  Well, if we go back to the second exhibit, B0127,

18   Your Honor, and go to page 6 of the audit opinion --

19          THE COURT:  Which one am I on now?

20          MR. PARKINS:  You're on the B0 -- it's on the B0127.

21   Go to page 6 of that, the second -- it's the 2005 audit.  It

22   has a number at the bottom, B0127.

23          THE COURT:  Oh, I see.  I couldn't find the B.  All

24   right.  What number?  I'm sorry.

25          MR. PARKINS:  Go to page 6 with me, Judge.

1          THE COURT:  Okay.

2          MR. PARKINS:  If you take a moment and read the

3    fourth paragraph there, you will see that the company had --

4    was in financial distress, had a working capital deficiency.

5    "The company will not comply with payment terms and existing

6    credit facility."  And what does E & Y identify as possible

7    resolutions of this distress?  Restructuring the company's

8    existing credit facility including amending certain financial

9    covenants.  In connection with the restructuring, the existing

10   credit facility completing and closing the pending sale are

11   certain cable properties.  Those were options that the

12   management, operational, financial plans to address the

13   conditions including but not limited to the following.  Now

14   what we have here is in 2005 a company in distress.  We also

15   have here that as a result of the refinancing, a company with

16   a clean opinion in 2006 as a result of the refinancing of the

17   recapitalization of this company.  The summary judgment

18   evidence is clear.  Bad, healed.  And the consequence of this

19   is because E & Y viewed this as recapitalization,

20   restructuring the existing credit facility.  It happened.

21   This is debt.  They viewed it as debt.  It healed the company.

22   So there is no doubt, Your Honor, that this is debt.

23          The other point why this is debt, if you go back to

24   AutoStyle, AutoStyle is a case that says a lot of things.  One

25   of the big things in AutoStyle talked about the fact of what

1  is the relationship of the holding of the debt to the equity

2  that the same creditor held, if there's a direct relationship.

3  In other words, if I hold 50 percent of the equity or 70

4  percent of the equity, I get 70 percent of the debt or if I

5  put 70 percent of the debt in, I get 70 percent of the equity.

6  There's a correlation of the relationship between the creditor

7  and the equity.  In the situation we have here, there was no

8  correlation.  The equity was ultimately held at the holding

9  company level.

10          THE COURT:  Well, let me ask you.  In July '06, how

11  much of the IRNs did your collective clients own?

12          MR. PARKINS:  The answer, Your Honor, is 23 percent,

13  and if you open with me tab 2 -- I'm sorry -- tab 2, yes.

14          THE COURT:  I tried to keep track but --

15          MR. PARKINS:  We've prepared these to help keep

16  track --

17          THE COURT:  Oh, thank you.  That's very good.

18          MR. PARKINS:  It owned 25 percent of the IRNs, Your

19  Honor.  It's on the first page of tab 2.

20          THE COURT:  And, of course, the response to that is,

21  or the point of that question is, given the fact that the IRNs

22  -- excuse me -- are undersecured -- well, I can't remember if

23  they're secured or not -- but under water at the time, aren't

24  the IRNs, in effect, given the distressed situation equity?

25          MR. PARKINS:  Your Honor --

THE COURT:  And you can add to that there are -- and the board moves but -- the Committee moves but there were at least two of the, I want to say Tamarin (sic) -- I can't -- I'm sorry.  I'm no good with names.

MR. PARKINS:  Trimaran?

THE COURT:  Trimaran?

MR. PARKINS:  Yes.

THE COURT:  There are at least two Trimaran entities on the board at that time and they were IRN holders.

MR. PARKINS:  There were no Highland members on the board at that time.

THE COURT:  But, again going back to my -- and the point I make for that is treating IRN -- in effect, recharacterizing IRN is equity for purposes of deciding whether I should recharacterize your company's loan as equity.

MR. PARKINS:  We anticipated that thought and here's -- the answer to it is a fairly simple answer to what we anticipated this question would be.  If you look at this Exhibit Number 2 --

THE COURT:  I'm going to surprise you before this --

MR. PARKINS:  Your Honor --

THE COURT:  I promise you.  I'm going to ask you a question you didn't anticipate.

MR. PARKINS:  Your Honor, no matter how hard we worked, I am sure you will.  Okay.  The one thing for certain

1    is that judges always do.  And so if you look at tab 2 here

2    and the first page at tab 2, you see the IRN holding of the

3    Highland was 25 percent.  And, Judge, just to help understand

4    the situation, if you look at tab 1, we have a breakdown of

5    the corporate structure where the various pieces of debt and

6    IRNs are for you to look at as we talk through this.  The IRN

7    debt is the Mid Level Holding Company.  The first and second

8    lien debt is the OpCo Company.  I'll refer to them as

9    "Holding" and "OpCo" for ease as we go through here.

10            THE COURT:  That's fine.

11            MR. PARKINS:  Highland held 25 percent of the IRN

12   debt at the Mid Level Holding Company.  As a consequence of

13   the refinancing, Highland had almost all the second lien debt

14   and 65 or 68 percent of the first lien debt.  It didn't -- and

15   that debt at the financing level, the OpCo level, never was

16   the driver of equity ownership.  Never was the driver of

17   equity ownership.  Clear summary judgment evidence in this

18   case.  The driver of equity ownership, as Your Honor pointed

19   out, was the IRNs.  So the debt bore no relationship to

20   equity.  It was debt.  It was characterized a debt.

21            THE COURT:  But if the IRNs and the secured are

22   significantly overlapped by the same owners and the IRN is

23   driving the equity of -- the equity -- the IRN, in effect,

24   holds -- in effect -- and these are, I'm assuming, arguendo,

25   some points here, but to talk them out.  IRN, in effect, holds

1 the equity of OpCo. So doesn't that make the connection we

2 were just talking about, which is 25 percent of the equity of

3 OpCo is by the same party that has 190 million of the debt of

4 OpCo?

5 MR. PARKINS: It would normally turn out to be that

6 if I was -- it would be the relationship would be closer. In

7 fact, AutoStyle, I think point 6 of the AutoStyle case exactly

8 talks about that. It says, "It's going to be deemed equity if

9 there is a direct relation of your equity ownership and your

10 debt ownership." There is no relationship here at all. It's

11 25 percent of the IRNs. To basically --

12 THE COURT: It's not a controlling position.

13 MR. PARKINS: Right.

14 THE COURT: Apparently not without -- and this goes

15 to the Wave sale I guess.

16 MR. PARKINS: We'll get into that.

17 THE COURT: Not enough, even at a later point

18 without help to block the sale.

19 MR. PARKINS: And, Your Honor, there was nobody on

20 the board, no management control. They were not an insider.

21 There was no relationship other than they funded $236 million

22 of debt to do the refinancing. We think there's no summary

23 judgment evidence to the contrary. Certainly, the AutoStyle

24 11 checklist and the other checklists that are adopted in this

25 Circuit speak to checklists that the Court could look to as

indicia, sort of like the indicia we used to look to as whether it was a financing or a lease. But the answer is, this clearly was debt and should be considered as debt and summary judgment should be granted as debt. And, in fact, the --

THE COURT: And I would argue -- one could argue, and Judge Walsh said this -- you bring the point on lease versus secured financing. It is what it is, sort of identified as, until you prove it's something else.

MR. PARKINS: And that's --

THE COURT: If someone's going to call it a lease, it's a lease, presumptively a lease. You're going to call somebody an officer. For instance, in my <u>Foothills</u> opinion, you're presumptively one until you -- language has to mean something at some point.

MR. PARKINS: And that's what the summary judgment evidence we think before the Court unequivocally demonstrate this was debt.

THE COURT: Now, of course, you touched on this, and I'm sure we'll get to this later on the insider point, you're not -- you're not until October a defined insider of the list --

MR. PARKINS: Correct. Correct.

THE COURT: -- but there is that catchall that Judge Lobider (ph) just discussed recently in <u>WinStar</u>, and we'll

1  have to come back to that at some point.

2      MR. PARKINS:  We'll talk about that.  I'm not going

3  to miss that one.

4      THE COURT:  All right.  I'm sorry.  I keep

5  interrupting.  Go ahead.

6      MR. PARKINS:  So recharacterization of debt, just

7  two other points I want to raise, Your Honor.  Of the $70

8  million that went in, it paid off other debt, as you can see

9  from our tab number 5.  Here we (inaudible) other indebtedness

10  on the cost of the financing.  It was not incremental money

11  except for $13 million was new money.  And the other thing

12  that's important to show that the equity, there's no

13  relationship to the debt here and it's not an equity

14  investment.  Trimaran, which had two people on the board and

15  had a huge, a huge IRN position, held no senior debt, 43

16  percent of the equity.  So they bore no relationship to one

17  another whatsoever and there's no summary judgment evidence to

18  the contrary.

19      I want to move on now to the Wave deal.  As I said

20  earlier, Your Honor, in 2005, the existing lenders, which

21  Highland was then a very small player, voted to compel -- made

22  an amendment which compelled the borrower Broadstripe to sell

23  its assets in an effort to retire the debt and the lenders

24  gave the company one year.  It effectively occurred.  It was

25  to occur in July but the refinancing occurred in July in lieu

1  of that.  In December of 2005, discussions and, in fact, a

2  letter of intent was being discussed with Wave for Wave to

3  acquire two of the three big divisions or operating parts of

4  Broadstripe.  In January '05, there was a meeting of the IRN

5  holders in New York and they met with the company to discuss

6  the Wave transaction and to sort of voice their initial

7  feelings about it.  And, Your Honor, I think this is depicted

8  on tab number 2, on 1506, IRN meeting with Broadstripe

9  management held at Trimaran's New York offices, Trimaran, the

10 leading holder of the IRN debt.  Thereafter, one month later,

11 Broadstripe signs its contract with Wave.  Now the gravamen of

12 the issue here raised by the Committee, that there is

13 inequitable conduct by the Highland Defendants in acquiring

14 debt on the secondary market and they acquired it basically at

15 par.  That's not really what they're saying is bad.  What

16 they're really saying is bad, Your Honor, is I'm a lender in

17 an existing facility, I acquire more debt and I vote.  I vote

18 no with respect to the Wave transaction and that vote no was

19 wrongful.  It was inequitable.  It was done with some bad

20 reason, okay, that caused harm --

21         THE COURT:  Well --

22         MR. PARKINS:  -- that caused harm to the Debtor.

23         THE COURT:  I think their argument would be, look,

24 at least -- and, again, think about it at OpCo level, because

25 that's the deal, basically is the OpCo deal.

1     MR. PARKINS:  Right.

2     THE COURT:  You have something on the table that

3 will take care of -- will buy out a substantial piece of the

4 debt, maybe even all of the secured.  I don't remember.

5     MR. PARKINS:  It left a substantial amount of the

6 secured --

7     THE COURT:  That's the James River transaction.  No.

8 James River is --

9     MR. PARKINS:  No.  There were potential offers for

10 what's called the Maryland --

11     THE COURT:  Central --

12     MR. PARKINS:  -- the Maryland piece but Wave was

13 buying all the rest but the Maryland piece --

14     THE COURT:  Right.

15     MR. PARKINS:  -- and it left a substantial part of

16 the secured debt unpaid as a result of just the Wave

17 transaction.

18     THE COURT:  Okay.

19     MR. PARKINS:  So you have a transaction that was

20 going to pay off a lot but not all of the existing first lien

21 indebtedness.  You have a transaction that was going to

22 dramatically hurt the IRNs because there was not going to be

23 any amount of money certainly generated from this sale which

24 was going to go up to the IRNs and it was dependent upon

25 subsequent disposition of assets, for money to go up to the

1    IRNs if and when it got there. So you had the IRNs

2    dramatically impaired. Highland was an IRN holder. Trimaran

3    was an IRN holder. And Highland and the IRNs met and they

4    said, "we don't like getting wiped out." That's sort of a

5    natural consequence of a transaction. It's not good to have

6    millions of dollars in a deal and get wiped out. The issue

7    before the Court and why we think summary judgment is

8    appropriate is there's nothing wrong with Highland, an

9    existing lender, buying debt at par, getting its position up

10    to required lenders and voting no with respect to the Wave

11    transaction. The Committee says it's inequitable conduct,

12    it's unfair, it's not right. And because of that it blocked

13    the Wave transaction and, sure enough, the Wave transaction

14    did not go forward because the consent of the lenders was

15    required.

16          Now let's analyze this and see if this makes any

17    sense. A lender has a desire to buy secured debt. What's its

18    motivation? Number one, one could say its motivation was to

19    try to protect a dramatic economic loss in the IRN position

20    because the Wave sale did not give it any return. Second of

21    all, with respect to Highland, it's sort of the opportunity to

22    proceed with what it had viewed for a long time as a

23    possibility of a restructuring and recapitalization of the

24    company on a long-term basis. May I approach with another

25    exhibit, Your Honor?

1    THE COURT:  Yes.  Before you do that, can you give
2    me the time frame of the Comcast deal that fell through?
3    MR. PARKINS:  Comcast deal was in 2007.
4    THE COURT:  Okay.
5    MR. PARKINS:  The Comcast deal was for the property
6    that was not sold as part of the Wave deal --
7    THE COURT:  Yes, Maryland.
8    MR. PARKINS:  It was 2007.  Correct.  Your Honor,
9    what I've handed you is a document marked CC -- it's marked a
10   couple things, CC1, Exhibit 71, but it's certainly in the
11   record of the summary judgment evidence here.  It's an e-mail
12   from Pat Dougherty dated January 31, 2005 -- this is over a
13   year before the Wave transaction started to get going -- to
14   Dave Walls, another Highland person, and Kurt Plumer regarding
15   Millennium Digital for Crusader.  Crusader is the fund that
16   ended up -- the exclusive Highland fund and holder of IRN
17   debt.  This exhibit was used by the Creditors' Committee,
18   first of all, to say that Highland was looking at sort of like
19   betting and looking at a short term sort of gamble of putting
20   money in with respect to the Broadstripe and the IRN debt.
21   But I turn -- I ask the Court to look with me to the
22   second paragraph of this e-mail.  That even back in 2005,
23   Highland was looking at Broadstripe for a potential standalone
24   or complete capital structure restructuring back then.  So
25   what happened is in 2006, in furtherance of number one, trying

to protect its position with the IRNs that were going to be
wiped out, and, number two, bringing forward what it had
thought about for a long time, over a year, it started to buy
debt. Now it didn't buy just debt and stop at the 51 percent
as required lender and said, "Bingo, I've got 51 percent, Wave
is blocked." But they went on and bought more debt and they
facilitated the entire refinancing, not someone who just wants
to go in vindictively and stop a deal but someone who three
months later put in 236 million, and most of the $236 million
to refinance and fix the capital structure, clean up a balance
sheet which Ernst & Young said was in distress and at risk and
fix the company with a clean audit opinion next year. That's
what happened.

