# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BROADSTRIPE, LLC, et al., | ) | Case No. 09-10006 (CSS) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| ――――――――――――――――――― | ) | |
| OFFICIAL UNSECURED CREDITORS' | ) | |
| COMMITTEE OF BROADSTRIPE, LLC, | ) | |
| on behalf of the estate of BROADSTRIPE, | ) | |
| LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 09-50966 |
| | ) | |
| HIGHLAND CAPITAL | ) | Related Adv. Docket No. 58 |
| MANAGEMENT, L.P., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## OPINION[1]

Steven M. Yoder
Etta R. Wolfe
Potter Anderson & Corroon LLP
Hercules Plaza
1313 North Market Street, 6th Floor
Wilmington, DE  19801
        -and-
David M. Friedman
David J. Mark
Daniel A. Fliman (Argued)
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, NY  10019

Amanda M. Winfree
Don A. Beskrone
Ricardo Palacio
Ashby & Geddes, P.A.
500 Delaware Avenue, 8th Floor
Wilmington, DE  19899
        -and-
John P. Melko
Gardere Wynne Sewell, LLP
1000 Louisiana, Suite 3400
Houston, TX  77002

---

[1]  This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

Counsel for Official Committee of
Unsecured Creditors of Broadstripe
LLC, et al.

David B. Stratton
Pepper Hamilton LLP
Hercules Plaza, Suite 5100
1313 Market Street, P.O. Box 1709
Wilmington, DE  19899-1709
            -and-
Steven T. Hoort (Argued)
Ropes & Gray LLP
One International Place
Boston, MA  02110

Jared Nagley
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY  10036-8704

Counsel to the Highland
Retail Lenders

Michael P. Cooley
Gardere Wynne Sewell, LLP
1601 Elm Street, Suite 3000
Dallas, TX  75201-4761

Counsel to the Debtors and Debtors
In Possession

Richard W. Riley
Duane Morris LLP
1100 North Market Street, Suite 1200
Wilmington, DE  19801-1246
            -and-
Lenard M. Parkins (Argued)
Trevor R. Hoffmann (Argued)
Jonathan Hook
Haynes and Boone, LLP
1221 Avenue of the Americas, 26th Floor
New York, NY  10020

Counsel to Highland Capital
Management, L.P. and the Highland
Institutional Lenders

Dated: September 2, 2010

Sontchi, J. _Clifford S Sontchi_

## INTRODUCTION

Before this Court is the Highland Capital Management, L.P. ("HCMLP") and the Highland Institutional Lenders' (collectively referred to herein, and inclusive of HCMLP, "Highland") motion for summary judgment (the "Motion") as to a complaint ("Complaint") filed by the Official Committee of Unsecured Creditors (the "Committee").[2]  For the reasons set forth below, the Court denies the motion for summary judgment for all but one count due to the existence of triable issues of fact surrounding the allegations in the Complaint.  The Court grants summary judgment with regard to the remaining count.  Accordingly, the Court will grant the Motion, in part, and deny the Motion, in part.

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334.  Venue is proper in this district pursuant to 28 U.S.C. §§1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (K) and (O).

---

[2]  The Committee withdraws Count Ten of the Complaint, as Highland conceded that all relevant transfers were made to Highland on account of antecedent debt.  *See* Committee's response, p. 70, fn 34 (D.I. 42).  All exhibits referred herein are cited as "H-___" referring to the exhibits annexed and/or appended to the Motion or "CC-___" referring to the exhibits annexed and/or appended to the Committee's response (the "Response").  Deposition transcripts referenced herein are cited as "___ Depo."

## STATEMENT OF FACTS

**A.  April 1998–January 2005:  No Involvement by Highland Defendants**

On April 8, 1998, Millennium Digital Media Capital, LLC (n/k/a Broadstripe Capital, LLC) ("Capital") was formed to acquire, develop and operate cable television and related telecommunications properties.  Thereafter, Capital acquired cable television and related telecommunications properties in three regions:  Maryland (the "Mid-Atlantic System"); Michigan (the "Central System"); and Washington and Oregon (the "Northwest System" and collectively, the "Systems").  The Systems are operated by Broadstripe, LLC (f/k/a Millennium Digital Media Systems, LLC), the Debtors' principal operating company.

To fund the early System acquisitions, Capital entered into a Note Purchase Agreement, dated as of October 5, 1999 (as amended, supplemented or otherwise modified, the "IRN Purchase Agreement"), whereby it borrowed $70 million in the form of IRNs due to fully mature on March 31, 2009.[3]

In addition, Broadstripe (OpCo) entered into a $250 million loan facility dated December 29, 2000 (as amended, supplemented or otherwise modified, the "Original Loan Agreement" and together with all supporting documents, the "Original Loan Facility"), comprised of a secured term loan and a secured revolver.  The initial lenders under the loan facility were Fleet National Bank, Credit Lyonnais New York Branch, First Union National Bank, Canadian Imperial Bank of Commerce, and Bank of

---

[3]  Subsequently, the maturity date on the IRNs was extended to January 1, 2012.

Montreal.  The administrative agent was Fleet National Bank.  The Original Loan Facility granted the lenders thereunder first priority liens on substantially all of Broadstripe's assets.

**B.  February 2005:  Highland Enters the Picture**

The Highland Lenders' first purchase of Broadstripe debt occurred on the secondary market in February 2005.  By this time, Broadstripe was already indebted (i) at Opco to the existing secured lenders under the Original Loan Facility in an approximate amount of $196 million and (ii) at Capital to the IRN holders in an approximate accreted amount of $175 million.

At this time, Broadstripe was also on the verge of a covenant default under the Original Loan Facility.  As a result, on March 31, 2005, Broadstripe's existing secured lenders executed an amendment to the Original Loan Facility (the "Fifth Amendment") providing covenant relief, shortening the Original Loan Facility's maturity date from October 30, 2008 to June 30, 2006 and requiring Broadstripe to sell the Systems to repay the debt owing to them regardless of any negative consequences of a sale to Broadstripe or the IRN holders.  As of the date of the Fifth Amendment, the Highland Lenders were nowhere close to being "Majority Lenders" under the Fifth Amendment.

The Highland Lenders held only *de minimis* equity,[4] and no seats on the Management Committee of Broadstripe.

---

[4] Highland Crusader held a *de minimis* amount (*i.e.*, less than 2.3%) of membership units in Broadstripe (Capital) that were granted to each IRN holder over time on a *pro rata* basis according to its IRN holdings

**C.  December 2005: The Proposed Wave Sale**

As a consequence of the Fifth Amendment, Broadstripe retained Daniels & Associates to market the company's Systems for sale.   On December 15, 2005, Broadstripe and WaveDivision Holdings, LLC ("Wave") signed a letter of intent for Wave to acquire two of Broadstripe's three Systems (i.e., the Northwest and Central Systems) for $157 million (the "Wave Sale").

The Wave Sale was expressly conditioned upon and subject to the consent of (i) the Original Loan Facility lenders and (ii) the IRN holders, provided that the consent of the IRN holders would be deemed to have been obtained if Broadstripe and Wave reasonably concluded that such consent was not required.

The $157 million in proceeds from the proposed Wave Sale,[5] combined with expected proceeds of between $87.7 million and $125 million (based on indications of interest provided to Daniels & Associates) from a future sale of the Mid-Atlantic system (collectively, the "Expected Sale Proceeds"), were expected to be sufficient to repay in full the approximately $196 million in senior loans outstanding at the OpCo level under the Original Facility.   Based on these values and Broadstripe's audited financial statements, OpCo was clearly solvent at this time.   Unfortunately, the remaining sale proceeds would have been insufficient to pay off the approximately $211

---

pursuant to ¶¶ 1 and 5M of the IRN Purchase Agreement.  *See* Ex. H-5.  No other Highland Lenders ever held equity.

[5]  After payment of bank fees ($2.8 million), broker fees ($1.6 million), legal/accounting/other fees ($0.4 million) and severance, the expected net proceeds of the Wave Sale to be distributed to the senior secured lenders totaled $150.1 million.

million in accreted IRN obligations at Capital existing as of December 31, 2005, wiping out between an estimated $130 million and $169 million in accreted IRN obligations.

### D. Trimaran Mobilizes the IRNs

At the time of the Wave bid, Trimaran/Caravelle ("Trimaran")[6] was the largest IRN holder (holding approximately 43% of the IRNs).   As of this time, Trimaran's related parties also held equity in Broadstripe and two of the six seats on Broadstripe's Management Committee.

Trimaran held no Original Loan Facility debt however, and so with its large IRN holdings, it stood to lose the most from the Wave Sale.

Therefore, commencing in December 2005, Trimaran mobilized the IRN holders to determine whether or not to consent to the Wave Sale.  On December 14, 2005, at the request of William Phoenix, a Trimaran designee, Darren Fredette ("Fredette") (also of Trimaran) contacted Broadstripe's CEO, Kelvin Westbrook ("Westbrook"), to coordinate a presentation by Broadstripe to the IRN holders to be held at Trimaran's New York office.  Fredette instructed Westbrook as to precisely what topics Trimaran wanted included in the presentation and previewed and commented on drafts of it.  The IRN Holders were notified on December 20, 2005 of the meeting arranged by Fredette and Westbrook to be held on January 5, 2006.

---

[6] Trimaran Capital Partners, LLC was the manager of a number of investment entities.  As used herein, the term "Trimaran" is defined to include Trimaran Capital Partners, LLC, the Caravelle Millennium Investment Corporation, Caravelle Investment Fund, LLC,  CIBC WG Argosy Merchant Fund 2, L.L.C., Co-Investment Merchant Fund 3 L.L.C. and their affiliates.

The IRN holders in attendance at the January 5 meeting included Fredette (Trimaran), Jay Bloom ("Bloom") (Trimaran), David Walls ("Walls") (Highland Crusader), Ethan Garber (Bear Stearns), Jim Russo (Credit Suisse), Robert Davenport (Cerberus; attended telephonically) and Kelvin Westbrook, Bruce Beard and Tim Valley (each from Broadstripe).    Generally, topics covered in Broadstripe's January 5 presentation included (i) the Wave Sale process, (ii) expected proceeds and distribution waterfall for the Wave Sale, (iii) indications of interest for the Mid-Atlantic System and (iv) the financeability of Broadstripe going forward.    The IRN holders also questioned the effect of the proposed Wave Sale on their IRN holdings, and suggested that Broadstripe look into financing alternatives to the Wave Sale.    As of the January 5, 2006 meeting, the IRN holders' respective holdings were as follows:

| IRN Holders as of January 5, 2006 | Percentage of Holdings |
|---|---|
| Caravelle Millennium Investment Corp. (Trimaran) | 42.86% |
| Highland Crusader Offshore Partners, L.P. | 25.03% |
| Madeleine, L.L.C. (Cerberus) | 20.76% |
| Credit Suisse International | 7.71% |
| Bear Stearns Credit Products Inc. | 3.65% |

On February 8, 2006, Broadstripe and Wave executed purchase agreements for the proposed Wave Sale despite Broadstripe's knowledge that the IRN Holders had not yet determined whether to consent.

Following the execution of the Wave purchase agreements, the Highland Lenders began buying up existing senior debt under the Original Loan Facility.

On March 2, 2006, Trimaran informed Broadstripe of its and Highland Crusader's desire to retain Barrier Advisors, LP ("Barrier"), a financial advisory firm, on behalf of the IRN holders to perform financial and operational advisory services to assist in determining whether to support the Wave Sale or an alternative refinancing of the $196 million of existing debt under the Original Loan Facility.  On March 3, 2006, Trimaran and Highland Crusader engaged Barrier.

Prior to its engagement, Barrier requested input from its employees as to the names of cable industry experts that Barrier should consider hiring to work on the engagement.  Steven Tyler Nau ("Nau"), then a Barrier employee,[7] recommended William Shreffler ("Shreffler"), with whom Nau had previously worked at Cebridge Connections.  Shreffler had no previous interactions with Highland Capital and no prior contact with any of the Highland portfolio companies. Aside from his recommendation of Shreffler, Nau had no involvement with the Barrier engagement.

Trimaran and Broadstripe also began working to put together a refinancing alternative to the Wave Sale.  Trimaran and Broadstripe contacted nine lending sources: Back Bay Capital, GoldenTree Asset Management, Jefferies, CSFB, Bear Stearns, Highland, Black Diamond, Morgan Stanley and Cerberus Capital to solicit proposals to refinance the Original Loan Facility as an alternative to consummating the

---

[7] Nau later joined Highland Capital in April 2006.

Wave Sale.   Seven of the nine institutions Trimaran and Broadstripe contacted expressed interest in making refinancing proposals. Trimaran acted as a liaison between the potential lenders (including Highland) and Broadstripe.  Trimaran also acted as the IRN holder contact point for discussions with Broadstripe's existing senior lenders.

By March 29, 2006, the Highland Lenders constituted "Majority Lenders" under the Original Loan Facility as a result of their purchases of senior debt.   The Highland Lenders' aggregate holdings in Broadstripe as of March 29, 2006 are set forth below.

| Highland Lenders' Holdings as of March 29, 2006 | | |
|---|---|---|
| Holding | Amount | Percentage of Debt |
| Original Loan Facility (OpCo) | Approximately $103 million (out of $196 million) <br> - Institutional Lenders - $12.04 million; <br> - Retail Lenders - $91 million. | Approximately 52.6% |
| IRNs (Capital) | $53.4 million (Highland Crusader) out of approximately $212 million in accreted value of IRNs | Approximately 25% |
| Equity | *de minimis* (Highland Crusader) | *pro rata* share of membership units (*i.e.*, less than or equal to 2.5%) |
| Seats on Management Committee | None | N/A |

During March and April of 2006, Trimaran continued to act as a liaison between Broadstripe and Highland with respect to the Highland and other refinancing proposals.   The Highland financing proposal contemplated refinancing the Original

Loan Facility's outstanding $196 million debt into a new $240 million senior secured first lien revolver, senior secured first lien term loan and secured second lien term loan. At all times, Highland's negotiations with Broadstripe were conducted on an arms' length basis.

On April 3, 2006, Barrier issued a draft report concluding that with an improvement in the markets and access to additional funds to grow organically and through acquisition, Broadstripe had a reasonable chance of returning enhanced value to the IRN holders compared with the Wave Sale.[8]   The IRN holders (including Highland Crusader and Trimaran) thus determined to support a refinancing of Broadstripe's Original Loan Facility rather than the Wave Sale.

On April 7, 2006, Trimaran (holding 43% of the IRNs) and Highland Crusader (holding 25% of the IRNs) exercised their contractual rights under the IRN Purchase Agreement and together notified Broadstripe of their non-consent as IRN holders to the Wave Sale, and indicated their support for the Highland refinancing proposal.   Broadstripe voluntarily accepted the Highland proposal, which culminated in a refinancing of the Original Loan Facility on July 28, 2006.  On April 21, 2006, the Highland Lenders under the Original Loan Facility exercised their contractual rights as Majority Lenders and directed the agent under the facility not to consent to the Wave

---

[8]  Barrier provided the IRN holders with a further draft of its report on or about April 14, 2006.  Its findings were consistent with those contained in its April 3, 2006 report.

Sale.  Also on or about July 28, 2006, Broadstripe terminated the Wave Sale.[9]  Through

this date, Highland held no seats on the Management Committee.

**E.  The July 2006 Refinancing**

On July 28, 2006, Broadstripe's Management Committee approved the

refinancing of Broadstripe's Original Loan Facility of $196 million into new, syndicated

senior secured first and second lien facilities, paid down unsecured obligations (to

creditors other than the Highland Lenders) and pumped an additional $33.9 million of

liquidity into Broadstripe for working capital and other corporate purposes.  The

sources, uses and some salient terms of the July 2006 Refinancing facilities are

summarized as follows:

*[remainder of page intentionally left blank]*

---

[9]  Thereafter, on October 4, 2006, Wave commenced litigation against Broadstripe in Seattle, Washington, seeking specific performance and damages with respect to the Wave Sale.  *See* Case No. 06-2-32115 – 4SEA.  Notwithstanding the Wave litigation, the July 2006 Refinancing allowed Broadstripe to stay in business.  Without the July 2006 Refinancing, Broadstripe would have been required under the Fifth Amendment to virtually sell itself out of existence.

| Sources and Uses of July 2006 Refinancing | | | | |
|---|---|---|---|---|
| Debt | Amount of Proceeds | Use of Proceeds | Interest Rate | Maturity Date |
| First Lien Credit Facility | $146.5 million | $146.5 million to refinance Original Loan Facility | LIBOR plus 4% | June 30, 2011 |
| First Lien Revolver | $20 million | General corporate purposes | LIBOR plus 3.5% | June 30, 2011 |
| Second Lien Facility | $70 million | $50 million to refinance Original Loan Facility; $1.9 million for payables including management fees owing to MDM Systems; $4.2 million to refinance fees and expenses; $13.9 million to provide Broadstripe with Working Capital | Tranche C - LIBOR and a 10% non-accreting PIK Tranche D - 2% and a 13% non-accreting PIK | July 27, 2012 (as amended) |

Immediately following the July 2006 Refinancing, the Highland Lenders still held no equity or Management Committee seats in Broadstripe. As of July 28, 2006, the composition of the Management Committee was as follows:

| Membership of Broadstripe Management Committee as of July 28, 2006 | Affiliation |
|---|---|
| William Phoenix | Trimaran/Caravelle |
| Andrew Heyer | Trimaran/Caravelle |
| Darryl Thompson | TSG Capital |
| Mark Inglis | TSG Capital |
| Cleveland Christophe | TSG Capital |
| Kelvin Westbrook | Broadstripe |

In addition, as of July 28, 2006, the Highland Lenders' holdings were as follows:

| Highland Lenders' Holdings as of July 28, 2006 | | |
|---|---|---|
| Holding | Amount | Percentage of Aggregate Holdings |
| First Lien Facility | Approximately $103 million<br><br>- Institutional Lenders - Approximately $12 million;<br>- Retail Lenders - Approximately $91 million | Approximately 62% |
| Second Lien Facility (held by Institutional Lenders) | $20 million | 28.57% |
| IRNs (held by Highland Crusader) | $58.1 million | Approximately 25% |
| LLC Units | *de minimis* (Highland Crusader) | *pro rata* share of membership units (i.e., less than or equal to 2.5%) |

**F.  September 2006:  Shreffler Becomes CEO**

On or about September 1, 2006, Broadstripe hired Shreffler to replace Westbrook as CEO.