Now the predicate, we've cited a lot of law, New
York law with respect to the right to buy debt, the right to
vote. The right to buy debt by a debt holder or anyone else
in the open market is pretty much inviolate. The right to buy
debt by someone who, they're not an insider, they're not in
control of the company. They were a lender at that time. In
order to protect its position and to vote no, there's nothing
wrong with that and summary judgment should be granted. It is
almost preposterous to think of the predicate of the contrary,
that it's okay to buy debt, it's not okay to exercise the
right you have that goes with that debt under the credit
agreement. I think that as a consequence of what the

Committee is arguing, that it's okay to buy debt but it's not okay to vote no because it blocked the deal and harmed the company. It didn't harm the company. The company went on to have a clean financial statement, continued to operate and it was well capitalized. There was no undercapitalization issues that Ernst & Young raised the following year. It was clean. It was fixed. It was ongoing and it was fine.

So the issue here is as a matter of law, the facts are not in dispute. Highland bought the debt. Highland voted no. Told the agent as required lenders, "We don't support the Wave transaction." The Wave transaction, if you look at the timeline here, this occurred at the end of April. The Wave transaction did not go forward. Highland then proceeded to do a refinancing. There's no summary judgment evidence here that would controvert the right of Highland to buy debt and to vote under the credit agreement. Now what does the Creditors' Committee say? Ah-huh, we have you working with Trimaran. Trimaran's in control. Trimaran has board seats. Highland has no board seats. Trimaran also doesn't want to get wiped out. Trimaran and Highland sort of get together, is the Committee's theory, and Highland buys the debt. Trimaran doesn't buy any debt. Highland buys the debt and votes no. And they say because of that there's some kind of collective control, which raises the issue, raises the position of Highland to one of in control and, therefore, possibly giving

1    rise to duties.

2         Now we've briefed the issue on collective control

3    and the issues on collective control and the law on collective

4    control is very clear.  Trimaran and Highland don't smell the

5    same.  They're not the same.  Different owners.  Different

6    funds.  There's no contract between them which would evidence

7    joint voting, joint direction, joint agreement.  The only

8    parallel interest is, "I don't want to get wiped out."  And

9    that parallel interest absent more as a matter of law is not

10   sufficient to create a joint control, collective control

11   undertaking by Highland.  They haven't shown any evidence of

12   such an agreement.  There is none.  And because there is no

13   control by Highland, Highland was not an insider.  Highland

14   did not perform egregious conduct which would give rise to any

15   kind of negative harm, negative consequence to Highland by

16   subordinating its debt or doing anything else to Highland.  It

17   protected its debt, it put money in it, refinanced.  And

18   voting no or voting yes or voting anyway, is a right of a

19   lender to do.  And it bought the debt in order to protect its

20   interests and it bought the debt on its way to a complete

21   capital restructure.  There is no basis to not grant summary

22   judgment with respect to Wave and all their causes of action

23   with respect to Wave.  To rule otherwise would say that I can

24   buy debt but I can't vote it.  I have no duty to anybody.  I

25   don't have a duty to protect my position, Highland's position.

I have no duty to anybody else here. To say that someone
without a duty to anybody else can't buy debt and can't vote
would be an incredible outcome and one not supported by the
law and not supported by any facts here.

I want to move on to the James transaction. As we
get to the James transaction, Your Honor, if you go through
the timeline, which I think is important, as you work with me
through the timeline here at the end of 2006, what you had as
part of the refinancing that took place in July of 2006 when
the $236 million came in was a contemplated restructuring of
the IRN debt. Two, as Your Honor has identified, sort of
acknowledged that the IRNs where the buck stops in the equity
level, at the Holdco level. And so at the end of 2006, that
occurs. The IRNs are basically swapped for the equity and the
relative positions amounts, they held the IRN debt, swapped
for the equity and the holding company. And Highland ended up
as a result of that with 23 percent of the equity. As you see
here, 25 percent of the equity -- I'm sorry. 1026, go to page
2 --

THE COURT: Um-hmm.

MR. PARKINS: Highland ended up with 25 percent of
the IRNs and had 62 percent of the first lien facility and 89
percent of the second lien facility and then had seats on the
management company, Highland Crusader, two of seven. And that
certainly is a changed circumstance where all of a sudden

1    we're now on the management committee.  We have say.  We,

2    therefore, change our status and have duties, to the extent

3    the law requires it with respect to the equity or to the

4    creditors depending on the circumstances of the case, the

5    circumstances of the company.  That's certainly a changed

6    circumstance and there was nothing during this period of time

7    where there was no transactions that came up, there was no

8    material issues that came up with respect to operations other

9    than the company operated sufficient to have a clean opinion

10   for 2006 from Ernst & Young that really resulted.  But there

11   was a changed circumstance.  Highland became an insider.

12   Highland had control, some control at the board of directors,

13   though it did not have complete control of the board of

14   directors at that time.  Then we get into 2006.  As we move

15   through 2006, Your Honor, there's --

16             THE COURT:  I think 2007.

17             MR. PARKINS:  I'm sorry.  2007.  As we move through

18   2007, Your Honor, it is clearly the desire of Highland, no

19   dispute, that the company should try to seek out opportunities

20   to acquire assets and grow, acquire companies and grow.

21   There's no dispute about that.  And, in fact, the new

22   management was brought in.  Mr. Shreffler and Mr. Wiley were

23   brought in for the purpose of doing that.  And so

24   opportunities were looked at, many of them in 2007, and

25   several came to the forefront in 2007, one we know suddenly,

which never went forward to an Asset Purchase Agreement, and

one was James Cable, which did go forward with an Asset

Purchase Agreement on October 31, 2007.  And I think we see

that on our timeline here.

And, Your Honor, I point you also, if you would look

with me at exhibit, demonstrative Exhibit Number 4.  This also

shows the relative holdings of the Highland Institutional

Retail positions during the same timeline for the Court's

edification.

THE COURT:  I'm sorry.  Which --

MR. PARKINS:  Exhibit -- demonstrative Exhibit

Number 4.

THE COURT:  Okay.  Thank you.

MR. PARKINS:  We put this together to consolidate on

one page, to facilitate the argument, Your Honor's review of

this with respect to the positions here.  And if you look at

demonstrative Exhibit Number 4, you'll see the identification

of the time period of the Wave Division and you'll see the red

arrow there at the time period of the James Cable contract.

The issue before the Court with respect to James

Cable is not whether there was a promise by Highland given to

the company but whether or not there were assurances.  If you

read the Committee's papers, the conduct they allege Highland

of wrongdoing with is giving Broadstripe assurances that

Highland would finance acquisitions generally and would

1  finance James Cable that the company, therefore, went into the

2  James Cable contract based on these assurances -- okay -- and

3  Highland didn't finance it and, therefore, it gave rise to

4  damages and a lawsuit brought by James Cable and the conduct

5  of Highland in giving these assurances was wrongful.  Now

6  we've briefed the concept of assurances and what that means.

7  Let's get down to the nitty-gritty of what happened

8  at this point in time and what the testimony is in summary

9  judgment, for summary judgment.  The James Cable contract was

10  signed on October 31, 2007.  What happened before the James

11  Cable contract?  You have allegations of assurances and you

12  have a piece of paper.  You have a piece of paper sent by

13  Highland to Broadstripe.  The piece of paper sent by Highland

14  to Broadstripe was the proposal to consider as a talking point

15  how Highland would consider financing the James Cable

16  acquisition.  That was sent eight days before the James Cable

17  contract was signed.  It was responded to about eight days

18  afterwards by the CFO, Mr. Wiley.  It was sent to Mr. Wiley.

19  James Cable contract was signed and Mr. Wiley responded to the

20  initial proposal by Highland and financed eight days later.

21  So questions were asked.  Counsel for the Committee asked.  We

22  all took depositions of Mr. Wiley.  "Did you have a commitment

23  to finance James Cable at the time you signed the contract?"

24  The answer was "no."  The testimony is, this was not -- I'm

25  sorry, Your Honor.

1          THE COURT:  That's all right.  At the time of the

2     James Cable APA being signed, Highland has two out of three of

3     the seats on the management committee according to your chart

4     here.

5          MR. PARKINS:  Yes.

6          THE COURT:  September '07, two out of three.  I

7     assume the management committee -- I don't remember this from

8     the papers -- approved the APA that was signed?

9          MR. PARKINS:  Yes.

10          THE COURT:  Well, why did they -- do we know what

11     the implication of a management committee vote controlled by

12     Highland to purchase James Cable when Highland is a proposed

13     lender at least with the term sheet?  Doesn't it all sort of

14     say, "Wait a minute, we wouldn't have voted yes unless we

15     thought we could finance it, and the only real way to finance

16     it is through Highland"?

17          MR. PARKINS:  The answer is given in the summary

18     judgment testimony of Mr. Wiley because that question was

19     asked.  That's clearly the question before everybody today and

20     before the Court.  What was the expectation at the time the

21     contract was signed and the management committee voted to have

22     it signed.  And the expectation from Mr. Shreffler, the CEO,

23     and the expectation of Mr. Wiley, the CFO at the time, was

24     that most of these deals, almost all these deals at this time

25     -- remember this was a hot market.  This was before the

1  collapse.  It was a hot market.  That most of the deals do not

2  require financing -- do not have financing outs.  But, more

3  importantly, the magnitude of the commitment that Mr. Wiley

4  thought he had was as follows.  Number one, he's testified, "I

5  know I signed it and it was not underwritten."  That's clear

6  because he had a proposal which hadn't been agreed to.  Number

7  two asked, "But weren't you still comfortable it was going to

8  happen?"  And the answer he gave as a CFO and his testimony

9  was, "Well, I had some comfort -- some comfort that Highland

10  would come through because they were the equity owner and they

11  wanted to do deals."  That's a far cry from a commitment to

12  lend.

13  And the question raised by the Committee, are these

14  assurances assurances that existed generally with respect to

15  financing acquisitions or bring me deals and I'll finance

16  acquisitions sufficient to give rise to equitable

17  subordination claim or wrongful conduct by Highland.  And the

18  answer is, what were those assurances?  Let's talk about what

19  they were.  Well, a little before that when Mr. Wiley gave his

20  testimony, there was another deal out there called SuddenLink.

21  And if you look at the Committee's Brief and the Committee's

22  papers, it says, well SuddenLink was a deal where Mr.

23  Shreffler, the CEO, and Mr. Wiley got great comfort that

24  Highland was going to do the James Cable deal.  Why?  Because

25  the owner of SuddenLink specifically asked Highland, "Will you

finance this deal," and Highland said yes.  And that gave them great comfort.  Well when you look at their papers, Your Honor, the Committee's papers, and you move from the SuddenLink assurance given to the owner of SuddenLink, to the assurances given to Broadstripe Management, "would Highland finance Broadstripe Management," the page is blank.  You and I have a dialogue.  You say, "Will you finance?"  "Yes."  You say, "Well, good, that means you'll finance the next deal too."  That's the assurance that we are working on here as binding Highland to finance and giving Highland a negative vote with respect to being liable for inequitable conduct in the context of Broadstripe.

First of all, equity owners as a matter of law, and the Court is clear, the law is clear on this, are not undertaken to lend.  They may have fiduciaries even on the board of directors but their fiduciaries are not under an obligation to lend their money.  What we had at the time, unequivocally at the time of the James Cable transaction, was the CFO of the company saying, "It was not underwritten when we signed it but I had some comfort that it would be financed."   And, in fact, after the James Cable transaction was signed, numerous iterations and efforts were made between the company and Highland to try to find a way to do the financing and they didn't come up with it.  It just didn't happen.  The market, as Your Honor knows, collapsed in the

1  November/December/January time frame, November/December of

2  2007, financial credit market collapsed, and it just didn't

3  happen in 2008.  But the gravamen of the deal, the gravamen of

4  the case is here, that the assurances given by Highland to

5  finance acquisitions met an assurance, somehow a promise to

6  finance the James Cable deal, which gave rise to signing the

7  deal, which gave rise to damages.

8          Now this case sort of was tried once in front of

9  Vice Chancellor Lamb.  Highland was a party.  Highland moved

10 to dismiss.  Vice Chancellor Lamb's decision is part of our

11 summary judgment record.  And the issue there that Vice

12 Chancellor looked at is where's the promise?  Not only where's

13 the promise, where's the promissory estoppel or promise?

14 Forget that there's no writing.  Vice Chancellor Lamb said,

15 "My god, who does a $100 million deal without a piece of

16 paper?"  Put that aside.  Judge Lamb said, "Where is the

17 promise for even the concept of promissory estoppel?"  And

18 James Cable -- neither the Committee nor James Cable ever come

19 up with a promise to give rise to promissory estoppel from

20 which someone would say, "I am responsible for financing this

21 company."  And there wasn't any promise.  It wasn't oral.

22 There wasn't any writing because there was no proposal signed.

23 The CFO said it was not underwritten.  What we have are

24 assurances and those assurances -- okay -- general assurances,

25 we want the company to grow, is what the Committee says was

1  inequitable conduct.

2      THE COURT:  But whether James Cable was in a

3  position to rely on this low level of assurance is a different

4  issue as to whether the debtor was in a position to rely on

5  assurances by its majority debt holder and a party that had

6  the right to appoint two out of three of the management

7  committee.

8      MR. PARKINS:  The answer would be, yes, except Judge

9  Lamb went on to say in his decision -- when you read his

10  decision closely, it talked about was there a promise between

11  Highland and Broadstripe because James Cable said not only --

12  there was a promise between Highland and Broadstripe, which I

13  can rely on as third party beneficiary and that's why the

14  judge had to go into that, was there a promise from Highland

15  to Broadstripe, and the Court said no.  There's no evidence of

16  a promise from Highland to Broadstripe.  First is the

17  predicate, it's the foundation of promissory estoppel.  It's

18  the predicate of third party beneficiary.  There had to be an

19  act, a promise, written, oral, for which someone could rely on

20  and judge -- and the judge said no.  There was nothing.  He

21  found nothing.  And there is nothing.