The Complaint alleges that "[i]n September 2006, Highland caused Broadstripe to change its management in a manner beneficial to Highland."[10]  There is no truth to the allegation.  It was Trimaran, not Highland, that communicated with Shreffler in connection with his CEO-related employment negotiations.  Trimaran (along with its counsel, Sonnenschein) was also responsible for drafting Shreffler's employment agreement.  Since Highland Crusader possessed only de minimis equity in Broadstripe and no designees on the Broadstripe Management Committee in September 2006, Highland was incapable of "causing" (and did not cause) Broadstripe to do

---

[10]  Complaint at ¶38.

anything at that time.  Highland did agree with the Management Committee's decision to hire Shreffler and supported his vision to expand the company through acquisitions and organic growth.

Also contrary to the allegations contained in the Complaint, Shreffler did not have "strong ties" to Highland.  In fact, Shreffler testified at his deposition that, prior to the Barrier engagement, he had no previous interactions with Highland and no contact with any of its portfolio companies.  While Nau (a Barrier employee at the time) identified Shreffler to Barrier as a capable cable operator when Barrier was looking to hire an industry expert as a consultant for its engagement by the IRN holders in early 2006, Nau had no involvement in hiring Shreffler to be Broadstripe's CEO.

The Complaint also alleges that "Highland then gave Kelvin Westbrook the title of Chairman" and "Mr. Westbrook reported . . . to the Highland controlled board."[11]  Again, this allegation is verifiably wrong.  The Management Committee gave Westbrook the title of Chairman of Millennium Digital Media Systems (i.e., not the board) and Chief Strategic Officer in September 2006 – at or about the same time that Shreffler was appointed Broadstripe CEO.  Also, documentary evidence clearly shows that Trimaran and its counsel were responsible for the discussions with Westbrook, not Highland.   As discussed above, while Highland agreed with the Management Committee's actions related to Westbrook, this was a period during which Highland

---

[11]  Complaint at ¶40.

Crusader possessed only de minimis equity and no seats on the Management Committee.

### G.  The October 2006 Restructure

At the time of the July 2006 Refinancing, Broadstripe (OpCo) was solvent, since the $157 million proceeds of the Wave bid plus the expected proceeds of between $87.7 million and $125 million resulting from a sale of the Mid-Atlantic System exceeded the estimated $196 million debt at the OpCo level.

In contrast, since the combined proceeds of the sales would be insufficient to repay the IRN debt at Broadstripe (Capital), equity at the Broadstripe (HoldCo) level was worthless.  The July 2006 Refinancing contemplated a "second step" to reflect the economic reality that, at this point in time, the IRNs functionally were equity.  The "second step" ultimately closed on October 26, 2006 (the "October 2006 Restructure").  Pursuant to the October 2006 Restructure, Broadstripe redeemed and retired the equity holdings of all of its equity holders other than Trimaran.  Contemporaneously, the existing IRN holders at Broadstripe (Capital) were admitted to Broadstripe (HoldCo) as "New Members" and purchased LLC Units in Broadstripe (HoldCo) for nominal consideration in the following percentages according to their pro rata holdings in the IRNs (Trimaran, which was both an equity holder and an IRN holder simply exchanged its equity for new LLC Units):

| Membership Interests as of October 26, 2006 | | | |
|---|---|---|---|
| Member Name | Percentage of IRN Holdings | LLC Units | Sharing Percentage |
| Caravelle Millennium Investment Corp. (Trimaran) | 42.86% | 4,286 | 42.86% |
| Highland Crusader Offshore Partners, L.P. (Highland Crusader) | 25.03% | 2,503 | 25.03% |
| Madeleine, L.L.C. (Cerberus) | 20.76% | 2,076 | 20.76% |
| Credit Suisse International | 7.71% | 771 | 7.71% |
| Bear Stearns Credit Products Inc. | 3.65% | 365 | 3.65% |

Trimaran and its counsel, Sonnenschein, drafted the Third Amended and Restated LLC Agreement of Millennium Digital Media Holdings, L.L.C. dated October 26, 2006 (the "LLC Agreement") and other documentation related to the October 2006 Restructure.    For example, while a full conversion of the IRNs was originally contemplated, only a partial conversion was ultimately effected after Trimaran and its advisors determined that such a conversion would create adverse tax consequences for Broadstripe and its legacy equity holders (i.e., not Highland Crusader).

Pursuant to section 3.3 of the LLC Agreement, Trimaran and Highland Crusader were permitted to designate three and two persons, respectively, to the new seven-person Management Committee which was then constituted as noted in the chart below.    The balance of the Management Committee was comprised of Shreffler and Westbrook.

| Members of Broadstripe Management Committee as of October 26, 2006 | Affiliation |
|---|---|
| Jay Bloom | Trimaran/Caravelle |
| Darren Fredette | Trimaran/Caravelle |
| David Millison | Trimaran/Caravelle |
| David Walls | Highland Crusader |
| Carl Moore | Highland Crusader |
| William Shreffler | Broadstripe |
| Kelvin Westbrook | Broadstripe |

Thus, only after the October 2006 Restructure did Highland Crusader receive its first seats on Broadstripe's seven-member Management Committee, and even then, Highland Crusader's designees were outnumbered 5-2 (by Trimaran's three members and Shreffler and Westbrook).    On November 14, 2006, upon motion by Bloom and second by Westbrook, the Management Committee created an executive committee (the "Executive Committee") and appointed Walls, Fredette and Shreffler to serve on it.    The Executive Committee had no authority to dictate Management Committee decisions, and Highland only possessed one of the three seats on the Executive Committee.    To the extent that there was anything of import to act on, the Executive Committee would present it to the Management Committee for consideration.

## H.  April–September 2007

### i.    Comcast Sale and Termination of Westbrook's Employment

Having accomplished the July 2006 Refinancing, the October 2006 Restructure, and the hiring of Shreffler as CEO, Broadstripe's next steps were to pursue efforts to divest its Mid-Atlantic assets and to begin to carry out its growth plan.

On April 23, 2007, Comcast Corp. ("Comcast") executed a definitive agreement to purchase Broadstripe's Mid-Atlantic system in Anne Arundel County, Maryland for approximately $115 million.  The Comcast deal was subject to approval by the Federal Trade Commission (the "FTC").

The Comcast deal was projected to be a positive development, as it would have left Broadstripe well-positioned to begin its growth phase.  The sale of the Mid-Atlantic System would not only free the company of its most challenged System, but would infuse $115 million into Broadstripe to allow it to, among other things, pay down its senior secured debt and deleverage Broadstripe's balance sheet.

On or about May 4, 2007, with the closing of the Comcast sale on the horizon, Trimaran's Darren Fredette, acting on behalf of the Management Committee (still consisting of three Trimaran seats, two Highland seats, Shreffler and Westbrook) informed Kelvin Westbrook that Westbrook's employment would terminate following the closing of the Comcast sale.  Fredette and Westbrook agreed to an orderly transition in which Westbrook would be retained to shepherd Broadstripe through the closing of the sale.  Broadstripe and Westbrook memorialized the transition in the form of a Separation Agreement and General Release dated June 27, 2007.

The rationale for keeping Westbrook in charge of the Comcast deal was that Westbrook had key personal relationships with Comcast's founders (including Brian Roberts – Comcast's CEO, and Roberts' father, who was Comcast's former Chairman).  Indeed, as a result of these relationships, Broadstripe had been receiving

19

ongoing tangible benefits in the form of approximately $200,000 per month in programming discounts. In addition, based on Comcast's $115 million purchase price for the Mid-Atlantic System, Westbrook had a $1 million to $1.250 million incentive to close the Comcast deal as quickly as possible (i.e., the sooner the closing, the higher the incentive).

As discussed above, the Comcast APA, which was entered into on April 23, 2007, had always been subject to approval by the FTC. Unfortunately, on September 7, 2007, Comcast chose to terminate the Comcast APA pursuant to section 11.1(e) thereof following a regulatory holdup related to a second "unexpected (and quite lengthy) request for data" from the FTC. As explained by Walls, Comcast informed Broadstripe that Comcast "would not entertain an additional request as this was over and above the information the [sic] customarily provide for small acquisitions such as this. Millennium and counsel offered to assist in any way but Comcast chose to walk."

Following Comcast's termination of the Mid-Atlantic sale, Westbrook left Broadstripe.

### ii. May 2007–December 2007: Trimaran Approaches Highland to Sell Its IRN Stake

On or about May 31, 2007, with the Comcast sale pending and Broadstripe's future looking bright, Trimaran approached Highland Crusader seeking to sell Trimaran's entire IRN holdings and LLC Units. [12]

---

[12] Earlier, on March 21, 2007, Highland Crusader had purchased Cerberus' approximately $53 million in IRN holdings for approximately $30 million, bringing its economic interest in the IRNs from approximately 25% to 46%.

Trimaran's stated reason for selling its IRN holdings was that the CDO with which the IRNs invested was winding down, and Trimaran needed to monetize its IRN holdings to obtain a $9 million deferred management fee.  Trimaran also believed the price Highland Crusader was willing to pay to be attractive.

Highland Crusader purchased Trimaran's IRN holdings for approximately $65 million in cash, thus increasing Highland Crusader's stake in Broadstripe's long-term future.

Trimaran conditioned the IRN sale on Highland Crusader causing Broadstripe to enter into an indemnification agreement and a general release with Trimaran.  The Indemnification Agreement was negotiated by, among others, Broadstripe's counsel, Bruce Beard, and was structured to offer similar protections to those Trimaran already possessed under the LLC Agreement and the IRN Purchase Agreement.  On these bases, Broadstripe's Management Committee – including Shreffler and Westbrook – evaluated and authorized the sale and Indemnification Agreement.

The trade closed on August 31, 2007, and increased Highland Crusader's IRNs holdings from approximately 46% to approximately 89%.[13]

---

[13] While Trimaran's LLC Units (*i.e.*, the equity interests at HoldCo) were intended to be "stapled to" and traded along with the Trimaran's IRN holdings, the LLC Unit portion of the Trimaran trade never settled, since such transfer would have triggered a change in control, which, among other things, might have resulted in adverse tax consequences to Broadstripe and required Broadstripe to obtain the consent of up to 30 of its franchise authorities.  The trade of the LLC Units also required consent of Broadstripe's lenders, and consent was withheld by Black Diamond for several months.  Therefore, Trimaran continues to hold 42.86% of the LLC Units.  *See, e.g.*, Ex. H-4 at ¶ 20; Ex. H-80.  Notwithstanding this fact, since the closing of the IRN trade, Trimaran has typically agreed to vote its LLC Units as requested by Highland Crusader.

Pursuant to Section 3.3(a)(ii)(A) of the LLC Agreement, and as a result of the IRN trade, Trimaran's membership (i.e., three seats) on the Management Committee ended at or about this time.  As discussed above, at about this time, Westbrook also departed Broadstripe.  This was the first time that Highland Crusader ever held a majority of seats on the Management Committee.[14]

| Members of Broadstripe Management Committee as of September 2007 | Affiliation |
| --- | --- |
| David Walls | Highland Crusader |
| Carl Moore | Highland Crusader |
| William Shreffler | Broadstripe |

## I.  September 2007–February 2008:    Pursuit of Acquisition Opportunities by Broadstripe

Despite the blow dealt by Comcast's termination of the Mid-Atlantic sale, in September of 2007, Broadstripe continued to pursue its growth strategy in an effort to "increase [its] competitiveness and overall stability."  Under Shreffler's leadership (both before and after Trimaran exited the picture), Broadstripe engaged in acquisition-related discussions with, among others, Suddenlink Communications (formerly Cebridge Connections), James Cable, Vista III Media, and Atlantic Broadband.

Beginning in October 2007, Highland's lending arm – Highland Financial Corp. – engaged in discussions with Broadstripe regarding a possible financing of the James Cable transaction.  Unsigned draft proposal letters and terms sheets regarding

---

[14]  As a result of Westbrook's and Trimaran's departure from the Management Committee and pursuant to the terms of the LLC Agreement, Highland had the ability to appoint additional members of the Management Committee.    At the suggestion of Moore and Walls, the Management Committee determined to investigate the possibility of filling the seat with an independent director.

the terms of a possible financing were exchanged between Highland and Broadstripe

beginning on October 22, 2007. The draft proposal letter provided by Highland to

Broadstripe prior to execution of the contained the following language:

> . . . This letter (the "Proposal Letter") establishes terms under which we might provide the Company [Broadstripe Corp., LLC] a senior secured credit facility . . . Based upon information known to us today concerning the Transaction, we are pleased to provide you with this non-binding letter and general outline regarding the proposed Credit Facility . . .
>
> This letter is a non-binding proposal, to be used as a basis for continued discussions and due-diligence, and does not constitute a commitment of HFC or any lender, or an agreement to deliver such a commitment. If delivered, such a commitment would be subject to complete due diligence by HFC as well as any other lender.
>
> Please note, moreover, that the terms and conditions of the proposed Credit Facility are not limited to those set forth herein or in Attachment A. Those matters that are not covered or made clear herein or in Attachment A are subject to mutual agreement of the parties. The terms and conditions of this letter may be modified only in writing.
>
> . . . If delivered, a commitment would be subject to the absence of any material adverse condition in respect of the Borrower or financial or market conditions generally. . . .
>
> . . . This proposal letter sets forth the entire agreement between the parties with respect to the matters addressed herein and supersedes all prior communications, written or oral, with respect hereto. . . .[15]

On October 31, 2007, fully cognizant that it had no financing commitment

in hand, Broadstripe's discussions with James Cable culminated in a signed APA (the

---

[15] Ex. H-1, H-2, H-3.

"James Cable APA") with a purchase price of approximately $110 million, subject to adjustments.

Not only was there no promise made or a written financing commitment signed prior to the execution of the James Cable APA, but, in fact, it was not until November 8, 2007 (eight days after signing the James Cable APA), Broadstripe, through Wylie, finally transmitted its counsel's markup of the proposal letter and term sheet back to Highland.  This proves that Broadstripe and Highland never reached agreement on the financing of the James Cable deal prior to Broadstripe's execution of the James Cable APA.  Indeed, as testified to by Broadstripe's CFO, Mike Wylie, Highland never committed to finance the deal.

### J.  March 2008–December 2008:  Market Meltdown

Unfortunately, like millions of businesses, banks and consumers worldwide, Broadstripe began confronting liquidity issues during the first quarter of 2008.

Though they too were being affected by the economic meltdown, the Highland Lenders continued to support Broadstripe to the extent they could.  The Highland Lenders investigated a number of financing scenarios, in an effort to refinance Broadstripe's debt and fund the James Cables and Suddenlink deals.  Unfortunately, none of the scenarios was commercially feasible to Highland.

On February 20, 2008, Highland Crusader filled one of the vacant seats on the Management Committee with Nau, bringing its membership on the now four-seat

Management Committee up to three people.  Nau possessed experience in the cable industry as a result of his prior employment at Cequel Communications.

In March 2008, certain of the Highland First Lien Lenders agreed to an amendment of the First Lien Facility to provide Broadstripe with $10 million of new revolver availability under the First Lien Facility.  The amendment also provided for up to $55 million in accordion financing for the James Cable transaction.  No lender under the First Lien facility (including the Highland Lenders) was obligated to provide the $55 million in accordion financing to finance the James Cable transaction.  Unfortunately, Black Diamond – which possessed enough First Lien debt to give it a blocking position – had on several occasions taken an obstructionist position with respect to consents and amendments.  Here, too, Black Diamond was refusing to consent to the amendment.  As a result, the Highland Lenders were forced to actually buy out Black Diamond's approximately $64.4 million position at a price of $0.98375/dollar prior to being able to pass the amendment.  This dramatically increased the size of Highland's First Lien holdings.  As shown in the table below, as of March 17, 2008, the Highland defendants had the following positions with respect to Broadstripe:

*[remainder of page intentionally left blank]*

| Highland Lenders' Holdings as of March 17, 2008 | | |
| --- | --- | --- |
| Holding | Amount | Percentage of Aggregate Holdings |
| First Lien Facility | Approximately $173 million<br><br>- Institutional Lenders - Approximately $39 million;<br><br>- Retail Lenders - Approximately $134 million | Approximately 98.1% |
| Second Lien Facility (held by Institutional Lenders) | $62 million | Approximately 89% |
| IRNs (held by Highland Crusader) | $313.46 million | Approximately 89% |
| LLC Units | N/A | Approximately 46% (Highland Crusader), plus membership units granted under IRN Purchase Agreement |
| Seats on Management Committee | Three seats out of four. | N/A |

Also in March 2008, the Management Committee authorized Shreffler and Wylie to seek and explore additional sources of financing and to meet with potential financing sources for the purpose of financing James Cable and other acquisitions.

During April and May 2008, Shreffler and Wylie worked with Nau, as well as with brokers DH Capital and Waller Capital to set up meetings with potential financing sources, including TA Associates, Warburg Pincus and Providence Equity. A number of financing alternatives were discussed, including creating a new management company structure to attract outside financing for a possible James Cable acquisition or reorganizing Broadstripe's corporate structure by separating the challenged Mid-Atlantic System assets from the accreting Central and Northwest System assets and allowing new investors to invest into Central and Northwest Systems alone. Although

certain of the meetings resulted in informal indications of possible interest, none progressed beyond that.

On April 16, 2008, Broadstripe terminated the James Cable APA. Litigation ensued, with James Cable suing both Broadstripe and Highland in the Delaware Chancery Court on April 24, 2008 (the "Delaware Chancery Action").[16]

In that litigation, James Cable alleged, among other things, that the Highland defendants had orally committed to finance the James Cable sale, and that James Cable had agreed to the deal in reasonable reliance on the Highland defendants' alleged financing commitment. James Cable asserted claims against the Highland defendants for, among other things, tortious interference, alter ego theories, and oral inducement. The Highland defendants disputed the James Cable allegations, and filed a motion to dismiss the claims. As discussed, below, on June 11, 2009, Vice Chancellor Lamb ruled on Highland's motion and dismissed Highland from the James Cable litigation in its entirety. James Cable did not appeal the decision.

Although not announced publicly until late July, in May of 2008, Shreffler notified Nau that he had decided to resign as CEO of Broadstripe.[17] He had joined Broadstripe with an intention to grow the company through acquisition (and to garner personal upside through equity ownership). While he became frustrated at Broadstripe's inability to make significant acquisitions without Highland's funding, he

---

[16] C.A. No. 3637-VCL (Del. Ch. Ct.).

[17] Shreffler's resignation became official effective July 15, 2008, following which he stayed on as a consultant while Broadstripe looked for a new CEO.

did not blame Highland.  Rather, he understood that as a result of the market collapse, the Highland Lenders were simply not in a position to fund deals of this magnitude.