22      And, therefore, the question of was the assurances

23  of support, assurances that bring me deals, bring me deals and

24  I'll look to try to finance deals, an assurance that James

25  Cable would be financed?  The answer is no.  Was it

1 inequitable conduct?  No.  It wasn't inequitable conduct to

2 make assurances.  The case law is clear on that.  Was it done

3 with the intent to sort of abandon and put Broadstripe at

4 risk?  And the answer is no.  Why not?  Why not you say?

5 Well, Highland certainly couldn't go out and was unable to put

6 together or finance a $100 million deal.  But what happened in

7 the spring of 2008 that shows Highland didn't have any bad

8 feelings or bad conduct or was not doing anything to hurt

9 Broadstripe?  In the spring of 2008, if you look with me here,

10 Your Honor, to page 3 of this timeline, what happened?

11 Broadstripe needed cash, needed liquidity.  Highland as the

12 vast majority of the first lien debt and holding most of the

13 second lien debt wanted to accommodate them.  Highland was

14 unable to accommodate them and provide the liquidity necessary

15 because one of the major holders of the first lien debt had a

16 blocking vote, Black Diamond.

17        So what does Highland do in order to facilitate

18 financing Broadstripe in order to not leave Broadstripe

19 hanging out there without liquidity?  Highland goes and pays

20 $63 million to Black Diamond, summary judgment evidence, to

21 Black Diamond, to buy them out of the position so that it was

22 easy and able to finance Broadstripe.  So for anybody to say

23 that Highland put Broadstripe at risk here didn't -- it didn't

24 promise to finance the James Cable deal.  The testimony is

25 clear it didn't promise to finance the James Cable deal.  It

didn't put the company at risk.  It paid $63 million to get a
blocker out of the first lien debt so that they could finance
and, in fact, they did finance.  The first lien credit was
amended to provide $10 million of financing in the spring of
'08.  Later that year, the second lien financing was amended
to provide up to $17 million and nine of it was advanced in
the summer of 2008.  So there's no malice here.  There's no
inequitable conduct.  Highland didn't abandon Broadstripe.
Highland put more money in it, not only directly into
Broadstripe but it paid $63 million for the chance to do so
because it wanted to finance Broadstripe.  They couldn't put
together the financing for the James Cable transaction.  They
couldn't make it happen.  It didn't any longer wish to proceed
with that transaction and it couldn't find the money.  There
was no equity and no debt for Highland to do it but did it
abandon Broadstripe and leave it in the lurch?  The answer is
no.

So with respect to James Cable and the cause of
action pled at the time of the signing of the APA, where the
assurances rise to the level of inequitable conduct by
Highland to have its debt subordinated or have other actions
taken against it in light of a piece of paper that says,
"here's the talking points, I'd like to finance."  The CFO
says, "I know it wasn't underwritten to finance.  I didn't
agree to the financing and all the times that I know it was

1   not underwritten, I had comfort that they would," does not

2   rise to the level of inequitable conduct.

3           I want to talk about a few more points.  I think the

4   summary judgment evidence as Your Honor's decision in the

5   (inaudible) case, it's clear, you have to go by the facts.  At

6   the time of the signing of the transaction, what were the

7   facts?  And as a matter of law, we believe the facts and the

8   law demonstrate that summary judgment should be granted.

9           The next topic I want to talk about, Your Honor, is

10   the concept of alter ego.  The Committee says that an alter

11   ego situation exists here.  Well this company of Broadstripe

12   existed since 1999, seven years before Highland ever got

13   involved as a lender in the original credit facility.  The

14   company had its own offices, it had its own president, CEO,

15   CFO, treasury function, which Highland couldn't access, its

16   own employees, its own business.  Highland Capital Management

17   and the funds are not in the business of running a cable

18   company.  They're not the same.  There were separate audited

19   financials for all of these years.  There was no money

20   siphoned out from these companies by Highland.  There was no

21   manipulation of the books and records for the benefit of

22   Highland.  None of that occurred.  The classic test for alter

23   ego, was this company a fiction, basically is you just blow

24   through as a fiction, didn't exist.  We briefed it.  We're not

25   going to spend a lot of time on it but it's still out there,

1    hanging out there as a cause of action. We believe as a

2    matter of summary judgment law it doesn't exist.

3         Now what can they say Highland did? What are the

4    examples of what they said Highland did? Well Highland when

5    it had control of the board of directors and control of the

6    equity, because it kept buying up IRN debt and effectively got

7    control of the equity, a lot more control, and it's shown here

8    in our exhibits, what did they do? Well, it will show

9    circumstances where Highland's major owner, Jim Dondero,

10    wanted to fire the general counsel of the company because

11    there was no financing out in the James Cable deal and said,

12    "I want this person fired." You know what happened? Didn't

13    get fired because they didn't have absolute control of the

14    company, though he owned most of the equity, Highland did. He

15    said, "I want this person fired," and that person didn't get

16    fired because the board of directors, the managers, said "uh-

17    uh, it ain't right."

18         What other evidence of control did we have? Well,

19    we had Highland in 2008 seeing that the company was getting

20    into trouble and needed refinancing. They brought in people

21    from their experience who had restructuring capability. They

22    brought in people to oversee and brought them onto the board

23    that had restructuring capability, had independent financial

24    advisors that came on and took the role of the board, one of

25    the board seats, in order to facilitate the company's efforts

1    at restructuring.  It brought in the predecessor to FTI,

2    financial advisor, to work with the company and try to address

3    the restructure and it also financed the company until it

4    became clear that financing the company in the context of the

5    Wave litigation, the James litigation, the continued

6    deterioration of the company's operations in 2007, 2008, after

7    the credit crisis hit and after business was hurt, like

8    thousands of other businesses, the company said, "enough, no

9    more, let's put it in Chapter 11 and try to restructure the

10   company."  Those are really the evidences that control.  When

11   Highland got control, it was the fall of 2007 when it bought

12   out the IRN debt from Trimaran and Cerberus in the context of

13   2007.  So we have this window where about 12 months when

14   Highland had equity control, what did it do?  It didn't

15   finance James Cable but it didn't promise that it would.  It

16   put money in to finance the company in 2008 twice to give it

17   liquidity.  It brought in people to try to facilitate and

18   focus on the restructuring of the company.  It brought in a

19   new CEO.  It brought in people to the board who had experience

20   in restructuring and it hired outside advisors.  That's what

21   happened in 2008 because the company was in a series of

22   deterioration in 2008 and this Court knows the worst credit

23   crunch since before you or I were ever born since the

24   Depression.  So that's what happened in 2008 when Highland did

25   have control of the equity.

1    And the question before the Court is, what happened

2  in 2008 is the conduct in 2008 with respect to who the company

3  should hire, the direction in who the company should hire --

4  okay -- rise to the level of inequitable conduct?  And the

5  answer there is no.  Have to show harm to creditors.  And the

6  answer is, there's no harm to creditors.  As the Creditors'

7  Committee admits, basically no other unsecured creditors but

8  James Cable and Wave, the litigants here.  All the other

9  creditors were paid and they continued to be paid until right

10  up until the bankruptcy course, and there's always a stub-

11  period right before that they can get paid, but the creditors

12  got paid during the entirety of the time until up to the

13  bankruptcy case.  So there's no harm to creditor body

14  generally.  Wave is upset, James is upset, and they filed

15  lawsuits and they're suing people in different courts.  Now

16  what we have is a Creditors' Committee taking those same

17  causes of action, allegations, bringing them here, trying to

18  hang it on Highland from the beginning of the relationship in

19  2006, the beginning, to the end, is having caused harm and had

20  inequitable conduct which would give rise to equitable

21  subordination, recharacterization and the panoply of all

22  causes of action you see in every case where Creditors'

23  Committee go after the equity owner and lender in a situation

24  like this.

25    And for all those reasons, Your Honor, we've talked

1   about, summary judgment evidence, the law with respect to

2   recharacterization, summary judgment is appropriate.  With

3   respect to Wave, there is no doubt that summary judgment is

4   appropriate in favor of Highland.  Buying debt, voting it, has

5   to be the case.  Preserving, trying to protect your interests,

6   has to be a legitimate reason for doing it and the law and the

7   New York law on which this credit agreement is written says

8   it's okay.  Even if you wanted to be arbitrary and capricious,

9   it's okay.  I can buy debt.  I have no duty to anybody.  I can

10  buy debt and vote, one way or the other.  Their argument is

11  the vote no, the block the Wave deal was wrongful and

12  sanctionable against Highland.  James Cable, what's the

13  circumstance?  No financing.  CFO says, "No financing was in

14  place.  I signed it."  Your question is a great one, it's the

15  one that everybody asks, "Why the hell did you sign it?"  Why

16  did you sign it?  Didn't have financing.  The answer was, "I

17  had comfort, some comfort, but no commitment."  I know,

18  however, that Shreffler's testimony was --

19          THE COURT:  It's not just why did he sign it.  Why

20  did the board approve it?  And by "board," I mean the

21  management committee.

22          MR. PARKINS:  The board approved it because I think

23  they believed it was in the best interests of the company to

24  try to do the transaction.  There was no need to have

25  financing at the time.  You have to have financing at the end.

THE COURT:  Yeah but they signed it without a financing out and that's why people asked the CFO, you know, "Why did you sign a deal like this?"  In October '07, things are already well on their way to getting bad, not as bad as they were in '08.

MR. PARKINS:  And they believed this was a transaction they wanted to do.  Remember, they were in a growth mode.  They wanted to acquire more companies and this was an opportunity they looked at and they liked.  They wanted to acquire it and hoped that they could get financing at the time of the closing, which was going to be in the spring of '08, and they didn't get it.  But there was none committed at the time.  Your Honor, with that, I'm going to turn over to my colleague, Mr. Hoffmann, to talk about the preference issues.

THE COURT:  Okay.  Thank you.  Good morning, Mr. Hoffmann.  Excuse me.

MR. HOFFMANN:  Good morning, Your Honor.  Trevor Hoffmann from Haynes & Boone.  I'm also here on behalf of the Highland Institutional Funds and Highland Capital Management L.P.  As Mr. Parkins stated, I'm just going to speak a little bit about the preference action with regard to the second lien facility.  With regard to the first lien facility, Mr. Steven Hoort from Ropes & Gray will be discussing that.  The Highland

1   Institutional Funds were minority lenders in that facility but

2   it was by and large the retail investors and so Ropes & Gray

3   will be handling that portion of the argument.

4           THE COURT:  All right.  So you're doing the --

5           MR. HOFFMANN:  I believe it's claim 9, Your Honor.

6           THE COURT:  Yeah.  I'm looking for a date.  Which

7   transaction?

8           MR. HOFFMANN:  Well, it's actually -- it's the

9   various alleged transfers that were made in the year --

10          THE COURT:  In the last year.

11          MR. HOFFMANN:  In the year prior --

12          THE COURT:  All right.  So the new money, if you

13   will, that was put in.

14          MR. HOFFMANN:  Exactly.

15          THE COURT:  Or lent.

16          MR. HOFFMANN:  Exactly, Your Honor.  Essentially,

17   the Committee, if you take a look at paragraph 121 of their

18   Complaint, and I realize there's a lot of paper in this, in

19   the records --

20          THE COURT:  I have to say my clerk, who wrote a 109-

21   page bench memo, has had better days.

22          MR. HOFFMANN:  And I --

23          THE COURT:  Well, no, I don't mean with the quality

24   of the work.  I mean with the load.  Oh, look at her.  That's

25   not what I meant.

1    MR. HOFFMANN:  Well, I sincerely apologize to your

2    clerk no matter what you meant.

3         THE COURT:  Well, it wasn't your fault.  You didn't

4    file 121 counts or whatever.  All right.  Stricken from the

5    record.

6         MR. HOFFMANN:  All right.

7         THE COURT:  I'm sorry.  Mr. Hoffmann, I apologize.

8    Go ahead.

9         MR. HOFFMANN:  That's not a problem.  I will back up

10   though and if you do look to paragraph 121 of the Complaint,

11   the Committee has set forth, I believe it's nine transfers

12   that they believe occurred in the year prior to bankruptcy in

13   connection with the second lien facility, and the nine

14   transfers total approximately $1.6 million.  Now we have a

15   couple of defenses that we want to allege in connection with

16   the transfers.  The first one, which we believe really is not

17   based on any material disputed facts, is the subsequent new

18   value defense.  Eight of these nine transfers were made prior

19   to July 17th of 2008 and that totals approximately $1.1 million

20   out of the $1.6 million.  So we have $1.1 million worth of

21   transfers made on or prior to July 17th of 2008 but then on

22   July 21, 2008 and August 12, 2008, the second lien lenders

23   under the second lien facility made advances, subsequent

24   advances, of $9 million into the estate.  And the key here,

25   obviously, is that the policy behind subsequent new value and

1  preferences generally is harm to the estate.  Has the estate

2  been harmed by the transfers?  Well, the law states that in

3  the case where you have replenishment of the estate you have

4  no harm.  And so that really is the major factor here.

5  Obviously, an underlying policy rationale as well when it

6  comes to loans generally is that you want to be able to

7  encourage lenders to lend to borrowers who are in distressed

8  situations.  And the case law recognizes --

9      THE COURT:  I don't know if that's true.  I think

10  it's indicia of evidence or it's an indicia that what wasn't

11  going on is what the preference statute is designed to

12  prevent, which is inappropriate -- well not even

13  inappropriate, sucking money out of the debtor on the eve of

14  insolvency which creates a race to the assets problem.  I

15  don't know if there's any implication of the preference

16  statute and new value, more specifically, to encourage

17  creditors to continue to lend or to give credit support.  I

18  think it's more just the opposite to draw a bright line and

19  say, look -- and I agree, no harm, no foul but more a negative

20  implication to stop a race to the assets.

21      MR. HOFFMANN:  I certainly agree with Your Honor

22  that the prevention of the race to the courthouse is one of

23  the aspects but I would say that the flip side -- and there is

24  some case law out there that says this.  The flip side is --

25  and, you know, there are a line of decisions, not just in

1  preferences, obviously, but in other context as well, whether

2  it's _Radner_ or _Trenwith_ that would state that you don't want

3  to just have creditors -- you don't want to have lenders just

4  shut the door as soon as there's any first sign of trouble

5  because they're worried that if they put in money -- you know,

6  as a matter of risk, if they put in money to a company that

7  needs it, that suddenly that money is at jeopardy.  But I

8  think that that's really not necessary for Your Honor to rule

9  for the matter for the purpose of summary judgment.