During the spring and summer of 2008, the Management Committee continued to evaluate potential candidates for an independent director position.  Given the economic climate and Broadstripe's liquidity issues, Kevin Dowd ("Dowd") was recommended to the Management Committee by certain individuals at Highland that had worked with Dowd on other matters, and knew him to be effective in distressed and turnaround situations.  Dowd is a principal in his own restructuring advisory firm, The Berkeley Square Group LLC, and has over 30 years of experience in restructuring and holding operating management positions in distressed businesses across a wide variety of industries.  On July 11, 2008, Kevin Dowd joined the Management Committee as an independent member.

| Members of Broadstripe Management Committee as of July 11, 2008 | Affiliation |
| --- | --- |
| David Walls | Highland Crusader |
| Carl Moore | Highland Crusader |
| Steven Tyler Nau | Highland Crusader |
| Kevin Dowd | Independent |
| William Shreffler | Broadstripe |

Also in July 2008, Broadstripe determined that it needed another cash infusion.  Prior to entering into an amendment with the second lien lenders to provide the additional liquidity, the Management Committee determined that it would be prudent to hire DH Capital to study the loan market and ensure that the amendment

was being offered on terms favorable to Broadstripe. On the basis of its study, the Management Committee concluded that the terms of the amendment were superior to those Broadstripe could obtain elsewhere. The required lenders under the Second Lien Credit Facility agreed to an amendment whereby the Institutional Lenders would provide up to $17.25 million in financing under certain conditions. On July 21, 2008, Broadstripe entered into the amendment.

That same day (July 21, 2008), Broadstripe drew down $4.05 million. On August 12, 2008, Broadstripe drew down an additional $5 million.[18] Following the draws by Broadstripe, the Highland defendants had the following positions with respect to Broadstripe:

---

[18]  In connection with the July 21, 2008 amendment of the Second Lien Credit Agreement, the Highland Lenders received an original issue discount ("OID") of 9% on each borrowing made under the amendment on and after July 21, 2008. This OID was designed to permit an increase in the interest rate under the Second Lien Credit Agreement without having to increase the interest rate under the First Lien Credit Agreement, which would otherwise have been required under the First Lien credit documents.

| Highland Lenders' Holdings as of August 12, 2008 | | |
|---|---|---|
| Holding | Amount | Percentage of Aggregate Holdings |
| First Lien Facility | Approximately $173 million<br>- Institutional Lenders - Approximately $39 million;<br>- Retail Lenders - Approximately $134 million | Approximately 98.3% |
| Second Lien Facility (held by Institutional Lenders) | $71.05 million | Approximately 90% |
| IRNs (held by Highland Crusader) | $313.46 million | Approximately 92.3% |
| LLC Units | N/A | Approximately 46% (Highland Crusader), plus membership units granted under IRN Purchase Agreement |
| Seats on Management Committee | Three seats out of four. | N/A |

These additional loans were made by the Second Lien Lenders for working capital needs and to act as a liquidity bridge to provide Broadstripe with liquidity to sell South Lyon, a small non-core subscriber system. Unfortunately, Broadstripe was unable to sell South Lyon and so no proceeds were received.

Broadstripe continued to have liquidity issues into the third quarter of 2008. The Management Committee, upon certain of the Highland Lenders' recommendation, hired Gustavo Prilick ("Prilick") as a consultant. Prilick was a crisis manager that certain of the Highland Lenders had worked with in the past on HySky Communications, L.L.C. and SunCom Wireless Holding workouts and whose performance had impressed them.

As discussed above, Shreffler had informed the Management Committee in May 2008 of his intention to resign as CEO of Broadstripe.  While Shreffler was willing to enter into a transition agreement to stay with Broadstripe until a new CEO could be found, there was a pressing need to find a suitable CEO – one with experience dealing with distressed companies.

In a July 25, 2008 e-mail from Timothy Lawler ("Lawler") of Highland Capital to Carl Moore ("Moore"), Lawler informed Moore of the preference of Jim Dondero ("Dondero"), Highland Capital's managing partner, that Broadstripe get Prilick involved in working with the company.  Notwithstanding Dondero's apparent direction, however, Broadstripe did not immediately hire Prilick for any purpose but rather completed an extensive vetting process assisted by Lawler and his team.  Only after reviewing dozens of candidates' resumes, and conducting multiple in-person interviews, did Broadstripe determine to retain Prilick.  Even then, Prilick was hired first (on August 7, 2008) as a consultant.  Only later (on or about September 5, 2008) was Prilick hired as CEO.

On October 21, 2008, Walls resigned from Highland Capital as a result of a "reduction in force" at Highland Capital and contemporaneously gave up his seat on the Management Committee.  Following Wall's resignation from the Management Committee, it was comprised of two Highland Crusader designees (Nau and Moore) and two non-Highland Crusader designees (Dowd and Prilick).

| Members of Broadstripe Management Committee as of October 21, 2008 | Affiliation |
|---|---|
| Carl Moore | Highland Crusader |
| Steven Tyler Nau | Highland Crusader |
| Kevin Dowd | Independent |
| William Shreffler | Broadstripe |

During this same time period, Broadstripe retained and worked with Stephen Dube of CXO as financial/restructuring advisors and Gardere Wynne Sewell, LLP as insolvency counsel to assist with a potential restructuring.

On November 19, 2008, Nau resigned from the Management Committee when he was assigned to work on a different project by Highland.  From that time until Broadstripe's bankruptcy filing, the Management Committee only had three members (Moore (Highland Crusader), Prilick (Broadstripe), and Kevin Dowd (independent)).

| Members of Broadstripe Management Committee as of November 19, 2008 | Affiliation |
|---|---|
| Carl Moore | Highland Crusader |
| Kevin Dowd | Independent |
| Gustavo Prilick | Broadstripe |

On November 28, 2008, Broadstripe received a forbearance from its First Lien Lenders (including the Highland Lenders) regarding a principal payment that was due to them so that it could make payments to certain trade creditors.  Broadstripe also received a forbearance from its Second Lien Lenders (including the Highland Lenders) from the triggering of the Second Lien Credit Agreement's cross-default provisions.

In addition, during 2008, while Broadstripe engaged in settlement negotiations with James Cable in connection with James Cable's lawsuit in the Delaware

Chancery Court, negotiations ended after Broadstripe's summary judgment motion in the Wave litigation was denied. The Highland lenders had been exploring solutions to help fund a James Cable settlement (and, in fact, an agreement had been reached in principle to fund the purchase of James Cable at a price of $95 million). Following denial of the Wave summary judgment motion, however, the Highland lenders determined that they were unwilling to sink additional funds into Broadstripe with the overhang of the continuing Wave litigation.

Broadstripe (OpCo and Capital) filed for bankruptcy protection in the Bankruptcy Court for the District of Delaware on January 2, 2009.

As discussed above, Vice Chancellor Lamb heard oral argument on the Highland defendants' motion to dismiss the James Cable lawsuit during November 2008, but had not yet ruled when Broadstripe filed for bankruptcy protection. During oral argument, V.C. Lamb made the following statement on the record to counsel for James Cable:

> . . . when sophisticated people - - and I take it your clients are sophisticated and they were represented by sophisticated lawyers when they signed this contract - - when they deal this way and then come into court later and want to sue a lot of people that they didn't sign contracts with, it's the sort of disruption in what ought to be sort of the normal flow of commerce that courts are somewhat wary or chary of permitting. . . ."

On January 20, 2009, James Cable filed a motion to lift the automatic stay to continue to pursue its litigation against Broadstripe in the Delaware Chancery

Court.[19]  While the Debtors objected to the lift stay motion,[20] the Highland defendants

filed a response seeking the Bankruptcy Court's clarification that, regardless of whether

the case remained stayed against the Debtors, the James Cable litigation was not stayed

as against the Highland defendants.[21]  This Court ultimately denied the lift stay motion,

but did clarify that the James Cable litigation was not stayed as against the Highland

Defendants.[22]   On March 6, 2009, the Highland defendants filed a copy of the

Bankruptcy Court's order with the Delaware Chancery Court.

On June 11, 2009, the Delaware Chancery Court issued a memorandum

and order granting the Highland defendants' motion to dismiss, and dismissing the

Delaware Chancery Action as against the Highland defendants in its entirety.[23]   The

memorandum and order contains the following rulings by V.C. Lamb:

> The claims in James Cable's amended complaint spring from
> Highland's alleged obligation to provide funding for the
> transaction at issue.  The allegations against Highland are . . .
> inconsistent with the structure of the APA, which was
> heavily negotiated by sophisticated parties. [24]
>
> . . . James Cable does not adequately allege facts to support
> an inference that Highland had any obligation to fund.  To
> the contrary, the amended complaint and the exhibits
> attached thereto show that the parties negotiated a

---

[19] D.I. 97.

[20] D.I. 207.

[21] D.I. 206, 209.

[22] D.I. 281.

[23] *See James Cable, LLC v. Millennium Digital Media Sys., L.L.C.*, No. 3637-VCL, 2009 Del. Ch. LEXIS 102 (Del. Ch. June 11, 2009).

[24] *Id.* at *12.

transaction where the responsibility to arrange financing fell on Broadstripe's shoulders.[25]

. . . the amended complaint alleges that the LOI "identified Highland Capital as both the primary investor and the source of answers to questions about the financing." This language does not reflect a promise. It does not convey an intent to act in connection with the funding of the transaction. At most, it creates a promise to answer questions (a promise that is not alleged to be breached) and is a representation that Highland is Broadstripe's primary investor (a claim James Cable does not dispute). [26]

. . . the amended complaint alleges that Highland representatives "pitched themselves for purposes of a transaction with James [Cable], and made representations about the advantages of doing a transaction with a company controlled by Highland." These allegations also fail to identify a promise because they fail to identify any manifestation of an intention to act or any commitment by Highland. This allegation does not identify a promise by Highland, but merely contains an admittedly true statement about the ownership structure of Broadstripe and an allegation that Highland touted its financial capabilities.[27]

While not necessary for the court's determination … the court notes that the amended complaint and its exhibits strongly suggest that James Cable could not have reasonably relied on a promise by Highland to fund. The buyer's ability to pay the purchase price is generally the single most important concern of a seller. In sophisticated merger and acquisition activity with large amounts of money at stake, such as here, the parties typically reduce even seemingly insignificant matters to writing. . . . If James Cable could have convinced Highland to fund the deal, Highland's obligations would likely have been extensively negotiated and reduced to writing with a substantial amount of detail.[28]

---

[25] *Id.* at *17.

[26] *Id.* at *22.

[27] *Id.* at *22.

[28] *Id.* at *24.

. . . James Cable has failed to adequately allege that Highland engaged in any wrongdoing . . . .[29]

Despite Vice Chancellor Lamb's ruling (and the language of the draft proposal letters and CFO Wylie's deposition testimony that Highland never agreed to finance the James Cable deal), the Committee continues to press ahead with this lawsuit. Exactly like James Cable did in the Chancery Court litigation, however, the Committee has failed to allege any claims or meritorious causes of action which are sustainable against Highland.

## K. Motion for Summary Judgment

Highland moved for summary judgment of all counts of the Complaint. Briefing has been completed. The Court heard oral argument on the motion on February 1, 2010. This matter is ripe for decision.

## LEGAL DISCUSSION

## A.    Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure, directs that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[30]

---

[29] *Id.* at *28.

[30] Fed.R.Civ.P. 56.

Summary judgment is designed "to avoid trial or extensive discovery if facts are settled and dispute turns on issue of law."[31]  Its purpose is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required."[32]  Furthermore, summary judgment's operative goal is "to isolate and dispose of factually unsupported claims or defenses"[33] in order to avert "full-dress trials in unwinnable cases, thereby freeing courts to utilize scarce judicial resources in more beneficial ways."[34]

When requesting summary judgment, the moving party must "put the ball in play, averring an absence of evidence to support the nonmoving party's case."[35]  In order to continue, the burden shifts to the nonmovant to identify "some factual disagreement sufficient to deflect *brevis* disposition."[36]  Not every discrepancy in the proof, however, is enough to forestall a properly supported motion for summary judgment; the "disagreement must relate to some genuine issue of material fact."[37]  In other words, the summary judgment standard "provides that the mere existence of

---

[31]  11-56 MOORE'S FEDERAL PRACTICE, § 56.02 (Matthew Bender 3d ed.).

[32]  *Mesnick v. General Electric Co.*, 950 F.2d 816, 822 (1st Cir. 1991), *cert. denied*, 504 U.S. 985 (1992) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).

[33]  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

[34]  *Mesnick*, 950 F.2d at 822.

[35]  *Celotex Corp.*, 477 U.S. at 325.

[36]  *Mesnick*, 950 F.2d at 822.

[37]  *Id.*

some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."[38]

In order to demonstrate the existence of a genuine issue of material fact in a jury trial, the nonmovant must supply sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant.[39]  The same principles apply in a bench trial where the judge is the ultimate trier of fact; the nonmovant must obviate an adequate showing to the judge to find for the nonmovant.[40]  At the summary judgment stage, the court does not "weigh the evidence and determine the truth of the matter;" rather, the court determines "whether there is a genuine issue for trial."[41]  A material fact is one which "could alter the outcome" of the case.  It is genuine when it is "triable," that is, when reasonable minds could disagree on the result.[42]  Importantly, all reasonable

---

[38] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

[39] *United States v. Jamas Day Care Ctr. Corp.*, 152 Fed.Appx. 171, 173 (3d Cir. 2005) (quoting *Olson v. GE Astrospace*, 101 F.3d 947, 950 (3d Cir. 1996) (citing *Coolspring Stone Supply, Inc. v. American States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993))). *See also Mesnick*, 950 F.2d at 822. ("... 'genuine' means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party [and] 'material' means that the fact is one that might affect the outcome of the suit under the governing law").

[40] *Leonard v. General Motors Corp. (In re Headquarters Dodge)*, 13 F.3d 674, 679 (3d Cir. 1993) ("A fact is material if it might affect the outcome of the case, and an issue is genuine if the evidence is such that a reasonable factfinder [sic] could return a verdict in favor of the nonmovant."). *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial").

[41] *Argus Mgmt. Group v. GAB Robins, Inc. (In re CVEO Corp.)*, 327 B.R. 210, 214 (Bankr. D. Del.2005) (quoting *Anderson*, 477 U.S. at 249).

[42] *Id*. at 210 (citing *Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300, 301 (3d Cir. 1995)).

inferences must be drawn in favor of the nonmoving party[43] and any doubt must be read in favor of the nonmovant.[44]

The requirement that the movant supply sufficient evidence carries a significant corollary: the burden of proof is switched to the non-movant who "must present definite, competent evidence to rebut the motion."[45]  Such evidence "cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial."[46] Furthermore, evidence that "is merely colorable or is not significantly probative" cannot deter summary judgment.[47]   In response, "the non-moving party must adduce more than a mere scintilla of evidence in its favor;"[48] it cannot simply reassert factually unsupported allegations contained in its pleadings.[49]  In other words, the non-moving party must do more than "simply show that there is some metaphysical doubt as to the material facts."[50]  Conversely, in a situation where there is a complete failure of proof

---

[43]  *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004) (citing *Suders v. Easton*, 325 F.3d 432, 435 n.2 (3d Cir. 2003)).  *See also Interim Investors Comm. v. Jacoby*, 90 B.R. 777, 780 (W.D.N.C. 1988), *aff'd*, 914 F.2d 1491 (4th Cir. 1990); *In re Holzinger*, 89 B.R. 529, 530 (Bankr. E.D. Pa.1988); and *In re Pashi*, 88 B.R. 456, 457 (Bankr. N.D. Ga.1988).

[44]  *In re Cantin*, 114 B.R. 339, 341 (Bankr. D. Mass.1990); and *In re Dempster*, 59 B.R. 453, 455 (Bankr. M.D. Ga.1984).

[45]  *Id. See also Mesnick*, 950 F.2d at 822.

[46]  *Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 181 (1st Cir. 1989).

[47]  *Id. See also Anderson*, 477 U.S. at 249-50.

[48]  *Id. See also In re CVEO Corp.*, 327 B.R. at 213.

[49]  *See, e.g., Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

[50]  *PTC v. Robert Wholey & Co. (In re Fleming Cos.)*, 2006 Bankr. LEXIS 896 at *3 (Bankr. D. Del. 2006) (citing *Matsushita Elec. Indus. Co.*, 478 US at 1356).

concerning an essential element of the nonmoving party's case, Rule 56(c) necessarily renders all other facts immaterial and mandates a ruling in favor of the moving party.[51]

## B. Count Two: Equitable Subordination

Count Two of the Complaint seeks equitable subordination of Highland's First Lien Investments and Second Lien Investments. The essence of the Committee's claim is that Highland, through their status as both statutory and non-statutory insiders, engaged in inequitable conduct by (1) blocking the WaveDivision sale and (2) inducing Broadstripe to enter into the James Cable APA, then refusing to finance the deal, harming unsecured creditors in the process. Highland asserts summary judgment is appropriate because, regardless of their status as insiders,[52] (1) Highland did not act inequitably by exercising its contractual rights to not approve the WaveDivision sale, and (2) Highland never concretely committed to finance the James Cable APA.

Given the existence of triable issues of fact regarding, (1) Highland's status as an insider prior to the October 2006 Restructuring, (2) whether Highland's conduct was inequitable, and (3) whether Highland harmed Broadstripe and its creditors, summary judgment is inappropriate on Count Two.

### i.    Applicable Law

The Bankruptcy Code provides that a court may "under principles of equitable subordination, subordinate for purposes of distribution all or part of an

---

[51] *Celotex Corp.*, 477 U.S. at 317.

[52] There is no dispute that Highland was an insider at the time the James Cable APA was signed. However, there are issues of material fact as to Highland's status as an insider at the time the WaveDivision sale collapsed.

allowed claim to all or part of another allowed claim."[53]   Under the *Mobile Steel*
framework, equitable subordination requires proof of three elements:

> 1.    The defendant engaged in some type of inequitable
> conduct;
>
> 2.    The misconduct caused injury to the creditors or
> conferred an unfair advantage on the defendant; and
>
> 3.    Equitable subordination of the claim is consistent
> with bankruptcy law. [54]

Courts differentiate between insiders and outsiders when analyzing
whether a claimants conduct was inequitable.  Indeed, "[t]he most important factor in
determining if a claimant has engaged in inequitable conduct for the purposes of
equitable subordination is whether the claimant was an insider or outsider in relation to
the debtor at the time of the act."[55]   An insider's conduct is "rigorously scrutinized,"
and the plaintiff "bears the burden of presenting material evidence of unfair conduct
that the insider claimant then must rebut by proving the fairness of his transactions
with the debtor."[56]  The rationale behind the heightened scrutiny of insider conduct is
that:

> in circumstances where the plaintiff seeks to equitably
> subordinate the claim of a fiduciary or insider of the debtor
> who is also a creditor, the line between the defendant
> creditor and the debtor is often blurred.  The insider creditor

---

[53]  11 U.S.C. § 510(c)(1).