10         THE COURT:  Well, it's not that.  It's if they don't

11  put in new money, they will be exposing previous receipts of

12  money.  We're talking about preference --

13         MR. HOFFMANN:  Right.

14         THE COURT:  -- at this point, not fraudulent

15  demands.  But, of course, does it make any sense to save two

16  million I put in five?  Well, of course not, because money is

17  money.

18         MR. HOFFMANN:  Right.

19         THE COURT:  And some costs are sunk.

20         MR. HOFFMANN:  Right.

21         THE COURT:  I think they covered that in some class

22  I took.

23         MR. HOFFMANN:  Right, Your Honor.  Anyway, I think

24  the basic premise here is that if you replenish the estate,

25  which clearly did occur here, then those funds that were taken

1  out as transfers will not be held to be preferences.

2  Obviously, the one point that the Committee has tried to make

3  in its opposition Brief is to say, well, that only applies to

4  the extent that the funds were put in on an unsecured basis.

5  The case law, however, states that -- and there are different

6  cases out there but the standard, depending on which one you

7  want to look at, is either that you look at it on the petition

8  date or you look at it as of the date that the advances were

9  made.  Here, the advances were made approximately three, four

10 months before the bankruptcy filing.  And I think that we can

11 all agree and that there is no material disputed fact here,

12 that regardless of the number as to how much the second lien

13 lenders are undersecured by, we can all agree that as of those

14 dates they were undersecured.  The Committee, of course, has

15 alleged that the Debtors have been insolvent since early

16 March, since early 2006.  We disagree with that, obviously,

17 but I think we do have agreement and no material issue of

18 dispute as to the fact that in this time period the second

19 lien facility was undersecured.  And so on that basis, we

20 should be able to wipe out all but the last of these

21 transfers, all but the 552,000.  So that would be the

22 subsequent new value defense.

23      Second defense is the ordinary course defense and I

24 recognize that to a large extent a lot of courts would say

25 that this is a fact intensive discussion.  I would argue that

1  in the case of a long-term credit facility such as this one,

2  it really is not quite so fact intensive.  The case law looks

3  to whether or not the parties have acted within the same basic

4  range of market terms that they did under a baseline period.

5  Here, of course, you take a look --

6  THE COURT:  But if they dispute that, that's a

7  material fact in dispute.

8  MR. HOFFMANN:  Well --

9  THE COURT:  Your evidence would have to be so

10  overwhelming that there would be no reasonable likelihood that

11  I would rule the other way.

12  MR. HOFFMANN:  I certainly understand that, Your

13  Honor, but if we go through and actually take a look at

14  547(c)(2), the factors are, number one, was the debt incurred

15  in the ordinary course of the affairs of the borrower and the

16  creditor?  So that's number one.  Well, let's take a look.

17  This credit facility was originally entered into in the year

18  2000.  It was then obviously amended in 2006 to split it into

19  a first lien and a second lien and then there were -- and then

20  there was --

21  THE COURT:  Well, it wasn't amended.  It was

22  replaced.

23  MR. HOFFMANN:  Well, the -- that's partially true.

24  The original credit facility, the -- my understanding of it at

25  least is that the senior -- the original facility was amended

1  so that the first lien facility was an amendment of the

2  original facility and the second lien facility was a new

3  facility entirely.  That's my understanding at least but

4  regardless, we're talking about the same funds in whatever

5  form you want to say, whether it's a new facility or an old

6  facility.  But these funds have been outstanding essentially

7  since the year 2000 and, or -- yeah, 2000 there was the

8  amendment or if you want to say a new facility in 2006, that's

9  fine.  And then there was an amendment to add in new money in

10  2008.  But in terms of ordinary course of affairs between the

11  borrower and its creditors, including Highland, this has been

12  ordinary course between these creditors.  I think it's also

13  typical for companies of a variety of sizes to have credit

14  facilities and I think the Court can take notice of that,

15  obviously.  Obviously, the Walash (ph) case recognizes --

16         THE COURT:  But it's not -- I'm sorry.  But it's not

17  having a facility.  Of course, I'd say virtually every company

18  of any size has debt and usually bank debt of some kind.  It's

19  not having the debt.  It's how the debt was applied in this

20  instance.  All right.  So each -- it's not to say, you know,

21  the vertical and horizontal test on ordinary course.  It's not

22  to say that the horizontal test in this instance is to have

23  debt.  It's the way it was paid, the way it was increased or

24  decreased in this instance, and this is a permanent defense.

25  So the way it was increased in this instance was not in the

ordinary course of business in the industry or across the

board, as opposed to, you know, in the context of this

company.  And, again, how do I know that more specific piece

for purposes of summary judgment?

MR. HOFFMANN:  Understood, Your Honor.  And I would

say one thing here is that we have certainly cited to case

law, which states that debt incurred in the context of

restructurings very well may be ordinary course.  You have to

look at the course of the conduct of the parties over time.

And that leads me to the second prong.  The parties have to

show that either the transfer was made in the ordinary course

of the Debtors and Creditors' affairs or that it was made

according to ordinary business terms.  In terms of prong A,

you take a look at the Jeff Scott Declaration, which Jeff

Scott is the officer at Nexbank SSB, which is the agent on the

second lien facility.  He's been the manager of these types of

loans for I believe he says eight years in his Declaration.

There's a chart in his Declaration which lists both baseline

payments for several years prior to the alleged transfers and

the transfers during the 2008 period.  You'll note from that

Declaration, Your Honor, that the various transfers made

during the year prior to the petition date were all interest

payments.  They were wired.  They were all made within a

standard time of between zero and I believe it was 11 days

after the notice was delivered.  So in terms of the ordinary

1  course of the Debtors and Creditors' affairs, I believe that

2  we do satisfy that test.

3         And, lastly, as I say, it's an either or.  The other

4  prong is that the transfers were made according to ordinary

5  business terms and the cases do say that, you know, you would

6  look at a range of terms and that only dealings so unusual as

7  to fall outside the broad range should be deemed

8  extraordinary.  I would argue that taking a look at what Ernst

9  & Young deemed to be a long-term loan facility and I would say

10 is pretty garden variety that we meet that prong as well.  But

11 with that, Your Honor, I will turn the podium over to Mr.

12 Hoort in connection with the preferences against the first

13 lien facility and any other points he wishes to argue.

14         THE COURT:  Thank you

15         MR. HOFFMANN:  Thank you, Your Honor.

16         THE COURT:  You're welcome.  Mr. Hoort.

17         MR. HOORT:  Good morning, Your Honor.

18         THE COURT:  Good morning.

19         MR. HOORT:  Steven Hoort of Ropes & Gray on behalf

20 of the Highland First Lien Lenders or the Retail Lenders, Your

21 Honor.  First of all, I don't intend to repeat the areas that

22 Mr. Parkins went over.  I would like to reserve the right for

23 rebuttal in response to whatever the Committee might argue.

24         With respect to the preference issues, they actually

25 fall into three categories, preference, fraudulent conveyance

and 550 issues but I think that I can shorthand it by saying

that the fraudulent conveyance count applies only to the

extent that for some reason the payments are any kind of

preferences, which isn't the case.  And the 550 count is just

a repetition of the prior two accounts.  So I'll deal with

them all in the preference context.  We have the same ordinary

course defense and the same issues which were just raised

which is predicated on the 2006 refinancing, being an ordinary

course transaction and there's the same regularity of payment

and this is all detailed in our papers.

We also have a new value defense.  The new value

defense is a little different.  It would wipe out

approximately half of the preference exposure.  There was a

$10 million increased revolver availability on March 17, 2008.

Assuming the Debtors drew down the entire amount at that point

in time, the amount of payments that have been received within

the one year insider preference period was approximately 4.4

million.  The amount that came after that was approximately

4.3 million and then there was $640,000 in payments which were

received on the same date as the revolver, in which there is

no summary judgment evidence in terms of whether it came

before or after or whether it was a substantially

contemporaneous exchange.  But I think the thing that really

makes the first lien lenders different, Your Honor, is that

they did have a first lien secured position and this is not a

defense.  This is something that goes to the cause of action itself, 547(b)(5).  The Committee would have to prove that the first lien lenders received more than they otherwise would have received.  And as long as we're fully secured, we would not have received more than we otherwise would have received.

The evidence that's in the case record as of now is that as of the petition date the first lien lenders continue to be fully secured and the evidence, the valuation evidence, presented by the Debtors had a value of approximately 186 million on the collateral that secured the first lien position at a point in time when the first lien debt was approximately 181 million.  Similarly related to 547(b)(5) position is that the first lien lenders at all time had a lien on substantially all of the Debtors' assets.  "All" or "substantially all" has always been the magic language, and as a result, to the extent they received payments that were proceeds of their collateral, they wouldn't have received more than they otherwise would have received.  They would have received the benefit of the collateral to which they were otherwise entitled.  There, as part of the stipulation and DIP order, which was entered on June 30, of '09, it's docket number 658 at paragraph 18, findings were made to the effect that the first liens -- between the Debtor and the Highland first lien lenders was the stipulation that were fully perfected subject only to the Committee action.  Now the Committee action doesn't challenge

1    perfection per se.  It seeks subordination.  It seeks other

2    things.  So the Committee's response on the preference count

3    is you receive more than you otherwise would have received

4    because your position should be subordinated.  And I think

5    that goes back to what Mr. Parkins talked about here earlier,

6    which is there is no grounds for subordination.  So once the

7    Court addresses the subordination issue, I think that the

8    Committee's counts for preference, fraudulent conveyance and

9    550 of the first lien lenders also all go away.  Thank you,

10   Your Honor.

11        THE COURT:  You're welcome.  Anyone else on the

12   movant's side?  All right.  I want to hear from -- obviously

13   from the Committee.  Is the Debtor going to be heard on these

14   issues, Mr. Beskrone?

15        MR. BESKRONE:  Your Honor, for the record, Don

16   Beskrone.  No, we're not going to be making any argument at

17   this point.  Thank you.

18        THE COURT:  Thank you.  I have to run out of the

19   office for a short period.  So before I hear the Committee,

20   I'd like to take -- well let's reconvene at 12:15, if we may.

21   You can leave your things.  Thank you.

22      (Recess from 11:29 a.m. to 12:15 p.m.)

23        THE COURT:  Please be seated.  I'll hear from the

24   Committee.

25        MR. FLIMAN:  Good afternoon, Your Honor.  Daniel

1  Fliman, Kasowitz, Benson, Torres & Friedman on behalf of the

2  Official Committee of Unsecured Creditors.  Your Honor, I've

3  prepared binders of some of the exhibits I plan to refer Your

4  Honor to.  If I could approach and give one to you.

5       THE COURT:  Yeah.  Thank you.  Will you give one to

6  Ms. Workeiser (ph), please, if you have one.  Thank you.

7  Okay.

8       MR. FLIMAN:  Your Honor, the Committee appears today

9  in opposition to the Highland Defendants' Motion for Summary

10  Judgment.  We believe that that request should be denied on

11  each count and that the Complaint filed by the Committee

12  should proceed to trial.

13       There are three overarching reasons why this should

14  happen, the three fundamental issues that arise throughout

15  this case.  The first is that the record shows that since

16  early 2006 the Highland Defendants have exercised control over

17  Broadstripe's business affairs, that they were insiders and

18  that they owed fiduciary duties to Broadstripe and its

19  creditors.

20       The second reason, that Highland's papers and

21  arguments for summary judgment are just wholly deficient in

22  satisfying their burden for summary judgment.  In several

23  instances, Highland's own papers highlight the fact that

24  there's a genuine dispute of fact that should proceed to

25  trial.  One example that comes to mind is in discussing the

harm from not closing the James Cable deal and also in
addressing solvency issues. Highland, in fact, highlights
through its papers that there is a genuine dispute of fact.
In other places in its papers, Highland doesn't even challenge
that the records supports the Committee's Complaint. And in
other places, Highland is focusing on wholly irrelevant
arguments, the key of which relates to the James Cable
transaction and the issue of whether, in fact, Highland was
"committed" to providing financing when, in fact, that is not
a relevant issue here. It is rather what Highland's actions
were towards Broadstripe in giving assurances leading up to
the APA.

And the last reason, the last overarching reason why
it is that the Committee's Complaint should go to trial and
that Highland's summary judgment should be denied is that the
record shows that Highland consistently took risks with
Broadstripe's money going back to 2006. It was its approach,
if not it's policy, to look for acquisitions, to look for
transactions or to prevent transactions from happening in
order to protect Highland's own investments but in total
disregard of what that meant for Broadstripe and what that
meant for Broadstripe's creditors.

I think the best place to begin, Your Honor, since
it seems that, you know, we have agreement on the summary
judgment standards it's probably with equitable subordination

itself.  And when we get there, again, I don't think that there's much of a disagreement of what standard governs, although, of course, the issue is which facts are before us and we would argue that the Committee's Complaint should proceed to trial.  Of course, the equitable subordination claim under the Mobile Steel factor requires inequitable conduct that caused injury and that equitable subordination is consistent with bankruptcy laws.  On the last factor, I don't think anybody disputes that here.  So really the inquiry focuses on what inequitable conduct occurred and what harm resulted from that.  And we really are dealing with two different periods of time and two different situations.  One is the Wave Division sale and one is the James Cable acquisition.

The standard for inequitable conduct is really governed by whether we're looking at an insider or not and we believe that there's substantial evidence in the record that Highland was acting as an insider going back to 2006, including when it orchestrated a scheme to block the Wave Division sale.  Mr. Parkins has argued to us that in 2006 Highland was just a lender, although it did hold equity through the IRNs.  I think the conversation Your Honor had with Mr. Parkins flushed that out, but that it was acting as an IRN holder and as a creditor and that it did no more than exercise its contractual rights.  Well, the record clearly

shows that it went way beyond what a creditor would do.  Among

them, Your Honor, and if I could just refer your attention to

the relevant exhibits in the binder I've handed up.  The

record kind of begins in the beginning of 2006 and if Your

Honor would turn to Exhibit 3 it shows that Mr. Walls of

Highland, and I'll draw Your Honor to the language in a

second, but Mr. Walls of Highland and Mr. Fredette of Trimaran

are clearly agreeing how to approach a situation to block the

Wave Division sale.  There's a conversation that's reflected

here in which they are trying to discuss the next steps of

what would be necessary, whether it's to hire an industry

expert, trying to figure out how it is that they positioned

themselves to keep the company from going forward with a

signed APA in order to sell the northwest and the central

assets to Wave Division.