[54]  *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699-705 (5th Cir. 1977).  *See also United States v. Noland*, 517 U.S. 535, 538-39) (1996) (adopting the *Mobile Steel* test for equitable subordination); *Shubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 411 (3d Cir. 2009).

[55]  *In re Mid-American Waste Sys., Inc.*, 284 B.R. 53, 69 (Bankr. D. Del. 2002).

[56]  *Winstar*, 554 F.3d at 412.

is typically in a position to exert control over the debtor.  The creditor may also share common management and/or ownership with the debtor.  In its efforts to collect its debt, therefore, the creditor may act directly or cause the debtor to act.[57]

"On the other hand, if the claimant is not an insider, then evidence of more egregious conduct such as fraud, spoliation or overreaching is necessary."[58]

### ii.    Highland's Insider Status.

A party may be found to constitute an "insider" for purposes of equitable subordination if the party either (1) meets the statutory definition of insider, or (2) are in a close relationship with the debtor to such an extent as to suggest transactions were not conducted at arm's length.[59]

The Bankruptcy Code contains a list of entities always deemed "insiders" of a debtor, including an "affiliate, or insider of an affiliate as if such affiliate were the debtor."[60]  An "affiliate" is an:

> (A) entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities – (i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or (ii) solely to secure a debt, if such entity has not in fact exercised such power to vote.[61]

---

[57] *Official Comm. of Unsecured Creditors of Toy King Distribs. v. Liberty Sav. Bank, FSB (In re Toy King Distribs.)*, 256 B.R. 1, 198 (Bankr. M.D. Fla. 2000).

[58] *Winstar*, 554 F.3d at 412 (internal quotations omitted).

[59] *Winstar*, 554 F.3d at 397.

[60] 11 U.S.C. § 101(31)(E).

[61] 11 U.S.C. § 101(2).

In addition, "courts have uniformly held that the Bankruptcy Code's definition is merely illustrative and that the term 'insider' must be flexibly applied on a case-by-case basis."[62]    The Third Circuit held that "it is not necessary that a non-statutory insider have actual control; rather the question is whether there is a close relationship [between the debtor and creditor] and . . . anything other than closeness to suggest that any transactions were not conducted at arm's length."[63]    Courts have looked at various factors in determining a creditor's insider status, including whether the creditor: (1) attempted to influence decisions made by the debtor; (2) selected new management for the debtor; (3) had special access to the debtor's premises and personnel; (4) was the debtor's sole source of financial support; (5) generally acted as a joint venture or prospective partner with the debtor rather than an arm's-length creditor; (6) control over the debtor's voting stock; (7) managerial control, including personnel decisions and decisions as to which creditors should be paid; (8) whether the relationship between the debtor and lender was the result of an arm's-length transaction.[64]

### a. Highland was a statutory insider from October 26, 2006 through today.

Prior to the October 2006 Restructuring, Highland, through Highland Crusader, owned only a de minimis amount of the LLC Units of Broadstripe Holdings,

---

[62] *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 499 (S.D.N.Y. 1994).

[63] *Winstar*, 554 F.3d at 397.

[64] *See In re KDI Holdings*, 277 B.R. 493, 512 (Bankr. S.D.N.Y. 1999); *Pan Am Corp.*, 175 B.R. at 500.

LLC, although Highland owned significant amounts of Broadstripe's debt.    For

instance, after the July 2006 Refinancing, Highland, through various funds, owned

approximately 62% of the First Lien Investments, 28% of the Second Lien Investments,

and 25% of the IRNs.    According to Highland's own papers, "[t]he July 2006

Refinancing contemplated a 'second step' to reflect the economic reality that, at this

point in time, the IRNs functionally were equity" since the projected valuation of the

enterprise was insufficient to fully repay the IRNs and therefore no equity existed at the

Broadstripe Holdings, LLC level.[65]   Pursuant to the October 2006 Restructuring, the LLC

Units were functionally redistributed to the IRN holders, wherein Highland obtained

25% of the LLC units, held by the Highland Crusader entity.[66]   Accordingly, there is no

issue of material fact that after the October 2006 Restructuring, Highland became a

statutory insider by virtue of holding over 20% of the voting securities in Broadstripe.

> **b.  *There are issue of material fact as to whether Highland was a non-statutory insider prior to the October 2006 Restructuring.***

Under the Third Circuit's two-part test for non-statutory insiders from

Winstar, there are genuine issues of material fact as to "whether there is a close

---

[65]  Motion at ¶ 19.

[66]  The various defendants in this case are all insiders by virtue of Highland Crusader's ownership of the LLC Units.   Specifically, HCMLP holds an interest in, and controls Highland Crusader as its manager. Furthermore, the Highland Funds are "person[s]" whose business is operated by HCMLP under a management agreement.   *See* 11 U.S.C. § 101(2)(C) (defining an affiliate as a "person whose business is operated under a lease or operating agreement by a debtor, or person substantially all of whose property is operated under an operating agreement with the debtor.")

relationship [between the debtor and creditor] and . . . anything other than closeness to suggest that any transactions were not conducted at arm's length."[67]

Highland, through its holdings of the IRNs, was in a close relationship with Broadstripe. As of March 31, 2005, Highland owned: (1) 11.4% of the Original Loan Facility, and (2) 23% of the IRNs. Highland's holdings remained relatively constant until after Broadstripe's execution of the WaveDivision purchase agreements on February 8, 2006. Subsequently, Highland increased its holdings to: (1) 52.6% of the Original Loan Facility, and (2) 25% of the IRNs by March 29, 2006. After the July 2006 Refinancing (which retired the Original Loan Facility), Highland held: (1) 62% of the First Lien Investments, (2) 28% of the Second Lien Investments, and (3) 25% of the IRNs. As noted earlier, by July 2006 at the latest, the Highland recognized that the LLC Units in Broadstripe Holdings, LLC were worthless, and that "the IRNs functionally were equity."[68] Accordingly, due to its substantial holdings of Broadstripe debt from March 2005 through October 2006, Highland was in a close relationship with Broadstripe.

In addition, the Committee alleges facts which, viewed in the light most favorable to the Committee, reflect that Highland may not have conducted transactions at arm's length. The following allegations are excerpted from the Committee's response to Highland's Motion:

• HCMLP directed management hiring and firing. HCMLP was directly involved in the selection of Shreffler as

---

[67] *Winstar*, 554 F.3d at 397.

[68] Motion at ¶ 19.

CEO in September, 2006.  While the Highland Defendants pretend that HCMLP was totally uninvolved, and Trimaran acted alone (Motion, 11 15, 25), that is simply not supported by the evidence.  (Fredette Depo., 230:23-231:2) ("Q. And who negotiated with Bill Shreffler, in terms of his potential engagement as CEO? A. Dave Walls and myself."); (Walls, 52:18-53:l) (Q. Do you recall why that happened, why Mr. Westbrook was replaced by Bill Shreffler? A. My recollection is that the investors, Highland and Trimaran, wanted a CEO who had more of a hands-on operational experience in running cable companies, and that we felt given Mr. Shreffler's tenure as an adviser to Barrier and his suggestions as to how to improve the company's operations, that he would be a good candidate."); (Fredette Depo., 227:18-22) ("But Bill had expressed an interest in joining the company, and we, meaning Dave Walls and myself and Jay Bloom, had expressed an interest in having Bill come on board.").

•      HCMLP failed to act at arm's-length by causing Broadstripe to retain and compensate Barrier, its affiliate. HCMLP selected Barrier as consultant to the IRN holders in 2006, and caused Broadstripe to pay, despite there being no basis for it to do so. (CC-5, at 60:13-18).  Barrier was an affiliate of HCMLP; one of its principals was a partner at Highland.  (Walls Depo., 39:16-40:l).  Broadstripe paid $137,500 per month.  Moreover, when HCMLP successfully convinced Broadstripe to retain Shreffler, Barrier made an additional fee, as commission, equal to 30% of Shreffler's first year compensation. (CC-21, § 3(c)).

•      HCMLP failed to act at arm's-length by causing NexBank, SSB, its affiliate, to become agent for the Second Lien Investments.  Dondero owns more than 50% of NexBank (and HCMLP) and other HCMLP employees - including Daugherty, who was and is directly involved with Broadstripe, are also NexBank shareholders.  (Daugherty Depo., 57:3-4; 24-25). As agent under the Second Lien Credit Agreement, NexBank was entitled to yearly payments of $75,000. (H-47, at § 2.09(e)).[69]

---

[69] Response at pp. 21-24.

The Committee also alleges various other facts which, according to the Committee, support its position that Highland was a non-statutory insider.  However, the majority of the other allegations occurred after the October 2006 Restructuring, whereafter Highland was already a statutory insider.   The only allegations which support the Committee's contention that Highland was a non-statutory insider prior to October 2006 are the allegations above, specifically that: (1) Highland directed Broadstripe to hire Shreffler as CEO in September 2006, (2) Highland caused Broadstripe to retain and compensate Barrier, an affiliate of Highland as consultants, and (3) that Highland caused Broadstripe to retain NexBank as the agent for the Second Lien Investments in the July 2006 Refinancing.

Oddly, by not differentiating between the pre- and post-October 2006 Restructuring periods, the Committee's papers' argument that Highland was a non-statutory insider pre-October 2006 Restructuring is lackluster.   Such argument is adequately laid out by Vice Chancellor Strine in his bench ruling in Wave Division Holdings, LLC v. Millennium Digital Media Systems.[70]

> I really - - I have to say, I'm not - - it's not at all apparent to me why this motion was brought.  I mean, if you want to come in to court and prove that this was all ducky, that's fine.   But, you know, this would come back from Dover so fast, you wouldn't even see it if I were to grant summary judgment on this record.  Hiring a banker, running projections for alternative transactions?   And, honestly, the argument that this was somehow - - the IRN holders were

---

[70]  Civil Action No. 2993-VCS (Del. Ch. Oct. 1, 2008).  This Chancery Court litigation involved a breach of contract action filed by WaveDivision against Broadstripe for alleged breach of the sale agreement.

contractually entitled to this?  I mean, frankly, that's - - that doesn't pass the straight-face test.

And, actually, companies often treat their lenders in a fairly - - you know, "Here's what you're entitled to.  We'll get it.  We're not making information for you, much less running scenarios, hiring bankers."

. . .

Who knows what Highland would do if it doesn't have access to inside information, if it's not getting projections and doesn't - - able to get comfort with itself that it can refinance?

And, honestly, it's really - - it's - - it is - - again, doesn't pass the straight-face test to argue there was nothing akin to a change of control that occurred here.  Highland was - - had 10 percent or so of the debt.  It now controls Millennium.  It's easy to conceive of that as an acquisition of the business.  Why did it do that?  It certainly didn't do it because it was taking it on the chin as a debtor.  The debtors had actually - - the real debtors had actually instigated the sale.  Highland came in - - Highland was more a buyer than a debtor.  This was a business opportunity for Highland to gin up an M and A deal for itself. [71]

What VC Strine is referring to is the following timeline:

• February 8, 2006:  Broadstripe and WaveDivision execute a purchase agreement.  Said agreement is contingent upon consent of Original Loan Facility lenders and the IRNs, if Broadstripe and WaveDivision believe the consent of the IRN lenders is required.  At this point, Highland owns about 10% of the Original Loan Facility, but begins acquiring more of the debt.

• March 2, 2006: Barrier consultants retained.

• March 29, 2006:  Highland completes its acquisition of 51% of the Original Loan Facility.

---

[71] CC-5 (Transcript of Oct. 1, 2008, *WaveDivision Holdings, LLC v. Millennium Digital Media Sys., L.L.C.*, No. 2993-VCL (Del. Ch.) at pp. 59-61).

      •    April 7, 2006: Trimaran, owner of 43% of IRNs and Highland, owner of 25% of the IRNs notify Broadstripe of non-consent to the WaveDivision sale.

      •    April 21, 2006: Highland notifies Broadstripe that, as 51% owner of Original Loan Facility, it will not consent to the WaveDivision sale.

      •    July 28, 2006: Broadstripe terminates the WaveDivision sale and enters into the July 2006 Refinancing.

The argument is that Highland (and Trimaran), holders of large amounts of the IRNs realized they would be virtually wiped out by the WaveDivision sale and their consent would most likely not be required to the sale, thus embarked on a course of conduct to prevent such an event. Highland and Trimaran then hired Barrier, at Broadstripe's expense, as investment bankers to analyze alternative scenarios to the WaveDivision sale. Highland then acquired a majority position in the Original Loan Facility to block the WaveDivision sale. At that point, with the sale blocked, and a maturity date of June 30, 2006 on the Original Loan Facility, Broadstripe had no choice but to enter into the July 2006 Refinancing and the October 2006 Restructuring. This culminated in Highland's control of Broadstripe. Accordingly, there are triable issues of fact as to whether Highland was a non-statutory insider prior to the October 2006 Restructuring.

### iii. Inequitable Conduct

#### a. Inequitable Conduct Surrounding the WaveDivision Sale

The Committee alleges that Highland acted inequitably in connection with blocking the WaveDivision sale. I will let the Committee explain their argument:

The Highland Defendants blocked the Wave Division sale for one reason: to speculate regarding the value of the IRNs. As discussed above, when Walls learned that the Northwest and Michigan assets could be sold for far less than needed to pay-off all of the secured debt, HCMLP chose to avoid an immediate loss to the IRNs by increasing its speculative investment in Broadstripe and by becoming actively involved in the management of the Company.

HCMLP did not act alone in this.  Trimaran, the largest IRN holder, at some point also decided that the Wave Division sale was disadvantageous to its holdings.  But Trimaran could not unilaterally stop the sale for three reasons.  First, it only held 43% of the IRNs. (Fredette Depo., 50:8-51:6). Second, the IRNs had no contractual right to block the Wave Division sale because, under the sale agreement, the IRN holders' consent would be deemed to have been obtained if Broadstripe and Wave Division concluded that it was not required.   (Motion,  ¶  23).   Third, Trimaran needed a financing partner to put forth an alternative transaction. Accordingly, Trimaran, which held two seats on the Debtors' board - the very board that had already signed the Wave Division APA and was obligated to obtain consent from the existing first lien debt holders ("Old Bank Debt") to that deal -- worked through Fredette, in collaboration with Walls, to structure an alternative proposal that would preserve the potential upside to the IRNs.  Indeed, in a March 29, 2006 E-mail, Walls told Fredette "FYI, we bought bank debt today that got us over 51%," to which Fredette responded "Let's talk about how that plays out in a bank consent process." (CC-23).

Fredette and Walls, ignoring that the Company had already signed an APA and was obligated to work toward getting consents, convinced the Company to pay the fees for Barrier Advisors allegedly to analyze the transaction, but in reality, to justify Trimaran and Walls' view that a refinancing would be more beneficial than the signed APA. (Shreffler Depo., 30:1-13) (Shreffler, who was a consultant at Barrier at the time, testified that the model prepared by Barrier assumed no sale, and a $30 million infusion. He further testified that the IRN holders had asked Barrier to make those assumptions).  Barrier, as discussed above, was an affiliate of

HCMLP.    Highlighting that Barrier's conclusion were predetermined, in a March 7, 2006 E-Mail, before Barrier was even retained, Walls told Kent Laber, a principal at Barrier: "On the sale issue, I'm pretty sure we (Highland) won't let that happen . . ." (CC-24).

There was no justifiable reason for the Company to pay for Barrier's services, much less facilitate an analysis that contravened its signed APA with Wave Division.  As Vice Chancellor Strine concluded: "Hiring a banker, running projections for alternative transactions? And, honestly, the argument that this was somehow - the IRN holders were contractually entitled to this? I mean, frankly, that's -that doesn't pass the straight-face test." (CC-5, at 60:13-18).

While Broadstripe and Fredette were working to find potential financing candidates, HCMLP caused the Highland Funds to buy a blocking position of the Old Bank Debt. (Motion, ¶ 17, 18).  The reason is clear: otherwise, the Old Bank Debt lenders were going to approve the Wave Division sale.  In fact, O'Melveny & Myers, as counsel for Bank of America, the Old Bank Debt's agent, had prepared a draft consent notice approving the sale and transmitted it to the Company for comments. (H-121).  Highland's purchase of the Old Bank Debt was to reverse course and block that consent from being given.  Vice Chancellor Strine explained, in the Wave Division Opinion, as follows:

> Then you have the role of Trimaran as manager. They've got their dude, their man [Fredette], their point guy arranging this, talking to Westbrook.  Why would they do that? Because they want to stay in the game and they're not primarily in the senior debt. Their equity holders in IRN.  So if they can foster something with Highland that keeps them in the game, that's far better.
>
> ***
>
> Highland would never have actually been in a situation to say no if it wasn't confident that there was an upside to buying the senior debt that gave it a reason to take on that position of risk.

*\*\**

> It was only because Highland believed that there was
> a refinancing opportunity and that people were going
> to be open to it and do it instead of this transaction
> that Highland would behave as it did.

> Accordingly, HCMLP's inequitable conduct can best be
> summed up as "taking a bet with other people's money."
> Seeing a speculative opportunity, HCMLP bought the Old
> Bank Debt, blocked the Wave Division sale, and caused
> Broadstripe to incur insurmountable liabilities (discussed
> below), on the off-chance that HCMLP could engineer a
> home-run scenario.[72]

Highland takes the position that there is simply nothing wrong with its

conduct in blocking the sale.  Highland believes it was simply exercising their rights as

creditors not to consent to the proposed sale.  Here is the Third Circuit in Winstar's take

on exercising contractual rights as a creditor:

> Lucent's contention that it was merely driving a hard
> bargain and exercising its contractual rights is not
> persuasive.  The decision of the bankruptcy court in *Johnson
> v. NBD Park Ridge Bank (In re Octagon Roofing)*, 124 B.R. 522,
> 530 (Bankr. N.D. Ill. 1991), provides an instructive contrast.
> There, the alleged insider creditor required the debtor to
> provide a mortgage on certain property in order to secure a
> previously unsecured debt; if the debtor refused, the creditor
> "could have, and would have, effectively shut down
> Debtor's operations."  124 B.R. at 530.  The bankruptcy court
> held that the creditor was not a "person in control of the
> debtor" because these facts "merely demonstrate that the
> [creditor] could compel payment of its debt" and "it is well
> established that the exercise of financial control . . . incident
> to the creditor-debtor relationship[ ] does not make the
> creditor an insider."  Id.  **Here, however, the Bankruptcy
> Court's findings are not limited to Lucent compelling
> payment of debts or other financial concessions**

---

**"incidental" to the Credit Agreements.**    Instead, the Bankruptcy Court found, among other things, that Lucent had the ability to coerce Winstar to make unnecessary purchases and used "Winstar as a mere instrumentality to inflate Lucent's own revenues."  348 B.R. at 284.