        THE COURT:  Well, not to be flip, but so -- so what?

        MR. FLIMAN:  Well, Your Honor, if we continue with

what it is that Highland and Trimaran agreed to do, we realize

that they really were infiltrating the company.  I mean,

you've got a company that has signed an APA and part of the

APA requires that they get consent from the lenders.

Notwithstanding all this, Highland and Trimaran convinced the

company to retain a consultant to justify walking away from

that very APA.  Barrier Advisors, which is an affiliate of

Highland, is brought in and is told to assume a situation
where there's no sale, where there's $30 million of equity
infusion and to try to justify why it is that this company go
forward through a refinancing and to walk away from the sale.
I think the document that kind of illustrates that the most,
Your Honor, is Exhibit 2 in the binder.  And in this e-mail,
you've got an exchange between Mr. Walls and Mr. Laver (ph) of
Barrier Advisors.  And he tells him -- this is a conversation
in connection with the retention of Barrier.  He tells him,
"I'm pretty sure that we Highland won't let this happen, so it
shouldn't worry you too much," referring to the fact that
we're not going to let a sale go through.  It was clear that
Barrier was retained to justify the conclusion of walking away
from the Wave Division sale.  Now this is a very significant
fact.

        THE COURT:  All right.  Go ahead.

        MR. FLIMAN:  The company's paying the freight.
They're paying Barrier Advisors to basically justify undoing a
deal that the board had already approved and that the company
was already pursuing.  And this caused some real concerns for
Vice Chancellor Strine when reviewing the Motion for Summary
Judgment that had been filed by Highland against the
Broadstripe Defendants in that litigation.  To quote Vice
Chancellor Strine, he said, "Hiring a banker, running
projections for an alternative transaction" -- and honestly

1  the argument that this was somehow the IRN holders were

2  contractually obligated to this, I mean, frankly that doesn't

3  pass the straight-face test.  This is what happened here, is

4  that Trimaran and Highland team up, they hire Barrier

5  Advisors, they have the company pay the freight on that.

6  Barrier is given access.  Barrier does its analysis to justify

7  walking away from the Wave Division sale, pursuing a

8  refinancing through an acquisition strategy going forward.

9  This is way beyond what it is that a lender does when he

10  exercises contractual rights to, you know, veto a deal through

11  its consent.  This is infiltrating a company and really taking

12  control over the process.  The evidence also shows that way

13  before Highland actually steps onto the board, it is acting as

14  a director.  It is making strategic business decisions and

15  it's making hiring decisions.  In September of 2006, it's

16  Highland that brings Bill Shreffler aboard as a CEO.

17  Trimaran, of course, as a member of the board at that point,

18  Highland was not, is the one that's pushing the company on the

19  decision but the evidence is clear that this was Highland's

20  decision to bring him on and Highland was the one pushing for

21  a change of CEO.  This was done before they even stepped on

22  the board.  They were clearly exercising control of the

23  company before even joining the board.

24        The record also reflects that Highland after buying

25  into the IRN position learned that it was likely that the

1   existing bank debt holders were going to consent to the Wave

2   Division sale.  It's only once they learned that, and the

3   record, I've got an exhibit where counsel for the bank debt

4   holders submits a draft consent to the sale, saying, "we are

5   going to agree to the Wave Division sale going forward."

6   Well, so what does Highland do?  That's when Highland starts

7   buying up its huge stake in bank debt and is paying above par

8   prices.  Now why is it doing that?  Well, because it realizes

9   that this is part of -- it's a necessary step of its overall

10  scheme with Trimaran to stop this from going forward in order

11  to capitalize on the value of its equity which is the IRN

12  stake.

13          So in April of 2006, Barrier issues its report,

14  which not surprisingly says that the company can go forward

15  through a refinancing and through an acquisition strategy

16  where value might run to the IRNs one day.  Immediately

17  thereafter, Trimaran and Highland send a joint letter over to

18  the company saying, "We on behalf of the IRNs are blocking the

19  sale.  We're not providing consent to the Wave Division sale

20  going forward."  A couple weeks later, Highland sends a letter

21  in its capacity as bank debt holder, majority of the bank debt

22  that it holds at this point, saying, "We are not going to

23  consent to the sale going forward."  On July 28th, the company

24  terminates the Wave Division APA and on the same day

25  refinancing goes through.  That refinancing puts Highland in a

large portion of the first lien debt and a large portion of

the second lien debt.  And between that point in time in July

of 2006 and October 2006, as I mentioned when Highland

actually steps on the board through a refinancing, Highland is

making strategic business decisions, it's making hiring

decisions and, in fact, made decisions about getting rid of

Broadstripe's former CEO, Kelvin Westbrook.

Your Honor, we believe that the record shows that

leading up to the July 2006 refinancing, which includes the

termination of the Wave Division APA, Highland was an insider.

It was in control of the company through its efforts with

Trimaran.  Trimaran and Highland had a common purpose, which

was to block the sale, and the record does indicate that there

was an agreement among them through the various steps to work

together to block the sale from going through.  So given that

Highland was an insider, the standard that must be applied to

them in order to establish inequitable conduct for equitable

subordination, is just to show unfair conduct.  And we think

that the record is clear that Highland acted unfairly towards

Broadstripe and its creditors in connection with the Wave

Division sale.  And that is actually glaring from the fact

that, as I mentioned, Highland worked with Trimaran to retain

a consultant paid by the company to justify walking away from

an approved transaction and that Highland clearly disregarded

the fact that there would be huge litigation claims that did

1    arise from walking away from the Wave Division sale.

2          We think that the harm is clearly established from

3    the conduct that was undertaken by Highland back in 2006.

4    That's shown by the fact that there is a large claim asserted

5    by Wave Division against Broadstripe.  That's shown by the

6    fact that significant litigation fees, attorneys' fees have

7    been incurred from that litigation.  The record shows that the

8    number well exceeds at least $3.5 million in litigation fees

9    that would have been avoided had the transaction, of course,

10   gone through and the litigation didn't ensue with Wave

11   Division.  The record also shows that as a result of walking

12   away from the Wave deal, Broadstripe had a reputation for

13   being toxic to deal with and had a bad reputation for getting

14   deals done in the industry that hurt it.

15         Now Highland makes certain arguments of why it is

16   that they say that walking away from the Wave Division didn't

17   harm Broadstripe, but those arguments are fully unveiling.

18   First of all, the argument -- the first argument that they

19   make is that, well, given that the draft consent given by the

20   bank debt holders was -- I'm sorry.  They argue that blocking

21   the sale as bank debt holders wasn't the real causation of

22   walking away from the Wave Division sale because the IRNs

23   would have blocked it anyway.  This is one of the arguments

24   contained in their papers, the memos, at paragraph 26 when

25   they make that argument.  So essentially what they're saying

1  is, you know, we didn't cause any harm by blocking the Wave

2  Division sale because we as the secured debt holders wouldn't

3  have -- even had we not blocked it, the IRN holders would have

4  blocked it.  The problem is that, of course, the Highland

5  entities also held the IRNs.  So essentially they're ignoring

6  the fact that they held both capacities and were capable of

7  blocking the deal.  But, more importantly, this is a causation

8  issue and not a harm issue.  This does negate the fact that

9  there was real harm that came about by blocking the Wave

10  Division sale.

11        The other argument that Highland makes, which is

12  equally flawed, is the fact that not going forward with the

13  Wave Division sale somehow prevented an erosion of value to

14  the IRNs.  Well, but that doesn't show that no harm occurred

15  to Broadstripe.  Harm certainly occurred and, if anything,

16  today, I think everybody would agree that the IRNs had

17  absolutely no value anyway.  Indeed when the Debtors

18  originally filed a plan with this case, it would have given no

19  value to the IRNs.  So the argument that somehow temporarily

20  there was value attained to the IRNs certainly doesn't go to

21  the issue of was harm caused to Broadstripe.  And I would

22  submit that the record clearly shows that Broadstripe was

23  harmed.

24        Now equitable subordination with respect to the

25  James Division deal kind of jumps over the first step.  I

1 don't think there's any doubt in anybody's mind that when it

2 came to the Wave Division (sic) deal, clearly Highland was an

3 insider.  At that point, it was on the board.

4        THE COURT:  You mean James River (sic) deal?

5        MR. FLIMAN:  James Cable.  Yeah.  I'm sorry.  When

6 it comes to James Cable.  At that point, Highland's on the

7 board.  Highland at the time of the signing of James Cable APA

8 held or had the ability to vote about 89 percent of the LLC

9 units at Broadstripe.  So clearly the unfair conduct standard

10 applies when we're determining whether it acted unfairly.

11        Now Highland would like us to focus -- let me back

12 up.  Highland's papers asked us to focus on something

13 different than Mr. Parkins did today.  Highland's papers

14 focused for pages and pages about the fact that Highland did

15 not commit to provide financing to Broadstripe.  Well today

16 Mr. Parkins kind of backed away from that realizing that maybe

17 that's not the most relevant argument here.  The most relevant

18 issue here is what did Highland give Broadstripe assurances

19 that it would do and, as Your Honor points out, how is it

20 possible that the management committee signs an Asset Purchase

21 Agreement with no financing contingency where two of the

22 members, two of the three members of the management committee

23 are Highland employees?  How did they permit that to go

24 forward?  Well, Mr. Parkins would have you believe that at the

25 time it was standard to have asset purchase agreements with no

financing out.  Well, we've got absolutely no evidence of
that.  We've got certain witnesses that testified that may
have been the case but certainly there's no evidence of the
fact that that was industry standard, and actually I would
submit that at the period of time in October 2007 it probably
wasn't standard to have no financing clauses.  But, more
importantly, the conduct that Highland itself demonstrates
that they really doubted whether this was industry terms.  As
Mr. Parkins alluded to, after the dust had settled with the
James Cable APA, Jim Dondero, the head of Highland, directed
somebody be fired in Broadstripe's management over the fact
that there was no financing out.  Now Mr. Parkins tells us
that ultimately didn't happen because, you know, as the record
shows they talked Dondero out of it.  But the fact that he
wanted somebody fired clearly tells us that these were not
market terms and that it wasn't a reasonable thing to do.  Mr.
Dougherty, who is one of the senior members of the Highland
Capital Management and also a lawyer himself, also thought it
was imprudent that they enter into the APA with James Cable
that had no financing out.  So the question really is, what
was going through the minds of the members of the management
committee when they signed this deal?  And the record can only
-- the record does reflect that they thought financing was
coming from Highland.  And perhaps the document that shows
this most --

1          THE COURT:  Wait a minute.  Wait a minute.  Wait a

2    minute.  Okay.  They thought -- the Debtor thought financing

3    was coming from Highland.  Highland Control Management

4    Committee approves the deal, then Highland wants to get the

5    general counsel fired for signing the deal that Highland,

6    under your theory, wanted to happen.  Am I missing -- am I

7    making any sense?  Highland wanted X to happen, it happened,

8    and then they wanted to fire the general counsel for making X

9    happen.

10          MR. FLIMAN:  That's right, Your Honor.

11          THE COURT:  Well, I'm confused.

12          MR. FLIMAN:  Well, so are we.  I mean, you know, the

13    reality --

14          THE COURT:  So your issue is I don't know why and

15    that's why it's inappropriate for summary judgment or --

16          MR. FLIMAN:  Well, that is one of our arguments but

17    I think what you're really seeing here is the fact that Jim

18    Dondero, the head of Highland, is realizing the ramifications.

19    This is later on.  He's realizing the ramifications of this.

20    He's realizing that there's going to be a lawsuit that comes

21    about and says, how is it possible that we had this deal with

22    no financing out, and then Highland didn't provide the

23    financing.  But I don't think the fact that somebody -- the

24    fact that Highland wants somebody fired at Broadstripe in any

25    way takes away from the fact that they signed the deal with no

1   financing out knowing that they didn't have financing.  And

2   maybe I'm missing --

3           THE COURT:  Well then why -- well, I'm trying to

4   figure out the inequitable conduct involved with what may have

5   been -- I'm trying to figure out the inequitable conduct by

6   Highland in signing -- in approving the signing of the deal

7   and then not with no financing out and then not lending.

8   What's the inequitable conduct if ultimately Highland says,

9   "What were we doing?"

10          MR. FLIMAN:  Maybe I'm missing the point, Your

11  Honor.  Just because Highland wakes up and says, "What were we

12  doing," doesn't mean that they didn't do anything bad.  And I

13  would submit --

14          THE COURT:  You're saying Highland woke up to its

15  own conduct?

16          MR. FLIMAN:  That's right.

17          THE COURT:  And then tried to shift it to --

18          MR. FLIMAN:  That's exactly right.

19          THE COURT:  -- the Debtor.

20          MR. FLIMAN:  That's exactly right.

21          THE COURT:  And the facts to support that I guess

22  are implication of the facts that you would say are in

23  dispute?  And the implication being that what Highland did was

24  wake up to its own purposes and blame the Debtor.  I mean,

25  there's no document that says that.  It simply says Mr.

1  Dondero -- no. It says that Highland wanted the general

2  counsel fired for taking a stupid action on behalf of the

3  Debtor. I can maybe by implication deduce that or infer that,

4  okay, what was really going on was Highland realized they had

5  gotten itself into a corner and needed to blame somebody.

6          MR. FLIMAN: I think that's right, Your Honor.

7  Yeah.

8          THE COURT: Was that appropriate? I mean, look --

9  if summary judgment is going to mean something, at some point

10 I have to stop spinning theories and I have to look at what

11 the evidence actually says.

12         MR. FLIMAN: Well, I think the evidence says that it

13 was perfectly reasonable for Highland -- perfectly reasonable

14 for Broadstripe to assume that this financing was coming from

15 Highland. We've got two members on the management committee

16 from Highland approving this deal with no financing out.