Moreover, given our conclusion that actual control is unnecessary for an entity to be deemed a non-statutory insider, even if Lucent was not a "person in control" of Winstar, it was a non-statutory insider of Winstar based on the Bankruptcy Court's findings.  Not only was Lucent both a major creditor and supplier of Winstar, but, according to the Bankruptcy Court, it had the ability to coerce Winstar into a series of transactions that were not in Winstar's best interests, such as the Software Pool transaction, the improper bill-and-hold transactions, and other purchases of unneeded equipment.  Such one-sided transactions refute any suggestion of arm's-length dealings.  *See Anstine v. Carl Zeiss Meditec AG ( In re U.S. Med., Inc.)*, 531 F.3d 1272, 1277 n.4 (10th Cir.2008) ("An arm's-length transaction is a transaction in good faith in the ordinary course of business by parties with independent interests ... [that] each acting in his or her own best interest[ ]would carry out ....") (quotation omitted). [73]

First, it is worth noting that the determination of whether Highland's conduct was inequitable is highly dependent of whether Highland was indeed a non-statutory insider.  If Highland was not an insider, there is little doubt this conduct does not constitute "fraud, spoliation or overreaching."[74]

However, the question of whether Highland was a non-statutory insider is wrapped up with the question of whether Highland acted inequitably.  Both questions require a factual determination of whether Highland was simply exercising its contractual rights "incidental" to its position in the Original Loan Facility, or whether

---

[73] *Winstar*, 554 F.3d at 398-99 (emphasis added).

[74] *Winstar*, 554 F.3d at 412 (internal quotations omitted).

Highland's conduct controlled Broadstripe to the point of becoming an insider.  Here, Highland blocked the WaveDivision sale <u>not for the benefit of the Original Loan Facility</u>, which gave it the blocking position, but rather for the benefit of the IRNs, which had no blocking position.  Moreover, Highland did not expressly block the sale until, working with Trimaran (which held multiple board seats) the Barrier consultants/bankers generated a feasible refinancing plan using inside corporate information.

### b.  Inequitable Conduct Surrounding the James Cable APA

The Committee also argues that Highland acted inequitably by leading Broadstripe's management team to believe that Highland would finance the acquisition of the James Cable system assets, then refusing to finance the deal after the APA was signed and Highland concluded the deal was uneconomic.  This appears to be the Committee's best argument regarding equitable subordination because there is no dispute that Highland was an insider at the time the conduct occurred.  According to the Committee:

> Immediately following the closing of the July 2006 Financing, HCMLP, acting together with Trimaran, took steps to cement their control of Broadstripe.  Together, they replaced the existing CEO, Westbrook, with Shreffler. (Fredette Depo., 227:18-22; 230:23-231:2); (Walls Depo., 52:18-53:l).  Shreffler had first come to Highland's attention when he was brought in by Barrier as a consultant. (Motion, ¶ 16). As discussed above, Shreffler was assured when hired that it was HCMLP's intention to use Broadstripe as a platform to make acquisitions in the cable industry.
>
> Beginning in early 2007, identifying and negotiating potential acquisitions became a principal focus of

Broadstripe's management, and Broadstripe commenced negotiations with James Cable. All HCMLP employees working with the Broadstripe investment were aware of those discussions and, more to the point, knew that the sale would require financing. (See below). On October 31, 2007, Broadstripe and James Cable executed the James Cable APA. The James Cable APA was not subject to a financing contingency; meaning, Broadstripe was not excused from closing if it could not find financing.

### HCMLP Employees Review And Approve The James Cable APA Before It Is Signed.

The James Cable APA, with no financing contingency, was reviewed and approved throughout HCMLP before it was signed. The Highland Designees, Walls and Moore - both reviewed the James Cable APA and approved it knowing that it contained no "financing out." (Walls Depo., 146:15-147:10); (Moore Depo., 56:13-18) (Q. So at the time that -- before Broadstripe signed the APA, you knew that Broadstripe was not excused from performing simply because it couldn't line up financing under the terms of the APA; is that correct? A. Yes."); (Wylie Depo., 44:9-13). Indeed, Shreffler specifically provided the James Cable APA to Walls and Moore to be sure they had understood its terms before the Company went forward; they received the APA and told him they both approved. (Shreffler Depo., 170:5-23) (A. "Before we signed the deal, I made a point of sending it to Carl [Moore] and Dave [Walls] and saying, 'Would you please review this and make sure you're good with this because we're about ready to sign this.' And the feedback I got back was, 'Yep, you're good,' so we signed it. Q. And when you sent it over there was no financing out, right? A. Correct.").

Other HCMLP employees were directly involved in negotiating the James Cable APA and knew its terms before it was signed. HCMLP's internal general counsel reviewed the James Cable APA before it was signed. (Walls Depo., 272:4-6). HCMLP's Private Equity group, including senior team members such as Daugherty (also a lawyer and general counsel at times), John Honis, and Nau, were "fully engaged and fully involved" in negotiating the James Cable APA. (Walls Depo., 144:19-145:3).

The Highland Defendants make the utterly disingenuous argument that Broadstripe - acting alone - signed the James Cable APA and that HCMLP played no role in Broadstripe's decision to do so. (Motion, ¶ 48). The evidence clearly shows that Broadstripe only signed the James Cable APA after HCMLP vetted, reviewed, and approved it, and based on HCMLP's assurance that it would finance the deal.

## HCMLP Assured It Would Finance The James Cable Purchase; Broadstripe's Reliance.

The evidence shows that Broadstripe signed the James Cable APA relying, and wholly dependent, on HCMLP's assurances of financing. The Highland Defendants try to divert attention from this issue by arguing they engaged in no wrongful conduct because "Broadstripe and Highland never reached agreement on the financing of the James Cable deal prior to Broadstripe's execution of the James Cable APA." (Motion, ¶ 49). That, however, is simply not the issue in this litigation. Rather, what the Complaint alleges - as supported by the evidence - is that HCMLP assured Broadstripe, repeatedly, that it would finance the James Cable acquisition, and that without that assurance, on which Broadstripe reasonably relied, Broadstripe would never have signed the APA.

Since late 2006, HCMLP had been assuring Broadstripe that it would finance acquisitions. As recounted by Shreffler below, in a September 2007 meeting at HCMLP's offices, Dondero assured Broadstripe it would have funds to make acquisitions:

> My senior team and I created a plan on how to make Maryland work because we figured at this point, well, we've got to go figure out how to make it work. So we created a plan. Flew to Dallas. Presented it to Dave Walls. He had Tyler Nau sit in, although Tyler wasn't on the board at that time. He also had -- I believe Carl Moore was there. And Jim Dondero came in for the first part of that meeting, and it was myself, it was Rudy Tober, and it was Mike Wylie. And I believe it was Mike Jury, who was our CTO at the time, our chief technology officer.

And Jim Dondero came in and what he really wanted to see was the chart we brought that showed the acquisition opportunities that were in front of Broadstripe.  And he spent -- he was with us for probably ten, 15 minutes, and he focused in on those deals, and he said -- I remember this specifically.  He said, "Cable deals take longer than normal deals, but it's important that we get deals done.  So, you guys, let's go find some deals and let's make it happen."  So it was like music to my ears because we were obviously getting close to getting the James deal signed up, and it was like, Yes, sir.

(Shreffler Depo., 165:2-166:2); see also (Wylie Depo., 40:13-41:3).

In the time leading up to the James Cable negotiations, Walls, who not only sat on Broadstripe's board, but also was the HCMLP portfolio manager responsible for the Broadstripe investment, assured Broadstripe's senior management that the Highland Funds would finance acquisitions.  (Shreffler Depo., 131:6-20) ("In discussions I had with Dave Walls -- because at this point most of my discussions were with Dave directly - my understanding was that . . . equity would become available through Highland and that Highland could speak for the majority of the debt.  And if they couldn't, they would bring in somebody that they know and that they trust to come into the credit facility or into the capital structure.  So, again, for -- where Mike and I sat, we had a very good understanding that -- that Highland was going to help us in many ways as far as funding acquisitions.").

Indeed, HCMLP's commitment to Broadstripe's growth through acquisition was relayed to others, including potential targets.  In September 2007, Randy Wells, a broker seeking acquisition possibilities for Broadstripe, specifically inquired whether the Highland Funds would support purchases.  Nau, on behalf of HCMLP, responded that HCMLP was committed to seeing Broadstripe grow. (CC-25) (September 10, 2007 E-Mail chain between Nau and Walls).

Also in late 2007, Broadstripe was exploring a potential purchase of Suddenlink, which would have required

potentially $270,000,000 to $280,000,000 in financing. (Shreffler Depo., 177:21-178:14). Broadstripe negotiated terms, relying that HCMLP would either directly provide, or backstop, financing. *Id.* ("[W]e were of the understanding that -- that Highland could do the deal. It wouldn't be a problem. And if they needed assistance, they'd go and find the assistance.").

Before Suddenlink would sign a letter of intent with Broadstripe, however, its CEO demanded confirmation that HCMLP would underwrite the financing. In late October, 2007, Jerry Kent ("Kent"), Suddenlink's CEO, requested a call with Walls; Shreffler and Wylie participated. Kent directly asked Walls whether Highland funds would finance the Suddenlink purchase, and Walls responded, "Yes." (Shreffler Depo., 131:20-132:12); (Wylie Depo., 33:10-23). Kent then followed up by clarifying that he specifically meant whether Highland funds would "speak for" 100% of the commitment, meaning full backstop, and again Walls answered, "Yes." (Wylie Depo., 34:11-20); see also (CC-26) (In a January 14, 2008 E-Mail, Kent told Nau: "[I] [h]ad Walls (sic) word Highland would stand behind financing.").

Following this conversation with Kent, HCMLP continued to assure Broadstripe that it would finance the Suddenlink deal. The following week, Shreffler asked Walls when Broadstripe could sign an APA with Suddenlink. Walls identified the exact date to Shreffler and Wylie. (Shreffler 181:16-182:14). As such, as of the end of October 2007, Broadstripe had no doubt that the Suddenlink deal would progress to an APA and that HCMLP and the funds it manages would finance the deal.

On October 31, 2007, Broadstripe signed the James Cable APA. The James Cable APA required Broadstripe to pay approximately $115,000,000. It is undisputed that Broadstripe could not have completed the purchase on its own without financing. (Walls Depo., 95:21-96:3). It is also undisputed that as of October 31, 2007, no parties, other than HCMLP and its funds, had agreed to provide financing for the acquisition.

In his deposition, when asked whether Broadstripe had a written, binding commitment with HCMLP for finance, Shreffler answered as follows:

> [W]e never felt we needed to ask for that based on the feedback that we heard from -- number 1, the -- I'll use James as an example.   James never asked for a binding letter of financing.   And we never even thought we had to do it because again, literally, it was within the week that we signed the asset purchase agreement on the James deal that Dave Walls had communicated to Jerry Kent that Highland would backstop, would guarantee the funding on the Suddenlink deal.   **So there was never a question in my mind.**

(Shreffler Depo., 229:20-2305) (emphasis added).   Wylie similarly testified that one of reasons Broadstripe signed the James Cable APA without a financing out was that "not more than ten days before, we had heard a transaction of nearly four times the size was going to be fully spoken for [by Highland]." (Wylie Depo., 33:24-34:10).

The Highland Defendants try to mischaracterize Wylie's testimony by stating:  "As testified to by Broadstripe's CFO, Michael Wylie, the individual who actually engaged in financing discussions with Highland, ". . . [we] did not have a commitment letter from - Highland. It was not an underwritten debt transaction.")."  (Motion, ¶¶ 3-4) citing Wylie Depo. pp. 48:3-15, 102:22-103:2. However, Wylie's answer to that same question - which the Highland Defendants intentionally omit -- goes on to say: "On the other hand, again, this fact that Highland was the equity and there was a longer-term relationship there and a grander vision in terms of closing acquisitions gave us some comfort that that deal was going to get done." (Wylie Depo., 48:15-21).   The full quotation shows that Wylie did rely on HCMLP to provide financing, given their role in the Company.  Moreover, Wylie further testified that he saw the "no financing out" provision as not a significant issue because he was confident that Highland would finance the deal. (Wylie Depo., 45:9-46:2).

Given that (a) the James Cable APA had no financing out, (b) Broadstripe could not close without financing, (c) Broadstripe had no outside funds lined up, (d) HCMLP had made assurances that it would fund acquisitions, (e) HCMLP reviewed and approved the James Cable APA, and (f) Walls and Moore, the Highland Designees, knew the foregoing and voted to approve execution of the James Cable APA, it was perfectly reasonable for Broadstripe to rely on financing coming from HCMLP.

**HCMLP, Itself, Thought It Was Committed To Fund.**

The Highland Defendants' position that Broadstripe could not reasonably rely that HCMLP had committed to financing is unsupported by the evidence, especially since HCMLP itself believed (until litigation began) that it had so committed.

After the Company signed the James Cable APA, Broadstripe, working with its public relations firm, TMC Communications, drafted a press release announcing the deal. A November 14, 2007 draft of that press release announced that "Highland and certain of its investment funds **have committed** to provide senior debt financing to consummate this transaction." (CC-27) (emphasis added). Highland's Assistant General Counsel, Andrei Dorenbaum, concerned with the word "committed" - apparently since no formal agreement was signed - commented that the right language should reflect, instead, that Highland "anticipates" providing financing. (CC-28).

Nonetheless, Walls, who was the one directly involved in the discussions with Broadstripe about financing and **on the Broadstripe Board**, on November 16, 2007, approved the original language, and circulated the final press release internally to HCMLP's senior management team (i.e., "Team Leaders"). That version states that "Highland and certain of its investment funds **have committed** to provide senior debt financing to consummate this transaction." (CC-8) (emphasis added). At his deposition, Walls confirmed, again, that the press release was accurate. (Walls Depo., 166:19-25) ("Q. This statement talks about a commitment to provide financing; is that right? A. It does say -- yes, investment funds have committed to provide senior debt financing.

60

Correct. Q. And my question is rather straightforward. Is this accurate? A. Yes, it's accurate."). In transmitting it to the HCMLP leadership, Walls noted that the deal would be financed with "a merchant deal currently being worked on," meaning a syndicated loan via the HCMLP merchant banking group. (CC-8). Given that Walls, a senior Highland executive, who made the decision on behalf of Broadstripe to enter into the James Cable deal, had no doubt in his mind that Highland was committed to finance the deal, how can the Highland Defendants question Broadstripe's reliance?

Evidence of internal HCMLP discussions regarding the James Cable APA further confirm that, after it was signed, top brass at HCMLP reversed course and decided not to finance the deal. HCMLP very well understood that if it did not finance the transaction two things would happen: (a) Broadstripe could not close, and (b) James Cable would sue Broadstripe. (CC-29, at HIF-099878) (February 2008 private equity materials recognizing that "[w]ithout Highland sources equity our options include[d]," if Broadstripe "walked" from the James Cable deal there was "[p]otential for litigation"). Indeed, on February 14, 2008, Nau informed Walls that he would try to persuade James Cable to reduce the purchase price by threatening to make any litigation expensive and protracted. (CC-30). Nau added: "I think we are pretty credible as a firm in our willingness to litigate," to which Walls immediately responded "of that I'm certain." (*Id.*)

Fully aware that not closing the James Cable transaction would expose Broadstripe to litigation risk, HCMLP employees debated how to proceed. The decision ended up going up the ranks to Dondero. As reflected in a February 13, 2008 E-Mail exchange between Walls and Nau, HCMLP employees were questioning whether it could avoid financing the transaction. In Nau's words "Folks still are not viewing this as a signed APA." (CC-31). Walls responded he had discussed the James Cable APA with Dondero and that "he knows it's been signed . . . I've told him multiple times. He's just expecting us to 'work around' this." *Id.* Another E-Mail, around March 10, 2008, shows Dondero's involvement, again, to prevent HCMLP from going through with financing the James Cable transaction. In that exchange,

HCMLP employees discussed possibilities for financing the James Cable deal. Shawn Groves, a HCMLP Portfolio Manager working for Walls, and acting as HCMLP's lead negotiator for financing terms, informed Nau that Dondero "nixed any transaction with Broadstripe," meaning no financing would be given. (CC-32).

Finally, in February 2008, realizing the litigation exposure that would arise from inducing Broadstripe to sign the James Cable APA, but then denying financing, HCMLP was looking to assign blame. Despite the Highland Defendants' current argument - wholly unsupported by facts - that it was customary in the cable industry to sign APAs with no financing contingencies, that certainly was not, and is not, the view at HCMLP.  In February 2008, Dondero instructed Walls to terminate a member of Broadstripe's management team for signing the James Cable APA without a financing contingency.  (Walls Depo., 141:9-20).  Walls then met with Shreffler and suggested that Bruce Beard, Broadstripe's general counsel, be fired.  (Shreffler Depo., 167:8-11).  To this day, Dondero describes the lack of financing contingency in the James Cable APA as "nonstandard or legal oversight". (Dondero Depo., 58:23).   And Daugherty believes that Broadstripe was "imprudent" when it entered into the James Cable APA.  (Daugherty Depo., 238:24-239:2).

Ultimately, despite Dondero's instruction, Broadstripe did not fire anybody in management over the lack of financing out in the James Cable APA.  (Moore Depo., 52:23-54:20). According to Moore, he, along with Nau and Walls, concluded that nobody had done anything wrong. *Id.*  They reached that conclusion after reviewing "the circumstances around and the content of Broadstripe's asset purchase agreement that had been signed with James [Cable]."  *Id.* These circumstances presumably included the fact that Broadstripe's management reasonably relied on HCMLP's assurance of financing.