17 You've got testimony --

18         THE COURT: All right. So the inequitable conduct

19 then would be forget about who approved what and who wanted

20 who fired? The inequitable conduct would be they pursued

21 conduct that made it quite reasonable for the Debtor to assume

22 that they were going to lend. They signed a contract based on

23 that assumption and then Highland didn't lend and as a result

24 that's the inequitable conduct, the allowing the Debtor to

25 make a reasonable assumption based on their conduct, then

1  later not lending.  That leads to the harm because that leads

2  to the breach of contract.  Right?

3          MR. FLIMAN:  Right with one more -- one more way of

4  looking at it, which is the way we look at it, which is that

5  Highland basically saw this as option value.  Highland

6  basically told Broadstripe, "we want you to grow, go find

7  acquisitions," and thought to itself, "well, if we like the

8  acquisitions, we'll finance them," but while that's what they

9  were thinking, what they were really telling Broadstripe was,

10  "we will finance the acquisitions."  And they were also

11  blocking other money coming in from other lenders.  The record

12  shows that they were telling Broadstripe at the same time,

13  "don't find money anywhere else."  They were worried that that

14  would dilute the IRN holdings.  So they're sending Broadstripe

15  down a path of saying, "we will provide financing," but in the

16  meantime they're looking at this as option value and saying,

17  "you know what, if we want to pull the financing, we'll pull

18  the financing, not caring what that means for Broadstripe."

19  And that's what we see.  They signed this APA with no

20  financing out and then why do they decide to pull the

21  financing?  I mean, it's clear why they did that, because

22  Highland decided it wasn't a good deal for Highland.  That's

23  fine.  But Highland is the company.  I mean, it controls the

24  equity.  It controls the management committee.  It controls

25  the first lien and the second lien debt.  There's

1    ramifications of your decision not to lend that you need to

2    think about because of your obligations of fiduciary duties.

3    And you can't just ignore the fact that there's a signed APA

4    and that that's going to cause exposure to Broadstripe, and

5    that's what happened here.

6           I'm actually trying to locate one exhibit, Your

7    Honor.  Give me one sec.  Your Honor, if I can turn your

8    attention to what's been marked as Number 21 in the binder I

9    handed up to you.  And the fact that Broadstripe believed that

10   it was going to get financing from Highland is not surprising

11   given the fact that it seems like people within Highland

12   themselves thought that they had committed to provide

13   financing.  This exhibit shows a November 16, 2007 e-mail from

14   Dave Walls, who is the senior member in charge of the Highland

15   investment at Highland Capital Management.  And, Your Honor,

16   if I can turn your attention down -- this is a press release

17   that he circulated internally to the team leaders, which is

18   the senior management of Highland.  If I could turn your

19   attention to the very end of the first full paragraph, the

20   press release, the one that begins with "St. Louis, Missouri,"

21   at the very end that sentence reads, "Highland certain of its

22   investment funds have committed to provide senior debt

23   financing to consummate this transaction."  Now, Your Honor,

24   given the fact that Dave Walls is approving a press release

25   that goes out to the market that tells everybody they're

1  committed to provide this financing, it's not surprising to us

2  that Broadstripe believed the money was coming from Highland.

3  And so when Highland pulls the financing, it knows that

4  Broadstripe will definitely have to walk away from the deal

5  and breach its deal.  It is very well aware of that.  In fact,

6  the record shows that when Highland was debating how to

7  proceed with the James Cable situation, it knew that it would

8  expose Broadstripe to litigation risk and it took that into

9  account when making its own decision to breach the contract.

10        Turning your attention to the next tab in the

11  exhibit book, in this e-mail correspondence from February of

12  2008, Mr. Walls and Mr. Nau, who I believe at this point was

13  on the management committee, but I could be mistaken on the

14  dates, but certainly it was one of the Highland members

15  responsible for the Broadstripe investment.  They're

16  discussing whether they can renegotiate the James Cable deal.

17  And one of the things that Mr. Nau points out, he says, "well,

18  listen, we can" -- and at this point, by the way, there had

19  been no litigation commenced.  So at this point they're

20  saying, "well, I think one of the pressure points I could put

21  on them in order to renegotiate the deal is the fact that, you

22  know, we're pretty credible as a firm in our willingness to

23  litigate," to which Walls' response of that I'm certain.  In

24  our summary judgment

25  --

1        THE COURT:  So am I.

2        MR. FLIMAN:  In our Objection, we cite to other

3   places where Highland is clearly taking into account the fact

4   that not pursuing the James Cable deal is going to expose

5   Broadstripe to litigation risk.  Notwithstanding all this,

6   Highland decides to not finance the deal, causing liability to

7   incur at Broadstripe.  And while Highland would have you

8   believe that as a lender it can make a decision not to

9   finance, it was never committed to finance, the bottom line

10  here is that Highland wasn't just a lender.  It was

11  Broadstripe and it made a decision not to go forward because

12  it didn't make sense for its own portfolio.  That's fine but

13  it's got to pay the price of what happened at Broadstripe.

14  Your Honor, we would submit that Highland has not met its

15  burden on summary judgment on equitable subordination, that it

16  should proceed to trial.

17        On the recharacterization claim, I think Mr. Parkins

18  kind of glosses over some of the facts and some of the

19  applicable standards.  I think that the case law requires that

20  we have methodical analysis of each of these factors that have

21  been recognized in the Third Circuit and other Circuits.  And

22  I would submit that once you apply those factors, there's

23  certainly evidence in the record to support a finding that

24  Highland put in the $70 million really as equity, even though

25  they called it debt.  And perhaps the most obvious piece of

evidence that supports this is at tab 24 of the binder I've given you, Your Honor.  Now this is a letter from counsel for Broadstripe to Highland responding to a financing proposal that had submitted by Highland.  And, Your Honor, if I could turn your attention to paragraph 4 of this letter, which is dated March 31, 2006, counsel for Broadstripe tells Highland the following:  that the borrower has been treading water over the past several years, selling systems to keep its lenders at bay, deferring anything other than maintenance capital expenditures and servicing its interest in limited principal payments.  Now the proposal letter shows more debt, higher interest rates, substantial fees on this facility.  The proposal also requires that we provide you with projections that "must demonstrate full payment of the credit facility on or prior to maturity."  And this is the key language.  "We are concerned as to whether this can be accomplished given the amount borrowed, interest rates and fees in the proposal."  Here you've got Broadstripe warning Highland that if it extends this credit, if it makes this "loan," it might never be repaid.  Nonetheless, Highland goes forward and puts in this money.

Now Highland argues that somehow the refinancing fixed the company but, you know -- and they look at the audit opinions from Ernst & Young for year end 2005 and year end 2006.  Now even if -- and I'll talk about the fact that it

1  didn't -- but even if it "fixed the company," it doesn't

2  answer the question of, did Highland put in the money as debt

3  or did it put in the money as equity.  Just because the

4  company may have addressed certain of its concerns does not

5  mean that Highland lent this money as equity.  Now, as a

6  matter of fact, when you look at the Ernst & Young audit

7  opinion and you generally consider what an audit opinion is

8  and, by the way, for purposes of summary judgment, I submit

9  that we should not necessarily look at that because it really

10 is hearsay.  We should have somebody from Ernst & Young come

11 here and testify about what it really says.  But I would say

12 that the audit opinion at the very minimal says that, or at

13 its greatest rather, the audit opinion at its greatest says

14 that for the year of 2006, Ernst & Young did not anticipate

15 any default on debt that the company had.  Now clearly given

16 the fact that the terms of the second lien debt required

17 basically no payment, I mean we're talking about 2 percent

18 interest payment with an optional payment of some other

19 interest pieces, but really no payment because everything was

20 picked until the very end of maturity.  So it's not surprising

21 that Ernst & Young says, "well, there's probably not going to

22 be a default here because the company's not really paying

23 anything."  The reality is that the money was put in when

24 there was doubt about whether it would be repaid, when there

25 really was no requirement for continual periodic payments.

1          And I would also submit, Your Honor, that the

2    Highland Defendants' reliance on Submicron to say that somehow

3    because money was put in a distressed situation, we should

4    ignore some of the AutoStyle Plastics standards is just not --

5    shouldn't carry any weight.  I mean, when we look at the

6    actual opinion, and I had an opportunity to review the opinion

7    during the break, this was a situation where there had been a

8    full trial.  There was a full record developed and the

9    District Court had to look at all the issues before it.  This

10   was not a summary judgment situation.  This was not a

11   situation where the standard requires that the burden be

12   placed on the defendant.  So I would submit that simply

13   ignoring the AutoStyle Plastics, which is what Highland would

14   have Your Honor do because of a distressed situation, really

15   shouldn't be what happens here.

16          Your Honor, the second lien "debt" was also clearly

17   more like equity than debt, given the fact that it really was

18   lent on an unsecured basis.  There was insufficient collateral

19   to really cover the amount that was lent and while Highland

20   had made some arguments in its papers of why it wanted Your

21   Honor to think that maybe that they were fully secured through

22   the second lien, they really have failed to point anything in

23   the record that persuasively shows that.  Highland relies on

24   certain indications of interest that had come in back in 2005

25   for the sale of the Maryland assets.  But, Your Honor, non-

binding indications of interest certainly should not take the place of valuation, of which there's none in this record. And the reality is that as the party moving for summary judgment, Highland needed to show the valuation and to show that it was fully secured on the second lien piece. It has not done this.

I think one of the most persuasive factors that we need to look at of <u>AutoStyle Plastics</u> of why it is that this is really equity and not debt is the fact that nobody else was willing to put up this money, and there is nothing in the record to indicate that anybody else would have put up this financing. Now Highland had made several arguments in its papers that we have not heard about today pointing to certain internal memoranda at Trimaran that they think show that other parties were interested in financing. For reasons that are set forth in our papers, and I don't think I need to go into it at length today because, you know, we've set them out there, but, you know, the memorandum, which is the only piece of information that Highland points to in trying to establish that other people were interested in the financing, that memorandum does not establish that any outsiders would have put up the money. And, as a matter of fact, the testimony at depositions showed that Mr. Walls and Mr. Fredette both thought that no outside parties would likely ever put up this money, that Highland was putting in this money because of its

1  insider involvement and because it was an equity holder.  That

2  is one of the indicia recognized for finding that money was

3  put in as equity rather than as debt.

4          Your Honor, the final point that I'd like to focus

5  on for recharacterization of debt to equity is the fact that

6  repayment here was really subordinated.  Given the fact that

7  there was a huge pick piece on this and the fact that the

8  company was basically able to use the money that it wasn't

9  paying on a coupon or on a periodic payment to the second

10 liens, it basically means that the repayment was subordinated

11 because money was used for trade creditors and for other

12 obligations.  This also is one of the indicia looked at in

13 courts in trying to figure out whether debt was, in fact, debt

14 or was equity.  For all these reasons, we would submit that

15 Highland has failed to meet its burden on recharacterization

16 and that the Committee's claim should proceed to trial.

17         Now when it comes to the alter ego claim, Highland's

18 argument that you heard today basically amounts to the fact

19 that while, you know, we were doing nothing different than --

20 we were just acting as a lender, we were just acting as

21 shareholder but we were not controlling the company.  That's

22 clearly not true.  And I'll cite Your Honor to pages 21

23 through 24 of our Objection where we provide in detail all the

24 ways in which Highland was clearly controlling Broadstripe.

25 It exercised (inaudible) control at all relevant periods of

1    time.  Just to give Your Honor some highlights, it doesn't

2    include the fact that Highland (inaudible) control of the

3    Debtors' efforts to find financing.  The fact that Highland

4    controlled Broadstripe's budgeting of capital expenditures,

5    the fact that Highland controlled which vendors Broadstripe

6    would pay or not pay.  In fact, the record shows that Mr.

7    Walls of Highland effectively convinced Broadstripe to not pay

8    its lawyers, to delay making payment on those particular

9    bills, and to pay other creditors instead.

10           THE COURT:  How is it possible that the Debtor and

11   Highland, huge investment vehicles, series of investment

12   vehicles, heavily involved in distress that they and

13   Broadstripe were acting as a single economic entity?

14           MR. FLIMAN:  Well, Your Honor, I think the record

15   shows that Broadstripe was, in essence, a set of assets on

16   Highland's books but not on its books.  I mean, it was really

17   just looking at Broadstripe and saying, "This is really our

18   stuff.  If we want to grow it, we'll grow it.  If we don't

19   want to grow it, we won't grow it.  We'll do whatever we want

20   to this company and treat it as it's just another asset of

21   Highland."  And I would submit --

22           THE COURT:  Well, first of all, I think the Courts

23   have made clear that that's what parents can do with

24   subsidiaries within limits.  Certainly, to the extent you're

25   talking about fiduciary duty to the parent, it's up to the

parent how it wants to deal with its assets.  You have an

insolvency situation.  Now there may be issues with minority

shareholders.  So holding that aside, you're concerned about

creditors and that depends on whether there's a fiduciary duty

to the creditors or not and that can -- it's an amorphous

concept nobody's quite figured out.  So I'm not sure why

saying that Highland treated a company that it had ultimately

a controlling interest in as an asset is a problem, I mean in

and of itself.  That's what companies are.  They're assets and

liabilities mixed together.

MR. FLIMAN:  Right, Your Honor, but when you

exercise full demanding control over that asset --

THE COURT:  That doesn't mean it's an alter ego.  It

means you have it under control but it doesn't mean that it's

a singular economic entity.

MR. FLIMAN:  I believe it does, Your Honor.  I mean

--

THE COURT:  No, no.  If --

MR. FLIMAN:  The case says a complete domination or

control is the standard as long as you also show, you know,

some element of injustice and unfairness.

THE COURT:  All right.

MR. FLIMAN:  I'm sorry?

THE COURT:  Okay.  Okay.

MR. FLIMAN:  The record also shows that Highland

completely disregarded corporate formalities, that Highland's
designees on the board acted way beyond their scope as
directors.  Indeed, Mr. Walls and Mr. Nau when they were
members of the management committee were also at the same time
making key decisions at Highland regarding that investment.
As members of the management committee, they should not have
been making decisions like whether to buy up Black Diamond's
piece of the debt, whether to mark the Highland investment at
a certain place or other and whether to make further lending,
to provide further lending to Broadstripe.  These are all
things that the record shows that Mr. Nau and Mr. Walls were
clearly involved in.  They should not have been involved in
those things as members of the management committee.