In April 2008, around the time James Cable commenced litigation, HCMLP realized the immense harm caused to Broadstripe.  Indeed, HCMLP's outside counsel, Haynes and Boone, LLP ("H&B") analyzed "equitable subordination" issues and met with Dondero, Moore, Daugherty, and others to discuss that analysis and strategy. (CC-33, at BS-0071944)

Moreover, counsel at H&B instructed Moore to assemble documents relevant to the James Cable transaction for Shreffler's review, and then on April 10, 2008, held a call with Shreffler to discuss James Cable and, presumably, the expected litigation relating thereto. (CC-34).

In sum, HCMLP's inequitable conduct is clear from the evidence, including that HCMLP (a) induced Broadstripe's management to find acquisition targets by promising to finance purchases, (b) assured Broadstripe that HCMLP would finance the James Cable purchase, (c) knew that the James Cable APA had no "financing out" and that Broadstripe was signing the James Cable APA anyhow because it was confident HCMLP would finance the transaction, (d) believed in late 2007 that it had committed to provide that financing, and assured third-parties it would do so, and (e) pulled financing from the James Cable purchase, knowing that doing so would expose Broadstripe to significant litigation risk.[75]

Highland's argument is simple; it never entered into a binding contract with Broadstripe to fund the James Cable APA and any reliance by Broadstripe was unreasonable, based on vague statements of encouragement.   Highland begins by noting that the transmission e-mail of Highland's draft proposal to Mike Wylie, Broadstripe's CFO nine days prior to the execution of the James Cable APA states: "In line with our phone call, I attached a preliminary indication of terms for Broadstripe Corp, LLC that may make sense based on the separate structures for the transaction. We can use this as a launch of discussion terms that may be helpful over the next few days."[76]  The proposal letter itself contains numerous disclaimers that the proposals and term sheet were non-binding.  Furthermore, eight days after signing the James Cable

---

[75] Response at pp. 28-39.

[76] H-1.

APA, Broadstripe transmitted its counsel's markup of the proposal letter and term sheet back to Highland. The term sheet reflected numerous open economic issues, including with respect to payment of filing and recording fees, allocation of the possible financing among first and second lien facilities, whether the financing would contain a base rate interest option, whether the unused revolver fee would be flat or would change according to a leverage grid, the size of the administrative agent fee, excluded collateral, conditional precedent to closing, and events of default. And no proposal letter was ever signed.

Highland also asserts that it was unreasonable for Broadstripe, particularly Shreffler, to rely on "vague statements of encouragement" to finance the James Cable APA. Particularly, Highland notes that "the Committee cannot invoke the doctrine of promissory estoppel to try to back Highland into a commitment that Highland did not make."

In this case, there are triable issues of fact as to whether Highland **<u>acted inequitably</u>**. While proving promissory estoppel would be helpful to the Committee's case, it is not necessary, as the Committee only needs to make a showing that Highland acted inequitably. There are legitimate factual issues surrounding this issue. Due to Highland's status as insiders, the situation at bar is not the same as two separate entities negotiating financing for an APA at arm's length. By the point in Highland and Broadstripe's relationship that the James Cable APA was signed, Highland was an undisputed statutory insider, holding significant amounts of debt and equity in

Broadstripe.  Moreover, Highland had seats on the board and there are questions of fact as to the extent of Highland's involvement in the day-to-day management and operations of the company.  Specifically, there are significant questions of fact regarding Highland's involvement in strategic decision-making for acquisitions.  Even though the term sheets and the proposal letter for the James Cable APA financing reflected they were mere proposals and non-binding, there are significant factual questions as to whether, given the extent of Highland's involvement in the company, whether it was reasonable for Broadstripe to assume that Highland would finance the APA, and thus, whether it was inequitable for Highland to "do a 180" and refuse to fund the deal.

### iv.    Harm Caused by Inequitable Conduct

The second element of the *Mobile Steel* test requires the proponent of equitable subordination to plead and prove that the offending conduct caused injury to the debtor or to its creditors.   In determining whether the claimant's inequitable conduct has caused harm to other creditors or provided said claimant with an unfair advantage, the Court must look to and consider the effects on creditors then-known, and also on those to be identified in the future.[77]   "If the misconduct results in harm to the entire creditor body, the objecting party need not identify the injured creditors or quantify their injury, but need only show that the creditors were harmed in some general, concrete manner."[78]

---

[77] *See In re Dan-Ver Enterprises, Inc.*, 86 B.R. 443, 448 (Bankr. W.D. Pa. 1988).

[78] *In re 80 Nassau Associates*, 169 B.R. 832, 840 (Bankr. S.D.N.Y. 1994).

"A bankruptcy court should . . . attempt to identify the nature and extent of the harm it intends to compensate in a manner that will permit a judgment to be made regarding the proportionality of the remedy to the injury that has been suffered by those who will benefit from the subordination."[79]  However, quantification of harm may not always be feasible and, where that is the case, it should not redound to the benefit of the wrongdoer.[80]

### a. Harm Caused by Inequitable Conduct Surrounding the WaveDivision Sale.

The Committee alleges significant harm arising from the terminated WaveDivision sale.  First, the Committee argues Broadstripe was exposed to litigation. To date, said litigation has cost over $3 million in legal fees.  In addition, WaveDivision has asserted claims over $100 million in the bankruptcy case.  Second, the termination of the sale caused reputational risk.   Third, the WaveDivision litigation drove Broadstripe into bankruptcy because Highland, particularly Daugherty, refused to provide further financing or finalize a deal with James Cable once Broadstripe lost its summary judgment motion in the WaveDivision litigation in Chancery Court.

Accordingly, there are triable issues of fact regarding harm caused by the Highland's refusal to consent to the WaveDivision sale.

---

[79] *Citicorp Venture Capital v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 991 (3d Cir. 1998).

[80] *Columbia Gas and Electric Corp, v. United States*, 153 F.2d 101, 102 (6th Cir.), *cert denied*, 329 U.S. 737 (1946) (equitable subordination is appropriate where claimant's illegal or inequitable conduct harmed creditors, even if it is difficult to measure the harm caused); *In the Matter of Automatic Washer Co.*, 226 F.Supp. 834, 836 (S.D. Iowa), *aff'd*, 338 F.2d 1006 (8th Cir. 1964) (subordinating claim where the extent of the harm caused by claimant's inequitable conduct was difficult to ascertain); *In re Mid-American Waste Sys.*, 284 B.R. at 72 ("claims should be subordinated only to the extent necessary to offset that harm which the bankruptcy and its creditors suffered on account of the inequitable conduct").

### b. *Harm Caused by Inequitable Conduct Surrounding the James Cable APA.*

The Committee alleges significant harm arising from Highland's inducement of Broadstripe to enter into the James Cable APA then refusal to finance the transaction. Particularly, Broadstripe was exposed to legal fees, reputational harm, and potential exposure to large claims.

Highland asserts that Broadstripe, and the Committee, are actually **better off** since Highland avoided financing the transaction. This theory is as follows: the purchase price of the James Cable APA was $116 million. If the price was funded by Highland, it would have required $116 million in secured debt. However, by March 2009, the price of the James Cable assets declined to approximately $61 million. Thus, if the sale had closed, Broadstripe would be saddled with an additional $116 million in secured debt and an additional asset only worth $61 million. However, in the current case, Broadstripe is only facing a $56.65 million underlined unsecured claim from James Cable.

Highland's argument is too clever by half. This argument, that Broadstripe is actually better off, depends on a variety of assumptions wherein there are triable issues of fact. In particular (1) Highland ascribes a particular valuation to the James Cable assets which may be indispute; (2) Highland assumes the entire transaction would be financed with secured debt when evidence exists that Highland contemplated a mixed financing package using secured debt, unsecured debt, and equity; (3) the secured debt may be subject to recharacterization or other equitable remedies; and

(4) the costs the of the James Cable deal's collapse may be higher than Highland's assertion, particularly once litigation costs are taken into account.

Accordingly, there are triable issues of fact regarding harm caused by Highland's alleged inducement of Broadstripe to enter into the James Cable APA then refusal to finance the transaction.

## C.  Count One: Recharacterization

Count One of the Complaint seeks recharacterization of Highland's approximately $62 million in Second Lien Investments as equity.  The essence of the Committee's claim is that, as it alleges, Highland "infused money . . . at out of market terms, recognizing slim chances of repayment, with substantially all interest payments deferred and [did] so, not in exchange for real collateral, but rather for further control of the [c]ompany."[81]  This type of investment, according to the Committee, should be treated as equity.  Highland asserts that the Second Lien Investments were entirely appropriate as secured debt, and accordingly, that summary judgment is appropriate.

Ultimately, the Committee has an uphill climb to recharacterize the Second Lien Investments as equity, given that the Third Circuit, in *SubMicron* noted that "when existing lenders make loans to a distressed company, they are trying to protect their existing loans and traditional factors that lenders consider (such as capitalization, solvency, collateral, ability to pay cash interest and debt capacity rations) do not apply

---

[81] Response at pp. 57-58.

as they would when lending to a financially healthy company."[82]   However, in *SubMicron* Judge Ambro also placed considerable weight on the Judge Robinson's "reference to the conflicting testimony and relative credibility of witnesses presented by both parties," while noting that, with respect to recharacterization, "[a]nswers lie in facts that confer context case-by-case."[83]   Given the nature of the inquiry, and the fact intensive nature of this case, triable issues of fact appear to exist and summary judgment is inappropriate on Count One.

### i.   *Applicable Law*

Recharacterization and equitable subordination are related, but distinct remedies.   "Equitable subordination is apt when equity demands that the payment priority of claims of an otherwise legitimate creditor be changed to fall behind those of other claimants," while recharacterization seeks to determine "the proper characterization in the first instance of an investment."[84]

Recharacterization is grounded in a bankruptcy court's "equitable authority to ensure 'that substance will not give way to form, that technical considerations will not prevent substantial justice from being done.'"[85]   The focus of a recharacterization inquiry is "whether 'a debt actually exists'."[86]   Ultimately, the "overarching inquiry" is "whether the parties called an instrument one thing when in

---

[82] *In re Submicron Sys. Corp.*, 432 F.3d 448, 457 (3d Cir. 2006).

[83] *Id*. at 456-57.

[84] *Id*. at 454.

[85] *Id*. at 454  (*quoting Pepper v. Litton*, 308 US. 295, 305 (1939)).

[86] *Id*. at 455 (*quoting In re AutoStyle Plastics*, 269 F.3d 726, 748 (6th Cir. 2001)).

fact they intended it as something else."[87]   The Third Circuit is clear that such intent "may be inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances."[88]   Accordingly, recharacterization depends on facts, which "confer context case-by-case."[89]   Recharacterization is a question of fact.[90]   Courts have adopted various multi-factor tests to define the recharacterization inquiry.[91]   The Third Circuit has held that all of these tests include "pertinent factors."[92]   Rather than simply repeat the factors here, this analysis will use the factors as sub-headings.   However, as the Third Circuit frequently cautions, "[n]o mechanistic scorecard suffices,"[93]   and the Court must not allow a multi-factor test to obscure the relevant factual and legal analysis.

> ### ii.   Names Given to the Instruments, if any, Evidencing the Indebtedness.

The first factor in *AutoStyle* is the names given to the instruments.   "The absence of notes or other instruments of indebtedness is a strong indication that the advances were capital contributions and not loans."[94]

---

[87] *Id.* at 456.

[88] *Id.*

[89] *Id.*

[90] *Id.* at 457.

[91] *Compare AutoStyle*, 269 F.3d at 749-50 (using an eleven factor test) *with Stinnett's Pontiac Serv., Inc. v. Comm'r*, 730 F.2d 634, 648 (11th Cir. 1984) (using a thirteen factor test) and *Estate of Mixon v. United States*, 464 F.2d 394, 402 (5th Cir. 1972)).

[92] *Submicron*, 432 F.3d at 456.

[93] *Id.*

[94] *AutoStyle*, 269 F.3d at 750.

Here, the Second Lien Investments are provided for under a "credit facility," and are consistently referred to as "loans" or "debt" and are evidenced by "notes."[95]   This factor weighs heavily in favor of characterizing the Second Lien Investments as debt.

### iii.    *Presence or Absence of a Fixed Maturity Date and Schedule of Payments.*

The next factor in *AutoStyle* is the presence or absence of a fixed maturity date and schedule of payments.  "The absence of a fixed maturity date and a fixed obligation to repay is an indication that the advances were capital contributions and not loans."[96]

Here, the Second Lien Investments had a stated maturity date of July 27, 2012.   Accordingly, this factor weighs in favor of characterizing the Second Lien Investments as debt.

### iv.    *No Fixed Rate of Interest and Interest Payments.*

One factor in the *AutoStyle* analysis is the presence or absence of a fixed rate of interest and interest payments.  The absence of such is a strong indication the investment was a capital contribution, rather than a loan.

The Second Lien Investments were issued in two tranches: Tranche C, in the principal amount of $30 million and Tranche D, in the principal amount of $40 million.  Tranche C required periodic payments at the LIBOR Rate, with an additional

---

[95] *See* Ex. H-47 at § 1.01 (definitions of "Loans," "Note," and "Obligations").

[96] *AutoStyle*, 269 F.3d at 750.

10% interest accruing as PIK, payable at maturity.  The Tranche C Libor Payments did

not have a fixed payment schedule, rather Broadstripe could select payment dates.  The

payment history reflects payments were made sporadically with no consistent

frequency.  Tranche D required monthly payments of 2%, with an additional 13%

interest accruing as PIK, payable at maturity.

Here, the Second Lien Investments contain <u>some</u> fixed interest rates and

<u>some</u> fixed interest payments.  While Broadstripe was able to determine its interest

payments schedule on Tranche C, interest payments were made.  Tranche D required

regular interest payments, albeit at a very low rate.  Moreover, the presence of PIK

interest is not decisive, especially in a distressed investment context.[97]  This factor does

not weigh heavily in any direction, but slightly in favor of the Second Lien Investments

being categorized as debt.

### v.    *Repayment Dependent on Success.*

Another factor in the *AutoStyle* test is the source of repayments.  "If the

expectation of repayment depends solely on the success of the borrower's business, the

transaction has the appearance of a capital contribution."[98]

Here, the Committee cites correspondence from corporate counsel Kevin

Conboy to Highland, responding to a request that Broadstripe demonstrate full

repayment of the credit facility prior to maturity, that Broadstripe was most likely

unable to make repayments out of cash flows:

---

[97] *See SubMicron,*  432 F.3d at 457.

[98] *AutoStyle*, 269 F.3d at 751.

> The Borrower has been treading water over the past several years, selling systems to keep its lenders at bay, deferring anything other than maintenance capital expenditures, and servicing it interest and limited principal payments.  The Proposal Letter shows more debt, higher interest rates, and substantial fees on this five-year facility.  The Proposal Letter also requires that we provide you with projections that "must demonstrate full repayment of the Credit Facility on or prior to Maturity."  **We are concerned as to whether this can be accomplished, given the amount borrowed, interest rates and fees in the Proposal Letter.**[99]

David Walls also testified in his deposition that even if Broadstripe met its budgets it still would have been unable to make complete cash payments, which is why a PIK component was necessary for the Second Lien Investments.[100]   Thus, the Committees' evidence shows that Highland was aware that Broadstripe would be unable to repay the Second Lien Investments prior to maturity out of operating cash flows.

This factor most likely requires more detailed testimony as to whether Broadstripe was, indeed, unable to repay the Second Lien Investments out of operating cash flows prior to maturity.  However, given the available evidence, this factor weighs in favor of rechacterization as equity.

### vi.    Inadequacy of Capitalization.

Another factor in the *AutoStyle* test is the adequacy of capitalization.  "Thin or inadequate capitalization is strong evidence that the advances are capital contributions rather than loans."[101]

---

[99]  CC-4.

[100]  Walls Depo., 73:2-74:7.

[101]  *AutoStyle*, 269 F.3d at 751.

First, Broadstripe was on the verge of covenant default under the Original Loan Facility prior to the July 2006 Refinancing.   In addition, on April 7, 2006, Broadstripe's auditors issued a "going concern" notice.   The auditors observed "management has determined it is probably the Company will not comply with the payment terms included in its existing senior credit facility which matures on June 30, 2006.   These conditions **raise substantial doubt about the Company's ability to continue as a going concern.**"[102]

Again, whether Broadstripe was adequately capitalized in July 2006 is a fact intensive question.   Given the available evidence, this factor weighs in favor of recharacterization as equity.

### vii.     Identity of Interests Between Creditor and Stockholder.

Another factor in the *AutoStyle* test is the identity of interest between the creditor and the stockholder.   "If stockholders make advances in proportion to their respective stock ownership, an equity contribution is indicated.   On the other hand, a sharply disproportionate ratio between a stockholder's percentage interest in stock and debt is indicative of bona fide debt.   Where there is an exact correlation between the ownership interests of the equity holders and their proportionate share of the alleged loan this evidence standing alone is almost overwhelming."[103]

---

[102]  CC-6.

[103]  *AutoStyle*, 269 F.3d at 751.

According to the Committee:

The Highland Defendants state as follows: "The identity of interest between the lenders under the Second Lien Facility and Broadstripe's stockholders is weak, at best [because] Highland Crusader possessed no seats on the Management Committee, held only a *de minimis* amount of the equity units of Broadstripe Holdings and held approximately 25% of the outstanding IRNs." (Memo, ¶ 8).

The evidence shows that the Highland Defendants were most certainly equity holders when they issued the Second Lien Investments.   As conceded by the Highland Defendants, Highland Crusader held 25% of the IRNs at the time of the July 2006 Refinancing. (Motion, ¶ 12).  The IRNs effectively served as the equity of the Company, as the Broadstripe Holdings LLC Units ("Old LLC Units") were totally worthless.  This was well recognized by the parties at the time and to this date. As explained by Fredette,

> [f]rom the lender's perspective, there was concern that the existing equity holders had very little value. So the view was that the equity value was really in the increasing rate notes (IRNs) and not in the actual equity - the actual equity holdings.  So it made sense, from an alignment standpoint, to have those parties, the IRN holders who had the equity value, for them to have, in effect, the control of the company or be able to, you know, have -- be represented on the management committee of the company.  And that was consistent - it was consistent between the lender's view, the IRN holder's view and the equity holder's view.

(Fredette Depo., 220: 14 - 221 : 12).

That the IRNs were the Company's real equity value is further demonstrated by the October 2006 Restructuring in which old equity interests were tendered to the Company for no monetary consideration, and then reissued to IRN holders in proportion of their holdings. (Fredette Depo., 76:5-10).  This transaction, only three months after the July 2006 Refinancing, was contemplated all along.  (Walls Depo.,

72:14-20); (Fredette Depo., 222:4-9).    The October 2006 Restructuring confirmed the economic realities that the IRNs were equity.