THE COURT:  Can you move your blackberries below the
table, please?  Otherwise it interferes with the microphones
and we get that buzzing noise.  Or are you running wireless
there, Mr. Hoffmann?  Okay.  All right.  Never mind.

MR. FLIMAN:  I think the evidence does support a
finding or rather proceeding to trial on the issue of whether
Broadstripe was, in fact, its own separate entity.  I think
that it's clear that there is evidence to support the fact
that Highland was treating Broadstripe as just its own -- as
an instrumentality and that he exercised (inaudible) control.
And for these reasons, I think that Highland's summary
judgment on alter ego claim should be denied.

On the breach of fiduciary duty claims, I believe that we really when it comes down to whether there was a fiduciary duty owed really looking at -- I'm sorry -- really looking at three different periods of time.  We're looking at the period of time before October of '06, meaning before you've got Highland designated members to the management committee.  Then you're looking at the period of time between October and August -- between October 2006 and August of 2007 because at August of 2007 Highland clearly has a majority of the LLC units under its control.  And the last period of time was August 2007 to January 2009.  So starting with that first period, Your Honor, for reasons I discussed earlier in relation to equitable subordination, I think it's clear that Highland did exercise control over the board through its participation with Trimaran.  And indeed in one of the cases that Highland cites in its own papers, you can have an individual asserting control over a corporation through a collective group if, and I'm quoting this case, which is Dubroth v. Ren Holdings (ph), "If by contract, common ownership, agreement or other agreement to work together towards a shared goal, you have shareholders that are taking control."  And I think it's clear here, for the reasons I cited before, that Trimaran and Highland were working together.  They had an agreement to function together in order to block the Wave Division sale and that was their shared

goal.  I think for this reason Highland did owe fiduciary

duties going back to early 2006 and owed those fiduciary

duties when it caused the company to walk away from the Wave

Division sale.

I also believe, and I think that the record supports

the fact, that the fiduciary duties did run to creditors.  I

think that the record does reflect the fact that Highland was

insolvent -- I mean was insolvent back in 2006.  We just heard

Mr. Parkins talk about the fact that Highland took the actions

that it took because it would be worried that there would be

no value leftover for the IRNs if the transaction went

through.  Well, that only makes sense if the company was, in

fact, insolvent.  But regardless of all this, Highland clearly

hasn't put on its burden to show that the company was solvent.

So at the very least, we've got a material dispute of fact

that needs to go to trial.  But we would submit that the

fiduciary duties did run to creditors and that Broadstripe

breached those fiduciary duties.  The applicable standard here

is the entire fairness standard and that applies to the Wave

Division sale and that applies to the James Cable deal.  The

Wave Division sale requires the entire fairness standard

because Highland was on both sides of it.  Highland acted to

block the transaction through its participation with Trimaran

and Highland also had a financial stake in seeing that the

transaction didn't go through.  Indeed, the fact that it was

buying up debt at above par shows that it clearly was invested

in the transaction not going through as it was concerned that

it would get washed out if there was a sale.  Highland's

actions do not amount to the entire fairness standard, which

requires fair dealings and fair price.  By blocking the Wave

Division sale, Highland acted unfairly towards Broadstripe and

acted unfairly towards its creditors.

Going back to the James deal, in that transaction

also, Highland should be bound to the entire fairness

standard.  Again, Highland was on both sides of the

transaction.  It controlled Broadstripe.  It controlled all

its equity.  It controlled the entire tranche of debt.  But at

the same time, as a post-financing party, it was on both sides

of the transaction.  The fact that it blocked that transaction

from going through by denying financing was an unfair act

towards Broadstripe and its creditors.

THE COURT:  I'd like you to back up again if you

could --

MR. FLIMAN:  Yeah.

THE COURT:  -- and tell me again why in connection

with the Wave Division sale, assuming the company is

insolvent, which would mean any fiduciary duties would flow to

the creditors, why it is that Highland was a party that owed

those fiduciary duties prior to October 2006.

MR. FLIMAN:  Well, Your Honor, because it was acting

1  in control jointly with Trimaran and when you've got a

2  controlling group, which it was, you owe fiduciary duties.

3        THE COURT:  All right.  So it's a controlled group

4  analysis?

5        MR. FLIMAN:  Correct, Your Honor.

6        THE COURT:  And at that time with IRN, you add them

7  up -- excuse me -- with Tri --

8        MR. FLIMAN:  Trimaran.  Yeah.

9        THE COURT:  Thank you.  Trimaran, if you add them

10  up, you get to a controlled position, you get over to 50

11  percent on the IRNs?

12        MR. FLIMAN:  That's right, Your Honor.  I'd also

13  note that in the alternative we've argued that Highland if it

14  didn't owe fiduciary duties directly, aiding and embedding

15  breaches of fiduciary duties by the Trimaran designees on the

16  board of directors.  The Trimaran designees -- Trimaran had

17  two members on the management committee back in 2006.

18        THE COURT:  Was Trimaran part of the July 2006

19  restructuring?

20        MR. FLIMAN:  I'm sorry, Your Honor.  What do you

21  mean by "part of"?  Were they a lender?

22        THE COURT:  Well, were they a party to it?

23        MR. FLIMAN:  Well, I mean, they were on -- they were

24  on the management committee of Broadstripe both before and

25  after the transaction.

1      THE COURT:  Yeah, but I'm trying to figure out how -

2  - and I guess it comes down to whether were an entire fairness

3  issue -- you can only aid and embed a breach of fiduciary

4  duty.

5      MR. FLIMAN:  Correct.

6      THE COURT:  All right.  So that means Trimaran had

7  breached a fiduciary duty.

8      MR. FLIMAN:  Right.

9      THE COURT:  And the question then would be, well, by

10  walking away from the Wave Division sale, was that gross

11  negligence, was it violation of the duty of loyalty or do we

12  have to look at it more carefully and have them prove the

13  entire fairness of the deal?  And the entire fairness concept

14  would only kick in if they were on both sides of the

15  transaction, and that really means the alternative

16  transaction.  So that's why I was asking if they were on the

17  other side of the July '06 restructuring.

18      MR. FLIMAN:  Well, I mean, they were wearing two

19  hats in that they were on the management committee.  Right.

20  They were controlling Broadstripe.

21      THE COURT:  Right.

22      MR. FLIMAN:  And at the same time they're worried

23  about their IRN exposure and worried about that value.

24      THE COURT:  Well, that's just -- that's like saying,

25  okay, say, you know, somebody owns 30 percent of the stock and

they're on a board, they're worried about both but unless

there's something -- some action that's going to be taken

where the shareholders are doing some sort of deal with the

Debtor, you really don't have a conflict in fiduciary duties.

Of course they're worried about their equity investment.  In

the context of any conflict, obviously their fiduciary duty of

the company as a whole kicks in.

MR. FLIMAN:  Right.

THE COURT:  So, again, how were they on the other

side, Trimaran?

MR. FLIMAN:  Well, their obligation should have been

to Broadstripe and its creditors because of the insolvency and

it exposed Broadstripe to the huge litigation claim by Wave

Division from walking away from this deal solely because they

were trying to maximize the value of their IRNs.

THE COURT:  And that's gross negligence?

MR. FLIMAN:  I think that it's at least a triable

issue, yes, Your Honor.

THE COURT:  Okay.

MR. FLIMAN:  And in addition for aiding and

embedding count, we've shown that Highland clearly and

knowingly participated in the breaches by the Trimaran board

members.  They clearly were aware of their actions and they

participated in them.

Your Honor, I think the fiduciary duties of loyalty

are especially implicated here.  When you look at the James

Cable transaction, Highland's obligation would have been to

put Broadstripe's interests ahead of its own interests.  It

clearly did not do that.  It was using Broadstripe as an

option transaction, as a way of potentially expanding its

portfolio but then ultimately decided not to finance their

transaction because it saw a potential harm to the Highland

portfolio, ignoring the impact that would have had on

Broadstripe and its creditors.  Your Honor looked like he was

about to ask a question.  Okay.  We would submit that Highland

has failed to meet its burden for summary judgment on either

the breach of fiduciary duty counts or the aiding and

embedding counts set forth in the Complaint and this should

proceed to trial.

Finally, Your Honor, on the preference counts that

are contained in the Complaint, I think the starting point

that we need to identify, of course, is that the party

asserting affirmative defenses, of course, has the absolute

burden under 547(g).  Highland does not put forth any evidence

to really support its burden, much less on a summary judgment

standard.  The elements for preferences are that a transfer of

property of the Debtor occurred.  I believe that's

uncontested.  That it was made to or for the benefit of a

creditor.  I believe that's also uncontested.  For on account

of an antecedent debt, there's no issue on that.  That it was

made while the Debtor was insolvent.  Well, we have a
presumption the Debtor was insolvent for the 90 days before
and then we have absolutely no evidence from Highland showing
why Broadstripe was solvent in the period before that.
Highland would need to put forward this evidence for summary
judgment, and it certainly has not.
The next element for preference is that the transfer was made
within a year of the bankruptcy if it's an insider.  So it
comes down to the issue of whether Highland and all its funds
were insiders for the full year before the bankruptcy.  We
think that it's clear from the record that they certainly were
insiders.  First of all, Highland Capital Management was, no
doubt, an insider because it controlled the voting indirectly
of more than 20 percent of the equity units at Broadstripe.
Highland Capital Management controlled Highland Crusader and
Highland Crusader held in the year before bankruptcy well over
20 percent of those units.  I think the Bankruptcy Court also
tells us that as an affiliate of the Debtor, which Highland
Capital Management was, any insiders of that affiliate are
also insiders.  That's contained in Section 101.  So all of
Highland Capital Management's insiders are also insiders of
Broadstripe.  And all the Highland funds, which were operated
under a management agreement with Highland Capital, are also
insiders.
          Now both the first lien piece of the Highland debt

1   and the second lien argue for the ordinary course defense and

2   for the new value defense.  Well, I think that there's

3   certainly insufficient evidence to conclude that there was an

4   ordinary course here, primarily whether it was incurred in the

5   ordinary course.  There's really just no evidence on this.

6          On the new value defense, that really needs to --

7   that comes down to the fact that the new value needs to

8   provide an unsecured basis.  Since we don't have valuation, we

9   just don't know that.  Highland can't just make assumptions

10  here and assume that summary judgment will be awarded.  They

11  need to put forth valuation to show why it is that it was

12  provided on an unsecured basis, if that's the case.

13         Similarly, on the issue of whether it is that the

14  first liens received more than they would in a Chapter 7

15  liquidation, again, we need to see a valuation to understand

16  whether the first liens were fully secured.  Highland's

17  reliance on the DH Capital reports submitted to Your Honor in

18  connection with DIP financing is just not valuation that's

19  relevant here.  That was provided solely for the purpose of

20  showing that adequate protection couldn't be provided in a

21  priming situation for Highland.  But, if anything, it

22  established what is the maximum value, not is what is the

23  minimum value of the Broadstripe assets, and that was as of a

24  fixed date.  I believe it was in March of 2009, not the

25  relevant period.

1       Finally, Your Honor, the last count in the Complaint

2  is on disallowance of Highland's claims.  I think 502(d) just

3  speaks on its face that because of the fact that Highland is a

4  potential preference, Defendants' claim should be disallowed.

5  We also believe that equitable disallowance applies here.

6  Highland makes a vague illusion to the fact that that might

7  not be a real cause of action.  Well, the cases they cite in

8  their own papers acknowledge that it is.

9       Also, Your Honor, Highland has failed to meet its

10  burdens on its affirmative defenses and for reasons set forth

11  in our papers, we believe that summary judgment should be

12  denied on those defenses as well.

13       THE COURT:  All right.  Thank you.

14       MR. FLIMAN:  Thank you, Your Honor.

15       THE COURT:  Reply?

16       MR. PARKINS:  Can we take five minutes, Judge, to

17  put it together so it's more efficient or do you want to just

18  --

19       THE COURT:  Yes.  I have a 1:30 status conference on

20  the telephone.  Why don't we reconvene about 1:45?

21       MR. PARKINS:  I think it will go much quicker if you

22  give us --

23       THE COURT:  That's fine.  And you needn't clear your

24  items because it is on the phone.  The status conference is on

25  the phone.  So you don't need to worry about clearing your

1   desks.  Sorry.

2         MR. PARKINS:  I'm sorry.  I thought you said you

3   need to clear them.

4         THE COURT:  No, no, no.  I just -- I buried the

5   "don't" I guess.  All right.  We're in recess until 1:45.

6      (Recess from 1:14 p.m. to 2:01 p.m.)

7         THE COURT:  Please be seated.

8         MR. PARKINS:  May I proceed, Your Honor?

9         THE COURT: Yes.

10        MR. PARKINS:  Thank you.  A number of points I want

11   to touch on in rebuttal to the presentation made by counsel

12   for the Committee.  First one I'd like --

13        THE COURT:  I'm sorry.  Could you adjust the

14   microphone a little bit?  There you go.

15        MR. PARKINS:  I'm short.  I'm sorry.

16        THE COURT:  That's all right.

17        MR. PARKINS:  The first one I want to touch on, Your

18   Honor, is the issue with respect to evidence that Highland was

19   in control of a situation during the Wave period, and one of

20   the evidences was the fact that Barrier Advisors, an affiliate

21   of Highland, was engaged.  And while we see one side of the

22   dialogue in the e-mail presented by the Committee, I think it

23   was Exhibit Number 2, requesting an e-mail from Mr. Fredette

24   of Trimaran to the CEO of the company requesting that Barrier

25   be considered for an engagement, we don't see the rest of the

1  story, and I would like to approach with an e-mail from March

2  14th, if I could.

3         THE COURT:  Yes.  Thank you.

4         MR. PARKINS:  What I've handed you has been marked

5  as A680, Appendix 680 exhibit.  It's also been used in the

6  deposition exhibits throughout this litigation.  Anomalously,

7  what we have here is someone saying that Highland was in

8  control and wanted to get Barrier hired.  If Highland and

9  Trimaran were in control, they would have just done it.  But

10 what we have here is in the exhibit that the Committee counsel

11 gave you, was a request, an e-mail request, from Mr. Fredette

12 at Trimaran to the CEO of the company saying they would like

13 to engage Barrier.  And we have in the exhibit I just gave you

14 was the response.  Notice that if you're in control, you don't

15 have to wait 10, 12 days to get an answer about hiring a

16 financial advisor.  You just get it done.  But, nevertheless,

17 putting that aside, let's look at the substance of the exhibit

18 I just handed to Your Honor.  It says, "In response to your

19 recent e-mail and based on advice of counsel, the company

20 believes it is appropriate and proper for the company to

21 reimburse and pay expenses, including consulting fees related

22 to the request for IRN holder consent."  So they went to their

23 counsel and they said, "it's okay under the IRN purchase

24 agreement to pay for an advisor to go look at this

25 transaction."  What's wrong with that?  That's not evidence of

control.  They asked the company, "will you do it," and the
company takes it to its counsel and the counsel says it's
okay.  That's not any evidence of any control and domination.