Indeed, Vice Chancellor Strine, in denying Broadstripe's motion for summary judgment against Wave Division, observed that the July 2006 Refinancing effectively was Highland's successful bid to buy Broadstripe.   "And, honestly, it's really - it's - it is - again, doesn't pass the straight-face test to argue that there was nothing akin to a change of control that occurred here.   Highland was - had 10 percent or so of the debt. It now controls Millennium. It's easy to conceive of that as an acquisition of the business. . . Highland was more a buyer than a debtor.   This was business opportunity for Highland to gin up an M and A deal for itself." (CC-5, at 61:12-16, 21-24).

While the Highland Defendants try to mislead the Court about it, the Highland Defendants have always held nearly all of the Second Lien Investments.   In Figure 8 of the Motion, the Highland Defendants list holdings of only $20,000,000 or 28.57% of the Second Lien Investments, as of July 28, 2006. (Motion, ¶ 23).  As the Highland Defendants are well aware, this figure is deceptive.  Prior to the July 2006 Refinancing, HCMLP and Foothills Capital Corp. ("Foothills") entered into a contract pursuant to which Foothills purchased $42,000,000 or 60% of the Second Lien Investments, as a pass-through to "season" the debt for the Highland Funds.   (Daugherty Depo., 202:19-203:7).   And that's exactly what happened: on September 15, 2006 - 49 days after Foothills funded the Second Lien Investments - it sold 100% of its holdings to the Highland Funds. (H-8, at HIF-A-0124671).   This arrangement existed solely because the Highland Funds faced structural limitations preventing them from originating loans.  (Daugherty Depo., 201:13-20). Foothills' holdings, therefore, were purely mechanical and for HCMLP's convenience.   In reality, following the July 2006 Refinancing, the Highland Defendants held $62,000,000 or 88.57% of the Second Lien Investments and the remaining Second Lien Investments were acquired by another IRN holder.[104]

---

[104]  Response at pp. 49-50.

It is difficult to understand the Committee's point here.  Taking what the Committee is alleging as true, the IRNs were functionally equity at the time of the July 2006 Refinancing.  Highland owned about 25% of the IRNs/equity.  Broadstripe then commenced the July 2006 Restructuring, whereafter, taking into account that Foothills "seasoned" the Second Lien Investments, **Highland owned 88.57% of the Second Lien Investments**.  Under the *AutoStyle* analysis, the key to the "identity of creditors and shareholders" factor is proportionality.[105]  Yet here, Highland's ownership of 88.57% is vastly out of proportion to its "equity" stake of 25%.

Accordingly, this factor weighs in favor of the Second Lien Investments being characterized as debt.

### viii.    *Security, if any, for the Advances.*

Another factor in the *AutoStyle* test is presence or absence of security for the advances made under the alleged debt.  "The absence of a security for an advance is a strong indication that the advances were capital contributions rather than loans."[106]

In this case, there is a genuine factual issue as to whether the Second Lien Investments were undersecured, or would even be out of the money at the time of the July 2006 Refinancing.  Under the July 2006 Refinancing, Broadstripe incurred $166.5 million in First Lien Investments and $70 million in Second Lien Investments.  The proposed WaveDivision sale was to net $150.1 million.  The only remaining asset, the

---

[105] "A sharply disproportionate ratio between a stockholder's percentage interest in stock and debt is indicative of bona fide debt." *AutoStyle*, 269 F.3d at 751.

[106] *AutoStyle*, 269 F.3d at 752.

Maryland system, was not provided with a value in the parties' papers.  There is a material issue of fact regarding the valuation of the company, and accordingly, the amount of security available for the Second Lien Investments in July 2006.

### ix. Ability to Obtain Financing From Outside Lending Institutions.

Another factor in the *AutoStyle* test is the debtor's ability to obtain outside financing.  "When there is no evidence of other outside financing, the fact that no reasonable creditor would have acted in the same manner is strong evidence that the advances were capital contributions rather than loans."[107]

According to the Committee:

> The evidence clearly demonstrates that HCMLP was the only possible source for financing the Second Lien Investments and that it was not issued on market terms.  On March 21, 2006, Fredette sent an internal Trimaran memorandum discussing the Company's efforts to obtain financing for the July 2006 Refinancing.  (H-24).  Fredette testified as follows regarding this memorandum:

>> Q. Okay. On the second page of the document it states, "Highland Capital has provided the company with the most aggressive financing proposal." What do you mean by the word "aggressive," or the whole sentence, if that's -- if that helps?

>> A. I think it was the size of the financing proposal and how much debt they were willing to put on the company.  **Other companies were not willing to put as much debt on the company.**

> (Fredette Depo., 126:7-18) (emphasis added).

> Indeed, in an March 31, 2006 E-mail, Fredette described HCMLP's financing proposal to Broadstripe's general

---

[107] *AutoStyle*, 269 F.3d at 752.

counsel as "our only financing option" and to Trimaran's investment team as "the only game in town." (H-37); see also (Walls Depo., 76:15-24) (Q. Do you think the company would have been able to get the same financing terms from a third party? A. I don't know. I think it's probably unlikely, but I don't know.").

HCMLP's July 2006 financing proposal was not on market terms, therefore rational lenders would not have made it. Fredette testified: "[I]t wasn't a traditional refinancing. There were a lot of challenges with this particular company. And so that's why . . . I perceived it to be **outside of a market deal**." (Fredette Depo., 163:24-164:6) (emphasis added). Indeed, E-Mails from the time show that other lenders, to the extent even interested, were proposing terms totally different from Highland.   See (CC 39) (Jefferies's initial suggestion of $150MM first lien, with "$80MM Mezz (targeting 17% return)").

HCMLP was well aware when issuing the Second Lien Investments that it was providing below-market terms. Daugherty acknowledged in his deposition that in structuring the July 2006 Refinancing, Highland knew ratings agencies would give lower ratings to the Second Lien Investments.   (Daugherty Depo., 256:18-23).   HCMLP was indifferent to this, however, because it could place its investment into funds Daugherty characterized as "ratings indifferent, like hedge funds."   *Id*.   It seems likely that HCMLP also preferred calling this infusion "debt," rather than equity because an equity contribution at Broadstripe, LLC likely would have diluted the IRNs.

The only attempt by the Highland Defendants to show Broadstripe's ability to obtain the Second Lien Investments from "outsiders" is the statement that "[s]even of the nine institutions Trimaran and Broadstripe contacted expressed interest in making refinancing proposals." (Motion, ¶ 17; Memo, ¶ 8).  There are several problems with this assertion. First, the purported nine institutions identified in H-24, the Fredette memorandum discussed above and cited by the Highland Defendants, were "Back Bay Capital, GoldenTree Asset Management, Jefferies, CSFB, Bear Stearns, Highland, Black Diamond, Morgan Stanley and Cerberus Capital." (Motion, ¶ 17).  Of these, CSFB, Bear Stearns, Highland, and

Cerberus all owned IRNs, and therefore, were not "outsiders". Second, as shown in the very document cited by the Highland Defendants, Back Bay Capital and GoldenTree indicated they would not submit a proposal. (H-24) and Fredette testified that Black Diamond's proposal "didn't work" or "just didn't make sense." (Fredette Depo., 294:10-25). Third, nothing in the Highland Defendants' papers, nor in documentary or testimonial evidence, suggests that anybody would have put in financing at terms anywhere similar to the Highland Defendants'.[108]

Viewing the evidence most favorably to the Committee, Highland provided financing on terms that would be unavailable in the market. However, the Third Circuit, in *SubMicron* noted that "when existing lenders make loans to a distressed company, they are trying to protect their existing loans and traditional factors that lenders consider (such as capitalization, solvency, collateral, ability to pay cash interest and debt capacity rations) do not apply as they would when lending to a financially healthy company."[109]   Accordingly, this factor, while weighing in favor of recharacterization as equity, should be afforded little to no weight.

### ix.    Extent to Which the Advances Were Subordinated to the Claim of Outside Creditors.

Another factor in the *AutoStyle* test is the extent to which the payments to be made are subordinated to the claims of outside creditors.  "Subordination of advances to claims of all other creditors indicates that the advances were capital contributions, not loans."[110]

---

[108]  Response at pp. 53-55.

[109]  *In re Submicron Sys. Corp.*, 432 F.3d 448, 457 (3d Cir. 2006).

[110]  *AutoStyle*, 269 F.3d at 752.

The Second Lien Credit Facility contained a PIK component and minimal cash payment. This was allowed Broadstripe to pay trade other creditors, rather than Highland. As explained by Daugherty at his deposition: "Well, the company was better suited to use its cash for its operations and to pursue growth and cost adjustments than it was to pay interest. So it was very common for second liens especially to have a PIK component that allows the company to keep its cash flow for growth, but rewards the second lien holder for not -- for basically foregoing a cash pay coupon." (Daugherty Depo., 258:13-19).

The Second Lien Investments are the most subordinate tier of claims, except for unsecured claims (the two largest of which are involuntary creditors, WaveDivision and James Cable). The IRN units are superior, based on the corporate structure to both the First Lien and Second Lien Investments. The Second Lien Investments are thus, the most subordinate in the capital structure.

Accordingly, this factor weights in favor of recharacterizing the Second Lien Investments as equity.

> x.    **The Extent to Which the Advances Were Used to Acquire Capital Assets.**

Another factor in the *AutoStyle* test is whether the advances were used to acquire capital assets. "Use of advances to meet the daily operating needs of the corporation, rather than to purchase capital assets, is indicative of bona fide indebtedness."[111]

---

[111] *AutoStyle*, 269 F.3d at 752.

Here, Broadstripe used the $70 million provided under the Second Lien Investment as follows: (1) $50 million to refinance the Original Loan Facility; (2) $1.9 for payables including management fees owing to MDM Systems; (3) $4.2 million to refinance fees and expenses; and (4) $13.9 million to provide Broadstripe with working capital.

Thus, this factor weighs in favor of treating the Second Lien Investments as debt.  In fact, the vast majority of the Second Lien Investments were used, not simply for operating expenses, but **to refinance existing secured debt**.

### xi.    Presence or Absence of a Sinking Fund.

Another factor in the *AutoStyle* test is the presence or absence of a sinking fund to provide repayments.

Highland concedes there was no sinking fund, but argues that "the presence or absence of a sinking fund is insignificant where, as here, the loans were fully secured." (Memo, ¶ 8).  They provide no evidence that the Second Lien Investments were, in fact, fully secured.

As such, a material dispute of fact surrounds Highland's assertion that the Second Lien Investments were fully secured.

### xii.    Summary

As discussed above, given the nature of the inquiry, and the fact intensive nature of this case, the Court finds that triable issues of fact exists and summary judgment is inappropriate on Count One.

**D. Count Three: Alter Ego**

Count Three of the Complaint seeks a ruling that Broadstripe was the alter ego of Highland. The essence of the Committee's claim is that Highland so completely and thoroughly dominated Broadstripe by placing Walls and Nau on the board, who then proceeded to act, not as board members, but as agents of Highland in the best interest of Highland. Highland point to the fact that Broadstripe was a large operating cable company, observing corporate formalities.

Summary judgment in favor of Highland is appropriate on Count Three. The Committee's factual allegations give rise to triable issues of fact regarding breaches of fiduciary duty, not an alter ego claim.

### i. *Applicable Law*

Delaware law permits a court to pierce the corporate veil of a company "where there is fraud or where [it] is in fact a mere instrumentality or alter ego of its owner."[112] The District Court for Delaware has applied the doctrine of alter ego.[113] To prevail on an alter ego claim under Delaware law, a plaintiff must show (1) that the companies "operated as a single economic entity" and (2) that an "overall element of injustice or unfairness ... [is] present."[114]

---

[112] *Geyer v. Ingersoll Publications Co.*, 621 A.2d 784, 793 (Del.Ch.1992).

[113] *Harper v. Delaware Valley Broadcasters, Inc.*, 743 F.Supp. 1076, 1085 (D.Del.1990), *aff'd*, 932 F.2d 959 (3d Cir.1991).

[114] *Id.*

The Third Circuit uses the following multi-factor test for determining whether a "single economic entity" exists between entities: (1) undercapitalization; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) the insolvency of the debtor corporation at the time; (5) siphoning of the corporation's funds by the dominant stockholder; (6) absence of corporate records; and (7) the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders.[115] However, "[w]hile no single factor justifies a decision to disregard the corporate entity, some combination of the above is required, and an overall element of injustice or unfairness must always be present, as well.[116]

### ii.   Operation as Single Economic Entity.

Without breaking down the Committee's facts by the above factors, the Committee points to the following facts as evidence of Highland's domination and control over Broadstripe:

- Despite being on Broadstripe's board, Walls and Nau were directly involved in CMLP's investment decisions in Broadstripe, which was wholly inappropriate, especially since those decisions were often harmful to Broadstripe.

   ○ Walls and Nau participated in HCMLP investment committee meetings where the topic discussed was whether to provide financing to Broadstripe. (Daugherty Depo., 147:19-148:24); (Nau Depo., 132:1-7); (Walls Depo., 101:18-25). Nau often prepared presentations for those meetings, evaluating the potential investments from HCMLP's perspective,

---

[115]  *Trevino v. Merscorp, Inc.*, 583 F.Supp.2d 521, 528-529 (D. Del. 2008) (*citing United States v. Pisani*, 646 F.2d 83, 88 (3d. Cir.1981)).

[116]  *Id.*

including discussions that acquisitions would create HCMLP's "exit opportunities" by making Broadstripe more attractive for sale. (CC-36, at HIF-A-0085206) (Highland Committee Presentation, Draft dated January 16, 2007).

○ Walls was directly involved in structuring HCMLP's potential investments in Broadstripe. In late February 2008, when Broadstripe was seeking additional financing, Groves suggested that HCMLP lend to Broadstripe on an unsecured basis. Walls - Groves' boss -- vetoed that suggestion, directing instead, that HCMLP increase the secured revolver instead of loaning on an unsecured basis. (CC-14). Nau was also involved in such decisions. (CC-40) (In a March 5, 2008 E-Mail, Nau commented on HCMLP's model prepared by Gonzalez and Groves noting that "a $30mm RC would be needed under this scenario, with strings attached (CAPEX, EBITDA, FCF). . . "and by asking whether eliminating the Second Lien Investments would create "debt forgiveness/tax, fund implications").

○ Walls and Nau took the lead on HCMLP's decision to buy-out Black Diamond's position in the First Lien Investments. Nau's strategy was to paint a story that would disparage Broadstripe and drive down the purchase price. (CC-41). Moreover, Walls and Nau relied on data contained in the Company's "Board Book," given to them as directors, not lenders, in deciding how to deal with Black Diamond. (CC-42).

• Throughout 2008, Nau was involved in "marking" the Highland Funds' holdings of Broadstripe debt including the IRNs. (Nau Depo., 175:25-176:10); (CC-43). In June 2008, when HCMLP decided to mark-down the value of the Second Lien Debt, Nau was asked to approve that lower mark and was directly involved in that decision. (CC-44).

• Perhaps one of the most egregious examples of the role the Highland Designees played as directors, in treating Broadstripe as a mere facade, is demonstrated in a March 11, 2008 E-Mail from Moore directing Wylie, Shreffler, and Beard to copy HCMLP's outside counsel, [Haynes & Boone

LLP], "on ALL internal email communications regarding our pending acquisition and related analyses, requests for information, etc." (CC-45). In essence, Moore directed Broadstripe's management to divulge all such discussions with HCMLP. Moore unilaterally did this to create an attorney-client privilege between Broadstripe and HCMLP regarding the James Cable transaction. He testified: "[I]f you cast as wide a net as possible, then you make sure that nothing that is legal advice is communicated outside of the attorney group. I will agree with you that this subject matter listed in the e-mail is broader than what would just be seeking advice." (Moore Depo., at 86:20-25). Moore's email, which was way outside his duties as a director, demonstrate HCMLP's influence over every aspect of Broadstripe's operations and dealings.

> ○ In April 2008, when James Cable commenced litigation, and Daugherty became directly involved, HCMLP became concerned about its designee's actions beyond the scope of director duties. As a result, Daugherty repeatedly wrote e-mails instructing Walls and Nau to limit involvement in lending issues internally at HCMLP and management decisions at Broadstripe. (CC-46) (In a September 22, 2008 E-Mail, Daugherty advised: "Fyi, Dave and Tyler should not be included on emails like this as they serve on the Broadstripe Board and must limit their involvement to their fiduciary role."); (CC-47) (In an October 17, 2008 E-Mail, Daugherty, again, stated to Nau: "I must remind you that your duties are simply as a board member. Accordingly, you must leave all decisions of day to day management to Gustavo and Kevin. Your actions must remain strictly limited to your role as a board member.").

For its part, Highland points to facts reflecting that Broadstripe was an independent economic entity, such as: (1) Broadstripe was cable company with hundreds of employees, operations in multiple states, and tens of millions in annual revenues; (2) headquartered in St. Louis, had its own CFO, treasurer, bank accounts,

accounting department, paid taxes, operating expenses, insurance; (3) possessed formation and operational documents, issued audited financial statements, maintained active Management Committee, which conducted regularly-held board meetings.

The Committee's allegations do not create triable issues of fact as to whether Highland and Broadstripe were a single economic entity. Rather, they create triable issue of fact regarding breaches of fiduciary duty by Walls, Nau, and Highland. The Committee, in effect, alleges that Walls and Nau were moles or double agents within Broadstripe, such that they were using their role inside Broadstripe to benefit Highland. However, such allegations do not create triable issues of fact that Broadstripe and Highland were a single economic entity. Accordingly, summary judgment is granted as to Count Three.

### iii.    Overall Element of Injustice or Unfairness.

As there are no triable issues of fact regarding the first prong of the alter-ego test and summary judgment is granted as to Count Three, the Court will not address the overall element of injustice or unfairness.

### E.  Counts Four and Five: Breach of Duty of Care and Loyalty

Counts Four and Five of the Complaint seeks damages related to Highland's (alleged) breaches of the duty of care and loyalty to Broadstripe and its creditors by not acting as reasonably prudent business persons in considering all the information available and acting on an informed basis. The Committee's claim focuses on the following conduct (among others): (1) blocking the WaveDivision sale;

(2) limiting Broadstripe's access to financing to make acquisitions; (3) ignoring the Broadstripe's best interest when making director and officer hirings; and (4) failing to use expertise as to how to rehabilitate the Debtors.    Highland asserts summary judgment is appropriate because (1) Broadstripe (OpCo) was solvent during the period in which the Wave sale was being considered; (2) Highland did not control Broadstripe during the WaveDivision transaction, it was merely a lender; (3) the entry into the July 2006 refinancing was not a breach of any duty; (4) Highland had no duty to lend money to Broadstripe; (5) there was no resulting harm to Broadstripe; (6) all hirings were in Broadstripe's best interests.