Second of all, I think Your Honor asked a question
of counsel, was Trimaran on both sides of the deal under the
total fairness doctrine?  Was Trimaran on both sides of the
Wave deal -- I mean, the refinancing that took place with
respect to the Wave deal?  The answer is no.  Trimaran was
equity.  Trimaran had no debt.  Trimaran's position -- I mean
held IRN debt -- IRN holdings and equity and Highland had IRN
but no equity at the time of the refinance.  After the
refinance, Trimaran stayed in.  Trimaran stayed in, didn't get
paid off, didn't get taken out at all until 2007 when Highland
bought their interest in the middle of 2007, over a year
later.  So they were not on both sides of the transaction.
They stayed in the deal and they're in the exact same position
they were before and after the deal.

The question was also raised about solvency and that
there's no evidence in the record about solvency.  Well, if
Your Honor would open both of the financial statements I gave
you earlier in the argument, the audited financials from Ernst
& Young, and go to the balance sheet for both, one for 2004
and 2005 and one for 2005 and 2006, you will see that the
company was solvent in 2005 and the company was solvent in
2006.

In addition, Your Honor, in the context of the credit agreement that was executed by the parties, there's a representation in the credit agreement that the borrower is solvent and its affiliates and the aggregate are solvent. And the issue is the solvency of the OpCo. The audited financial statements, Your Honor, unlike many that deal with the entire family of companies, these audited financials are for OpCo. And so OpCo, which is the center of our inquiry here as to solvency or not, was solvent by virtue of -- so say its auditors and it's so stated in its representations in the credit agreement.

Another point raised, Your Honor, which I want to touch on is the question about Highland's involvement as a board member and sort of breaching its duty as going well beyond what board members might do. And I have here a reference, which I will read to you, Your Honor. It's from Mr. Wiley, the CFO's, deposition, pages 73 through 76, in response to questions made by Mr. Mark, one of the counsel for the Committee.

Question: "At the time you joined the company, what was Highland's involvement, if any, in the operations, natural operations of the company?"

Answer: "I mean no more or less than a board member would have. I mean they -- we updated routinely weekly calls. They were not involved."

1       Question:  "Did they change at any time while

2       you were at Broadstripe?"

3       Answer:  "You know, I think they got -- when

4       Tyler Nau became a board member, Tyler brought with

5       him more operational cable experience, some

6       operational cable experience.  And so, you know, he

7       was -- I would say he was much more hands on than

8       Highland had been in the past."

9       Question:  "Can you amplify that -- can you

10      amplify what that means by 'hands on'?"

11      Answer:  "Well, you know, there were a number I

12      would say of tactical operating decisions that where

13      he certainly -- you know, he didn't mandate, he

14      didn't direct, but, you know, he was in our office a

15      lot more.  He was certainly questioning the

16      rationale behind operating decisions.  He was

17      offering suggestions about, you know, pricing

18      strategies, you know, and again things that are

19      relatively tactical but, you know, he was -- it

20      didn't strike me as something that was inappropriate

21      -- an inappropriate amount of involvement for a

22      board member but he was quite detailed and involved.

23      I mean, he was pretty present."

24      Question:  "How often did he come to St.

25      Louis?"      Answer:  "Geez, I'd be guessing.  I

1    mean, towards, you know, towards the latter half of

2    2008, it was frequent, a few or several days per

3    month.  Before that it was less frequent but he was,

4    you know -- you know, he was on the phone a lot and

5    pretty involved."

6        Question:  "Can you be a little more specific

7    about the types of decisions he got involved with?"

8        Answer:  "You know, again, I want to be clear.

9    He wasn't -- I don't -- he wasn't making decisions

10   but one example would be, you know, his view was

11   that, you know, our Maryland market in particular,

12   that the Premium HBO, Cinemax and their subscribers

13   were underpriced and that we needed to increase the

14   price on those levels of service.  So, you know,

15   again, that, you know, he had done some financial

16   analysis around that."

17       The testimony of Mr. Wiley, who is the CFO, who

18   observed the board, who observed Highland's conduct, is

19   contrary to what is alleged by the Committee.  Summary

20   judgment evidence is that the board acted appropriately and

21   there wasn't any exercise of control or any exercise of

22   decision making inappropriately by the board.

23       I'd like to refer Your Honor to the Committee's

24   demonstrative Exhibit Number 24, and it's looseleaf notebook

25   please.

1     THE COURT:  I have it.

2     MR. PARKINS:  This is a letter from counsel for the

3  company, Paul Hastings, to Mr. Todd Travers of Highland

4  Financial Corp.  This is regarding the perspective financing

5  that Highland might do and this was characterized as a letter

6  that basically said this would be a very high risk loan, high

7  risk situation.  And, in fact, this letter includes a

8  statement that says that the -- in this counsel's view, Kevin

9  Cooley from Paul Hastings, that the IRNs, if you deem them to

10 be sort of the equity, are out of the money.  Well Your Honor

11 has tremendous experience as a practitioner and more

12 experience as a judge.  If the equity is out of the money,

13 than you got to be dumber than dumb to put it in as equity,

14 put more money in as equity.  Nobody would do that based on

15 the letter from the company saying equity is out of the money.

16 Only the dumbest of individuals would then say, "gee, I'll put

17 some more in where it's out of the money."  This was debt.

18     Now Your Honor has asked why would the board -- why

19 would the members of Broadstripe go in and sign the APA with

20 James when it didn't have financing.  The testimony -- there

21 is summary judgment testimony from Mr. Shreffler, who is the

22 CEO, and his answer was that 95 percent of cable deals are

23 done without financing in front.  I'm using my limited

24 technology here, capability.

25     THE COURT:  Well, you have an appropriately aged

1  person --

2      MR. PARKINS:  Thank goodness.  Page 167 of Mr.

3  Shreffler's deposition, this is in response to a dialogue with

4  Mr. Dondero.  In cable, 95 percent of the deals -- page 167,

5  lines 1 through -- 111 through 171 or something.  "In cable,

6  95 percent of the deals that happen in cable, you don't get a

7  financing out because it's just the way it works.  I mean,

8  very few of them that you get a financing out."  And he said,

9  "it's that way, it's the way it is."  And that's the end of

10 the quote of that but Mr. Shreffler, the CEO of the company,

11 said you don't get them.  And why did they do this deal?  This

12 deal was -- the James deal was looked at -- and there's plenty

13 of summary judgment evidence for several months by the

14 company.  This was a good deal for the company.  The company

15 wanted to grow and they had strategic markets that they wanted

16 to get and they wanted to acquire.  There was no financing

17 commitment needed at the time you sign the deal.  You had to

18 finance it when you close and they signed it, expected to get

19 financing, and it never happened.

20      Your Honor had a dialogue earlier with me I think

21 saying how in October of 2007 the financing market, the

22 markets started to crack and it got worse later on.  I think

23 October of 2007 was the height of the stock market but October

24 31, sort of right at the lip when this thing's signed, and

25 within 30 days, we were in trial all over place about the fact

1   that there was no more credit anywhere, within 30 days.  So at

2   that time, Shreffler testifies that 95 percent of the deals

3   had no financing outs.  I doubt he would have said that 30

4   days later when the market collapsed.  But the circumstances

5   changed.  We all lived through a circumstance where on Monday

6   you say something and by Friday that market changed, and it

7   just changed dramatically.

8        More transcript from Mr. Shreffler.  Page 199 of Mr.

9   Shreffler's deposition.

10            Question by Mr. Hoffman:  "Do you have a view

11            as to whether, and I'm talking now in a

12            macroeconomic sense, whether the market for

13            financing changed in late 2007, early 2008, from

14            what it had been previously?"

15            Answer:  "Yes."

16            Question:  "What's your view?"

17            Answer:  "It funds availability.  It was a lot

18            more difficulty to get funding and that the terms of

19            that funding had changed."

20            Question:  "Had the terms become more

21            expensive?"

22            Answer:  "Yes."

23            Question:  "And availability had begun to dry

24            up.  Is that correct?"

25            Answer:  "I don't know if 'dry up' is the

1          right"

2  -- does this scroll down?  That was it.  I limited my

3  technology.  While we're looking for that, to fix my error

4  there, on page 48 of Mr. Wiley's deposition again.

5                Question:  "Now during this time period, did

6                you get any indication that there was going to be

7                any difficulty in arranging the financing?"

8                Answer:  "You know, the debt market obviously

9                overall got worse during the time, during that time

10               period; right?  I mean, the December and January

11               time frame there was a lot of bad news in the

12               marketplace."

13     There's no doubt that what happened after the James Cable

14  deal was signed is everything went down.  It fell off a cliff.

15  And at the time they did the James Cable deal, as Mr.

16  Shreffler, summary judgment evidence, CEO of the company

17  testified, "95 percent of the deals went in without financing

18  outs."  And as also as summary judgment -- replete through the

19  summary judgment is that the James Cable deal had strategic

20  advantage for the company and in a hot market you go in and

21  make your deal and get the financing when it needs to close.

22  That's what happened.  There's no doubt, however, that there

23  was no commitment to finance and the assurances that were

24  given about financing deals have to be deal specific.  You go

25  back to the Chancery Court and say, you just don't say "I'll

1 | finance deals, I like the company, I'll finance whatever it

2 | is." You and I don't make deals. People don't make deals by

3 | saying, "Don't worry, Bob, I'll finance any deal you bring

4 | me." There was no legitimacy and any assurance to sign up the

5 | deal. They expected to finance it later, not at the time of

6 | the signing, because they knew they didn't have a financing

7 | commitment and Mr. Wiley testified about that. There's no

8 | summary judgment evidence to the contrary. They knew they

9 | didn't have a financing commitment. That's all we have,

10 | Judge.

11 | THE COURT: All right. Mr. Hoffmann, did you have

12 | anything?

13 | MR. HOFFMANN: I do not.

14 | THE COURT: No. Mr. Hoort?

15 | MR. HOORT: Nothing, Your Honor.

16 | MR. FLIMAN: Two quick points, Your Honor.

17 | THE COURT: All right.

18 | MR. FLIMAN: The first is on Mr. Parkins and

19 | Highland Defendants rely on the Ernst & Young audit opinion.

20 | That is not valuation. No valuation has been conducted here.

21 | And when it comes to solvency, it's critical that inability to

22 | pay debt as they come due also renders the company insolvent.

23 | No analysis has been done on that and there's certainly no

24 | evidence presented by the Highland Defendants.

25 | And there's one final point we wanted to make, Your

1   Honor, which is looking at the James Cable transaction.  And

2   the question really is, how should this have gone down?  What

3   really should have happened?  Well, the board of directors

4   should not sign an Asset Purchase Agreement without a

5   financing out unless it thinks it can get finance.  Right?

6   And it would have an obligation to turn to a lender and say,

7   "Give us a commitment for financing.  Sign something saying

8   that you'll give us the money if we're going to go down this

9   path."  Well Broadstripe couldn't do that because Highland

10  controlled the company.  Highland was the company.  So we come

11  to the question of, who should be on the hook for this now?

12  Should it be Broadstripe or should it be Highland?  We submit

13  that based on the cause of action in the Complaint, Highland

14  should be the one that in some form has to pay for those

15  damages.  Thank you.

16          THE COURT:  You're welcome.  Mr. Parkins, anything

17  else?

18          MR. PARKINS:  Your Honor, I don't have anything.  I

19  forgot something in my response.

20          THE COURT:  Okay.

21          MR. PARKINS:  If I may.

22          THE COURT:  Yes.

23          MR. PARKINS:  One thing with respect -- this goes

24  back to the Wave transaction.  I think there's been discussion

25  between you and counsel for the Committee in the Wave

1  transaction about Trimaran sort of sending out solicitations,

2  supporting solicitations of alternatives rather than honoring

3  the contract.  I think counsel said there was a contract.  No

4  solicit provision by the company.  Well, the Committee sort of

5  stands in the shoes of the company and if the company did

6  something wrong, they cannot now allege under the doctrine of

7  (inaudible) that we are culpable.  There's an absolute

8  defense.  If the company did something wrong in soliciting

9  something and Highland, as Vice Chancellor Strine said, ate

10  the ice cream sundae that was put out in front of it, then

11  Highland cannot be culpable and they are not -- we have an

12  absolute defense to that in the doctrine of (inaudible).

13          THE COURT:  Okay.

14          MR. PARKINS:  Thank you.

15          THE COURT:  Thank you.  Response?  All right.  It

16  probably doesn't come as a surprise that I'm going to take the

17  matter under advisement.  I don't know if I'm going to write

18  on it or render an oral ruling, but in any event I certainly

19  need time to go back over the papers and consider the

20  arguments.  I would request that the movant order the

21  transcript of the argument and provide it to me in hard copy

22  when it's -- or electronic copy -- it doesn't matter.

23          MR. PARKINS:  We'll certainly do that, Your Honor.

24          THE COURT:  Thank you.  You don't need to expedite

25  that.  I mean -- well if you don't, you'll never get it I

1  guess.  I take that back.  Listen, Leslie, you're not the one

2  that I'm pointing fingers at.  It's those people in Jersey.

3  All right.  If there's nothing further, thank you very much.

4  You'll hear from me.  I may call you back for an oral ruling

5  or I may do a written ruling.  But in any event, it's a lot of

6  things to go through.  So I'll turn to it and decide it as

7  quickly as I can.  All right.  Thank you very much.  Hearing

8  adjourned.

9       (Court adjourned at 2:21 p.m.)

10                    CERTIFICATE

11       I certify that the foregoing is a correct transcript

12  from the electronic sound recording of the proceedings in the

13  above-entitled matter.

14

15   _/s/April J. Foga_____          February 8, 2010
    April J. Foga, CET, CCR, CRCR
16

17

18

19

20

21

22

23

24

25