### i.    Applicable Law

A claim for fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty.

To breach the fiduciary duties of care there must be gross negligence and the failure to act on an uninformed basis.[117]  "The more significant the subject matter of the decision, the greater is the requirement to probe and consider alternatives.    For

---

[117] *Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 539-540 (Bankr. D. Del. 2009) ("A plaintiff cannot prove a breach of the duty of care without a showing of gross negligence.") *See, e.g., Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1113 (Del. Ch. 2008) (noting "a corporate director is only considered to have breached his duty of care in instances of gross negligence").  The exact behavior that will constitute gross negligence varies based on the situation, but generally requires directors and officers to fail to inform themselves fully and in a deliberate manner. *See Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 368 (Del. 1993) (collecting cases explaining the requirements established by the duty of care in a variety of settings). For instance, the Delaware Court of Chancery has recently observed that gross negligence may be pled by a complaint alleging "that a board undertook a major acquisition without conducting due diligence, without retaining experienced advisors, and after holding a single meeting at which management made a cursory presentation." *Trenwick America Litigation Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 194 (Del. Ch. 2006), *aff'd*, 931 A.2d 438 (Del. 2007).

example, when the decision is to sell the company or to engage in a recapitalization that will change control of the firm, the gravity of the transaction places a special burden on the directors to make sure they have a basis for an informed view."[118]  "While a board of directors may rely in good faith upon information, opinions, reports or statements presented by corporate officers, employees and experts selected with reasonable care,  8 Del. C. § 141(e), it may not avoid its active and direct duty of oversight in a matter as significant as the sale of corporate control."[119]

To allege a breach the fiduciary duty of loyalty the "plaintiffs must allege facts showing that a self-interested transaction occurred, and that the transaction was unfair to the plaintiffs."[120]

Fiduciary duties are only owed to creditors of insolvent[121] companies.[122] "Once a corporation becomes insolvent, however, the directors assume a fiduciary or 'quasi-trust' duty to the corporation's creditors."[123]  Insolvency is an issue of material

---

[118]  *Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.)*, 208 B.R. 288, 305 (Bankr. D. Mass. 1997) (citations omitted).

[119]  *Healthco Int'l, Inc.*, 208 B.R.  at 305-306 (citations and quotations omitted).

[120]  *Joyce v. Cuccia*, 1997 Del. Ch. LEXIS 71, 1997 WL 257448, at *5 (Del. Ch. May 14, 1997).  *See Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 540 (Bankr. D. Del. 2009) ("[T]he duty of loyalty "mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *citing Cede & Co. v. Technicolor, Inc.*, 634 A.2d at 361.).

[121]  "The bankruptcy code defines insolvency as a 'financial condition such that the sum of such entity's debts is greater than all o such entity's property, at a fair valuation.'"  *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 648 (3d Cir. 1991) (*citing* 11 U.S.C. §101(32)).

[122]  *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007) (creditors of solvent corporation are not owed fiduciary duties).

[123]  *Bd. of Trs. v. Foodtown, Inc.*, 296 F.3d 164, 173 (3d Cir. N.J. 2002).

fact (Plaintiff claims that Broadstripe was "balance sheet" and/or "cash flow" insolvent; defendants claim that Broadstripe was solvent because the offers to purchase the various portions of the business exceeded the amount of debt at the OpCo level).

The Committee alleges that as Highland was on both sides of each of the transactions, that the "business judgment rule" no longer applies and that they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain.[124] "The requirement of fairness is unflinching in its demand that where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts."[125]  This "fairness" requirement contains *both* (i) fair dealing and (ii) fair price, *examined together as a whole*.[126]  "Fair dealing" involves elements such as (i) when the transaction was timed, (ii) how it was initiated, (iii) how it was structured, (iv) how it was negotiated, (v) how it was disclosed to the directors, and (vi) how the approvals of the directors and the stockholders were obtained.[127]  "Fair price" includes such considerations as "economic and financial considerations of the proposed merger, including all relevant

---

[124] *Gottlieb v. Heyden Chemical Corp.*, 91 A.2d 57, 58 (Del. 1952) ("Where the directors have represented both themselves and the corporation, and where there was no ratification by stockholders, and the action is thereupon duly challenged, the court will usually have no choice but to employ its own judgment in deciding the perhaps very close and troublesome questions as to whether the evidence shows that the directors in fact used the utmost good faith and the most scrupulous fairness.").

[125] *Weinberger v. Uop*, 457 A.2d 701, 710 (Del. 1983).

[126] *Weinberger,* 457 A.2d at 711.

[127] *Weinberger*, 457 A.2d at 711.

factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock."[128]

### ii.    Control Over Broadstripe

The Committee alleges that Highland controlled Broadstripe during the Wave Division Sale by the following: (i) Highland Fund's IRN holdings functioned as equity, giving it control; (ii) HCMLP exercised control over Broadstripe by preventing the Wave Division sale; and (iii) HCMLP's control is demonstrated by its involvement in the selection of Shreffler as CEO in September 2006.  There are triable issues of fact as to whether the above constitutes control over Broadstripe during this time.

### iii.    Solvency

The Committee alleges that Broadstripe was insolvent which would shift the fiduciary duties to Broadstripe's creditors.  Highland argues that Broadstripe was solvent during these time periods which would mandate dismissal of the fiduciary duties counts.  Based on the evidence presently before the Court, there is a triable issue of fact regarding Broadstripe's solvency, or insolvency, during the relevant time periods.

### iv.    Breaches of Duty of Care and "Entire Fairness" in its Dealings.

The Committee alleges that HCMLP was self-interested with respect to the Wave Division sale, the July 2006 Refinancing, and the James Cable sale.  The Committee alleges that HCMLP took these actions with knowing disregard for Broadstripe's best interests and without "fair dealings" and not at arm's-length.  As

---

[128] *Weinberger*, 457 A.2d at 711 (citations omitted).

discussed above, there are triable issues of fact as to Highland's actions, whether they were in control of Broadstripe at the relevant times, and whether such actions harmed Broadstripe.  Therefore, summary judgment is inappropriate.

       *v.*   **Summary**

There are triable issues of fact regarding (1) Highland's status as an insider during the Wave transaction, (2) whether Highland's conduct was inequitable, (3) whether Broadstripe was insolvent, and (4) whether Highland harmed Broadstripe and its creditors; as such, summary judgment is denied as to Counts Four and Five.

## F.  Counts Six and Seven: Aiding and Abetting Breaches of Fiduciary Duties

Counts Six and Seven of the Complaint allege that the Management Committee breach its fiduciary duties of care and loyalty by (i) interfering with the Wave transaction in order to allow Highland to amass a blocking position of the 2000 Credit Facility debt; (ii) failing to consider the interest of the unsecured creditors in distributing the Debtors' asserts; (iii) causing the Debtors to pursue acquisitions, but denying the ability of Broadstripe to finance those acquisitions (exposing the Debtors to substantial risk and liabilities), (iv) ignoring the best interests of Broadstripe when making director and officer hirings, (v) treating Broadstripe like an investment rather than a company to which it owed duties; and (vi) failing to provide its expertise as to how to rehabilitate the Debtors.  Counts Six and Seven continue by claiming that Highland knew of these breaches and failed to stop them, instead Highland took advantage of these breaches for the benefit of Highland.

Highland's motion for summary judgment argues that the record evidences that the Management Committee used its business judgment in reasonably trying to grow Broadstripe and that the Management Committee relied on experts and reports in making all of their decisions.

The Plaintiff argues that there are substantial material issues of fact to preclude summary judgment. The Plaintiff alleges that Highland knew all the details of each of the transactions at issue and "urged" the Highland designees on the Management Committee.

### i.    Applicable Law

"In order to be found liable for aiding and abetting a breach of a fiduciary duty, one must demonstrate that the party knew that the other's conduct constituted a breach of a fiduciary duty and gave substantial assistance or encouragement to the other in committing that breach."[129] There are four elements to a claim of aiding and abetting a breach of fiduciary duty: (i) the existence of a fiduciary relationship; (ii) a breach of the fiduciary's duty; (iii) knowing participation in that breach by the defendant; and (iv) damages proximately caused by the breach.[130]

"Knowing participation" in a board's fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes

---

[129] *Bd. of Trs. v. Foodtown, Inc.*, 296 F.3d 164, 174 (3d Cir. N.J. 2002) (*citing Resolution Trust Corp. v. Spagnoli*, 811 F. Supp. 1005, 1014 (D.N.J. 1993)).

[130] *Damage Recovery Sys. v. Tucker*, 2004 U.S. Dist. LEXIS 19821, 14-15 (D. Del. Sept. 28, 2004) (citations omitted).

such a breach.[131]   In *Healthco International*, [132] the Court found that a party that purchased the debtor's stock in a leveraged buyout was a "knowing participant" in the director's breach of fiduciary duties because it placed three members of the board with the mandate to sell its stock, it (through a representative) attended several board meetings, it urged the board at every step and knew all of the essential details of the proposed transaction.

### ii.    Conclusion

In addition to the material and triable facts set forth in connection with Counts Four and Five.  There are material issues of fact relating to Highland's control and urging of the Management Committee to warrant denial of the motion for summary judgments on Counts Six and Seven.

## G.  Counts Eight and Nine: Preferences

Count Eight of the Complaint seeks recovery or approximately $9.4 million on account of transfers made to or for the benefit of Highland with respect to the First Lien Investments.   Count Nine of the Complaint seeks recovery of approximately $1.63 million on account of transfers made to or for the benefit of Highland with respect to the Second Lien Investments.

---

[131] *Malpiede v. Townson*, 780 A.2d 1075, 1097-1098 (Del. 2001) ("Under this standard, a bidder's attempts to reduce the sale price through arm's-length negotiations cannot give rise to liability for aiding and abetting, whereas a bidder may be liable to the target's stockholders if the bidder attempts to create or exploit conflicts of interest in the board.  Similarly, a bidder may be liable to a target's stockholders for aiding and abetting a fiduciary breach by the target's board where the bidder and the board conspire in or agree to the fiduciary breach." (citations omitted)).

[132] *Healthco Int'l, Inc.*, 208 B.R. at 309.  *See also Fry v. Trump*, 681 F. Supp. 252 (D.N.J. 1988).

Highland argues that *only* "Highland Crusader" was an insider (as owner of IRNs, LCC Units or possessing the rights to designate members to the Management Committee). Therefore, pursuant to §547(b)(4), the one-year preference period may apply to Highland Crusader, the other Highland defendants should only be subject to the 90-day preference period. Secondly, Highland argues that as to the First Lien Transfers, it was fully-secured and would therefore receive the same amount in a liquidation. Lastly, Highland asserts several defenses to the preference actions, including (i) ordinary course defenses and (ii) new value defenses.

The Committee responds that *all* the Highland defendants are "insiders" and therefore the one-year preference period is applicable.[133] The Committee also argues that Highland was not "fully secured" so therefore would receive less in a chapter 7 case. This is a material issue of fact (whether the First Lien Investments are fully secured) (this also ties with whether the Committee can equitably subordinate the First Liens). Also the Committee asserts that it is inappropriate at this time to consider the defendants' affirmative defenses (such as ordinary course, new value) – as such items must be supported by evidence for which there is none at this time.

### i.   *Applicable Law*

A preferential transfer, or "preference," is "a transfer that enables a creditor to receive payment of a greater percentage of his claim against the debtor than

---

[133] *See* 11 U.S.C. §547(b)(4)(B).

he would have received if the transfer had not been made and he had participated in the distribution of the assets of the bankruptcy estate."[134]

Section 547(b)(4)(B) states that a trustee "may avoid any transfer of an interest of the debtor in property made between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider."[135]

### ii.    Conclusion

There are genuine material issues of fact: (i) whether the First Lien Investments were fully secured; (ii) whether the First Lien Debt is being equitably subordinated; (iii) whether the First Liens and Second Lien Investments were made in the ordinary course of business in accordance with ordinary business terms.  As such, summary judgment is denied as to Counts Eight and Nine.

## H.  Count Eleven: Recovery of Avoidance Actions

The Count Eleven of the Complaint seeks recovery of Counts Eight, Nine, and Ten pursuant to §550.  As summary judgment is denied as to Counts Eight and Nine, the Court will also deny summary judgment as to Court Eleven.

## I.   Count Twelve: Disallowance Under Principles of Equity and § 502(d).

Count Twelve of the Complaint seeks disallowance of Highland's claims pursuant to §502(d).

---

[134] *Caliolo v. Saginaw Bay Plastics, Inc. (In re Cambridge Indus. Holdings, Inc.)*, 2006 U.S. Dist. LEXIS 7939, 5-6 (D. Del. Mar. 2, 2006) (*citing* H.R. Rep. No. 95-595, at 177 (1978), as reprinted in 1978 U.S.C.C.A.N. 5963, 6138.).

[135]  11 U.S.C. §547(b)(4)(B).

Highland argues that the Plaintiff cannot support its equitable subordination claim so therefore it cannot support its §502(d) claim.

### i.    Applicable Law

Section 502(d) states: "the court shall disallow any claim of any entity from which property is recoverable under section . . . section 550 . . . unless such entity or transferee has paid the amount, or turned over any such property for which such entity or transferee is liable under section . . . 550 . . . of this title."[136] "Under § 502(d) the bankruptcy court may disallow a claim if the claimant has failed to pay money it owes the estate or turn over property of the estate. This provision is based on the policy that a creditor who fails to turn over to estate any money or property it owes to the estate, will not be entitled to share in the proceeds of the estate."[137]   To disallow a claim under section 502(d) requires a judicial determination that a claimant is liable.[138]  "[W]hen a trustee raises a preference objection to a creditor's claim, the very nature of the statutory scheme requires the bankruptcy court to adjudicate the preference matter before

---

[136]  11 U.S.C. §502(d).

[137]  *In re Oxford Royal Mushroom Products, Inc.*, 59 B.R. 926, 927 (Bankr. E.D. Pa. 1986) (footnotes omitted).

[138]   *In re Lids Corp.*, 260 B.R. 680, 684 (Bankr. D. Del. 2001).  *See, e.g., Creditors of Melon Produce, Inc. v. Braunstein*, 112 F.3d 1232, 1237 (1st Cir. 1997)("the key phrase in this inquiry is 'the amount . . . for which such entity or transferee is liable'"). Therefore, a debtor wishing to avail itself of the benefits of section 502(d) must first obtain a judicial determination on the preference complaint. *See Campbell v. United States (In re Davis)*, 889 F.2d 658, 662 (5th Cir. 1989)(section 502(d) "is designed to be triggered after a creditor has been afforded reasonable time in which to turn over amounts adjudicated to belong to the bankruptcy estate"); *In re Mountaineer Coal Co., Inc.*, 247 B.R. 633, 641 (Bankr. W.D. Va. 2000)(section 502(d) "would not appear applicable unless and until a finding under one of the cited sections had been made and then the claimant had failed to comply with such ruling").

allowing or disallowing the claim. "[139]  "The command of § 502(d) is clear: The preference dispute must be resolved in tandem with the claim objection."[140]

### ii.    Conclusion

The Court hereby denies summary judgment as to this allegation in the Complaint.  If the Court finds that there is no valid equitable subordination or preferential payments, the Court can deny relief based on §502(d) at that time.

## J.  Highland's Affirmative Defenses

Highland asserts various defenses to the causes of action set forth in the complaint (acquiescence,[141] ratification,[142] waiver and *in pari delicto*[143]).

Based on the Counts of the Complaint, it does not make sense that Broadstripe "acquiesced" or "ratified" Highland's dealings in these transactions.  There are material and triable issues of fact.  If Highland caused Broadstripe to terminate the Wave sale, those actions were not "acquiesced" or "ratified" by Broadstripe's subsequent entry into the First and/or Second Credit Agreements.

---

[139]  *Caliolo v. Saginaw Bay Plastics, Inc. (In re Cambridge Indus. Holdings, Inc.)*, 2006 U.S. Dist. LEXIS 7939 (D. Del. Mar. 2, 2006) (citations omitted).

[140]  *Caliolo v. Azdel, Inc. (In re Cambridge Indus. Holdings)*, 2003 Bankr. LEXIS 794 (Bankr. D. Del. July 18, 2003).

[141]  "Acquiescence" is the assent by words or conduct during the process of the transaction.  *See The Chase Manhattan Bank v. Iridium Africa Corp.*, 197 F.Supp.2d 120, 130 (D. Del. 2002) ("Under Delaware law, acquiescence properly speaks of assent by words or conduct during the progress of a transaction, while ratification suggests an assent after the fact." (citations omitted)).

[142]  "Ratification" is the assent after the fact.  *Id.* ("While ratification implies a voluntary and positive act . . . inaction alone may amount to a positive act." (citations omitted)).

[143]  The *in pari delicto* doctrine prohibits a party who participates in wrongful conduct from recovering against another alleged non-insider participant.  *See Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 354058 (3d Cir. 2001) (holding that "one who has himself participated in a violation of law cannot be permitted to assert . . . any right founded upon . . . the illegal transaction." citations omitted)).

Highland also claims that the First and Second Lien Credit Agreements expressly waived any right to sue Highland for entry into those documents. This too does not make sense as the Plaintiff is asserting that (i) Highland manipulated the process by being on all sides of the transactions, and (ii) Highland left no alternative transactions available (either by blocking or withholding funding).

Lastly, Highland claims that the plaintiff cannot recover against a "non-insider" for wrongful conduct that the plaintiff participated in. Accepting the averments in the Complaint as "true" for the purposes of summary judgment, Highland is an insider. As such, this defense also fails.

## CONCLUSION

The Court hereby denies the motion for summary judgment as to Counts One (recharacterization), Two (equitable subordination), Four (breach of duty of care), Five (breach of duty of loyalty), Six (aiding and abetting breach of duty of care), Seven (aiding and abetting breach of duty of loyalty), Eight (preference claims related to First Liens), Nine (preference claims related to Second Liens), Eleven (recovery of avoidance actions), and Twelve (Disallowance of Highland's claims pursuant to §502(d)). The Court hereby grants the motion for summary judgment as to Count Three (alter ego).

The Court issued an order consistent with the findings set forth herein on May 3, 2010.[144]

---

[144] D.I. 58.